1   Robert S. Green
    GREEN & NOBLIN, P.C.
2   2200 Larkspur Landing Circle, Ste. 101
    Larkspur, California 94939
3   Tel: (415) 477-6700
    Fax: (415) 477-6710
4   -and-
    4500 East Pacific Coast Highway
5   Fourth Floor
    Long Beach, California 90804
6   Tel: (562) 391-2487
    rsg@classcounsel.com
7
    *Liaison Counsel for Plaintiffs*
8
    William B. Federman (admitted *pro hac vice*)
9   A. Brooke Murphy (admitted *pro hac vice*)
    FEDERMAN & SHERWOOD
10  10205 N. Pennsylvania Ave.
    Oklahoma City, OK 73120
11  Telephone:  405-235-1560
    Facsimile:  405-239-2112
12  wbf@federmanlaw.com
    abm@federman.law.com
13
14  *Lead Counsel for Plaintiffs*
15
16              **UNITED STATES DISTRICT COURT**
17              **NORTHERN DISTRICT OF CALIFORNIA**
18  SHANE MULDERRIG and RONY          Case No.:  4:19-cv-01765-YGR
    DEVORAH, Individually and on Behalf
19  of All Others Similarly Situated,     CLASS ACTION

20                 Plaintiff,           **AMENDED CLASS ACTION
                                        COMPLAINT**
21  v.

22
    AMYRIS, INC., JOHN G. MELO, and
23  KATHLEEN VALIASEK,

24                 Defendants.
25
26
27
28

## **TABLE OF CONTENTS**

I.      NATURE OF THE ACTION ...........................................................................................1

II.     JURISDICTION AND VENUE ....................................................................................3

III.    PARTIES .....................................................................................................................4

IV.     SUBSTANTIVE ALLEGATIONS ..............................................................................5

      A.      Background .......................................................................................................5

      B.      Confidential Witnesses ..................................................................................10

V.      MATERIALLY FALSE OR MISLEADING STATEMENTS .....................................12

      A.      March 15, 2018 Statements .............................................................................12

      B.      April 17, 2018 Statements ...............................................................................16

      C.      May 2018 Statements .....................................................................................18

      D.      August 2018 Statements .................................................................................27

VI.     THE TRUTH IS SLOWLY REVEALED ...................................................................31

      A.      November 13, 2018 and November 15, 2018 Disclosures ..................................31

      B.      March 18, 2019 and March 19, 2019 Disclosures ................................................35

      C.      April 11, 2019 Disclosures .............................................................................37

VII.    DISCLOSURES FOLLOWING THE END OF THE CLASS PERIOD.......................39

VIII.   ADDITIONAL ALLEGATIONS OF SCIENTER ......................................................43

      A.      Defendants Had Access To Information Undermining Their Statements............43

      B.      Defendants' History Of Reckless Reporting .......................................................46

      C.      Motive ............................................................................................................47

IX.     CLASS ACTION ALLEGATIONS............................................................................49

X.      LOSS CAUSATION ..................................................................................................51

XI.     APPLICABILITY OF PRESUMPTION OF RELIANCE  (FRAUD-ON-THE-MARKET DOCTRINE) .......................................................................................................51

XII.    NO SAFE HARBOR ..................................................................................................53

XIII.   FIRST CLAIM ...........................................................................................................53

XIV.    SECOND CLAIM ......................................................................................................56

i

XV.    PRAYER FOR RELIEF ................................................................................................57

XVI.   JURY TRIAL DEMANDED ......................................................................................57

AMENDED CLASS ACTION COMPLAINT                          FILE NO. 4:19-cv-01765-YGR

Lead Plaintiff Rob Jansen ("Lead Plaintiff" or "Jansen") and Plaintiff Vincent Carbone ("Carbone") (collectively "Plaintiffs"), individually and on behalf of all others similarly situated, by and through Plaintiffs' attorneys, allege the following against Defendant Amyris, Inc. ("Amyris" or the "Company"), Defendant John G. Melo, and Defendant Kathleen Valiasek (collectively "Defendants"). Plaintiffs' allegations are asserted upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon Plaintiffs' counsel's investigation, which included, among other things, a review of the public documents and announcements issued by Amyris filings by the Company with the Securities and Exchange Commission ("SEC"), press releases and media reports issued by and disseminated by Amyris, securities analysts' reports and advisories about the Company, other publicly available information concerning Amyris, and interviews of confidential witnesses.

## I.      NATURE OF THE ACTION

1.      This is a class action on behalf of persons and entities that purchased or otherwise acquired Amyris securities between March 15, 2018 and April 11, 2019, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Amyris is an industrial biotechnology company that manufactures and sells natural, sustainably-sourced products in health and wellness, clean beauty, and flavor and fragrance markets.

3.      On January 1, 2018, a new accounting rule, Accounting Standard Codification ("ASC") Topic 606, Revenue From Contracts with Customers ("ASC 606"), became available for use by public companies.  Generally, ASC 606 permits businesses to recognize revenue, in certain circumstances, once they have fulfilled all of their performance obligations rather than upon receipt of payment.

4.      Amyris began using ASC 606 immediately after the rule became effective in 2018. Defendants' application of ASC 606 to Amyris's royalty revenue gave the appearance of sizeable growth.  Defendants, however, either knew or recklessly ignored that the reported growth resulted

1

from the material and gross inflation of estimated and uncertain royalty payments. Despite their awareness that reported royalty revenue was based on materially inflated estimates of future sales-based royalties, Defendants failed to disclose this material information to investors. Instead, Defendants claimed the Company's revenue growth was actual and sustainable, frequently touted the new record revenues, and used the outsized figures as a basis for claiming even larger revenues for the future.

5.      Prior to Amyris's adoption of ASC 606, the Company had disclosed a material weakness in its internal control over financial reporting related to "a lack of sufficient resources…to be able to adequately identify, record, and disclose non-routine transactions." During the Class Period, Defendants claimed that this material weakness was being resolved through various remediation measures. In truth, Amyris's material weakness in its internal control over financial reporting was ongoing and remained unabated. Defendants, however, recklessly implemented the new accounting rule ASC 606, notwithstanding the fact that Defendants knew the Company lacked the resources and visibility to effectively record estimated future royalty payment as actual realized revenue. Moreover, Defendants were in fact concealing *additional* material weaknesses in Amyris's internal control over financial reporting that existed during the Class Period and that led to improper revenue recognition and the issuance of materially false financial statements.

6.      Defendants' materially false or misleading statements artificially inflated the price of Amyris securities during the Class Period. Indeed, the Company's stock price increased from a closing price of $5.58 per share on March 15, 2018 (the start of the Class Period) to a closing price of $9.20 per share on October 9, 2018, just weeks before the truth began to emerge.

7.      On November 13, 2018, the Company reported poor financial results for the third quarter 2018, with $14.86 million in revenue compared to $24.2 million in revenue for the prior year period. Of the $14.86 million in total revenue, only $142,000 came from royalty revenue—well short of Defendants' projected royalty revenue of *$15 million* for the third quarter. Defendants attributed the disappointing performance to the "volatility of the Vitamin E market."

On this news, the Company's share price fell $1.76, or nearly 30%, to close at $4.14 per share on November 14, 2018, on unusually heavy trading volume.

8.     On March 19, 2019, the Company disclosed that it would be unable to timely file its annual report due to "significant time and resources that were devoted to the accounting for and disclosure of the significant transactions with Koninklijke DSM N.V. that closed in November 2018." The Company also disclosed that it "is in the process of completing its evaluation of internal control over financial reporting and may have further deficiencies to report." The Company further disclosed that it expects to "report that there is substantial doubt about its ability to continue as a going concern." On this news, the Company's share price fell $0.78, or nearly 20%, to close at $3.10 per share on March 20, 2019, on unusually heavy trading volume.

9.     On April 11, 2019, the Company announced that it was restating its fiscal 2018 results to reduce revenue by at least $12 million and increase net loss by at least $7 million, explaining, among other things, that "a material error was made related to the estimates for recognizing revenue for royalty payments." Defendants also disclosed for the first time that Amyris "expects to report material weaknesses in addition to the material weakness reported in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2017." On these disclosures, the price of Amyris stock fell $0.86 per share, or nearly 24%, to close at $2.89 per share, on unusually heavy trading volume.

10.    As a result of Defendants' materially false and misleading statements, and the resulting precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## II.     JURISDICTION AND VENUE

11.    The claims asserted herein arise under Sections l0(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule l0b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.l0b-5).

12.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

13.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are located in this district.

14.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

### III.     PARTIES

15.     Lead Plaintiff, Rob Jansen as set forth in the accompanying certification, incorporated by reference herein, purchased Amyris securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

16.     Plaintiff, Vincent Carbone as set forth in the accompanying certification, incorporated by reference herein, purchased Amyris securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

17.     Defendant Amyris is incorporated under the laws of Delaware with its principal executive offices located in Emeryville, California. Amyris's common stock trades on the NASDAQ exchange under the symbol "AMRS."

18.     Defendant John G. Melo ("Melo") has served as the Chief Executive Officer ("CEO") and a director of Amyris since January 2007, and as President since 2008.  Before joining Amyris, Defendant Melo served in various senior executive positions at BP Plc (formerly British Petroleum), one of the world's largest energy firms.  Prior to joining BP, Defendant Melo was with Ernst & Young, an accounting firm.

19.     Defendant Kathleen Valiasek ("Valiasek") served as the Company's Chief Financial Officer ("CFO") from January 2017 through June 2019.  She was replaced as CFO in June 2019 and now serves as the Company's Chief Business Officer.  Prior to joining Amyris, Defendant Valiasek was Founder and Chief Executive Officer of Lenox Group, Inc., a finance and strategic consulting firm.  Prior to founding Lenox Group, Defendant Valiasek served in key venture capital and accounting roles.  Defendant Valiasek holds a degree in accounting from the University of Massachusetts, Amherst.

20.     Defendants Melo and Valiasek because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.,* the market.  Defendants Melo and Valiasek were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, Defendants Melo and Valiasek knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. These Defendants are liable for the false statements pleaded herein.

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     Background

21.     Amyris is an industrial biotechnology company that manufactures and sells natural, sustainably-sourced products in health and wellness, clean beauty, and flavor and fragrance markets.

22.     In 2014, the Company successfully commercialized its brand of renewable farnesene, a hydrocarbon molecule that the Company manufactures through fermentation using its engineered microbes.  Farnesene is Amyris's first revenue-generating molecule, the derivatives of which are sold in hundreds of products as solvents, fragrances, skincare products, polymers, and lubricant ingredients.

23.     On December 28, 2017, Amyris sold a farnesene manufacturing facility to Koninklijke DSM N.V. ("DSM") for $57 million.  In connection with the sale, DSM and Amyris entered into a license agreement and royalty agreement, under which the Company licensed the use of farnesene in the Vitamin E, lubricant, and flavor and fragrance markets to DSM for a nonrefundable fee of $27.5 million. Amyris also assigned a farnesene supply agreement with Nenter & Co., Inc. ("Nenter") to DSM.  Pursuant to this assignment agreement, DSM agreed to pay Amyris a portion of the profits realized by Nenter that were paid to DSM.

24.     In accounting for license and royalty payments during the Class Period, Amyris utilized a new rule issued by the Financial Accounting Standards Board that took effect on January 1, 2018. The new rule, Accounting Standard Codification ("ASC") Topic 606, Revenue From Contracts with Customers ("ASC 606"), provides guidance on how and when to recognize revenue from customers.  Generally, ASC 606 permits businesses to recognize revenue, in certain circumstances, once they have fulfilled all of their performance obligations rather than upon receipt of payment.  For instance, a business may recognize revenue when it delivers a good, provided delivery is its final performance obligation.  In such a scenario, revenue is certain because money exchanges hands at a fixed price for a product.  Amyris's application of ASC 606 to future royalty payments due from Nenter via DSM, however, was considerably less certain.

25.     As previously described, Amyris licensed farnesene to DSM, who supplied the ingredient to Nenter.  Nenter then used the farnesene to produce Vitamin E products to sell to consumers. Amyris and DSM shared royalties on Nenter's profits from these product sales. However, since the amount of payment Amyris would actually receive was dependent on Nenter's profit at a later date, Amyris recorded as recognized revenue mere *estimates* of future royalty payments based on estimated sales pricing and volumes.

26.     For such transactions, where there are sales-based royalties in exchange for a license of intellectual property, ASC 606-10-55-65 provides:

> [A]n entity should recognize revenue for a sales-based or usage-based royalty promised in exchange for a license of intellectual property only when (or as) the *later* of the following events occurs:

a. The *subsequent sale or usage occurs*.

b. The performance obligation to which some or all of the sales-based or usage-based royalty has been allocated has been satisfied (or partially satisfied).

*Id.* (emphasis added).[1]

27.     The rule provides, however, that paragraph 606-10-55-65 "applies when the royalty relates only to a license of intellectual property or when a license of intellectual property is the predominant item to which the royalty relates."  ASC 606-10-55-65A.  When revenue is sales-based but where the license of intellectual property is *not* the only or predominant item to which the royalty relates, "the guidance on variable consideration…applies to the sales-based or usage-based royalty."  ASC 606-10-55-65B.

28.     ASC 606-10-32-11 provides specific constraints on the recognition of variable consideration and states that:

An entity shall include in the transaction price some or all of an amount of variable consideration estimated … *only to the extent that it is probable that a significant reversal* in the amount of cumulative revenue recognized *will not occur* when the uncertainty associated with the variable consideration is subsequently resolved.

