Robert S. Green
GREEN & NOBLIN, P.C.
2200 Larkspur Landing Circle, Ste. 101
Larkspur, California 94939
Tel: (415) 477-6700
Fax: (415) 477-6710
-and-
4500 East Pacific Coast Highway
Fourth Floor
Long Beach, California 90804
Tel: (562) 391-2487
rsg@classcounsel.com

*Liaison Counsel for Plaintiffs*

William B. Federman (admitted *pro hac vice*)
A. Brooke Murphy (admitted *pro hac vice*)
FEDERMAN & SHERWOOD
10205 N. Pennsylvania Ave.
Oklahoma City, OK 73120
Telephone:  405-235-1560
Facsimile:  405-239-2112
wbf@federmanlaw.com
abm@federmanlaw.com

*Lead Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHANE MULDERRIG and RONY DEVORAH, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>AMYRIS, INC., JOHN G. MELO, and KATHLEEN VALIASEK,<br><br>Defendants. | Case No.:  3:19-cv-01765-YGR<br><br>**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>Date:  January 21, 2020<br>Time:  2:00 p.m.<br>Courtroom:  1<br>Judge:  Hon. Yvonne Gonzalez Rogers |

# TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT.................................................................................1

II.   STATEMENT OF FACTUAL ALLEGATIONS................................................1

III.  THE COMPLAINT SATISFIES THE APPLICABLE PLEADING STANDARDS ............3

IV.   THE COMPLAINT SUFFICIENTLY PLEADS THAT DEFENDANTS MADE
      MATERIALLY FALSE OR MISLEADING STATEMENTS ...............................................3

      A.    Defendants' Statements Touting Financial Results and Revenues ........................3

      B.    Defendants' Statements About Royalty Revenue Accounting and ASC 606 ........6

      C.    Defendants Fail to Demonstrate That Their Royalty Revenue and
            Accounting Statements Are Inactionable ................................................................8

            1.    Defendants' Truth-On-The-Market Defense Is Unsuccessful....................8

            2.    Defendants' Statements Are Not Protected by the Safe Harbor .............10

      D.    Statements Regarding Amyris's Internal Control Over Financial Reporting ......14

V.    PLAINTIFFS HAVE ALLEGED A STRONG INFERENCE OF SCIENTER...................16

      A.    The Totality of the Allegations Support a Strong Inference of Scienter.............16

            1.    Defendants Had Access to Facts Contradicting Their Statements ..........17

            2.    Knowledge Can Be Imputed to Defendants ...........................................19

            3.    Defendants Were Motived to Report Favorable Financial Results..........22

VI.   PLAINTIFFS SUFFICIENTLY ALLEGE CONTROL PERSON LIABILITY..................25

VII.  CONCLUSION ..................................................................................................25

i

# TABLE OF AUTHORITIES

**Cases**

*Aldridge v. A.T. Cross Corp.*,

284 F.3d 72 (1st Cir. 2002) ...............................................................................................19

*Backe v. Novatel Wireless, Inc.*,

642 F. Supp. 2d 1169 (S.D. Cal. 2009) .............................................................................25

*Basic Inc. v. Levinson*,

485 U.S. 224 (1988) ........................................................................................................1, 7

*Bell Atl. Corp. v. Twombly*,

550 U.S. 544 (2007) .............................................................................................................3

*Berson v. Applied Signal Technology, Inc.*,

527 F.3d 982 (9th Cir. 2008) ....................................................................................7, 10, 19

*Brody v. Transitional Hospital Corp.*,

280 F.3d 997 (9th Cir. 2002) .............................................................................................3, 4

*Brown v. China Integrated Energy, Inc.*,

875 F. Supp. 2d 1096 (C.D. Cal. 2012) ............................................................................22

*City of Miami Gen. Employees' & Sanitation Employees' Ret. Tr. v. RH, Inc.*,

302 F. Supp. 3d 1028 (N.D. Cal. 2018) ...........................................................................4, 5

*Diaz v. Intuit, Inc.*,

2018 WL 2215790 (N.D. Cal. May 15, 2018) ....................................................................9

*Gebhart v. SEC*,

595 F.3d 1034 (9th Cir. 2010) ...........................................................................................17

*Glazer Capital Mgmt. v. Magistri*,

549 F.3d 736 (9th Cir. 2008) .............................................................................................22

*Howard v. Everex Sys., Inc.*,

228 F.3d 1057 (9th Cir. 2000) .....................................................................................21, 23

Plaintiffs' Memorandum of Law in Opposition
to Defendants' Motion to Dismiss                                    FILE NO. 3:19-cv-01765-YGR

*In re Amgen Inc. Sec. Litig.*,

    544 F. Supp. 2d 1009 (C.D. Cal. 2008) ..................................................................................6

*In re ArthroCare Corp. Sec. Litig.*,

    726 F. Supp. 2d 696 (W.D. Tex. 2010) ................................................................................21

*In re Atossa Genetics Inc Sec. Litig.*,

    868 F.3d 784 (9th Cir. 2017) ................................................................................................5

*In re BofI Holding, Inc. Sec. Litig.*,

    No. 3:15-CV-02324, 2017 WL 2257980 (S.D. Cal. May 23, 2017) .....................................25

*In re Celera Corp. Sec. Litig.*,

    2013 WL 4726097 (N.D. Cal. Sept. 3, 2013) ......................................................................13

*In re Daou Sys., Inc.*,

    411 F.3d 1006 (9th Cir. 2005) ...............................................................................5, 9, 17, 18

*In re Immune Response Sec. Litig.*,

    375 F. Supp. 2d 983 (S.D. Cal. 2005) .................................................................................10

*In re Mannkind Sec. Actions*,

    835 F. Supp. 2d 797 (C.D. Cal. 2012) .................................................................................23

*In re Maxwell Techs., Inc. Sec. Litig.*,

    18 F. Supp. 3d 1023 (S.D. Cal. 2014) .................................................................................23

*In re Nuvelo, Inc. Sec. Litig.*,

    668 F. Supp. 2d 1217 (N.D. Cal. 2009) ..............................................................................13

*In re Quality Sys., Inc. Sec. Litig.*,

    865 F.3d 1130 (9th Cir. 2017) ..................................................................................10, 12, 14

*In re Software Toolworks*,

    50 F.3d 615 (9th Cir. 1994) ................................................................................................21

*In re Time Warner Sec. Litig.*,

    9 F.3d 259 (2d Cir. 1993) ...................................................................................................23

iii

*In re Verifone Holdings, Inc. Sec. Litig.*,

704 F.3d 694 (9th Cir. 2012) ...................................................................................17

*Lopez v. Smith*,

203 F.3d 1122 (9th Cir. 2000) .................................................................................25

*Lormand v. US Unwired, Inc.*,

565 F.3d 228 (5th Cir. 2009) ..................................................................................7, 8

*Mallen v. Alphatec Holdings, Inc.*,

861 F. Supp. 2d 1111 (S.D. Cal. 2012) ...................................................................13

*Nakkhumpun v. Taylor*,

782 F.3d 1142 (10th Cir. 2015) ...............................................................................19

*No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,

320 F.3d 920 (9th Cir. 2003) ...................................................................1, 12, 16, 25

*Northpoint Comm Group, Inc,. Sec. Litig.*,

221 F.Supp. 2d 1090 (N.D. Cal. 2002).....................................................................20

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,

380 F.3d 1226 (9th Cir. 2004) ....................................................................17, 18, 24

*Omnicare, Inc. v. Laborers Dist. Council Const. Industry*,

135 S.Ct. 1318 (2015) ...........................................................................................3, 16

*Plumbers Union Local No. 12 Pension Fund v. Ambassador's Grp.*,

717 F. Supp. 2d 1170 (E.D. Wash. 2010) ................................................................13

*Provenz v. Miller*,

102 F.3d 1478 (9th Cir. 1996) ...............................................................................9, 10

*Reese v. Malone*,

747 F.3d 557 (9th Cir. 2014) ...................................................................3, 19, 20, 24

*S. Ferry LP #2 v. Killinger*,

687 F. Supp. 2d 1248 (W.D. Wash. 2009) ..........................................................18, 22

iv

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,

  551 U.S. 308 (2007) ......................................................................................................3

*Thomas v. Magnachip Semiconductor Corp.*,

  167 F. Supp. 3d 1029 (N.D. Cal. 2016)........................................................19, 20, 24

*Virginia Bankshares v. Sandberg*,

  510 U.S. 1083 (1991) ..................................................................................................10

*Weiss v. Amkor Technology, Inc.*,

  527 F.Supp.2d 938 (D.Ariz. 2007) .............................................................................21

*Yanek v. Staar Surgical Co.*,

  388 F. Supp. 2d 1110 (C.D. Cal 2005).................................................................14, 16

*Zucco Partners, LLC v. Digimarc Corp.*,

  552 F.3d (9th Cir. 2009) .......................................................................................18, 19

**Statutes**

15 U.S.C. § 78u-5(c)(1)........................................................................................................13

15 U.S.C. § 78u-5(c)(1)(A)(i) .............................................................................................14

15 U.S.C. § 78u-5(c)(1)(B) ..................................................................................................14

v

Lead Plaintiff Rob Jansen and Plaintiff Vincent Carbone (collectively "Plaintiffs") submit this Memorandum in Opposition to Defendants' Motion to Dismiss and Memorandum in Support (Dkt. No. 45) ("Def. Mem.").