*Id.* (emphasis added).

29.     ASC 606-10-32-12 provides additional guidance on this constraint:

In assessing whether it is probable that a significant reversal in the amount of cumulative revenue recognized will not occur once the uncertainty related to the variable consideration is subsequently resolved, an entity shall consider both the likelihood and the magnitude of the revenue reversal. *Factors that could increase the likelihood or the magnitude of a revenue reversal include*, but are not limited to, _any of the following_:

a The amount of consideration is *highly susceptible to factors outside the entity's influence*. Those factors may include *volatility in a market, the judgment or actions of third parties*, weather conditions, and a high risk of obsolescence of the promised good or service.

---

[1] As Deloitte & Touch LLP has explained, "Under this sales- or usage-based royalty exception, an entity *would not estimate* the variable consideration from sales- or usage-based royalties. Instead, the entity would wait until the subsequent sale or usage occurs to determine the amount of revenue to recognize."
Available at:   https://www2.deloitte.com/content/dam/Deloitte/us/Documents/audit/us-audit-interpretive-guidance-on-revenue-recognition-under-asc-606.pdf.

b.   The uncertainty about the amount of consideration is not expected to be resolved for a long period of time.

c.   The *entity's experience (or other evidence) with similar types of contracts is limited, or that experience (or other evidence) has limited predictive value*.

d.   The entity has a practice of either offering a broad range of price concessions or changing the payment terms and conditions of similar contracts in similar circumstances.

e.   *The contract has a* larger number and *broad range of possible consideration amounts*.

*Id.* (emphasis added).

30.     Under these ASC 606 rules, Defendants were required to recognize sales-based royalty revenue either: (1) when the subsequent sale occurs (in the event that the IP license is the predominant item) (ASC 606-10-55-65), or (2) *only to the extent that it is probable that a significant reversal* in the amount of cumulative revenue recognized *will not occur* when the uncertainty associated with the variable consideration is subsequently resolved (in the event that the IP license is *not* the predominant item) (ASC 606-10-32-11, 606-10-32-12 and 606-10-55-65B).[2]   What Defendants reported as recognized royalty revenues, however, were grossly

---

[2]ASC 606's application to sales-based royalties is more succinctly explained in an article written by auditing firm BDO USA, LLP, as follows:

*Sales-based Royalties*
Royalties are another form of variable consideration. However, ASC 606 contains an exception to the principle requiring an estimate of variable consideration for a sales-based royalty for a license of Intellectual Property (IP). This is because estimating future royalties is quite difficult and would likely result in significant adjustments to the amount of revenue recognized due to changes in circumstances not related to the entity's performance. Instead, royalties received in exchange for a license of IP are recognized as revenue at the later of when the sale occurs or when the performance obligation to which the royalty relates has been satisfied.

This guidance only applies to royalties received in exchange for a license of IP. Where the arrangement consists of a license and other deliverables, such as research and development services, life sciences companies will need to assess whether the license is the predominant deliverable to which the royalties relate. If so, then the royalty is subject to express guidance discussed in the prior paragraph. If not, then it should be treated like other variable consideration—i.e., estimated and included in the transaction price to the extent not constrained [by ASC 606-10-32-11 and 606-10-32-12].

(https://www.bdo.com/insights/industries/technology/life-sciences-spring-2017/when-it-comes-to-new-revenue-recognition-model,-as).

8

1   overstated estimations of future royalty payments that were based on *projected and estimated*

2   Nenter product sales, in violation of Generally Accepted Accounting Principles ("GAAP").[3]

3   Financial statements not in compliance with GAAP are presumed to be misleading. *See* SEC

4   Regulation S-X, 17 C.F.R. § 210.4-01.

5       31.     Initially, Defendants' application of ASC 606 to Amyris's royalty revenues gave

6   the appearance of impressive growth. For example, with the new accounting rule, Amyris was

7   able to report year-over-year revenue growth of 19% in the first half of 2018, whereas without

8   ASC 606 revenue would have slipped 27% in the comparable periods. Defendants, however,

9   either knew or recklessly ignored that the reported growth resulted from overestimated and

10  uncertain future royalty payments.

11      32.     In truth, Defendants were at minimum extremely reckless in reporting as

12  recognized revenue such large future royalty payments based on estimated product sales,

13  particularly because it was at least as likely, if not more likely, that there would be a significant

14  reversal in the amount of cumulative revenue recognized once the uncertainty associated with the

15  variable consideration would subsequently be resolved. Indeed, Defendants have now admitted

16  that they reported the significantly increased royalty revenues despite the fact that Amyris had

17  very "limited" information at its disposal and "the amount of consideration [was] highly

18  susceptible to factors outside the entity's influence," including "volatility in a market" and "the

19  judgment or actions of third parties"—circumstances that ASC 606 explicitly warns will increase

20  the likelihood of revenue reversal. *See* ASC 606-10-32-12; *see infra* ¶68. Importantly though,

21

22

---

23  [3] GAAP are those principles recognized by the accounting profession as the conventions, rules,

24  and procedures necessary to define accepted accounting practice at a particular time. Those
    principles are the official standards adopted by the American Institute of Certified Public

25  Accountants ("AICPA"), a private professional association, through three successor groups it
    established: the Committee on Accounting Procedure, the Accounting Principles Board, and the

26  Financial Accounting Standards Board ("FASB"). On July 1, 2009, the FASB approved the
    Accounting Standards Codification ("ASC" or the "Codification") as the single source of

27  authoritative U.S. accounting and reporting standards, other than guidance issued by the SEC.
    The Codification is effective for interim and annual periods ending after September 15, 2009.

28  The Codification does not change GAAP—it introduces a new structure.

---

AMENDED CLASS ACTION COMPLAINT                              FILE NO. 4:19-cv-01765-YGR

Defendants not only reported these estimated royalties as recognized revenues in Amyris's earnings press releases and 2018 quarterly financial statements, but Defendants also failed to disclose that such royalty revenues were materially uncertain and susceptible to reversal. Instead, despite this considerable uncertainty, Defendants repeatedly claimed that the revenue growth was sustainable, that the new method of accounting actually simplified financial reporting, that there were no new deficiencies in the Company's internal control over financial reporting, and that the strong revenue numbers were due to the growing acceptance of the Company's products.

33. The true facts—and the risks associated with Defendants' materially false and misleading statements concerning Amyris's financial condition, inflated revenues, and internal control over financial reporting—began to reveal themselves and materialize on November 13, 2018 when Defendants announced severely disappointing third quarter royalty revenues that missed Defendants' previous projections by $15 million. The truth continued to slowly emerge, culminating in the announcement on April 11, 2019, that Amyris had been operating with an undisclosed material weakness in financial controls and that due to "a material error [that] was made related to the estimates for recognizing revenue for royalty payments," Amyris was restating its fiscal 2018 results to reduce revenue by at least $12 million and increase net loss by at least $7 million.

## B. Confidential Witnesses

34. Confidential Witness 1 ("CW 1") served in Amyris's finance department from January 2018 to October 2018. CW 1 was based at the Company's headquarters in Emeryville, California. CW 1 assisted in overseeing the accounting and financial operations and with closing the Company's books.

35. According to CW 1, several employees in senior accounting roles reported directly to Defendant Valiasek (CFO), including the VP of technical accounting, the revenue manager, the corporate controller, and the chief accounting officer. According to CW 1, "[t]here was a revenue person, a technical accounting person, and a chief accounting officer" who reported to Valiasek, and "they handled all the technical stuff," including revenue accounting. CW 1 further explained that the VP of technical accounting was the person primarily responsible for calculating revenue

10

recognition, including the accounting for the royalty revenues under the Company's agreement with DSM, and this VP of technical accounting reported directly to Defendant Valiasek.

36.     According to CW 1, there was a considerable amount of turnover within the accounting department during CW 1's tenure with the Company.  CW 1 explained that Amyris's financial reporting difficulties were one of the reasons CW 1 left the Company.

37.     Confidential Witness 2 ("CW 2") served in Amyris's accounting department from January 2018 to August 2018.  CW 2 was based at the Company's headquarters in Emeryville, California.   CW 2 primarily assisted with operational accounting.

38.     CW 2 said that the two key accountants responsible for revenue accounting were the VP of Technical Accounting and the Senior Accounting Manager who, according to CW 2, was effectively the revenue manager.  According to CW 2, the revenue from Amyris's royalty agreement with DSM was primarily handled by the VP of Technical Accounting.  CW 2 said that Defendant Valiasek (CFO) was very involved in overseeing the process of revenue recognition and financial reporting.  According to CW 2, Defendant Valiasek communicated regularly with the VP of Technical Accounting and the Senior Accounting Manager on revenue recognition and financial reporting, with CW 2 adding, "Kathy [Defendant Valiasek] worked closely with the technical accounting, especially with [the VP of Technical Accounting]."

39.     CW 2 also explained that Defendant Valiasek and Defendant Melo participated in "senior level meetings" with the top accounting personnel, such as the VP of Technical Accounting, the Chief Accounting Officer, and the Controller.  According to CW 2, these senior level meetings took place frequently but not necessarily at regular intervals.  CW 2 also said that Defendants Melo and Valiasek received regular reports on the Company's finances.  It was CW 2's understanding that Defendants Melo and Valiasek reviewed the Company's revenue numbers weekly or at a minimum monthly.  "They looked at least monthly and quarterly — that's a minimum," CW 2 said.  "Every time you close the financials, they look," CW 2 stated.  As CW 2 definitively stated, "they [Defendants Melo and Valiasek] have access to the financial information."

40.     CW 2 said that Defendant Valiasek was closely involved in the accounting department.  CW 2 explained that Defendant Valiasek had no choice but to be very involved day-to-day in the accounting operations at Amyris because the turnover was so high that few employees had the experience to serve well in their roles without guidance and support.  Both senior managers and department staff were in constant flux at Amyris, CW 2 said.  As an example, CW 2 explained that the Company's Chief Accounting Officer left her position after just six months and was not immediately replaced.  According to CW 2, temporary employees filled key roles, such as SEC reporting and accounting.  CW 2 described the Company's "full-time accounting department" as "nonexistent." CW 2 elaborated that during CW 2's tenure at Amyris the accounting department had nine or 10 employees, and 80 percent of the accounting staff were temporary hires.  CW 2 said the lack of long tenured employees made the operations of the accounting department difficult.

41.     Amyris was deeply in debt during CW 2's tenure, CW 2 said, noting that the company owed $162 million when CW 2 came to work there.  According to CW 2, the debt loomed large over the accounting department.  CW 2 said that Amyris had complex repayment plans that were constantly being monitored.  CW 2 stated that internally, all of Amyris's employees were discussing the Company's debt and concerns about meeting the debt repayment schedules.  CW 2 explained that employees frequently expressed concerns with both the total amount of outstanding debt, as well as Amyris's planned repayment schedules.  CW 2 said that the parties owed included various business partners and stock warrant holders.[4]

## V.      MATERIALLY FALSE OR MISLEADING STATEMENTS

### A.      March 15, 2018 Statements

42.     The Class Period begins on March 15, 2018.  On that day, the Company issued a press release titled, "Amyris Reports Another Strong Quarter with Solid Operating Performance and 2017 Revenue of $143.3 Million up 113% over 2016." In the press release, Amyris reported

---

[4] While Plaintiffs reached out to other former employees, many declined to be interviewed, with one former employee citing to a non-disclosure agreement entered into with Amyris.

fiscal year 2017 revenue of $143.3 million, compared to $67.2 million for 2016.  The Company also announced revenue of $80.6 million for the fourth quarter of 2017, $57 million of which was "due to the DMS transaction."  The press release also stated that the Company expects GAAP revenue "of approximately $185-$195 million and expects more than $10 million of positive EBITDA for 2018."  Defendant Melo commented on these results in the press release.  In particular, the press release quoted Defendant Melo as stating:

> "We've completed another record year and a very strong fourth quarter. We've exceeded our key targets for 2017 and ***have started 2018 with continued strong growth in revenues*** and operating performance," said John Melo, Amyris President & CEO.  "We have completed the transformation of our company into one of the leading global companies focused on making our planet healthier. We have organized around three core markets – Performance Health and Wellness, Clean Skin-Care and Pure Flavor & Fragrance Ingredients. ***Each of these markets is delivering strong, profitable growth*** underpinned by the most advantaged technology in the sector. We are making good for humanity and our planet with No Compromise® products. We are very pleased with our performance and ***expect another very strong year*** delivering continued market disruption with our partners."[5]

43.    The press release was materially false and/or misleading and led investors to believe that Amyris was already realizing strong growth in revenues for 2018 and would continue to experience positive revenue results for the year 2018 overall.  Specifically, while Defendant Melo touted that Amyris has "started 2018 with continued strong growth in revenues" and that Amryis's core markets "*is delivering* strong, profitable growth," such statements were materially false or misleading because they wrongly suggested that Amyris was *already* receiving significantly increased revenues.  As would later be revealed, essentially all of Amyris's increase in revenue for the first quarter of 2018 was attributed to royalty revenues—revenues that were entirely *estimated*, and therefore would not have been received at the time of these statements, and that were materially inflated.

44.    On the same day, Amyris held a conference call with analysts and investors to discuss the results disclosed in the press release.  During the call, Defendants made prepared statements and answered analysts' questions, stating, in relevant part:

---

[5] All emphasis herein is added unless otherwise stated.