## I.   PRELIMINARY STATEMENT

In the Amended Class Action Complaint ("Complaint") (Dkt. No. 43), Plaintiffs assert Section 10(b) and 20(a) claims on behalf of purchasers of Amyris, Inc. ("Amyris" or the "Company") securities during the period March 15, 2018 and April 11, 2019, inclusive (the "Class Period").  Defendants are Amyris, John G. Melo ("Melo") Amyris's Chief Executive Officer ("CEO"), and Kathleen Valiasek ("Valiasek") Amyris's former Chief Financial Officer ("CFO").

In their Motion to Dismiss, Defendants quickly paint themselves as the victims and assert that the enactment of the Private Securities Litigation Reform Act of 1995 (the "PSLRA") changed the operation of the federal securities laws so as to "protect companies like Amyris." Def. Mem. at 1.  In truth, however, it is well recognized that, even after the enactment of the PSLRA, the federal securities laws serve the legitimate and important function of protecting "the welfare of *victimized investors* and the integrity of the stock market[.]"  *No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920 (9th Cir. 2003) (emphasis added); *see also Basic Inc. v. Levinson*, 485 U.S. 224, 230 (1988) ("'There cannot be honest markets without honest publicity.'") (internal citation omitted).  It is on these grounds that Plaintiffs, who suffered significant financial losses, have filed the Complaint. The Complaint includes detailed allegations that raise meritorious claims of Defendants' violation of federal securities laws. *See* Section II, *infra*.

## II.   STATEMENT OF FACTUAL ALLEGATIONS

Amyris is an industrial biotechnology company that manufactures and sells products in health and wellness, clean beauty, and flavor and fragrance markets.  On January 1, 2018, Amyris began utilizing Accounting Standard Codification ("ASC") Topic 606, Revenue From Contracts with Customers ("ASC 606").  In most circumstances, the application of ASC 606 allows a business to recognize revenue when it delivers a product rather than upon receipt of payment.

1

Unknown to investors, however, Defendants used ASC 606 to report as recognized royalty revenues grossly *overstated estimations* of future royalty payments to be paid by third party DSM, based on product sales by third party Nenter. ¶¶23-32 ("¶¶" citations herein are to the Complaint). Defendants now admit that the *estimates* they recognized as revenue were uncertain and based on *virtually no information. See* ¶68 (Melo admitting "*[w]e have no visibility on the actual royalty*"); Def. Mem. at 2 and n.1 (conceding that Amyris "had *much less information* about what it would receive" as royalty payments and that "since Amyris had no control over the price at which Nenter sold its products or the quantity it sold, the *revenue Amyris would receive was inherently difficult to predict*"). Despite the fact that Defendants knew or recklessly ignored that their application of ASC 606 created highly speculative and significantly overestimated royalty revenue numbers, throughout the Class Period, Defendants falsely and misleadingly: touted Amyris's record financial results and growing revenues (¶¶44, 51, 59, 61-62, 67-68); assured that the revenue growth was real and sustainable (¶¶51, 59, 62); attributed the newly improved revenue numbers to the growing acceptance of Amyris's products (¶¶44, 51, 62, 67); claimed that the application of ASC 606 had no material impact on the financial results but actually *simplified* Amyris's financial reporting (¶¶44, 53); and attested that there were no undisclosed deficiencies in the Company's internal control over financial reporting (¶¶47-49, 55-58, 64-65, 70-71).

The true facts—and the risks associated with Defendants' materially false and misleading statements concerning Amyris's financial condition, inflated revenues, and internal control over financial reporting—began to reveal themselves and materialize on November 13, 2018, when Defendants announced severely disappointing third quarter royalty revenues that missed Defendants' previous projections by $15 million. The truth continued to emerge, culminating in the announcement on April 11, 2019, that Amyris had been operating with undisclosed material weaknesses in financial controls and that due to "a *material error* [that] was made *related to the estimates for recognizing revenue for royalty payments*," Amyris was restating its fiscal 2018 results to reduce revenue by at least $12 million and increase net loss by at least $7 million. As a result of these revelations, the price of Amyris's stock fell precipitously. ¶¶67-77.

## III. THE COMPLAINT SATISFIES THE APPLICABLE PLEADING STANDARDS

Defendants challenge the sufficiency of Plaintiffs' falsity and scienter allegations, but the Complaint satisfies the PSLRA' standards by pleading these elements "with particularity." *Reese v. Malone*, 747 F.3d 557, 568-69, 580-81 (9th Cir. 2014). Further, when viewed as a whole and construed in the light most favorable to Plaintiffs, as required at this stage, the Complaint *plausibly* alleges violations of securities laws. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (must plead *plausible* allegations that, when assumed true, "raise a right to relief above a speculative level"); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007) (scienter claims "need not be…the most plausible" but "must be cogent and compelling").

## IV. THE COMPLAINT SUFFICIENTLY PLEADS THAT DEFENDANTS MADE MATERIALLY FALSE OR MISLEADING STATEMENTS

While Defendants consistently argue that their statements were literally accurate and therefore not actionable (Def. Mem. at 8-11), this proposition lacks legal support. The Supreme Court has definitively held that "*literal accuracy is not enough*: an issuer must as well desist from misleading investors by saying one thing and holding back another." *Omnicare, Inc. v. Laborers Dist. Council Const. Industry,* 135 S.Ct. 1318, 1331 (2015) (emphasis added). Indeed, a statement is actionably false or misleading if it would give a reasonable investor "an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hospital Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). As described in Section II, *supra*, and as set forth further below, Defendants repeatedly issued statements that did just this.

### A. Defendants' Statements Touting Financial Results and Revenues

Throughout the Class Period, Defendants trumpeted the dramatically improved financial results. At *no time*, however, did Defendants disclose that these results were achieved only because Defendants were, for the first time, recognizing as revenue their *uninformed guess* of what royalty payments would be, nor did Defendants disclose that the reported royalty revenues were materially uncertain and thus particularly susceptible to reversal. Instead, Defendants touted:

■ "[We have] started 2018 with continued *strong growth in revenues*" (Melo – Mar. 15, 2018, ¶42).