13

A) MELO: Let me start with our core markets and ***how we are <u>simplifying our reporting</u>***. Our business is focused on 3 core markets: Performance Health and Wellness; Clean Skin-Care; Flavor & Fragrance Pure Ingredients (sic) [Pure Flavor & Fragrance Ingredients].… ***[T]hese are markets where our No Compromise promise, this means products that perform better***, are lower cost and competitively priced, ***is taking significant share and enabling very strong profitable growth for Amyris, where we see this growth continuing for the next 3 to 5 years***.

In addition to making our core markets clear to you, ***we are also <u>simplifying how we talk about our business model and <u>how we report our results</u></u>***. We've been explaining the value share part of our business model to you and have been blending this into our product revenue line. ***This has become very material faster than we expected, and we will now be reported -- reporting separately and labeling these as license and royalties***. When you see this line in our GAAP results, this is mostly value share and ***<u>represents the revenue we receive from partners as our share of the value we create when our customers and partners use our product in their formulations. This is a good indicator of the level of disruption our technology is enabling.</u>***

B) MELO: So to summarize. Going forward, when you see royalties and licenses, this is where we will report our value share payments. Product revenue will not include value share. This will keep the product revenue and product direct cost of goods clean and near breakeven and the gross margin from products or what we see as our value share reported as a royalty. ***Think of royalties as 100% gross margin***. Think of products having the fully loaded cost of goods for those products.

\* \* \*

MELO: We are expecting continuous strong growth through 2022 and beyond, and ***have this well underpinned*** by customer agreements in each of our core markets. ***We are expecting <u>continued strong expansion of our gross margin into 2018</u> as a result of product mix and the full impact of our strategic partnership with DSM***.

\* \* \*

MELO: ***<u>2018 is starting off very well with very strong gross operating performance and revenue that will be around double the first quarter of 2017</u>***.

\* \* \*

AMIT DAYAL: A really strong quarter and the guidance is looking really good as well. Kathy, did you mention in your prepared statements that ***you're expecting gross margins of around 70% in 2018?*** Just wanted to double check if I had that number right.

VALIASEK: ***Yes. Yes, that's correct***.

AMIT DAYAL: Perfect. ***And is this mostly supported by licenses and royalty***

*revenues, you believe?*

VALIASEK: So what I would -- *primarily, the answer to that question is yes*.

MELO: I mean, I think, just to emphasize that, and I want to do that because of the language change, right. I know we're now using licenses and royalties. In the past, it was value share. *So you could think of what's happening in '18 as predominantly value share affecting that gross margin. But it will be reported and categorized as royalties and licenses, and it's the royalty piece/value share that drives a lot of that gross margin performance.*

C) MELO: Now let me review our outlook for 2018. We have proven our ability to grow. We have now transitioned our business to *profitable growth with very strong gross margin performance in 2017 and beyond*. We expect our revenue pattern through each quarter of 2018 to be largely consistent with prior years. As a result, the first quarter will start off sequentially lower and *2018 is anticipated to be back-half loaded* as before, with the sales growth of our sweetener project, a new flavor ingredient, the batch production and sale of our fragrance ingredients, the established base, as well as the expected close of several new collaborations in the fourth quarter.

To give you more granularity, *we expect that roughly 1/3 of our 2018 revenue will be delivered in the first half, with the remaining 2/3 coming in the second half and more of it in the fourth quarter versus the third quarter*.

*For 2018, we anticipate revenue of approximately $185 million to $195 million. Gross margin on a blended basis across all 4 quarters is expected to average above 70%,* with high marks anticipated in the first half of this year and then some moderation in the second half due to planned expenses associated with launching several of our new products. We expect EBITDA of positive $10 million or better in 2018 and to be net income positive in 2019.

45.     These statements were materially false and/or misleading.  Defendant Melo again portrayed royalty revenues as amounts *already provided* to Amyris, stating that royalty revenue "represents the revenue we receive" (bullet A) when, in truth, Amyris recorded royalty revenues based on uncertain, and inflated, *estimates* of future payments.  Further, even though Amyris's 2018 royalty revenues were based on complex estimates (that were at best under informed and at worst fraudulent), Defendant Melo insisted that Amyris was "simplifying" its royalty revenue reporting for 2018 (bullet A), thereby wrongly suggesting that the financial results for 2018 would be even more certain than in previous years.  Additionally, while Defendants touted its expanding gross margins and stated that "2018 is starting off very well with very strong gross operating

15

performance [predominately consisting of royalty revenues] and revenue that will be around double the first quarter of 2017" (bullet B), Defendants failed to disclose that Amyris's expanding gross margins were the result of highly uncertain overestimates that lacked a reasonable basis and that had a substantial likelihood of *not* being received.  Defendants similarly failed to disclose the uncertain and inflated nature of its royalty revenues when touting the overall revenue projections for 2018 (bullet C).

### B.      April 17, 2018 Statements

46.     On April 17, 2018, the Company filed its annual report on Form 10-K for the period ended December 31, 2017.[6]  The Form 10-K substantially affirmed the results announced in the previously-issued press release.  Additionally, the Form 10-K revealed that *Nenter was the Company's third-largest customer*, contributing $2.6 million in license and royalty revenue.  The 2017 Form 10-K reported total liabilities of $346.1 million and net loss attributable to the Company's common stockholders of $93.3 million.

47.     The 2017 Form 10-K also disclosed a material weakness identified by management, stating in relevant part:

> Management, under the supervision of our CEO and CFO, and oversight of the Board of Directors, conducted an assessment of the effectiveness of our internal control over financial reporting as of December 31, 2017, based on the criteria set forth in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework). Based on this assessment, management has identified the material weakness described below:
>
> • The Company's control environment was not effective because the Company lacked a sufficient number of trained resources with assigned responsibility and accountability over the design and operation of internal controls related to complex, significant non-routine transactions as well as routine transactions and financial statement presentation and disclosure;

---

[6] On April 2, 2018, the Company filed a Notification of Late Filing with the SEC on Form 12b-25, announcing that it was unable to timely file its Annual Report for 2017. Amyris explained its tardiness was due to the "significant time and resources that were devoted to the accounting for and disclosure of a significant transaction with [DSM]," the continued process of compiling information related to its cash flows, and the Company's evaluation of the impact of ASC 606 on its disclosures.

- The Company did not have an effective risk assessment process to identify and analyze necessary changes in significant accounting policies and practices that were responsive to: (i) changes in business operations resulting from complex significant non-routine transactions, (ii) implementation of new accounting standards and related disclosures, and (iii) completeness and adequacy of required disclosures; and

- The Company did not have an effective information and communication process to ensure that the processes and controls were effectively documented and disseminated to enable financial personnel to effectively carry out their roles and responsibilities.

As a consequence, the Company did not have effective process level control activities over the following:

- ***The Company did not adequately design and document controls over complex, significant non-routine transactions that included various financing arrangements and a business divestiture, all which involved multiple components including revenue elements***; and

- The Company's controls over account reconciliations, review and approval of manual journal entries, and timely and complete financial statement presentation and disclosure did not operate effectively

The material weakness described above resulted in material misstatements in the gain or loss on extinguishment, gain or loss from change in fair value of derivative liabilities, derivative liabilities, collaboration revenue, and additional paid-in capital in the preliminary consolidated financial statements that were corrected prior to the issuance of the consolidated financial statements as of and for the year ended December 31, 2017. However, the material weakness creates a reasonable possibility that a material misstatement of our annual or interim consolidated financial statements that would not be prevented or detected on a timely basis. Therefore, we concluded that our internal control over financial reporting is not effective as of December 31, 2017.

48.    However, Defendants claimed that Amyris was in the process of resolving these material weaknesses through certain actions it was taking as part of the Company's "remediation plan." The 2017 Form 10-K stated:

***Remediation Plan***

We are addressing the identified material weakness by taking the following actions:

- Augmenting our accounting staff with additional personnel, as well as evaluating our personnel in key accounting positions;

- Documenting and augmenting key policies and internal control procedures to strengthen our identification of and accounting for complex, significant non-routine transactions and routine transactions; and
- Implementing a program for training of internal staff members covering: (i) the Company's accounting policies and procedures, (ii) roles and responsibilities of the Company's finance department, and (iii) new and existing financial accounting issues.

***Management believes that the foregoing efforts will effectively remediate the material weakness***. As we continue to evaluate and work to improve our internal control over financial reporting, management may determine to take additional measures to address control deficiencies or determine to modify the remediation plan described above.

49.     Defendants' representations regarding Amyris's remediation plan were materially false and/or misleading in that they left the impression that Amyris was curing its internal control weakness over financial reporting and that future financial results would be unlikely to include misstatements.  Defendants made these representations despite the fact that the Company was in the process of implementing new accounting rule ASC 606 in such a way as to recognize as revenue estimates of future royalty payments that were inflated, and/or uninformed, and that had a substantial likelihood of not being received.  Indeed, Defendants failed to disclose that the Company was in the process of preparing financial statements for 2018 that included, for the first time, royalty revenues based on complex and uncertain estimates that would further strain Amyris's internal control over financial reporting.  Additionally, while Defendants represented that remedial augmenting of accounting staff and improved training was underway, as well as the implementation of improved accounting policies and procedures, Defendants failed to disclose that, at the time of their statements, the Company's accounting department was experiencing near constant turnover, was staffed predominately by inexperienced temporary employees (who were serving in both regular staff positions and senior management positions), and as a result was struggling to function effectively, according to CW 2 and CW 1.

**C.     May 2018 Statements**

50.     On May 14, 2018, Amyris issued a press release titled, "Amyris Continues Strong Momentum and Execution with 77% Revenue Growth and Exceeds Gross Margin Target." In the press release, Amyris reported revenue of $23 million for the first quarter of 2018, compared with

18

$13 million in the first quarter of 2017. The Company further announced over $11 million in royalty revenues for the first quarter of 2018, explaining, "[o]ur product related royalty revenue (previously referred to as value share) *delivered $11.4 million* of 100% gross margin related revenue."

51.     Also on May 14, 2018, the Company held an earnings conference call with analysts and investors to discuss the results announced in the press release.   Specifically, Defendants stated, in relevant part:

A) MELO: We've successfully transitioned our Brotas fermentation facility to DSM, and *we are <u>delivering</u> on our strategy of growing our revenue at above the rate of our peers and <u>doing it profitably at the gross margin level</u>*.

We exceeded our guidance for the year of about *70% gross margin and delivered strong revenue growth*. We delivered activity in the first quarter that would have represented an additional $1 million in revenue. This would have been mostly 100% gross margin revenue that is expected to be accounted for in the second quarter due to timing.

*This is what we consider <u>growing sustainably</u>, and <u>we have very good visibility on continuing at this rate or better for the next several years</u>*.

B) MELO: We delivered strong growth in both our consumer business and our ingredients business during the quarter, and our business model continue to deliver strong cash performance. Our royalty payments, which we used to call value share from products delivered was $11.4 million in the first quarter versus $225,000 for the same period last year. *This is a <u>strong indication of the underlying performance of our products</u> in their respective end markets and the <u>sustainability</u> of our differentiated and advantaged business model*.

C) VALIASEK: Now let me review our first quarter 2018 results. *Q1 2018 GAAP revenue was $23 million, up 77% over $13 million for the first quarter of 2017*. As a reminder, on our Q4 2017 teleconference, we noted that due to the growth of our royalty or value share revenues, for Q4 onward, *we begin reporting them on a separate line item as license and royalty revenue, and they will no longer be grouped within product revenues*. Prior year amounts are also classified to conform to this presentation.

Non-GAAP gross profit was $19 million or 82.6% compared with negative $574,000 or negative 4.4% for Q1 2017. *This is an indicator of much improved margins going forward based on product mix and royalty revenue as we work toward our goal of adjusted gross margin for 2018 of about 70%*.

19

52.     Defendants' statements were materially false and misleading.  While Defendants stated that royalty revenues had "delivered" (previous paragraph) and that Amyris was "delivering" on its revenue projections (bullet A), described Amyris's revenue as "growing sustainably," and described themselves as having "very good visibility" for continued revenue growth "at this rate or better" (bullet A), they failed to disclose that Amyris's revenue growth was very likely not sustainable but was achieved only by overstated estimates of *future* payments and that Defendants, in fact, had very little visibility into or control over those royalty revenues. Defendants similarly claimed the increased royalty revenues were due to the "performance of [Amyris's] products" (bullet B) wrongly suggesting that the Company was actually receiving royalty profits from products sold rather than overestimating future royalties due from DSM based on Nenter sales.  Defendant Valiasek further oversimplified the implementation of ASC 606 as primarily just a change in description, saying that license and royalty revenues are being reported "on a separate line item" and are "no longer be[ing] grouped within product revenues" (bullet C) while failing to warn investors of the true implications—that aspirational and largely uninformed estimates that had a substantial likelihood of not being realized were now being reported as recognized revenue.

53.     During the question and answer segment of the call, Defendants further downplayed the impact of ASC 606 and reiterated that investors should expect $50-$60 million in royalty revenue for the year.  Defendants stated, in relevant part:

A) AMIT DAYAL: One of my questions is around the royalty and licenses side. Is the $11.4 million, all of it royalties for the quarter? Or are there any license fees in it, too?

MELO: Amit, first of all, thank you for being on the call and thank you for the question. Just about all of it is royalty or what we used to call value share. So there is no license revenue in the quarter.