3

- ◼ "2018 is starting off very well with *very strong gross operating performance and revenue that will be around double the first quarter of 2017*" (Melo – Mar. 15, 2018, ¶44)

- ◼ "Our product related *royalty revenue* (previously referred to as value share) *delivered $11.4 million of 100% gross margin related revenue*." (Amyris – May 14, 2018, ¶50)

- ◼ "*Our royalty payments*, which we used to call value share *from products delivered was $11.4 million in the first quarter versus $225,000 for the same period last year. This is a strong indication of the underlying performance of our products in their respective end markets and the sustainability of our differentiated and advantaged business model.*" (Melo – May 14, 2018, ¶51)

- ◼ "*[W]e have the most profitable product portfolio in our industry with an anticipated gross margin of around 70% for the year.  And we blew through that in the first quarter*, as you know, *based on the mix of products that we sold in the first quarter.*" (Melo – May 22, 2018, ¶59)

- ◼ "*We delivered much better revenue in the first half of 2018, much stronger gross margin, lower cost and continued our improvement in net income. Our strategy of delivering strong, profitable growth is working, and we expect a very strong second half to build on the momentum of the first half.*" (Melo – Aug. 6, 2018, ¶61)

- ◼ "*First half of 2017, we had 19% non-GAAP gross margin. In the first half of 2018, we are at 84% non-GAAP gross margin, the second quarter also at the 84% gross margin level. We delivered most of this first half performance on the back of* our Clean Beauty business, the *value share/royalty payments* and collaborations. … *Our royalty/value share is continuing to do well*, and our Clean Beauty business is growing faster than we expected." (*Id.*)

These statements, and others (*see* ¶¶42-71),[1] were  materially misleading because they suggested that the reported revenue results were, indeed, *results* that were known and certain (as they had been prior to the Class Period).  This misleading impression is clear from statements such: "*[o]ur product related royalty revenue (previously referred to as value share) delivered $11.4 million of 100% gross margin related revenue*" (¶50); "*[w]e delivered much better revenue in the first half of 2018*" (¶61); and "*[w]e delivered most of this first half performance on the back*

---

[1] The Complaint sets out additional materially false and misleading statements other than those discussed herein, several of which Defendants do not challenge.  To the extent the Court deems the statements discussed herein to be sufficient to state a claim, the Court need not consider the other statements. *City of Miami Gen. Employees' & Sanitation Employees' Ret. Tr. v. RH, Inc.*, 302 F. Supp. 3d 1028, 1041, n.7 (N.D. Cal. 2018).

4

*of … the value share/royalty payments*" (¶61).  *See In re Atossa Genetics Inc Sec. Litig.*, 868 F.3d 784, 801 (9th Cir. 2017) (finding defendant's "use of the past tense: 'achieved' [and] 'obtained'" implied "that he spoke of events that had already happened, *i.e.*, that FDA clearance risk had already been achieved.").

Similarly misleading were Defendants' assertions that the royalty revenues were sustainable and based on actual payments from increased products sold.  For example: "*Our royalty payments…from products delivered was $11.4 million in the first quarter versus $225,000 for the same period last year*. This is a *strong indication of the underlying performance of our products* in their respective end markets *and the sustainability* of our differentiated and advantaged business model*" (¶51); and "*we blew through [our gross margin target, largely consisting of royalty revenue] in the first quarter*, as you know, *based on the mix of products that we sold in the first quarter*" (¶59).  *See City of Miami Gen. Employees' & Sanitation Employees' Ret. Tr. v. RH, Inc.*, 302 F. Supp. 3d 1028, 1039-40 (N.D. Cal. 2018) (Gonzalez, Rogers, J.) (finding statements that "led the market to believe the RH's inventory growth was driven by the launch of RH Modern and inventory investments regarding same" were materially misleading since "inventory growth was actually the result of non-Modern product returns").

In truth, the record revenues Defendants were reporting were *blind predictions* of future, as yet attained, royalty payments.  Indeed, Defendants have now admitted that Amyris had "*no visibility on the actual royalty*" (¶68), had "*much less information about what it would receive*" as royalty payments (Def. Mem. at 2), and "since Amyris had no control over the price at which Nenter sold its products or the quantity it sold, *the revenue Amyris would receive was inherently difficult to predict*." (*id.* at n.1).[2]  But this is *not* what Defendants disclosed to investors.  To the contrary, Defendants reported and repeatedly touted the improved financial results *without qualification*.  *See In re Daou Sys., Inc.*, 411 F.3d 1006, 1019-20 (9th Cir. 2005) (finding

---

[2] ASC 606 explicitly warns that these circumstances will increase the likelihood of revenue reversal, and provides that revenue should be recognized only when "it is probable that a significant reversal in amount…will *not* occur[.]" ¶¶28-29, 32.

5

"reporting statements" materially misleading since "systematically recognizing a set amount of revenues before such percentage of labor had been performed…could violate other GAAP principles" and "is not minor or technical in nature").

*At minimum*, it was materially false or misleading for Defendants to claim that the improved revenues were sustainable and based on actual demand but *without* explaining that Defendants lacked needed information when they reported the revenues, that the revenue numbers were materially uncertain, and that the actual royalty payments Amyris would eventually receive were likely to significantly differ from the reported numbers. *See In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1030 (C.D. Cal. 2008) ("Rule 10b-5 'imposes a duty to disclose material facts that are necessary to make disclosed statements . . . not misleading.'") (citation omitted).

**B.      Defendants' Statements About Royalty Revenue Accounting and ASC 606**

While Defendants claim that they "went to great pains to attempt to explain how the new accounting rule would work" (Def. Mem. at 9), this is simply untrue.  Instead, Defendants actively misrepresented the impact and significance of Amyris's application of ASC 606.

For example, Defendants described the change to Amyris's financial reporting for licensing and royalty revenue as essentially a "labeling" change that was being done to "simplify" the reporting of the financial results:

■ "*[W]e are also <u>simplifying</u> how we talk about our business model and <u>how we report our results</u>.… This [value share] has become very material faster than we expected, and we will now be reported -- reporting separately and <u>labeling these as license and royalties</u>. When you see this line in our GAAP results, this is mostly value share and <u>represents the revenue we receive</u> from partners as our share of the value we create when our customers and partners use our product in their formulations.*" (Melo – Mar. 15, 2018, ¶44)

■ "*Q1 2018 GAAP revenue was $23 million, up 77% over $13 million for the first quarter of 2017.  As a reminder, on our Q4 2017 teleconference, we noted that due to the growth of our royalty or value share revenues, for Q4 onward, we <u>begin reporting them on a separate line item as license and royalty revenues</u>.*" (Valiasek – May 14, 2018, ¶51)

These innocuous explanations for what was a *significant* change to the Company's accounting for royalty revenues were materially misleading because they failed to disclose the

6

material fact that Amyris had changed *what* it was reporting as royalty revenue, *i.e.,* it was now reporting uninformed and uncertain *estimates* of *future* payments instead of (its prior practice of) reporting royalty revenues when payments were received. *See Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (a statement is materially misleading if "the *disclosure of the omitted* fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.") (emphasis added). By speaking about the change to Amyris's reporting of royalty revenues, Defendants were required to disclose these material facts to make their statements not misleading. *Berson v. Applied Signal Technology, Inc.,* 527 F.3d 982, 987 (9th Cir. 2008) ("[O]nce defendants chose to tout the company's backlog, they were bound to do so in a manner that wouldn't mislead investors…."); *Lormand v. US Unwired, Inc.,* 565 F.3d 228, 248-49 (5th Cir. 2009) ("Once the defendants engaged in public discussions concerning the benefits of Type II affiliation and the no-deposit programs, they had a duty to disclose a 'mix of information' that is not misleading."). Defendant Melo even defined the licenses and royalty revenue line as "the revenue *we receive* from partners" (¶44), thereby suggesting this amount was certain and known while *omitting* that the royalty line actually represents the *estimated future* royalty payments (which Defendants were predicting based on very limited information).

Even when Defendants were *specifically asked* about the impact of ASC 606 to the financial results, Defendants definitely stated (three times) that the impact was "*de minimis*":

- ■ CARTER WILLIAM DRISCOLL: …. *ASC 606, any impact there*, Kathy?

  VALIASEK: *There is a de minimis impact*, Carter, interesting question, *a de minimis impact for us*. Though you can read about it in our 10-Q, but *it's relatively de minimis*. (May 14, 2018, ¶53)

When the analyst followed up to ask about "the timing of royalty recognition versus product recognition," Defendants provided the following relevant statements:

- ■ "So rolling forward, anything that we're -- any product where we are manufacturing and the royalty revenue will be recognized when we actually ship the product, whereas the *royalty revenue under the DSM and Nenter agreement is recognized when Nenter is selling into the market*." (Valiasek)

- ■ "[W]e used to wait for the payment and then book. And *now we can actually book when we ship the product out the door. That's the big change* around and

7

Plaintiffs' Memorandum of Law in Opposition
to Defendants' Motion to Dismiss

it's really around the flavor and fragrance space that we do that quite a bit." (Melo) (May 14, 2018, ¶53)

These statements were materially misleading because the impact of ASC 606 was not "de minimis" but was in fact significant, and *the application of ASC 606 amounted to far more than mere timing*.  To be sure, Defendants applied ASC 606 not simply to accelerate the recognition of a *known* payment amount; instead, Defendants recognized *estimated* revenue payments before they had information about what the actual *amount* of the royalty payment would be.