AMIT DAYAL: Understood. ***And how should we sort of look into these royalty revenues going forward?*** Will this kind of be steady state at this type of level or ***will there be some variances depending on the end-market sales?***

MELO: Yes. I mean, the way I would look at it, I think what we said in the last call is that we would generate around ***$50 million to $60 million*** of value share for the year, and that is the royalty line. ***And that's what you should expect***. It

20

won't be perfectly linear for the year, so you'll see some choppiness. But again, for the full year, $50 million to $60 million, I'd expect some choppiness, ***but full year strong flows. No change***.

B) CARTER WILLIAM DRISCOLL: …. Maybe just a couple others. ASC 606, any impact there, Kathy?

VALIASEK: ***There is a de minimis impact, Carter, interesting question, a de minimis impact for us***. Though you can read about it in our 10-Q, but it's ***relatively de minimis***.

CARTER WILLIAM DRISCOLL: Okay. And then there was some discussion, I thought, also about maybe the timing of royalty recognition versus product recognition. Any update there you can share?

VALIASEK: So in the instance of our -- the agreement that we have with DSM, right, and the Nenter royalty revenue, so that is recognized a little bit differently than our traditional value share or royalty revenue agreements. And the difference is that in that instance we aren't doing the manufacturing. So rolling forward, anything that we're -- any product where we are manufacturing and the royalty revenue will be recognized when we actually ship the product, whereas the ***royalty revenue under the DSM and Nenter agreement is recognized when Nenter is selling into the market***.

CARTER WILLIAM DRISCOLL: Okay. So the mix of the royalty might change, again, depending on who's doing what in any particular quarter. But as you add more outside of those relationships, I'm assuming it would be the latter. So you might get a little bit more, I'll say visibility might not be the right word, but the timing difference might be mitigated a bit?

MELO: Yes, it will be more predictable is probably the best way to say it because we used to wait for the payment and then book. And ***now we can actually book when we ship the product out the door. That's the big change around***, and it's really around the flavor and fragrance space that we do that quite a bit.

54.    Defendants' statements were materially false and/or misleading.  When asked if there would be variances in royalty revenues based on end-market sales, Defendant Melo offered only the slight qualification that it will "not be perfectly linear," but he assured that "for the full year, $50 million to $60 million, I'd expect some choppiness, but full year strong flows. No change." (Bullet A).  Thus, despite being *specifically asked* about possible "variances depending on the end-market sales," Defendant Melo failed to disclose that actual royalty revenues Amyris would receive *were highly susceptible to variances* depending on the actual sales. (Bullet A).  In

21

fact, Defendants went on to offer additional materially false and/or misleading answers to direct questions.  When asked about the impact of ASC 606, Defendant Valiasek flatly answered that the impact was "de minimis." (Bullet B).  When further pressed about the timing of the royalty revenue recognition, Defendants significantly downplayed the implications of its ASC 606 accounting and chalked up the impact of such accounting to a minor difference in timing, with Defendant Melo stating: "we used to wait for the payment and then book. And now we can actually book when we ship the product out the door. That's the big change around."  (Bullet B). Defendant Valiasek (CFO) provided a similarly incomplete and innocuous answer, saying "any product where we are manufacturing and the royalty revenue will be recognized when we actually ship the product" and that "the royalty revenue under the DSM and Nenter agreement is recognized when Nenter is selling into the market."  (Bullet B).  However, *the impact of ASC 606 amounted to far more than timing*, and it was not the case that Amyris waited to have actual sales information before recognizing royalty revenue under the DSM and Nenter agreement since Amyris was instead recognizing DSM/Nenter royalty revenue based on Defendants' inflated *estimates* of royalty payments based on *projected* Nenter sales.  As Defendants would later admit on April 11, 2019 (the end of the Class Period), "*a material error was made related to the estimates for recognizing revenue for royalty payments* under the Value Sharing Agreement…*between the Company and DSM under Accounting Standards Codification Topic 606*, Revenue from Contracts with Customers, *for the quarterly and year-to-date periods ended March 31, 2018 and June 30, 2018 and year-to-date period ended September 30, 2018*" that would require Amyris to restate its financial statements for those quarters.

55.     On May 16, 2018, the Company filed a Notification of Late Filing on Form 12b-25 for the quarterly report for the period ended March 31, 2018, reportedly "because of the significant time and resources that were devoted to the accounting for and disclosure of the adoption of ASC 606, *Revenue from Contracts with Customers*…"  Amyris further reported the Company was engaged in ongoing remediation efforts to resolve its previously disclosed material weaknesses in internal controls, including the hiring of experienced personnel, stating: "As part of the ongoing remediation efforts, during the quarter ended March 31, 2018, the Company hired

22

experienced personnel with qualifications in accounting leadership and technical accounting and will take further actions to remediate the material weakness in internal control over financial reporting."

56.     On May 18, 2018, the Company filed its quarterly report on Form 10-Q for the period ended March 31, 2018 and reported total revenue of $22.99 million and licensing and royalty revenue of $11.4 million.   In the Q1 2018 Form 10-Q, Defendants stated that the previously identified material weaknesses in internal control over financial reporting had not yet been remediated but stated that "[o]therwise, there were no changes in our internal control over financial reporting during the fiscal quarter ended March 31, 2018 that have materially affected, or are reasonably likely to materially effect, our internal control over financial reporting."

57.     The Q1 2018 Form 10-Q contained Defendants Melo's and Valiasek's signed certifications pursuant to SOX attesting to the accuracy of the report and the disclosure of any weakness or change in the Company's internal controls.   These certifications of Defendants Melo and Valiasek stated:

1. I have reviewed this Quarterly Report on Form 10-Q of Amyris, Inc.;

2. Based on my knowledge, *this report does not contain any untrue statement of a material fact or omit to state a material fact* necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, *the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows* of the registrant as of, and for, the periods presented in this report;

4. *The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures* (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) *and internal control over financial reporting* (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a) *Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information* relating to the registrant, including its consolidated subsidiaries, *is made known to us* by others within those entities, particularly during the period in which this report is being prepared;

23

b) *Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles*;

c) *Evaluated the effectiveness of the registrant's disclosure controls and procedures* and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) *Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter* (the registrant's fourth fiscal quarter in the case of an annual report) *that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting*; and

5. *The registrant's other certifying officer and I have disclosed*, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) *All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting* which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

58.     These certifications of Defendants Melo and Valiasek were materially false and/or misleading when made for the following reasons: (i) they falsely stated that the 10-Q fairly presented the financial condition, results of operations, and cash flows of Amyris when, in fact, the 10-Q materially overstated the Company's royalty revenues; (ii) they falsely asserted that the 10-Q did not include material misrepresentations or omissions when, in fact, the 10-Q materially failed to disclose that the royalty revenues were actually inflated estimates that lacked a reasonable basis and that had a substantial likelihood of not being received in the amount reported; (iii) they falsely stated that Defendants Melo and Valiasek had designed disclosure controls and procedures and internal control over financial reporting such as to ensure that material information

24

was made known to Defendants and to provide reasonable assurance that the financial statements were reliable in accordance with GAAP when, in fact, Defendants either knowingly or recklessly permitted the financial statements to include unreliable and incorrect financial results; and (iv) they falsely stated that significant deficiencies and material weaknesses in the Company's internal control over financial reporting had been disclosed when, in fact, additional undisclosed material weaknesses in Amyris's internal control over financial reporting existed.

59.     On May 22, 2018, the Company hosted a presentation to analysts and investors called "Amyris, Inc. BioDisrupt 2018."  During the presentation, Defendants stated, in relevant part:

A) MELO: We see the growth ahead at about 71%, and we see a margin in the health and wellness space of about 83%.  *So great gross margin business.  And it's a great gross margin business because a core part of that business in the near to medium term is actually 100% margin payments, or we used to call value share, we now call it royalty, from DSM for some of our vitamin technology*.

\*\*\*

VALIASEK: So again, what are seeing? ***Sustainable growth***. This is how we get to [earnings before interest, taxes, depreciation, and amortization ("EBITDA")] positive in 2018 and the outer years, Okay. 83% non-GAAP gross margin versus last year same quarter, negative 4%.

\*\*\*

But if you take out of our run rate from Q1 2018, that $6 million where it's almost at the exact same run rate we were at for Q4 2017. So a lot of investors and analysts are saying to me, Okay, well the information that you're giving me, we're doing the math, we've said our EBITDA will be $10 million positive. *If we do the math, you're going to be even more than that. **But what we wanted to do consistently is be conservative, make sure that we meet our numbers***.

Here's our revenue growth. It's again, year over year amazing. *We're expecting to do 185 to 195 in 2018. Again, gross margin at least 70% for 2018. And you'll see the same thing in 2019*.

B) MELO: *We're now one of the fastest-growing companies on Nasdaq*, one of the top 40 fastest growing companies on Nasdaq when you look at us over the last three years. And we've had a great share performance this year with exception of the last week, so we hope you all buy more shares to fix that problem, Okay.

25

***And we have the most profitable product portfolio in our industry with an anticipated gross margin of around 70% for the year. And we blew through that in the first quarter, as you know, based on the mix of products that we <u>sold</u> in the first quarter***.

C)  MELO: The next segment is health and wellness. And health and wellness has three specific drivers of growth that are all contracted and all part of our business today. The first is ***DSM has a value share/royalty agreement with us*** for our current vitamin, and also for the vitamin we plan on introducing.

What I don't think we've made very clear is that the rate, ***the percentage of that royalty increases significantly over the second half of this year and into next year and the year after***.

***The math is pretty simple***. We started the first half of this year with about a 25% value share. We end the year at a 35% value share. And we go into next year and the following year with a 45% value share.

Without much change to our base business, the share we get of the margin in Vitamin E or the ***royalty payment is significantly greater going into the second half and going into 2019 and 2020***.

60.     Defendants' statements were materially false and/or misleading.   Among other things, Defendants touted the Company's "great margin business" based on royalties from DSM, characterizing Amyris's improved revenues and gross margins as "sustainable growth" (bullet A) while failing to disclose any uncertainty around the DSM royalties or that Amyris's revenue growth was very likely not sustainable but was achieved only by overstated estimates of future payments that Defendants, in fact, had very little visibility into or control over.   Far from disclosing uncertainty, Defendant Valiasek (CFO) instead assured investors that the numbers being presented were "*consistently... conservative*" because of Defendants' objective to "make sure that we meet our numbers." (Bullet A).   Defendants further lauded Amyris as being "now one of the fastest-growing companies in NASDAQ" with "the most profitable product portfolio in the industry" due to "gross margin of around 70%," which Amyris exceeded in the first quarter "based on the mix of products that we *sold* in first quarter."   (Bullet B).   Such a representation was materially false, or at least misleading, because it attributed Amyris's gross margin—a metric predominately based on royalty revenues (*see* Defendants' earnings call statements on March 15, 2018, *supra* at ¶44)—to products "sold in the first quarter" when the exact opposition was true:

AMENDED CLASS ACTION COMPLAINT                                    FILE NO. 4:19-cv-01765-YGR

Amyris's purported gross margin was primarily based on invented estimates of future royalties that would come from *projected* product sales. In addition, when discussing the DSM royalty agreement specifically, Defendant Melo boasted about the increasing percentages that would be due to Amyris, describing the "math [a]s pretty simple," but again failing to warn of the considerable uncertainty of such royalty revenues that were, in truth, aspirational projections. Indeed, Defendants would later admit their lack of visibility into the factors determining their royal revenues. *See* ¶68, *infra* ("[W]e have no visibility on the actual royalty....").

**D.   August 2018 Statements**

61.     On August 6, 2018, Amyris issued a press release titled, "Amyris Delivers Another Quarter of Profitable Growth While Executing Well on Strategic Agenda." The press release disclosed total revenue of $24.8 million for the second quarter of 2018. Defendant Melo commented on the second quarter's positive results, stating they are a "demonstration that our focus on profitable growth *is yielding results*."

62.     On the same day, the Company held a conference call with analysts and investors to discuss the Company's second quarter results. During the call, Defendants stated, in relevant part:

A) MELO: We've completed a very good first half in comparison to the first half of 2017 and a strong second quarter. *We <u>delivered</u> much better revenue in the first half of 2018, much stronger gross margin, lower cost and continued our improvement in net income. Our strategy of delivering strong, profitable growth <u>is working</u>, and we expect a very strong second half to build on the momentum of the first half.*

\*\*\*

Our gross profit has also improved significantly from the first half of 2017. *First half of 2017, we had 19% non-GAAP gross margin. In the first half of 2018, we are at 84% non-GAAP gross margin, the second quarter also at the 84% gross margin level*.

*We <u>delivered</u> most of this first half performance on the back of* our Clean Beauty business, the *value share/royalty payments* and collaborations. …

*Our <u>royalty/value share is continuing to do well</u>*, and our Clean Beauty business is growing faster than we expected.

\*\*\*

27

B) MELO: Let me now end with our outlook. *We expect to deliver with our prior stated target revenue range of $185 million to $195 million and to achieve a full year positive EBITDA of around $10 million*….

In aggregate, *we expect these activities and our base business to deliver between $135 million and $145 million of revenue and gross profit in excess of $100 million in the second half. We feel <u>very confident</u> about the second half and have been exceeding our plan for the areas of our business that we control*.