In their Motion, Defendants concede that the royalty revenues they reported were uninformed predictions of future revenues.  *See* Def. Mem. at 2 ("[B]ecause [Amyris] was not actually supplying the farnesene, it *had much less information about what it would receive* and was required to estimate the revenue it would receive in a given quarter"); *id.* at 2, n.1 ("[S]ince *Amryis had no control over the price* at which Nenter sold its products *or the quantity* it sold, the *revenue Amyris would ultimately receive was inherently difficult to predict*.").  Defendants, however, would have the Court believe that investors were informed of this.  *See id.* (claiming that "Amyris repeatedly emphasized" these facts but citing *no* statements).  In truth, the facts set out in their Motion are precisely what Defendants did *not disclose* to investors when they discussed ASC 606, how it was being applied, and the significance of its application.

**C.    Defendants Fail to Demonstrate That Their Royalty Revenue and Accounting Statements Are Inactionable**

**1.    Defendants' Truth-On-The-Market Defense Is Unsuccessful**

Defendants repeatedly point to Amyris's disclosure of the financial results without the application of ASC 606.  Def. Mem. at 2-3, 9.  Here, Defendants appear to argue that their other statements during the Class Period could not have been materially false or misleading because the truth was "on the market."  However, based on Defendants' explanation to investors that ASC 606 merely allowed Amyris to recognize revenue *earlier* (¶53), a reasonable investor would view the royalty numbers without ASC 606 as showing only that Amyris had not yet received what it was owed.  *See* Def. Mem. at 9.  That is all it would reveal to investors; *not* that Amyris was using the new rule to report uninformed predictions of future royalty payments as recognized revenue,

8

and *not* that the actual *amount* of royalty revenue was entirely uncertain. This is analogous to the situation in *In re Daou Sys., Inc.*, 411 F.3d 1006 (9th Cir. 2005), in which the Court reasoned: "What defendants' disclos[ed]—that revenue was sometimes being recognized before the customer was billed—does not reveal is that defendants were recognizing revenue before it was even earned. An investor would read defendants' disclosure of revenues 'recognized' as meaning that the excess revenues recognized were at the very least earned." *Id.* at 1018-19. Accordingly, Defendants' incomplete disclosures are of little to no import. *See Provenz v. Miller*, 102 F.3d 1478, 1492-93 (9th Cir. 1996) (rejecting defendants' truth-on-the-market argument where the purportedly corrective disclosures lacked material information).

Further, Defendants fail to demonstrate that the disclosure of the non-ASC 606 revenues—made only *twice* and buried within Amyris's lengthy and technical Amyris's Forms 10-Q1 and Q2—were "transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance" their *repeated* misleading discussions of the inflated ASC 606 revenue numbers in press releases, earnings calls, presentations, and the Form 10-Qs. *Provenz*, 102 F.3d at 1492-93 ("[B]efore the 'truth-on-the-market' doctrine can be applied, the defendants must prove that the information that was withheld or misrepresented was *transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression*" created by defendants' misrepresentations). In fact, while Defendants claim that they "never tried to hide" the fact that ASC 606 "made a difference to its calculations" and "placed it front and center in its public disclosure and regulatory filings" (Def. Mem. at 3), Amyris's disclosure of its revenue numbers without the application of 606 was *not* done in an attempt to inform investors; rather, it was done because ASC 606 *required* Amyris to include this in its Forms 10-Q. ASC 606-10-65-1(i)(1).[3] Thus, Defendants' disclosures were decidedly minimal.

_____

[3] *See also* IPO Hub, *ASC 606 Adoption Considerations* ("ASC 606 requires that you include a disclosure presenting your financial statements as if you had not adopted [ASC 606]….") (https://www.ipohub.org/asc-606-adoption-considerations/). The Court may take judicial notice of this publicly available source. *Diaz v. Intuit, Inc.*, 2018 WL 2215790, at *3 (N.D. Cal. May 15, 2018) ("Publically accessible websites and news articles are proper subjects of judicial notice.").

9

Plaintiffs' Memorandum of Law in Opposition
to Defendants' Motion to Dismiss                                    FILE NO. 3:19-cv-01765-YGR

Defendants also point to Melo's statement on August 6, 2018 that "[t]his [Vitamin E] market is a very volatile market, and we have no control over the price Nenter sells into this market." Def. Mem. at 10. However, Defendant Melo was discussing the revenue *guidance* for the second half of the year—*not* the royalty revenue that Defendants were recognizing in their financial *results*. ¶62. And even for royalty revenue forecasts, Defendant Melo offered the assurance that "[w]e have been very effective at predicting market prices to date," when this was not true, as Defendants would later admit (¶76). Accordingly, Defendant Melo's statement that the volatile Vitamin E market as it might affect revenue *projections* falls well short of "exhaust[ing] the misleading conclusion's capacity to influence the reasonable shareholder." *Virginia Bankshares v. Sandberg*, 510 U.S. 1083, 1097 (1991).

Dismissal on the grounds of a truth-on-the-market defense "'is proper only if [defendants] show that no rational jury could find that the market was misled." *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1036 (S.D. Cal. 2005) (quoting *Provenz*, 102 F.3d at 1492-93). Thus, "[t]he defendants bear a heavy burden of proof." *Id.* Defendants' bare bones, and themselves materially omissive, disclosures can hardly be found to satisfy this "heavy burden."

### 2. Defendants' Statements Are Not Protected by the Safe Harbor

Defendants would have this Court dismiss all challenged statements that include or have proximity to financial guidances or revenue projections. Def. Mem. at 5-8 and n.2. However, the Ninth Circuit has made clear that "the safe harbor is not designed to protect companies and their officials when they knowingly make a materially false or misleading statement about current or past facts. Nor is the safe harbor designed to protect them when they make a materially false or misleading statement about current or past facts, and combine that statement with a forward-looking statement." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1142 (9th Cir. 2017), *cert. dismissed sub nom.*, 139 S. Ct. 589 (2018). Accordingly, "forward-looking statements made as part of mixed statements in which the non-forward-looking statements were materially false or misleading" are actionable under Rule 10b-5. *Id.* at 1146; *see also Berson,* 527 F.3d at 990 ("[D]escriptions of the present aren't forward-looking").

10

Here, Plaintiffs do not allege Defendants' statements were false because their predictions of future events were wrong, but because the statements misrepresented or omitted material past or present facts.  For example, Defendants stated:

- "[We] *have started 2018 with continued strong growth in revenues... Each of the[] markets is delivering strong, profitable growth* underpinned by the most advantaged technology in the sector…. We are very pleased with our performance and *expect another very strong year*" (Melo – Mar. 15, 2018 ¶42)

- "*We exceeded our guidance for the year of about 70% gross margin and delivered strong revenue growth…. This is what we considering growing sustainably, and we have very good visibility on continuing at this rate or better for the next several years.*" (Melo – May 14, 2018, ¶51)

- "*Non-GAAP gross profit was $19 million or 82.6% compared with negative $574,000 or negative 4.4% for Q1 2017.  This is an indicator of much improved margins going forward based on* product mix and *royalty revenue* as we work toward our goal of adjusted gross margin for 2018 of about 70%." (Valiasek – May 14, 2018, ¶51)

- AMIT DAYAL: "*And how should we sort of look into these royalty revenues going forward?* Will this kind of be steady state at this type of level or *will there be some variances depending on the end-market sales?*"

  MELO: "Yes. I mean, the way I would look at it, I think what we said in the last call is that we would generate around *$50 million to $60 million* of value share for the year, and that is the royalty line. *And that's what you should expect.* It won't be perfectly linear for the year, so you'll see some choppiness. But again, *for the full year, $50 million to $60 million*, I'd expect some choppiness, *but full year strong flows. No change.*" (Melo – May 14, 2018, ¶53)

- "*So great gross margin business.*  And it's a great gross margin business because a core part of that business in the near to medium term is *actually 100% margin payments*, or we used to call value share, *we now call it royalty, from DSM for some of our vitamin technology.…* So again, what are we seeing? *Sustainable growth. This is how we get to EBITDA positive in 2018 and the outer years*, okay. 83% non-GAAP gross margin versus last year same quarter, negative 4%.