The only area of our business that we have no control over is our Vitamin E royalty. In this activity, DSM is now responsible for the supply, and we are purely a receiver of value share or royalty based on market price and of volumes sold by Nenter. *This is a very volatile market, and we have no control over the price Nenter sells into this market*. These royalties represent between $10 million and $15 million of expected second half performance, and that is built within the $135 million to $145 million of expected second half revenue. *We have been very effective at predicting market prices to date*, but there's no guarantee that we will always get this right.

The *key drivers of our growth are very strong consumer demand* for natural, sustainable products that deliver great performance.

C) VALIASEK: *We are about where we expected to be at this point in the year and expect a large trajectory in revenue for the second half*. This is bolstered by the many agreements we expect that John mentioned, which will fuel our business through year-end. This pipeline of business is sizable. In fact, *we anticipate that our quarterly revenues in Q3 and Q4 will be at some of the highest quarterly levels we've experienced* since executing the fuels business and *at much improved profitability*. This is representative of the leverage and power within our current business model that we expect will get us to profitability.

Now let me review our second quarter 2018 results. Q2 2018 GAAP revenue was $24.8 million compared to $25.7 million for the second quarter of 2017. As a reminder, this reflects over $4 million of lower farnesene sales as a result of DSM now providing farnesene for Vitamin E, *offset by* increased sales in Clean Beauty, *Vitamin E royalties* and collaboration revenue. Adjusting out the low-margin revenues from 2017, our growth is 15% on an absolute basis.

63.   Defendants' statements were materially false and/or misleading.  Specifically, Defendant Melo spoke glowingly about how Amyris had "*delivered* much better revenue," how Amyris's strategy "*is working*" and "*is yielding* results," and falsely attributed Amyris's revenue growth to "strong demand" (bullet A) while failing to disclose that Amyris's revenue growth was really achieved only through overestimated future payments (and that it was yet to be determined

28

whether those estimates would "deliver" or "work").  Defendant Melo also touted the Company's improved gross margin performance, described Amyris's performance as "delivered" by "value share/royalty payments," and claimed royalty revenue was "continuing to do well" (bullet A) even though Amyris had actually received only a total of $2.6 million in royalty payments by the end of the second quarter in 2018—less than half of the $5.75 million the Company had received in royalty payments by the end of the second quarter in 2017.  Moreover, despite guardedly conceding volatility in the Vitamin E market and that Amyris has "no control over the price Nenter sells into this market," Defendants falsely and/or misleadingly assured investors that Defendants "have been *very effective at predicting market prices to date*," (bullet B), claimed that reduced farnesene sales had been offset, in part, by Vitamin E royalties (when this was yet to be proved) (bullet C), and maintained the Company's revenue estimate of between $135 million and $145 million (bullet B).  Thus, Defendants perpetuated expectations of "a large trajectory in revenue for the second half" saying they were "very confident" on being able to deliver on those projections.  (Bullets B and C).  Defendants still critically failed to disclose that Amyris had recognized royalty revenues based on estimated future royalty payments that were uncertain and likely to not be received in the amount reported.

64.    On August 14, 2018, the Company filed its quarterly report on Form 10-Q for the period ended June 30, 2018, in which it reported $23.19 million revenue.  The Q2 2018 Form 10-Q further announced license and royalty revenue of $6.88 million for the second quarter. The Q2 2018 Form 10-Q also stated that the Company's material weaknesses in internal control over financial reporting previously disclosed in the 2017 Form 10-K have not yet been remediated but assured that "otherwise, there were no changes in our internal control over financial reporting during the fiscal quarter ended June 30, 2018 that have materially affected, or are reasonably likely to materially effect, our internal control over financial reporting."

65.    The Q2 2018 Form 10-Q contained Defendants Melo's and Valiasek's signed certifications pursuant to SOX attesting to the accuracy of the report and the disclosure of any weakness or change in the Company's internal controls.  These certifications pursuant to SOX are the same or substantially similar to those in the Q1 2018 Form 10-Q, referenced in ¶57, above.

The certifications stated, among other things, that "based on my knowledge this quarterly report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made…not misleading…."   The certifications also stated that Amyris's "internal control over financial reporting" was designed "to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements." These certifications were materially false or misleading for the reasons provided in ¶58, above.

66.     In summation, Defendants' statements during the Class Period, identified herein, were each materially false or misleading when made because they gave an inaccurate picture of the Company's financial results and overall financial condition while failing to disclose the following material, adverse facts, which Defendants knew, consciously disregarded, or were reckless in not knowing:

(a)   that Defendants were misusing ASC 606;

(b)   that the reported licensing and royalty revenues were materially overstated and improperly based on uncertain estimations;

(c)   that the Company lacked sufficient resources to accurately report its financial results, including royalty revenues and accounting for certain transactions;

(d)   that Amyris would need to restate its 2018 financial statements;

(e)   that Defendants were not implementing the Company's announced Remediation Plan as represented, as it related to both financial reporting and the augmentation of accounting personnel and training;

(f)   that there were undisclosed material weakness in Amyris's internal control over financial reporting;

(g)   that, as a result of the foregoing, the Company's representations concerning its financial results, business prospects, and internal controls were improper and could not be relied upon; and

(h)   that, as a result of the foregoing, the Company would be unable to timely file its annual report for period ended December 31, 2018.

## VI.   THE TRUTH IS SLOWLY REVEALED

### A.   November 13, 2018 and November 15, 2018 Disclosures

67.   The truth began to emerge on November 13, 2018 when the Company reported poor financial results, which it attributed to "volatility of the Vitamin E market." For the third quarter 2018, the Company announced in a press release, in relevant part:

- Q3 2018 GAAP revenue of $14.9 million, compared with GAAP revenue of $24.2 million for Q3 2017. Third-quarter revenue of $14.9 million compared with the same period in 2017 of $22.5 million when adjusted for the loss making product sales on contracts assigned to DSM.

- Q3 2018 Adjusted gross margin of $8.2 million, or 55% of revenue, compared to Q3 of 2017 of $8.3 million, or 34%.

- Current quarter delivering at $200 million of annualized recurring revenue rate with over 60% gross margin. Doubling recurring revenue year on year while tripling adjusted gross margin dollars.

- Sugarcane based zero calorie sweetener successfully scaled and shipping commercially

EMERYVILLE, Calif., Nov. 13, 2018 (GLOBE NEWSWIRE) -- Amyris, Inc. (Nasdaq:AMRS), the industrial bioscience company, today announced preliminary unaudited financial results for the third quarter ended September 30, 2018.

"We are pleased with the rapid ramp up of our new, zero calorie sweetener product and our continued strong recurring revenue growth," said John Melo, President and CEO of Amyris. "However, *we are very disappointed with the volatility of the Vitamin E market and its direct impact on our third quarter revenue. Some of this shortfall is expected be made up with our core market revenue performance through year end*."

Continued Melo, "*While the unpredictable nature of the Vitamin E market and our royalty is disappointing*, we are very pleased by the strong growth of our Clean Beauty business, the early demand for our zero calorie sweetener and for the better than planned growth of our ingredients business. Our recurring revenue has been doubling year on year and we are on pace to deliver for the fourth quarter at an annualized rate of about $200 million in recurring revenue. This is double what we did in recurring revenue for the fourth quarter of last year and a great testament to the quality of our product portfolio and of our partnerships where we are delivering strong results. *We are achieving this revenue growth from our product sales and long term partnerships while delivering three times the gross margin dollars year to date 2018 versus 2017 at this time*. We expect strong continued recurring revenue growth where we control our destiny while delivering industry leading gross profit."

AMENDED CLASS ACTION COMPLAINT                    FILE NO. 4:19-cv-01765-YGR

68.    On the same day, Amyris held a conference call with analysts and investors to discuss the Company's third quarter results.  During the call, Defendants stated, in relevant part:

A) MELO: Our third quarter results were disappointing. ***We delivered strong results from the activities we controlled, with continued execution on the promises we've made to you, and very poor results from the Vitamin E royalty aspect of our business, an activity outside of our control***.

* * *

Since the start of 2018, we have had no direct involvement in the Vitamin E business. Short-term oversupply and selling price is the issue and a direct impact on our royalty revenue. ***We expected around $15 million of royalty revenue in the third quarter and realized 0***.

B) MELO: ***We have no visibility on the actual royalty*** as it is calculated on the selling price of their contracts that have been at a significant discount to market prices. *We have realized about $20 million in royalty payments during the first half of this year. We continue to believe and expect around $40 million of annual royalty payments in the short to midterm and after we get through the significant current market volatility*.

C) VALIASEK: To provide you with some color here, ***the biggest negative hit for Q3 2018 revenue was due to Vitamin E royalties not coming in for the quarter***, which had quite a material impact on revenue for the quarter, followed by a much smaller amount of fragrance partner royalty revenue that was earned but could not be recognized in Q3 due to ASC 606 requirements.

* * *

In closing, ***while the impact of Vitamin E royalties <u>on the third quarter</u> is a setback***, we are overcoming this with the diversification of our business and its performance where ***we largely continue to exceed our growth expectations***.

D) MELO: We said $170 million, or around $170 million in revenue. And again, the biggest thing we did was we adjusted out the total second half Vitamin E expectation of $30 million. And then, we're doing a little bit better on the underlying performance than we expected. So better underlying, removal of E completely. Any E we get would be upside. As I said on the call, I don't -- ***it's not that I don't expect us to earn E in the future, but because of the volatility, it is something we cannot forecast and we're removing from plans going forward***. So $170 million in revenue at about a 70% gross margin for the year.

* * *

AMIT DAYAL: Okay. Understood. That clarifies things. We should also remove Vitamin E from sort of our models for next year, do you think, I mean, just to be conservative?

32

MELO: I think, to be conservative, again, I just want to get away from not doing what we say on financial, so I would remove it. ***And don't be surprised if we deliver to the upside. There's no reason for us to believe we won't be able to access at least what we've done this year***. I mean, ***so far, this year, we've realized about $20 million, and again, at target***. Let's assume there's no craziness in the market, ***$40 million would be the expected outcome***. But we're not going to plan or guide to that. It still says going to next year, we have a very robust year, right? Everything we have in place, assuming it continues to perform, we would be around $240 million of revenue for next year. So we feel great about next year, but we're not going to add E into our guidance for next year.

* * *

E)  CARTER WILLIAM DRISCOLL: …[O]ne of the things that you had been progressing towards is fixing the capital structure you made progress with the '18 maturities. Certainly, you appear that you're making progress towards the '19 maturities. And I think, certainly, investors are rightfully concerned about the ability to refinance the significant bullets for those 2 payments that are due in April and May of next year…. I guess, what I'm trying to get at is what is your comfort level that you will be able to refinance these in time, while you're delivering on that positive cash generation in fourth quarter that you had been talking about through the balance of this year as you give people comfort that you will be able to adequately recap them without a significant increase in the interest rate?

MELO: Yes. ***Again, we have had no concern***. We've heard the concern, by the way, so I acknowledge that it's -- I mean, what you've just described, Carter, is something we have felt clearly from investors. ***Internally, I can tell you we've had no concern***. I mean, number one, we have people around the table that could easily refinance if that's what they decided to do; and number two, we have had significant discussion, including explicit offers on the table for what we do. And what we've been trying to do is optimize timing. Because of what we can see as the cash generation of the business, we think putting ourselves in a position to pay off that debt is better than letting it go to equity. And that's why we've been, again, trying to manage the discussions and timing as best as possible. And again, I think it's to be seen, right? But ***it has not been a significant concern whether or not we could resolve that debt. That's kind of the least of my worries.***

69.     Following the November 13, 2018 press release and earnings call, the price of Amyris's stock plunged 30%, or $1.76 per share, on November 14, 2018, to close at $4.14 per share compared to the previous trading day's closing of $5.90 per share, on unusually heavy trading volume.  However, the November 13, 2018 disclosures were only partially corrective. The disclosures were corrective in that they disclosed disappointing royalty revenues, which was a materialization of some of the risks concealed by Defendants' materially false or misleading

AMENDED CLASS ACTION COMPLAINT                    FILE NO. 4:19-cv-01765-YGR

statements. (Bullet A).   However, Defendants' statements were also materially false and/or misleading because Defendants attributed the cause of the shortfall entirely to recent volatility in the Vitamin E market and confined the disappointing royalty revenues only to the third quarter of 2018 while reiterating the royalty revenues previously recognized for the first and second quarter of 2018, suggesting that those revenues had been received and were correct.  (Bullets B, C, and D).  In truth, however, Defendants had recognized royalty revenues for the first half of 2018 based on overstated estimates, which would later be admitted by Defendants.   Moreover, Defendant Melo falsely or misleadingly assured that Amyris internally "had no concern" about repaying its debts obligations. This contradicted by CW 2 who described that Amyris's debt was a major concern throughout the Company.  Amyris's stock price would have dropped more if the full truth had been revealed at that time.

70.   On November 15, 2018, the Company filed its Quarterly Report on Form 10-Q for the third quarter ended September 30, 2018 (the "Q3 2018 Form 10-Q") with the SEC.  The Q3 2018 Form 10-Q confirmed the disappointing results previously announced by Amyris. The Company reported revenue of $14.86 million and net loss of $68.32 million. The Q3 2018 Form 10-Q reported license and royalty revenue of $18.46 million for the nine months ended September 30, 2018.  However, by the end of the third quarter, Amyris had only received $4.37 million in royalty revenue.  The report also stated that the previously-identified material weaknesses in internal control over financial reporting had not yet been remediated but falsely stated, "[o]therwise, there were no changes in our internal control over financial reporting during the fiscal quarter ended September 30, 2018 that have materially affected, or are reasonably likely to materially effect, our internal control over financial reporting."