  But if you take out of our run rate from Q1 2018, that $6 million where it's almost at the exact same run rate we were at for Q4 2017. So a lot of investors and analysts are saying to me, Okay, well the information that you're giving me, we're doing the math, we've said our EBITDA will be $10 million positive. *If we do the math, you're going to be even more than that. But what we wanted to do consistently is be conservative, make sure that we meet our numbers.*

11

*Here's our revenue growth. It's again, year over year amazing. We're expecting to do 185 to 195 in 2018. Again, gross margin at least 70% for 2018. And you'll see the same thing in 2019.*"  (Melo – May 22, 2018, ¶59)

■ "*[T]he percentage of that [DSM] royalty increases significantly* over the second half of this year and into next year and the year after. *The math is pretty simple*…. [T]he *royalty payment is significantly greater going into the second half and going into 2019 and 2020*." (Melo – May 22, 2018, ¶59)[4]

■ "*We are about where we expected to be at this point in the year* and expect a large trajectory in revenue for the second half…. In fact, *we anticipate that our quarterly revenues in Q3 and Q4 will be at some of the highest quarterly levels we've experienced* since executing the fuels business and *at much improved profitability*." (Valiasek – Aug. 6, 2018, ¶ 62)

Defendants' statements—affirming "strong growth in revenues" (¶42) (or "strong revenue growth", ¶51), with "good visibility on continuing at this rate or better for the next several years" (¶51), "much improved margins going forward based on…royalty revenue" (¶51), "sustainable growth" and "revenue growth…[that is] year over year amazing" with Defendants' assuring that their projections were "*conservative*" to "make sure that we meet our numbers" (¶59), and touting that "we anticipate that our quarterly revenues in Q3 and Q4 will be at some of the highest quarterly levels we've experienced" (¶69)—were materially false or misleading statements *about the reliability and sustainability of the Company's reported revenues*.

The Ninth Circuit in *In re Quality Sys., Inc. Sec. Litig.* considered strikingly similar statements, with defendants predicting a "'revenue range of growth of 21% to 24% for the year and an EPS growth of 29% to 33% for the year'" while "characterizing these predictions as 'quite conservative' given QSI's 'large' pipeline" and further describing "the pipeline as 'growing'[.]" 865 F.3d at 1147.  The Court held that these statements were not protected but were "non-forward-looking statements *about the state of QSI's sales pipeline*."  *Id.* at 1148 (emphasis added); *Am. West*, 320 F.3d at 937 (statements about the effects of past facts are not forward-looking).

---

[4] Defendants insist that this statement is inactionable because Melo was only describing the royalty *percentage* and was being technically accurate.  Def. Mem. at 10. However, a statement can be technically accurate but still misleading.  *Cooper v. Pickett*, 137 F.3d 616, 626 (9th Cir. 1998) (holding that allegations of "specific problems undermining a defendant's optimistic claims suffice to explain how the claims are false").

12

Plaintiffs' Memorandum of Law in Opposition
to Defendants' Motion to Dismiss                         FILE NO. 3:19-cv-01765-YGR

Even were the Court to find some of Defendants' statements to be purely forward-looking (as opposed to mixed with non-forward-looking statements), such statements are still actionably misleading because they failed to disclose then-existing material facts necessary to make them not misleading. "[T]o the extent Plaintiffs also challenge Defendants' alleged *omission of present facts* with respect to the challenged statements, the PSLRA's safe harbor does not apply." *Mallen v. Alphatec Holdings, Inc.*, 861 F. Supp. 2d 1111, 1126 (S.D. Cal. 2012) (emphasis in original) (finding statement that "we anticipate that our revenues throughout the balance of 2010 will continue to grow" not protected by the safe harbor); *see, e.g., In re Celera Corp. Sec. Litig.*, 2013 WL 4726097 (N.D. Cal. Sept. 3, 2013) ("the failure to alert investors to the reimbursement problem was not forward-looking; rather, it was an omission of a historical fact"); *In re Nuvelo, Inc. Sec. Litig.,* 668 F. Supp. 2d 1217, 1230 (N.D. Cal. 2009) (statements about drug's path to approval were actionable as they "concealed or downplayed known *present* risks related to approval"). Here, as in these cases, Defendants' extremely enthusiastic yet purportedly "conservative" financial forecasts were materially misleading because they failed to disclose material facts undermining the projections. Indeed, even when directly asked if the "royalty revenues going forward" would have "*some variations depending on the end-market sales*," Defendant Melo merely answered, "for the full year, *$50 million to $60 million [in royalty revenue]*, I'd expect some choppiness, but *full year strong flows. No change*." (¶53).[5] *See Plumbers Union Local No. 12 Pension Fund v. Ambassador's Grp.*, 717 F. Supp. 2d 1170, 1180 (E.D. Wash. 2010) ("Affirmative steps are required to prevent fraud, or to even merely clarify when a statement veers into a dangerous grey area."). Defendants' consistent rosy projections gave misleading credibility to royalty revenues Amyris was improperly recognizing, suggesting that they were indicative of future revenues.

Additionally, to be protected by the PSLRA safe harbor, the statements must not *only* be forward-looking, but they must *also* be accompanied by "meaningful" cautionary language, 15

---

[5] Defendants conveniently omit the analyst's direct question "will there be some variances depending on the end-market sales?" in their depiction of this exchange. Def. Mem. at 7.

Plaintiffs' Memorandum of Law in Opposition
to Defendants' Motion to Dismiss                                    FILE NO. 3:19-cv-01765-YGR

U.S.C. § 78u-5(c)(1), that identifies "'important factors that could cause actual results to differ materially from those in the forward-looking statement.'" *In re Quality Sys.*, 865 F.3d at 1148 (quoting 15 U.S.C. § 78u-5(c)(1)(A)(i)). Defendants' purportedly cautionary language does not meet this standard. The most specific language Defendants identify is that "management's current expectations… may differ materially due to…*risks related to Amyris's reliance on third parties*."[6] Def. Mem. at 6. Such a generic and vague warning could refer to any number of things and thus lacks the necessary specificity to indicate how the actual results could differ. *See, e.g., Yanek v. Staar Surgical Co.,* 388 F. Supp. 2d 1110, 1123 (C.D. Cal 2005) (cautionary language about general risks of FDA approval process "does not meaningfully address the risks related to [defendant's] pending FDA approval"). Moreover, according to Defendants' explanations, the actual results differed not because of "Amyris's reliance on third parties" but because Amyris wholly *lacked* necessary information. *See* ¶68 ("We have *no visibility on the actual royalty*…."); *see also* Def. Mem. at 2 and n.1. None of the cautionary language warned of Amyris's ongoing inability to access necessary financial data, which caused major revenue recognition problems. Indeed, because "Defendants repeatedly told investors that they could rely on predictions of growth in revenue" based on materially false and misleading non-forward-looking statements about Amyris's royalty revenues "virtually no cautionary language short of an outright admission that the non-forward-looking statements were materially false or misleading would have been adequate." *In re Quality Sys.,* at 1148 (9th Cir. 2017).

Finally, as set forth in Section V *infra*, Defendants had actual knowledge that their statements were materially false or misleading, which separately renders the safe harbor inapplicable. 15 U.S.C. § 78u-5(c)(1)(B); *In re Quality Sys.,* at 1148-79 (9th Cir. 2017).

## D.    Statements Regarding Amyris's Internal Control Over Financial Reporting

Prior to Amyris's adoption of ASC 606, the Company disclosed a material weakness in its internal control over financial reporting. On April 17, 2018, Defendants advised that this

---

[6] Defendants' earning calls and investor presentations did not even include this already lacking language. *See* Celio Dec. at Exh. F-I.

14

material weakness still existed (¶47) but disclosed a remediation plan, which Defendants asserted they believed would "effectively remediate the material weakness." ¶48.  Then, on May 18, 2018, August 14, 2018, and November 15, 2018, Defendants asserted in the Forms 10-Q1, Q2, Q3 that: "There were *no changes in our internal control over financial reporting* during [the most recently completed fiscal quarter] *that have materially affected, or are reasonably likely to materially affect*, our internal control over financial reporting." (¶¶56, 64, 70).