71.   The Q3 2018 Form 10-Q contained Defendants Melo's and Valiasek's signed certifications pursuant to SOX, attesting to the accuracy of the report and the disclosure of any weakness or change in the Company's internal controls.  These SOX certifications are the same or substantially similar to those in the Q1 2018 Form 10-Q, referenced in ¶57, above.  The certifications stated, among other things, that "based on my knowledge this quarterly report does not contain any untrue statement of material fact or omit to state a material fact necessary to make

34

the statements made…not misleading…."  The certifications also stated that Amyris's "internal control over financial reporting" was designed "to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements."  These certifications were materially false or misleading for the reasons provided in ¶58, above.

**B.      March 18, 2019 and March 19, 2019 Disclosures**

72.      On March 18, 2019, the Company issued a press release announcing Amyris's financial results for the fourth quarter and fiscal year ended December 31, 2018. The press release announced fourth quarter revenue of $19.4 million, fourth quarter license and royalty revenue of $1.2 million, and total revenue of $80.4 million for the full year 2018.  Thus, the press release revealed that *Defendants missed their fiscal 2018 revenue guidance by 58%*, with Defendant Melo noting that the "results for the quarter and year are below expectations."  However, Defendant Melo attributed the negative results to the termination of an assignment agreement with Hangzhou Xinfu Science & Tech Co. Ltd ("Xinfu")—a rushed deal entered into on the final day of the year (December 31, 2018) in a last ditch attempt to prop up Amyris's revenue to bring it closer to Defendants' repeated expectations for 2018.  Melo stated, "The negative results for the quarter and full year reflect the inability to recognize revenue for a $50 million multi-party Vitamin E deal in China during the fourth quarter."[7]  Defendants also attempted to offset the announcement of the negative financial results by simultaneously announcing the signing of an agreement for cannabinoid development, which the Company valued at $300 million.[8]

73.      The same day, Defendants participated in a conference call with analysts and investors to discuss the Company's results.  During the call, Defendant Melo discussed the disappointing results and essentially admitted recklessness in their earlier financial statements and projections, stating, in relevant part:

---

[7] Under the announced assignment agreement with Xinfu, certain payments due under Amyris's royalty agreement with DSM would be transferred to Xinfu in exchange for a payment of $50 million.  The agreement would have allowed Amyris to book $50 million in license and royalty revenue for fiscal year 2018.

[8] Indeed, Amyris has a practice of issuing positive disclosures at, or near, the same time that it issues negative disclosures, possibly in an effort to deter potential securities actions.

I will take some time to go through the three main drivers of our negative results in 2018 and the fourth quarter, and what we're doing to resolve these. First, *as we previously reported after the third quarter, when the Vitamin E pricing collapsed in the second half of 2018, this had a direct impact on our expectations for royalty. This resulted in $30 million to $40 million less revenue than we expected and also a direct hit to cash as this was 100% gross margin*. We now have an agreement in place to mitigate this risk going forward, which I will explain in full detail in a few moments.

***

As I said earlier, our 2018 results failed to meet our expectations. *We could have avoided most of the disappointment with a much more conservative approach to expectation management.* I've heard this from many of our investors and we are responding to this feedback by changing how we communicate financial expectations. *Going forward, we will set external expectations based on what we have in place and that what we believe we can achieve*. We believe by communicating in a much more conservative approach, we can better realize the true value of our business in our share price.

***

In closing, we acknowledge that our financial results are not acceptable, and *we want to avoid this in the future by better assessing what our realistic revenue assumptions versus those that are simply potentially possible and may have elements we cannot control*. The result is that we will exercise as much more conservative projected revenue analysis from here on out to improve -- avoid quarterly disappointments and instead meet or exceed our goals.

74.     The next day, on March 19, 2019, after the market closed, the Company filed a Notification of Late Filing on Form 12b-25 with the SEC. Therein, the Company stated:

Amyris, Inc. (the "Company") was *unable to file its Annual Report on Form 10-K for the fiscal year ended December 31, 2018* (the "Form 10-K") within the prescribed time period without unreasonable effort and expense *because of the significant time and resources that were devoted to the accounting for and disclosure of the significant transactions with Koninklijke DSM N.V.* that closed in November 2018. *The Company is also in the process of completing its evaluation of internal control over financial reporting for 2018 and finalizing related disclosures in the Form 10-K*. These activities delayed the completion of the Form 10-K.

As previously reported in Part II, Item 9A, "Controls and Procedures" of the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2017, the Company has identified a material weakness in its internal control over financial reporting, *which material weakness remains unremediated as of December 31, 2018*. The Company is in the process of completing its evaluation of internal control over financial reporting and *may have further deficiencies to report*. In addition, the Company *expects to continue to report that there is substantial doubt about its ability to continue as a going concern*.

36

75.     On this news, the Company's share price fell $0.78, or nearly 20%, to close at $3.10 per share on March 20, 2019, on unusually heavy trading volume.  The disclosure revealed: that Amyris was unable to timely file its annual report for the year 2018; that the Company was struggling to accounting for its transactions with DSM; that the material weakness in Amyris's internal control remained unremediated (despite Defendants' previously announced remediation measures); that Amyris may in fact have additional deficiencies in its internal control over financial reporting; that Amyris expects to continue to report that there is substantial doubt about its ability to continue as a going concern (despite the favorable financial results announced in 2018; and Defendant Melo's assurances that there were no concerns about repaying the Company's debt).  While revealing some of the true facts and some of the materialized risk associated with Defendants' materially false or misleading statements, the disclosure was only partially corrective.  The price of the stock would have dropped more if the full truth has been revealed, as indicated by the substantial drop in Amyris's stock on April 11, 2019 (the last day of the Class Period).

C.     **April 11, 2019 Disclosures**

76.     On April 11, 2019, the Company filed a report on Form 8-K with the SEC.  The Form 8-K announced that due to accounting errors, the Company would have to restate several quarterly and annual financial reports.  Specifically, the Form 8-K stated, in relevant part:

**Item 2.02 Results of Operations and Financial Condition.**
As a result of the restatement by the Company of the financial statements discussed in Item 4.02(a) below, as well as other adjustments identified during the preparation and audit of the Company's consolidated financial statements for the fiscal year ended December 31, 2018 ("Fiscal 2018"), *the Company anticipates that its revenue and net income for Fiscal 2018, as compared to the financial results included in the Company's earnings release issued on March 18, 2019, will be reduced by approximately $12 million to $16 million and $7 million to $11 million, respectively*….

…. These anticipated adjustments are the result of (i) evaluating the series of fourth quarter transactions and other transactions with Koninklijke DSM N.V. (together with its affiliates, "DSM") in 2018 as a combined arrangement, and (ii) determining the fair value of each element and adjusting the contractual values of each element to its allocated fair value….

***
37

**Item 4.02 Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.**

(a)

On April 5, 2019, the Audit Committee of the Board of Directors (the "Audit Committee") of the Company, after consultation with management of the Company and KPMG LLP ("KPMG"), the Company's independent registered public accounting firm, determined that *the Company will restate its interim condensed consolidated financial statements for the quarterly and year-to-date periods ended March 31, 2018, June 30, 2018 and September 30, 2018, included in the Company's Quarterly Reports on Form 10-Q for the fiscal quarters ended March 31, 2018, June 30, 2018 and September 30, 2018, respectively (collectively, the "Non-Reliance Periods")*.

*Accordingly, investors should no longer rely upon the Company's previously released consolidated financial statements for the Non-Reliance Periods. In addition, investors should no longer rely upon earnings releases for these periods and other communications relating to these consolidated financial statements.*

During the preparation and audit of the Company's consolidated financial statements for Fiscal 2018, the Company concluded that (i) *a material error was made related to the estimates for recognizing revenue for royalty payments* under the Value Sharing Agreement, dated December 28, 2017 (the "Value Sharing Agreement"), as amended, between the Company and DSM under Accounting Standards Codification Topic 606, Revenue from Contracts with Customers, *for the quarterly and year-to-date periods ended March 31, 2018 and June 30, 2018 and year-to-date period ended September 30, 2018*, (ii) *material errors were made related to certain expenses that should have been identified and recorded as accrued liabilities in the fiscal quarter ended September 30, 2018* and (iii) *material errors were made related to certain foreign currency transaction gains* that should have been identified and recorded as other income in the quarterly and year-to-date periods ended June 30, 2018 and September 30, 2018. As a result, the Company anticipates that the restatement for these material errors and certain other matters *will include a reduction in revenue and an increase in net loss for the Non-Reliance Periods as follows: approximately $4 million and $4 million, respectively, for the fiscal quarter ended March 31, 2018; approximately $8 million and $8 million, respectively, for the fiscal quarter ended June 30, 2018; approximately $1 million and $7 million, respectively, for the fiscal quarter ended September 30, 2018; approximately $12 million and $11 million, respectively, for the six months ended June 30, 2018; and approximately $13 million and $18 million, respectively, for the nine months ended September 30, 2018*. The estimated impact to the financial statements of the errors could materially change based on further review and analysis of the Non-Reliance Periods, including the identification of additional material errors. The Company is in the process of finalizing its evaluation of internal control over financial reporting *and expects to report material weaknesses in addition to the material weakness reported in the Company's Annual Report on Form 10-K for the fiscal year ended December 31,*

*2017*. ***The Company has reached a conclusion that its system of internal control over financial reporting is not effective as of December 31, 2018***.

77.     On this news, the price of Amyris stock fell $0.86 per share, *or 23%*, in one day to close at $2.89 per share on April 11, 2019, compared to its closing price of $3.75 per share the previous day, on unusually heavy trading volume.  The disclosure revealed for the first time that the previously announced quarterly financial results for 2018 contained a material error relating to "the estimates for recognizing revenue for royalty payments" under Amyris's agreement with DSM, that additional errors had been made concerning the accounting of liabilities and certain foreign currency transactions, that the previously announced financial results could no longer be relied upon and would need to be restated, that the Company expects to report new material weaknesses in its internal control over financial reporting in addition to the material weaknesses reported the previous year, and that Amyris has concluded that its system of internal control over financial reporting is not effective as of December 31, 2018.

## VII.   DISCLOSURES FOLLOWING THE END OF THE CLASS PERIOD

78.     On May 13, 2019, Amyris filed a Notification of Late Filing with the SEC on Form 12b-25 primarily because "[a]s part of the restatement process [announced on April 11, 2019], the Company is continuing to assess the adjustments to its financial statements for the Non-Reliance Periods as well as its financial statements for the fiscal year ended December 31, 2018 ("Fiscal 2018"), which will be included in the Company's Annual Report on Form 10-K for Fiscal 2018 (the "10-K").

79.     On May 16, 2019, the Company filed a report on Form 8-K with the SEC, announcing that the Company's independent registered accounting firm, KPMG LLP, was being dismissed and that additional restatements would be required for fiscal year 2017 as a result of a material accounting error.  The Form 8-K provided, in relevant part:

> On May 15, 2019, Amyris, Inc. (the "Company"), with the approval of the Audit Committee (the "Audit Committee") of the Board of Directors of the Company (the "Board") and ***the Board, appointed BDO USA, LLP ("BDO")*** to serve as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2019, and ***will dismiss KPMG LLP ("KPMG")***, which is currently serving as the Company's independent registered public accounting firm, upon completion of their audit of the Company's consolidated financial statement as of

and for the year ended December 31, 2018 and the effectiveness of internal control over financial reporting as of December 31, 2018, and the issuance of their reports thereon as well as the re-audit of the consolidated financial statements as of and for the year ended December 31, 2017 as discussed in Item 4.02 below. The Audit Committee authorized KPMG to respond fully to all inquiries from the Company's successor independent registered public accounting firm.

…. [A]s set forth below in Item 4.02, the Audit Committee, after consultation with senior management and KPMG, concluded that the Company's financial statements for (i) the year ended December 31, 2017 (the "2017 Non-Reliance Period") and (ii) the quarters and year to date periods ended March 31, 2018, June 30, 2018 and September 30, 2018 (the "2018 Non-Reliance Periods" and, together with the 2017 Non-Reliance Period, the "Non-Reliance Periods") should be restated and should no longer be relied upon. *Further, the Company's disclosures related to such financial statements and related communications issued by or on behalf of the Company with respect to the Non-Reliance Periods, including management's assessment of internal control over financial reporting as of December 31, 2017, should also no longer be relied upon*.

Additionally, as previously reported, *the Company expects to report material weaknesses in its internal control over financial reporting as of December 31, 2018*. As a result of the material weaknesses, senior management in consultation with the Audit Committee, concluded that *the Company's internal control over financial reporting and disclosure controls and procedures were ineffective as of December 31, 2018*. Additional material weaknesses may be identified, and the scope of financial items or periods required to be restated may be broadened. As of May 15, 2019, KPMG had not completed its audit procedures or issued any reports on the Company's consolidated financial statements as of and for the year ended December 31, 2018 or the Company's internal control over financial reporting as of December 31, 2018.