Defendants' statements, pointing to purportedly curative remediation measures that were supposedly fixing the *only disclosed* weakness and assuring that there was no material adverse change in Amyris's internal control over financial reporting, were materially false or misleading because they failed to disclose significant problems that constituted *other* then-existing material weaknesses in Amyris's internal control over financial reporting—namely that the Company lacked critical and necessary information to effectively account for the royalty revenues it was recognizing under its new application of ASC 606 (¶68; Def. Mem. at 2 and n.1) and that Amyris's accounting department was struggling to function (due largely to constant turnover) (¶¶34-41). These undisclosed material weaknesses significantly increased the likelihood that the reported financial statements were unreliable.  Indeed, the Company was ultimately required to restate each of its 2018 quarterly financial statements on Form 10-Q due to "a *material error…related to the estimates for recognizing revenue for royalty payments*…under [ASC] 606[.]"  ¶76.

Further, in their Sarbanes Oxley ("SOX") certifications, Defendants Melo and Valiasek represented to investors, *inter alia*, that they "*[d]esigned such internal control over financial reporting*, or caused such internal control over financial reporting to be designed under our supervision, *to provide reasonable assurance regarding the reliability of financial reporting* and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."  ¶¶57, 65, 71.  However, as Amyris has disclosed: "[t]he Company *did not design, implement and operate effective monitoring activities over complex, significant non-routine transactions*" and "*the Company did not design and operate effective controls over … complex, significant non-routine transactions related to licenses and royalty*

15

*revenue recognition*[.]"  Declaration of A. Brooke Murphy ("Murphy Dec."), Exh. A, 2018 Form 10-K, filed on October 1, 2019, at p. 13.[7]  Amyris acknowledges that these were "material weaknesses" in the Company's "internal control over financial reporting" that *existed in 2018* and that "resulted in material errors to our interim condensed consolidated financial statements for…March 31, 2018, June 30, 2018, and September 30, 2018…."  *Id.*

These *material weaknesses were undisclosed* throughout the Class Period. *Compare id. with* ¶47.  Accordingly, Defendants' statements that there were no changes even "reasonably likely to materially affect" Amyris's internal control over financial reporting were *objectively false* and certainly misleading.  While Defendants in their Motion argue otherwise, stating matter-of-factly that "[n]either the disclosure of the material weaknesses [sic][8] nor the remediation plan was false or misleading, and as such these statements are not actionable," (Def. Mem. at 12), it is truly unclear what Defendants' basis for this statement is.  The only legal argument Defendants raise in this section of their Motion is to claim that their statements of opinion, if sincere, cannot be materially false or misleading, citing *Omnicare*.  Def. Mem. at 11.  But, even for this point, Defendants are wrong.  Indeed, *Omnicare,* holds that a statement of opinion is actionably misleading if it "omits material facts" that "conflict with what a reasonable investor would take from the statement itself[.]" 135 S.Ct. at 1328-29 ("[A]n investor…expects such an assertion to rest on some meaningful [basis]—rather than, say, on mere intuition, however sincere.").

## V.   PLAINTIFFS HAVE ALLEGED A STRONG INFERENCE OF SCIENTER

### A.   The Totality of the Allegations Support a Strong Inference of Scienter

The PSLRA requires plaintiffs to allege facts constituting evidence of scienter defined as "deliberate or conscious recklessness." *No. 84 Employer-Teamster*, 320 F.3d at 937.  Thus, it is

---

[7] The Court may take judicial notice of the SEC filings referenced herein since their accuracy cannot reasonably be questioned.  Fed. R. Evid. 201(b); *see, e.g., Weller v. Scout Analytics, Inc.,* 230 F. Supp. 3d 1085, 1094 n.5 (N.D. Cal. 2017) (taking judicial notice of SEC filings).

[8] Defendants repeatedly refer to their disclosure of material "weaknesses."  Def. Mem. at 11-12. This is an error on Defendants' part.  During the Class Period, Defendants disclosed the existence of *one* material weakness but failed to disclose the existence of other then-existing material weaknesses in Amyris's internal control over financial reporting.

16

not necessary for a complaint to establish a strong inference that defendants "*actually knew*" contradicting facts because "[r]ecklessly turning a 'blind eye' to impropriety is equally culpable conduct under Rule 10(b)-5." *In re Verifone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 708 (9th Cir. 2012). For scienter, "the ultimate question is whether the defendant knew his or her statements were false, or was consciously reckless as to their truth or falsity." *Gebhart v. SEC*, 595 F.3d 1034, 1042 (9th Cir. 2010). When deciding whether an inference of scienter is pled, courts must consider the "totality of plaintiffs' allegations." *Daou Sys. Inc.*, 411 F.3d at 1022.

### 1.    Defendants Had Access to Facts Contradicting Their Statements

"The most direct way to show both that a statement was false when made and that the party making the statement knew that it was false is via contemporaneous reports or data, available to the party, which contradict the statement." *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004).

Defendants Melo and Valiasek has access to information contradicting their statements. According to the confidential witnesses' ("CWs") accounts: (1) Valiasek and Melo frequently participated in "senior level meetings" with the top accounting personnel, including the VP of Technical Accounting who was responsible for handling the revenue from Amyris's royalty agreement with DSM (¶85); (2) Melo and Valiasek received regular reports on the Company's financials (*id.*); (3) Melo and Valiasek reviewed the Company's revenue numbers weekly or, at a minimum, monthly (*id.*); (4) as CW 2 definitively said, "they [Melo and Valiasek] have access to the financial information" (*id.*); (5) Valiasek in particular, in her role as CFO, was very involved in overseeing the process of revenue recognition and financial reporting (*id.*); (6) the senior employees responsible for revenue recognition reported directly to Valiasek (*id.*); (7) Valiasek communicated regularly with and worked closely with the VP of Technical Accounting and the Senior Accounting Manager on revenue recognition and financial reporting, especially with [the VP of Technical Accounting]," who the CWs explained was primarily responsible for recognizing the royalty revenues (*id.*); (8) out of necessity, Valiasek was closely involved in the accounting department, including its day-to-day operations and was clearly aware that both senior managers

17

and staff positions were in constant flux in the small department of nine to 10 employees, with the Chief Accounting Officer leaving after just six months and with 80 percent of the positions in the department being held by temporary employees (¶86); and (9) as a result, Defendants, particularly Valiasek, were aware that the "non-existent" "full-time accounting department" (as CW 2 phrased it) that lacked experienced employees was struggling to operate effectively (*id.*).

The testimony of the CWs can be relied upon because the CWs were sufficiently described and were in positions to possess knowledge of the information they provided (¶¶34-41), and such information, when considered in its totality, supports an inference of scienter.  *Dauo Sys.,* 411 F.3d at 1015-16.  In particular, the CWs provided corroborating accounts of significant problems in Amyris's accounting/financial reporting department and of Defendants' access to information contradicting their public statements.  ¶¶34-41, 85-86.  While Defendants, however, suggest that the confidential witnesses must "have personal knowledge of Melo's or Valiasek's state of mind" (Def. Mem. at 14), the Ninth Circuit has held that this is *not* necessary in order for a CW's accounts to be reliable and indicative of scienter.  *See S. Ferry LP #2 v. Killinger*, 687 F. Supp. 2d 1248, 1254 (W.D. Wash. 2009) (because "it is difficult to find facts regarding an adversarial party's state of mind … Plaintiffs may point to either direct or circumstantial evidence to show" scienter); *see also Daou Sys.,* 411 F.3d at 1016.  Indeed, Defendants' assertion that *Zucco Partners, LLC v. Digimarc Corp.,* 552 F.3d at 981 (9th Cir. 2009) holds otherwise misrepresents *Zucco's* holding.  *See* Def. Mem. at 14.  The *Zucco* Court merely held that a CW's baseless assertion *about a defendant's mental state* was insufficient.  *Id.* at 998 (witness's "generalized claims" that defendant "'had to have known what was going on'" were "not sufficient…, since they fail to establish that the witness reporting them has reliable personal knowledge of the defendants' mental state").

Additionally, Defendants' own admissions confirm that *during the Class Period*, they had "no visibility on the actual royalty" amounts (¶68), that "a material error was [being] made related to the estimates for recognizing revenue for royalty payments…under [ASC] 606" for the 2018 quarterly financial statements (¶76), that they "*did not design and operate effective controls over*

18

… *complex, significant non-routine transactions related to licenses and royalty revenue recognition*" (Murphy Dec., Exh. A, at p. 13), and that Amyris was operating with undisclosed material weaknesses in its internal control over financial reporting. (*id.*; ¶76).  *See Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1043 (N.D. Cal. 2016) (admissions that management was "not maintaining an effective control environment" support scienter).