***

The Company previously reported in its Current Report on Form 8-K filed on April 11, 2019 that the Audit Committee, in consultation with senior management and KPMG, determined that the Company's previously issued interim condensed consolidated financial statements for the 2018 Non-Reliance Periods should be restated to reflect the impact of certain errors involving revenue recognition, expenses, foreign currency transaction gains and certain other matters; and, accordingly, should no longer be relied upon. The Company also concluded that its system of internal control over financial reporting was not effective as of December 31, 2018. During the preparation and audit of the Company's consolidated financial statements for the fiscal year ended December 31, 2018, *senior management concluded that a material error had been made related to the accounting for certain payment obligations of the Company under the Partnership Agreement dated October 20, 2017 (the "Ginkgo Agreement"), between the Company and Ginkgo Bioworks, Inc*. The contractual payment obligations of the Company under the Ginkgo Agreement and a related promissory note issued in connection therewith total $31.0 million over a five-year period ending on October 19, 2022 and had a

present value of approximately $17.0 million to $19.0 million at the October 20, 2017 commitment date. *A significant portion of these payment obligations had not been recorded as a liability or charged to the consolidated statement of operations as of December 31, 2017.*

On May 14, 2019, as a result of the error discussed above, the Board, upon the recommendation of the Audit Committee after consultation with senior management and KPMG, determined that *the Company will restate its audited consolidated financial statements for the year ended December 31, 2017*. Accordingly, investors should no longer rely upon the Company's previously released consolidated financial statements for the 2017 Non-Reliance Period.

***

The Company is diligently pursuing completion of the restatements and intends to file the Amended 2017 Form 10-K, if required, and the amended Quarterly Reports on Form 10-Q for the 2018 Non-Reliance Periods as soon as reasonably practicable; and also intends to file the 2018 Form 10-K, and the Q1, 2019 Form 10-Q as soon as reasonably practicable.

80.     On June 4, 2019, the Company filed a report on Form 8-K with the SEC.  The Form 8-K announced that the Company's CFO Kathleen Valiasek had been terminated from her role as CFO and was reassigned to the role of Chief Business Officer, effective June 3, 2019.  The Form 8-K stated, in relevant part:

On June 4, 2019, Amyris, Inc. (the "Company") announced that the Board of Directors of the Company had appointed Jonathan Wolter to serve as the Company's Interim Chief Financial Officer, reporting to the Company's Chief Executive Officer, effective June 3, 2019, and that Kathleen Valiasek had been reassigned from her role as the Company's Chief Financial Officer to a new role as Chief Business Officer of the Company, effective June 3, 2019.

81.     On July 10, 2019, the Company filed a report on Form 8-K with the SEC.  The Form 8-K announced that BDO USA, LLP had resigned as the Company's independent registered public accounting firm.  The Form 8-K stated, in relevant part:

As previously reported, on May 15, 2019, Amyris, Inc. (the "Company"), with the approval of the Audit Committee (the "Audit Committee") of the Board of Directors of the Company (the "Board") and the Board, appointed BDO USA, LLP ("BDO") to serve as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2019, and determined to dismiss KPMG LLP ("KPMG") as the Company's independent registered public accounting firm upon completion of KPMG's audit of the Company's consolidated financial statements as of and for the year ended December 31, 2018 and the effectiveness of the Company's internal control over financial reporting as of December 31,

41

2018, and the issuance of KPMG's reports thereon, as well as its re-audit of the Company's consolidated financial statements as of and for the year ended December 31, 2017 (the "Prior Auditor Change"). The Prior Auditor Change and related matters were previously reported in a Current Report on Form 8-K filed by the Company with the Securities and Exchange Commission (the "SEC") on May 16, 2019 (the "May 8-K"), which is incorporated herein by reference.

In the Company's ongoing efforts to file its Annual Report on Form 10-K for the fiscal year ended December 31, 2018, including the restatement of its audited consolidated financial statements as of and for the year ended December 31, 2017, and amended Quarterly Reports on Form 10-Q for the fiscal quarters ended March 31, 2018, June 30, 2018 and September 30, 2018, the Company has undertaken additional changes to its independent registered public accounting firms for the fiscal years ended December 31, 2017 and December 31, 2018, and for the fiscal year ending December 31, 2019, as described below.

On July 3, 2019, (i) ***BDO resigned as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2019, prior to performing any substantive work with respect to the audit work for that year***, and (ii) the Company, with the approval of the Audit Committee, took the following actions: (A) dismissed KPMG as the Company's independent registered public accounting firm for the fiscal years ended December 31, 2018 and 2017, (B) appointed Macias Gini & O'Connell LLP ("MGO") as the Company's independent registered public accounting firm for the fiscal years ended December 31, 2019 and 2018, subject to the completion of client acceptance procedures, and (C) appointed BDO as the Company's independent registered public accounting firm for the fiscal year ended December 31, 2017, subject to the completion of client acceptance procedures….

***

In accordance with Item 304(a)(3) of Regulation S-K, the Company provided KPMG and BDO with a copy of the statements set forth in this Item 4.01 prior to the filing of this Current Report on Form 8-K (this "Report") with the SEC. The Company requested that each of KPMG and BDO furnish the Company with a letter addressed to the SEC stating whether such accounting firm agrees with the statements in this Item 4.01 as required by SEC rules. Each of KPMG and BDO has furnished the requested letter, which are attached as Exhibit 16.1 and Exhibit 16.2, respectively, to this Report.

82.     As of the date of the filing of this Complaint, Amyris has yet to restate its 2017 Form 10-K, its 2018 Forms 10-Q, or issue its 2018 Form 10-K or any 2019 financial results.

# VIII.   ADDITIONAL ALLEGATIONS OF SCIENTER

83.     As Amyris has now admitted, Amyris's revenue announcements and financial statements issued during the Class Period were materially false and misleading.[9]  As has further been admitted, during the Class Period, Amyris was operating with undisclosed material weaknesses in its internal control over financial reporting.

## A.     Defendants Had Access To Information Undermining Their Statements

84.     Both Defendants Melo and Valiasek had access to information indicating that their statements concerning Amyris's financial results and condition, and the effectiveness of the Company's internal controls, were materially false and/or misleading.

85.     According to CW 2, Defendant Valiasek and Defendant Melo frequently participated in "senior level meetings" with the top accounting personnel, such as the VP of technical accounting, the chief accounting officer, and the controller.[10]  CW 2 also explained that Defendants Melo and Valiasek received regular reports on the Company's finances.  "Every time you close the financials, they look," CW 2 stated.  According to CW 2, Defendants Melo and Valiasek reviewed the Company's revenue numbers weekly or, at a minimum, monthly.  "They looked at least monthly and quarterly — that's a minimum," CW 2 said.  Thus, as CW 2 also definitively said, "they [Defendants Melo and Valiasek] have access to the financial information."  CW 2 further explained that Defendant Valiasek in particular, in her role as CFO, was very involved in overseeing the process of revenue recognition and financial reporting.  According to CW 2, Defendant Valiasek communicated regularly with the VP of technical accounting and the senior accounting manager on revenue recognition and financial reporting.  CW 2 added that "Kathy [Defendant Valiasek] worked closely with the technical accounting, especially with [the VP of Technical Accounting]," who CW 2 explained was primarily responsible for handling the revenue from Amyris's royalty agreement with DSM.  CW 1 similarly explained that the senior

---

[9] Indeed, a restatement is not required unless there is a *material* inaccuracy in a reported figure.

[10] The information provided by CW 2 is discussed in ¶¶35-41, *supra*.

1  employees responsible for revenue recognition reported directly to Defendant Valiasek.[11]

2  According to CW 1, "[t]here was a revenue person, a technical accounting person, and a Chief

3  Accounting Officer" who reported to Valiasek, and "they handled all the technical stuff,"

4  including revenue accounting. CW 1 further explained that the VP of Technical Accounting was

5  the person primarily responsible for calculating revenue recognition, including the accounting for

6  the royalty revenues under the Company's agreement with DSM, and this VP of Technical

7  Accounting reported directly to Defendant Valiasek. *See* ¶¶35, 38-39, *supra*.

8       86.    The confidential witnesses also described that Amyris's accounting department

9  was largely dysfunctional during the Class Period. CW 2 said that both senior managers and

10  department staff were in constant flux at Amyris. As an example, CW 2 explained that the

11  Company's Chief Accounting Officer left her position after just six months and was not

12  immediately replaced. According to CW 2, temporary employees filled key roles, such as SEC

13  reporting and accounting and said that the Company's "full-time accounting department" was

14  "nonexistent." CW 2 elaborated that during CW 2's tenure at Amyris the accounting department

15  had nine or 10 employees, and 80 percent of the accounting staff were temporary hires. CW 2

16  said the lack of long tenured employees made the operations of the accounting department

17  difficult. CW 1 made similar representations, saying that there was considerable turnover in the

18  accounting department and that Amyris's financial reporting difficulties was one of the reasons

19  CW 1 left the Company. Such conditions, including the perpetual lack of knowledgeable senior

20  employees and the departure of the Chief Accounting Officer, would not have gone unnoticed by

21  Defendants. Indeed, CW 2 said that Defendant Valiasek was closely involved in the accounting

22  department. CW 2 explained that Defendant Valiasek had no choice but to be very involved day-

23  to-day in the accounting operations at Amyris because the turnover was so high that few

24  employees had the experience to serve well in their roles without guidance and support. *See* ¶¶36,

25  40, *supra*.

26

27

28  [11] The information provided by CW 1 is described in ¶¶34-36, *supra*.

87.     Additionally, Defendant Melo (as CEO) and Defendant Valiasek (as CFO) were both required to oversee and ensure the accuracy of the Company's financial reports as well as the effectiveness of Amyris's internal controls over financial reporting.  Congress enacted the Sarbanes-Oxley Act in 2002, in part, to heighten the responsibility of public company's senior managers for the quality of financial reporting and disclosures made on behalf of companies under their management.  Accordingly, Defendant Melo (CEO) and Defendant Valiasek (CFO) were required to attest to their conclusions regarding the accuracy of the Company's financial reporting and the effectiveness of the Company's disclosure controls and procedures and its internal control over its financial reporting.  As set forth herein, Defendants Melo and Valiasek signed these SOX certifications for each of the quarterly financial reports that have now been admitted to be inaccurate and unreliable and for the periods when the Company's internal control over financial reporting was operating with undisclosed material weaknesses.  In signing these certifications and in fulfilling the responsibilities thereunder, Defendants Melo and Valiasek were required to apprise themselves of how the Company was conducting its financial reporting.  This would certainly include making themselves knowledgeable about how the Company was implementing the major new accounting rule, ASC 606.  Indeed, the persistent and unremediated material weakness in the Company's internal control over financial reporting identified before the start of the Class Period was, or should have been, an obvious red flag to Defendants to actively monitor the implementation of ASC 606.  This is particularly true given that the material weakness involved deficiencies with "implementation of new accounting standards and related disclosures" and deficiencies with controls over "complex" transactions that included "revenue elements."

88.     In truth, the implementation of ASC 606 was highly significant to Amyris and Defendants.  Not only did the change to the new accounting method require the Company to expend considerable resources, but its application (or misapplication) allowed Amyris to recognize unprecedented revenues and gross margin numbers.  These numbers were repeatedly touted by Defendants throughout the Class Period.  Specifically, with the new accounting rule, Amyris was able to report year-over-year revenue growth of 19% in the first half of 2018, whereas without ASC 606 revenue would have slipped 27% in the comparable periods.  As alleged herein,

this dramatic impact was achieved by Defendants' recognizing royalty revenues based on outsized *estimates* of *future* payments. Defendants almost certainly would have been aware of this fact, particularly since the Company was not actually receiving payments at nearly the rate that it was recognizing revenue. With Amyris struggling to manage its debt and cash flow throughout the Class Period, these unreceived revenues would have been monitored by Defendants, in the absence of recklessness. Indeed, CW 2 described that Defendant Valiasek led the Company's accounting department, that Defendant Valiasek was heavily involved in the accounting department, and that the management of Amyris's debt was constantly being monitored by the accounting department. *See* ¶41, *supra*.

89.     Additionally, Nenter was the Company's third largest customer, with its royalty payments accounting for approximately 10% of the Company's revenues in 2017. The significance of Nenter's royalty payments to Amyris, as well as the significance of Amyris's assignment agreement with related-party DSM, makes it all the more likely that Defendants were aware of how the application of ASC 606 was affecting the recognition of those royalty revenues or that Defendants were extremely reckless in not knowing.

**B.     Defendants' History Of Reckless Reporting**

90.     Amyris, at the helm of Defendants (particularly Melo), has a history of overpromising when it comes to financial projections and results. Indeed, Amyris has consistently failed to deliver on its financial projections in recent years, as demonstrated in the below table.

| Period | Guidance or Statement | Actual |
|--------|----------------------|--------|
| Q4 2013 | Business will achieve positive operating cash flow in 2014 and profitable operations in 2015. | Through Q3 2018, Amyris had not achieved positive operating cash flow or operating income in any period. |
| Q4 2014 | Business will achieve $105 million in total non-GAAP revenue in 2015. | Full-year 2015 GAAP revenue of $34 million. |
| Q2 2015 | Malaria treatment will achieve $50 million to $60 million in annual revenue in three to five years. | Amyris did not report any revenue from malaria treatments in 2018. |
| Q3 2015 | Polymers, solvents, and industrial lubricants will achieve $20 million in revenue in 2016. | Amyris did not report any revenue from polymers, solvents, or industrial lubricants in 2018. |

| | | |
|---|---|---|
| Q4 2016 | Next year product revenue will more than double from the $25 million achieved in 2016. | Amyris achieved product revenue of $42 million in 2017 (missed guidance by 16%). |
| Q4 2017 | Full-year 2018 revenue will be $185 million to $195 million. EBITDA will be $10 million. | Amyris achieved total revenue of $61 million through the first nine months of 2018. It did not report EBITDA. |

Defendants, therefore, were on notice of the need to closely supervise the Company's implementation of the new revenue reporting rule ASC 606 and its relation to royalty revenue recognition, particularly since the new rule facilitated the recognition of estimates as revenue. At a minimum, therefore, Defendants were reckless in issuing their materially false and/or misleading statements during the Class Period. As Defendant Melo admitted in the weeks before the Company's final corrective disclosure, Defendants "***could have avoided most of the disappointment with a much more conservative approach***…. ***Going forward, we will set external expectations based on <u>what we have in place</u> and that <u>what we believe we can achieve</u>***." While it is reassuring to know that Amyris intends to be less reckless "going forward," it is cold comfort to the investors who suffered financial losses based on Defendants' materially false and misleading statements during the Class Period.