In fact, Defendants *do not* dispute that they had access to and even *knowledge of* the fact that: (1) ASC 606 was being applied such that estimates of royalty payments were being recognized as royalty revenues; (2) these estimates were based on virtually no information; (3) Amyris was experiencing significant undisclosed deficiencies in its internal control over financial reporting—deficiencies that Amyris now admits existed throughout that Class Period and constituted material weaknesses; and (4) that these undisclosed material weaknesses significantly affected Amyris's ability to report reliable financial results, including it royalty revenues.  *See* Def. Mem. at 13-18.  All of this information *contradicted* Defendants' statements during the Class Period.  It is not necessary for Defendants to have known that they were improperly inflating royalty revenues, though they may well have known this.  Instead, here, it is sufficient for Defendants to have known the aforementioned material undisclosed facts that contradicted and undermined their statements to investors.  *See Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 82 (1st Cir. 2002) (finding scienter where material facts "were not disclosed, and that nondisclosure could hardly have been inadvertent"); *Nakkhumpun v. Taylor*, 782 F.3d 1142, 1153 (10th Cir. 2015) ("[The] risk [of misleading investors] was readily apparent, creating an inference of scienter that was at least as strong as an inference of innocence.").

## 2.   Knowledge Can Be Imputed to Defendants

The Ninth Circuit has held that scienter can be inferred from allegations regarding management's role in a company suggesting that the defendant had actual access to the disputed information or when the "facts were prominent enough that it would be 'absurd to suggest' that top management was without knowledge of the matter." *Berson*, 527 F.3d at 989 (citation

19

omitted); *Reese,* 747 F.3d 557, 575-76 (9th Cir. 2014) ("[T]he Court 'can impute scienter based on the inference that key officers have knowledge of the 'core operations' of the company.'").

Defendants held the positions of CEO (Melo) and CFO (Valiasek). It would be almost absurd for these Defendants to have been unaware of how new rule ASC 606 was being applied, particularly since it suddenly allowed the Company to recognize *dramatically* increased revenues. ¶88. Indeed, Defendants repeatedly discussed the new royalty revenue numbers, and the accounting for same, in public statements throughout the Class Period. *See* Section IV, *supra.* These statements were "specific and reflect [their regular] access to" information about the royalty revenues and how ASC 606 was being applied that undermined their statements. *Reese*, 747 F.3d at 576; *see, e.g.,* ¶¶44, 53 (Defendants discussing the accounting for royalty revenues); ¶68 (Melo discussing volatility in Vitamin E market and lack of "visibility on the actual revenue" (bullet B) but while still falsely/misleading affirming revenue results and projections (bullet D)).

Defendants Melo and Valiasek certainly would have been aware of the fact that the Company was *not* actually *receiving* revenue payments for its "core product" (Def. Mem. at 2) at nearly the rate or amount that was being reported, particularly since Amyris was struggling to manage its debt and cash flows—a situation Valiasek was specifically involved in as part of the accounting department's constant monitoring of debt, according to CW 2. ¶41. And here, royalty payments made up a substantial portion of Amyris's cash flow—accounting for 10% of the Company's revenues in 2017 (¶89), and they were essentially all gross profit (¶44). *See Magnachip Semiconductor Corp*., 167 F. Supp. 3d at 1042 ("Accounting errors that prove to have a significant impact on core business operations-*i.e*. cash, revenue, profits, liquidity…sometimes give rise to a compelling inference of scienter."); *In re Northpoint Comm Group, Inc,. Sec. Litig*., 221 F.Supp. 2d 1090, 1104 (N.D. Cal. 2002) (CFO's scienter inferred because of CFO's position and because fraud involved significant financial aspect of the business).

Further, both Defendants were required to oversee and manage financial reporting and the effectiveness of Amyris's internal controls. Indeed, Defendants Melo and Valiasek were required to attest in SOX certifications to their conclusions that the financial reporting was accurate, that

20

*they* had "*[d]esigned such internal control over financial reporting*, or caused such internal control over financial reporting to be designed under our supervision, *to provide reasonable assurance regarding the reliability of financial reporting* and the preparation of financial statements...", and that there were no undisclosed changes (*e.g.,* material errors or significant deficiencies)  ¶¶57, 65, 71.  Because Defendants had to, and did, attest to these facts, Defendant must have, in the absence of recklessness, apprised themselves about these matters.  *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1061 (9th Cir. 2000); *see Weiss v. Amkor Technology, Inc.*, 527 F.Supp.2d 938, 950 (D.Ariz. 2007) ("SOX certifications may provide additional evidence of scienter" where, as here, plaintiff alleges that "defendants had actual knowledge of their false or misleading nature or were deliberately reckless in issuing such statements").

Defendants' involvement was particularly necessary here since Defendants were aware of a pre-existing material weakness in its internal control over financial reporting.  ¶47.  Defendants, therefore, were on notice of the need to closely supervise the Company's implementation of the new revenue reporting rule ASC 606 and its relation to royalty revenue recognition.  This was especially true particularly since the new rule facilitated the recognition of *estimates* as revenue, given Amyris's consistent history of overpromising on financial projections.  ¶90 (chart of financial forecasts versus actual results); *see Everex Sys., Inc.*, 228 F.3d at 1064-65 (holding that where legitimate red flags exist, defendants were required to take further steps to ensure the accuracy of the disputed data to negate intent) (citing *In re Software Toolworks*, 50 F.3d 615, 624-25 (9th Cir. 1994)).  Essentially *any* degree of involvement by Defendants would have made them aware of facts contradicting their statements, since Amyris ultimately restated its 2018 royalty revenues from the previously reported $18.47 million down to $7.58 million—an overstatement of nearly $11 million (more than double the actual royalty revenues).  *See* Exh. A to Murphy Dec., 2018 Form 10-K, filed on October 1, 2019, at p. 167.  "Many courts have held significant overstatements of revenue or income 'tend to support the conclusion that defendants acted with scienter.'" *In re ArthroCare Corp. Sec. Litig.*, 726 F. Supp. 2d 696, 721–22 (W.D. Tex. 2010) (collecting cases).

Plaintiffs' Memorandum of Law in Opposition
to Defendants' Motion to Dismiss                                    FILE NO. 3:19-cv-01765-YGR

In truth, Defendants can hardly deny that they were at minimum reckless in issuing their materially false and misleading statements, including reporting such dramatically improved revenues when it was at least as likely, if not more likely, that there would be a significant reversal in the revenue amount once the royalty payments were actually known and received.  In fact, ASC 606 specifically warns of the circumstances that existed—that Amyris had very "limited" information at its disposal and that "the amount of consideration [was] highly susceptible to factors outside the entity's influence," including "volatility in a market" and "the judgment or actions of third parties"—and provides that such uncertainties should be resolved revenue is recognized.  ASC 606-10-32-12; *compare* ¶¶28-29 *with* ¶68.  Perhaps unsurprisingly then, Defendant Melo admitted in the weeks before Amyris's final corrective disclosure that Defendants "*could have avoided most of the disappointment with a much more conservative approach…. Going forward, we will set external expectations based on what we have in place and that what we believe we can achieve*." ¶73. At the very least, to the extent Defendants lacked knowledge, they were required to apprise themselves before speaking repeatedly about these issues in press releases, on earnings calls, in Forms 10-Q, and in their SOX certifications.  *S. Ferry LP #2*, 687 F. Supp. 2d at, 1260 ("If [defendant] did not in fact have such knowledge, it would be at least actionably reckless to reassure the public about these matters at all.").[9]

### 3.    Defendants Were Motived to Report Favorable Financial Results

During the Class Period, Defendants were incentivized to report improved revenues and financial results, regardless of whether these had actually improved.

As alleged, Defendants used Amyris's artificially inflated stock to provide needed financing to continue operations.  During the Class Period, Amyris was struggling with significant debt obligations and had disclosed that there was "substantial doubt about its ability to continue

---

[9] Further, Plaintiff has sufficiently alleged corporate scienter as to Amyris based on allegations "indicating that the company's 'named officers' are 'directly responsible for ... day-to-day operations' and that the subject of the alleged misleading statement is, 'by its nature, the type of transaction of which it would be hard to believe senior officials were unaware.'" *Brown v. China Integrated Energy, Inc.,* 875 F. Supp. 2d 1096, 1223 (C.D. Cal. 2012) (quoting *Glazer Capital Mgmt. v. Magistri,* 549 F.3d 736, 743, 745 (9th Cir. 2008)).