## C.    Motive

91.    In truth, Defendants were motivated to issue materially false and/or misleading statements, including overstating the Company's reported revenues. The Company has been struggling with significant debt obligations to the point that Amyris was required to disclose that there was "substantial doubt about its ability to continue as a going concern" in the Company's 2017 Form 10-K. Indeed, CW 2 described that the Company's tremendous debt and its ability to meet its repayment schedules was a significant concern expressed by the employees at Amyris. *See* ¶ 41 *supra*. Thus, during the Class Period, Defendants used Amyris's artificially inflated stock to finance its operations. Specifically, on August 21, 2018, Defendants conducted a secondary offering, under which the Company sold approximately 8.8 million shares of common stock at the public offering price of $6.25 per share. This offering, including the exercise of warrants associated with the transaction, generated approximately $46 million in desperately needed cash

proceeds to the Company.  In the press release announcing the offering's tremendous results, Defendant Melo stated, "We are very pleased with the results of our well over-subscribed transaction. We further improved our balance sheet by *significantly reducing the number of long-term warrants and adding significant new cash*. We expect to end the year with a very healthy cash balance as we transition to positive cash generation through the end of this year and going forward to next year. We are also very pleased with the level and quality of investor support and very excited to have new, high quality investors added as owners of Amyris."  This much needed financing was facilitated by the artificially inflated stock price, which was in turn propped up by Amyris's inflated financial results.

92.     Defendants were also personally motivated to exaggerate the Company's royalty revenues.  Under the Company's bonus plan, Defendants Melo and Valiasek were eligible to receive substantial bonuses based on Amyris's achievement of certain performance metrics, with Defendant Melo eligible for a cash bonus of up to 100% of his annual base salary, and Defendant Valiasek eligible for a cash bonus of up to 40% of her annual base salary.  The most significant performance metric under the bonus plan for 2017 was the Company's achievement of GAAP revenue, which was weighted 40%, with the other factors being technical milestone dollars received (weighted 30%), production costs (weighted 15%) and cash operating expenditures (weighted 15%).  Thus, based substantially on the Company's performance (namely GAAP revenue) in 2017, Defendant Melo received a bonus of $581,948 (more than 100% of his annual salary) while Defendant Valiasek received a bonus of $163,085 (more than 40% her annual salary).  For 2018, the Company changed its bonus plan in a way that made executive bonuses dependent on the achievement of two performance metrics for each quarter: GAAP revenue, (weighted 50%) and gross margin (primarily driven by royalty revenues, according to Defendants, *see* ¶44, *supra*) (weighted 50%).[12]  This change placed substantial importance on the Company's reported royalty revenues.  These potential bonuses, dependent largely on the Company's reported

_____

[12] Under the bonus plan, 12.5% was allocated for each quarter and 50% was allocated for the annual period.

revenues, and royalty revenues in particular, incentivized Defendants Melo and Valiasek to knowingly or recklessly inflate the Company's reported revenue, including royalty revenue.

93.     Additionally, Defendant Melo sold 27,550 shares of his personally held Amyris stock during the Class Period for proceeds of $186,655.55.  Defendant Melo's sales were timed when Amyris's stock was artificially inflated, with sales on July 16, 2018 and October 15, 2018, when Amyris stock traded at or near all-time highs of $6.61 per share and $7.50 per share, respectively.  Defendant Melo's sales were unusual compared to his previous trading history, with his *only* other sale within the last five years occurring on January 16, 2018 for proceeds of $83,172.  Defendant Melo was not the only Company insider to make strategically timed stock sales during the Class Period.  In addition to Defendant Melo, Amyris director John Doerr[13] sold 4,877,386 shares of his personally held Amyris stock (represented 37.52% of his holdings) during the Class Period for proceeds of over $30.33 million, and Amyris director Frank Kung[14] sold 3,924,884 of his personally held Amyris stock (representing 41.3% of his holdings) during the Class Period for proceeds of nearly $24.41 million.

## IX.     CLASS ACTION ALLEGATIONS

94.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Amyris securities between March 15, 2018 and April 11, 2019, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

95.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Amyris's common shares actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and

---

[13] The sales were by Foris Ventures, LLC, for which Doerr indirectly holds all of the membership interests.

[14] These sales were by Vivo Capital VIII, LLC, of which Kung is a voting member.

can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class.  Millions of Amyris common stock were traded publicly during the Class Period on the NASDAQ.  Record owners and other members of the Class may be identified from records maintained by Amyris or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

96.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

97.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

98.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Amyris; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

99.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## X.   LOSS CAUSATION

100.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.  During the Class Period, Plaintiffs and the Class purchased Amyris's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.  *See* ¶¶69, 75, 77, *supra*.

## XI.   APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

101.    The market for Amyris's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Amyris's securities traded at artificially inflated prices during the Class Period.   On October 9, 2018, the Company's share price closed at a Class Period high of $9.20 per share. Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Amyris's securities and market information relating to Amyris, and have been damaged thereby.

102.    During the Class Period, the artificial inflation of Amyris's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint, causing the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Amyris's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Amyris and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

103.   At all relevant times, the market for Amyris's securities was an efficient market for the following reasons, among others:

(a)   Amyris shares met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)   As a regulated issuer, Amyris filed periodic public reports with the SEC and/or the NASDAQ;

(c)   Amyris regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)   Amyris was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

104.   As a result of the foregoing, the market for Amyris's securities promptly digested current information regarding Amyris from all publicly available sources and reflected such information in Amyris's share price. Under these circumstances, all purchasers of Amyris's securities during the Class Period suffered similar injury through their purchase of Amyris's securities at artificially inflated prices and a presumption of reliance applies.

105.   A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects-information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the

52

1    importance of the Class Period material misstatements and omissions set forth above, that
2    requirement is satisfied here.

3                              **XII.   NO SAFE HARBOR**

4          106.    The statutory safe harbor provided for forward-looking statements under certain
5    circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.
6    The statements alleged to be false and misleading herein all relate to then-existing facts and
7    conditions. In addition, to the extent certain of the statements alleged to be false may be
8    characterized as forward-looking, they were not identified as "forward-looking statements" when
9    made, and there were no meaningful cautionary statements identifying important factors that
10   could cause actual results to differ materially from those in the purportedly forward-looking
11   statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to
12   any forward-looking statements pleaded herein, Defendants are liable for those false forward-
13   looking statements because at the time each of those forward-looking statements was made, the
14   speaker had actual knowledge that the forward-looking statement was materially false or
15   misleading, and/or the forward-looking statement was authorized or approved by an executive
16   officer of Amyris who knew that the statement was false when made.

17                             **XIII.   FIRST CLAIM**

18          **Violation of Section 10(b) of The Exchange Act and**
            **Rule l0b-5 Promulgated Thereunder Against All Defendants**
19

20         107.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully
21   set forth herein.

22         108.    During the Class Period, Defendants carried out a plan, scheme and course of
23   conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing
24   public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs
25   and other members of the Class to purchase Amyris's securities at artificially inflated prices. In
26   furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant,
27   took the actions set forth herein.

28

109.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Amyris's securities in violation of Section 10(b) of the Exchange Act and Rule l0b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

110.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Amyris's financial well-being and prospects, as specified herein.

111.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and as alleged herein engaged in acts, practices, and a course of conduct in an effort to assure investors of Amyris's value and performance and continued substantial growth.  As set forth more particularly herein, this course of conduct, included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Amyris and its business operations and future prospects in light of the circumstances under which they were made, not misleading, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

112.     Each of the Defendants' primary liability and controlling person liability arises from the following facts: (i) Defendants Melo and Valiasek were high-level executives (with Defendant Melo also serving as a directors at the Company) during the Class Period and members of the Company's management team or had control thereof; (ii) Defendants Melo and Valiasek, by virtue of their responsibilities and activities as senior officers and/or director of the Company, were privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or financial reports; (iii) Defendants Melo and Valiasek

54

1   had access to, other members of the Company's management team, internal reports and other data

2   and information about the Company's finances, operations, sales, accounting practices, and

3   internal controls at all relevant times; and (iv) Defendants Melo and Valiasek were aware of the

4   Company's dissemination of information to the investing public which they knew and/or

5   recklessly disregarded was materially false and misleading.

6       113.    Defendants had actual knowledge of the misrepresentations and/or omissions of

7   material facts set forth herein, or acted with reckless disregard for the truth in that they failed to

8   ascertain and to disclose such facts, even though such facts were available to them. Such

9   Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and

10  for the purpose and effect of concealing Amyris's financial well-being and prospects from the

11  investing public and supporting the artificially inflated price of its securities. As demonstrated by

12  Defendants' overstatements and/or misstatements of the Company's business, operations,

13  financial well-being, and prospects throughout the Class Period, Defendants, if they did not have

14  actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to

15  obtain such knowledge by deliberately refraining from taking the steps necessary to discover

16  whether those statements were false or misleading.

17      114.    As a result of the dissemination of the materially false and/or misleading

18  information and/or failure to disclose material facts, as set forth above, the market price of

19  Amyris's securities was artificially inflated during the Class Period. In ignorance of the fact that

20  market prices of the Company's securities were artificially inflated, and relying directly or

21  indirectly on the false and misleading statements made by Defendants, or upon the integrity of the

22  market in which the securities trades, and/or in the absence of material adverse information that

23  was known to or recklessly disregarded by Defendants, but not disclosed in public statements by

24  Defendants during the Class Period, Plaintiffs and the other members of the Class acquired

25  Amyris's securities during the Class Period at artificially high prices and were damaged thereby.

26      115.    At the time of said misrepresentations and/or omissions, Plaintiffs and other

27  members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs

28  and the other members of the Class and the marketplace known the truth regarding the problems

55

that Amyris was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Amyris securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

116.   By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

117.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## XIV.   SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act
### Against Defendants Melo and Valiasek

118.   Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

119.   Defendants Melo and Valiasek acted as controlling persons of Amyris within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Defendants Melo and Valiasek had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company.  This included the content and dissemination of the various statements, which Plaintiffs contend are false and misleading. Defendants Melo and Valiasek had control over, were provided with, or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

120.   In particular, Defendants Melo and Valiasek had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control

1  or influence the particular transactions giving rise to the securities violations as alleged herein,
2  and exercised the same.

3      121.   As set forth above, Amyris and Defendants Melo and Valiasek each violated
4  Section l0(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue
5  of their position as controlling persons, Defendants Melo and Valiasek are liable pursuant to
6  Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful
7  conduct, Plaintiffs and other members of the Class suffered damages in connection with their
8  purchases of the Company's securities during the Class Period.

9                          **XV.   PRAYER FOR RELIEF**

10     WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

11     (a)    Determining that this action is a proper class action under Rule 23 of the Federal
12  Rules of Civil Procedure;

13     (b)    Awarding compensatory damages in favor of Plaintiffs and the other Class
14  members against all defendants, jointly and severally, for all damages sustained as a result of
15  Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

16     (c)    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in
17  this action, including counsel fees and expert fees; and

18     (d)    Such other and further relief as the Court may deem just and proper.

19                      **XVI.   JURY TRIAL DEMANDED**

20  Plaintiffs hereby demand a trial by jury.

21

22

23

24

25

26

27

28

57

1 | Dated: September 13, 2019

Respectfully submitted,

2

/s/William B. Federman
William B. Federman (admitted *pro hac vice*)
3
A. Brooke Murphy (admitted *pro hac vice*)
FEDERMAN & SHERWOOD
4
10205 North Pennsylvania Avenue
5
Oklahoma City, Oklahoma 73120
Tel: (405) 235-1560/Fax: (405) 239-2112
6
-and-
212 W. Spring Valley Road
7
Richardson, TX  75081
8
wbf@federmanlaw.com
abm@federmanlaw.com

9

*Lead Counsel for Plaintiffs*
10

11
Robert S. Green
GREEN & NOBLIN, P.C.
12
2200 Larkspur Landing Circle, Ste. 101
Larkspur, California 94939
13
Tel: (415) 477-6700/Fax: (415) 477-6710
-and-
14
4500 East Pacific Coast Highway
Fourth Floor
15
Long Beach, CA 90804
rsg@classcounsel.com
16

17
*Liaison Counsel for Plaintiffs*

18

19

20
**CERTIFICATE OF SERVICE**

21
     I hereby certify that this document was filed through the ECF system and will be sent

22
electronically to the registered participants as identified on the Notice of Electronic Filing (NEF),

23
and paper copies will be sent to those indicated as non-registered participants on Friday,

24
September 13, 2019.

25
/s/William B. Federman
William B. Federman
26

27

28

AMENDED CLASS ACTION COMPLAINT                         FILE NO. 4:19-cv-01765-YGR