22

as a going concern" in the Company's 2017 Form 10-K. ¶91; *see also* ¶41 (CW 2 describing that the Company's tremendous debt and its ability to meet its repayment schedules was a significant concern at Amyris). Thus, on August 21, 2018, Defendants conducted a secondary offering, under which Amyris sold millions of shares of stock and generated approximately $46 million in desperately needed cash proceeds. ¶91. This much needed financing was facilitated by the artificially inflated stock price, which was in turn propped up by Amyris's inflated financial results. Contrary to Defendants assertion, courts have recognized that allegations like these support a finding of scienter. *See, e.g., Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1064-65 (9th Cir. 2000) (finding allegations that defendants misrepresented the company's financial condition to secure needed financing supported scienter); *In re Time Warner Sec. Litig.*, 9 F.3d 259, 269-70 (2d Cir. 1993) (motive to artificially inflate price of rights offering sufficient to allege scienter); *In re Mannkind Sec. Actions*, 835 F. Supp. 2d 797, 813 (C.D. Cal. 2012) (alleged motive "stems not merely from the 'generic desire' to raise capital, but also from a need to keep the share price above a particular level in order to maintain access to much-needed operating capital.").

Further, Defendants stood to, and did, personally profit from the inflated revenues. Amyris's executive bonus structure was changed for 2018 to make the *only* performance metrics (1) reported revenues, and (2) gross margins (which was primarily driven by royalty revenues, according to Defendants, ¶44).[10] ¶92. This change conveniently coincided with the adoption of ASC 606, and incentivized Defendants to overstate, or at least aggressively estimate, the royalty revenues. *Id.*; *In re Maxwell Techs., Inc. Sec. Litig.*, 18 F. Supp. 3d 1023, 1044 (S.D. Cal. 2014) ("The existence of performance-based compensation provides motive for the individual defendants to order or ignore misconduct that would increase revenues. The Court considers this in its holistic review."). In fact, based on the inflated financial results, Melo and Valiasek *did* receive significant bonus payments, near their annual salaries, despite the fact that Amyris

---

[10] Defendants argue that the 2017 bonus structure is irrelevant (Def. Mem. at 17, n.5), but they conveniently overlook that the 2017 structure was discussed in order to show how the bonus structure changed in 2018 to put even greater significance on royalty revenues. ¶92.

23

Plaintiffs' Memorandum of Law in Opposition
to Defendants' Motion to Dismiss                                    FILE NO. 3:19-cv-01765-YGR

restated those results. *See* Exh. B to Murphy Dec., 2018 Proxy Statement, filed on October 10, 2019, at p. 51 (showing Melo's bonus of $358,515 and Valiasek's bonus of $203,009, which *included bonuses based on the misstated quarterly financial statements* (*id.* at 50), and explaining that Amyris is "reviewing its determinations regarding the awards paid to our named executive officers under the 2018 cash bonus plan in light of such restatement."). Thus, contrary to Defendants' claim, Plaintiffs *have* alleged that the "bonuses would have been lower absent the alleged misstatements." Def. Mem. at 17. Defendants' feigned confusion that Plaintiffs somehow allege the "bonuses were tied to whether Amyris met its revenues *guidance*" (Def. Mem. at 17) (emphasis added) is an obvious red herring since the Complaint *nowhere* makes that allegation.

Defendant Melo profited even further, based on his sales of 27,550 shares of personally held Amyris stock during the Class Period for proceeds of $186,655.55. ¶93. As alleged, these sales were suspiciously timed and unusual compared to Defendant Melo's previous trading history. ¶93; *see Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004) (explaining that stock trades are indicative of scienter when they are "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information"). Defendants claim that these allegations cannot bolster an inference of scienter because the Complaint does not allege the percentage of shares sold, but this is incorrect. Although the percentage of shares is a relevant factor, the Ninth Circuit has held it is *not* dispositive on whether a stock sale is suspicious and supportive of scienter. *See Nursing Home Pension Fund,* 380 F.3d at 1232 (finding stock sales representing only 2.1 percent of holdings as evidence supporting scienter).

\* \* \*

While Plaintiffs have alleged several facts that, even viewed independently, could suffice to allege a strong inference of scienter, "looking at the totality of the circumstances under the *Tellabs* analysis makes the inference irresistible." *Reese*, 747 F.3d at 577 (finding scienter alleged under the "core operations" doctrine); *see, e.g., Magnachip Semiconductor Corp.*, 167 F. Supp. 3d at 1043 (finding allegations of defendants' "signing of Sarbanes-Oxley (SOX) certifications

24

stating that Magnachip's financial quarterly statements were accurate, and Defendants' potential motives for committing the violations, including securing a favorable corporate debt rating, inflating Magnachip's stock price, and securing personal bonuses tied to more favorable results" were indicative or scienter and should be considered as part of the court's holistic evaluation); *Backe v. Novatel Wireless, Inc*., 642 F. Supp. 2d 1169, 1186 (S.D. Cal. 2009) ("Plaintiff alleges that [defendants] acted with scienter when making such statements based upon their suspicious stock sales, position in the company, importance of Sprint to Novatel's business, GAAP violations, and false SOX certifications. The Court concludes that these allegations taken holistically do support a strong inference of scienter.")

## VI.    PLAINTIFFS SUFFICIENTLY ALLEGE CONTROL PERSON LIABILITY

A *prima face* case of control person liability requires evidence that: (1) a primary violation of the securities laws occurred; and (2) defendant directly or indirectly controlled the primary violator. *In re BofI Holding, Inc. Sec. Litig.*, No. 3:15-CV-02324, 2017 WL 2257980, at *21 (S.D. Cal. May 23, 2017). Plaintiffs need not prove Defendants' scienter or culpable participation in the alleged wrongdoing. *Id*. Moreover, control person liability allegations need only comply with the requirements of Rule 8. *Id*. at *22. Plaintiffs have met their standard by alleging primary violations and that Defendants were in positions of control. ¶¶18-20.

## VII.    CONCLUSION

For the federal securities laws to serve their purpose, "reasonable inferences" must suffice and plausible claims must be allowed an opportunity to be tested on the merits. *No. 84 Employer-Teamster,* 320 F.3d at 946 ("[W]e are cautious not to raise the bar of the PSLRA any higher than that which is required under its mandates.") (reversing dismissal).

Plaintiffs respectfully request that Defendants' motion to dismiss be denied. If the motion is granted in whole or in part, it should be without prejudice with leave to amend. *See Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (holding that leave to amend should be freely granted unless "the pleading could not possibly be cured by the allegation of other facts.").

25

Plaintiffs' Memorandum of Law in Opposition
to Defendants' Motion to Dismiss                                                 FILE NO. 3:19-cv-01765-YGR

Dated: November 22, 2019                    Respectfully submitted,

                                            /s/A. Brooke Murphy
                                            A. Brooke Murphy (admitted *pro hac vice*)
                                            William B. Federman (admitted *pro hac vice*)
                                            FEDERMAN & SHERWOOD
                                            10205 North Pennsylvania Avenue
                                            Oklahoma City, Oklahoma 73120
                                            Tel: (405) 235-1560/Fax: (405) 239-2112
                                            -and-
                                            212 W. Spring Valley Road
                                            Richardson, TX  75081
                                            abm@federmanlaw.com
                                            wbf@federmanlaw.com

                                            *Lead Counsel for Plaintiffs*

                                            Robert S. Green
                                            GREEN & NOBLIN, P.C.
                                            2200 Larkspur Landing Circle, Ste. 101
                                            Larkspur, California 94939
                                            Tel: (415) 477-6700/Fax: (415) 477-6710
                                            -and-
                                            4500 East Pacific Coast Highway
                                            Fourth Floor
                                            Long Beach, CA 90804
                                            rsg@classcounsel.com

                                            *Liaison Counsel for Plaintiffs*

26

Plaintiffs' Memorandum of Law in Opposition
to Defendants' Motion to Dismiss                              FILE NO. 3:19-cv-01765-YGR

**CERTIFICATE OF SERVICE**

I hereby certify that this document was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants on Friday, November 22, 2019.

/s/A. Brooke Murphy
A. Brooke Murphy

27

Plaintiffs' Memorandum of Law in Opposition
to Defendants' Motion to Dismiss                                    FILE NO. 3:19-cv-01765-YGR