GIBSON, DUNN & CRUTCHER LLP
MICHAEL D. CELIO, SBN 197998
mcelio@gibsondunn.com
1881 Page Mill Road
Palo Alto, CA  94304-1211
Telephone: 650.849.5300
Facsimile: 650.849.5333

SHIREEN A. BARDAY, (*pro hac vice*)
sbarday@gibsondunn.com
200 Park Avenue
New York, NY 10166-0193
Telephone: 212.351.2621
Facsimile: 212.817.9421

ELIZABETH A. DOOLEY, SBN 292358
edooley@gibsondunn.com
PIPER M. PEHRSON, SBN 324031
ppehrson@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone: 415.393.8342
Facsimile: 415.393.8469

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| SHANE MULDERRIG and RONY DEVORAH, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br>v.<br><br>AMYRIS, INC., JOHN G. MELO, and KATHLEEN VALIASEK,<br><br>Defendants. | CASE NO. 4:19-cv-01765-YGR<br><br>**DEFENDANTS' REPLY TO PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>**Hearing:**<br>Date: January 21, 2020<br>Time: 2:00 p.m.<br>Place: 1301 Clay St., Courtroom 1, Fourth Floor<br>Judge: Hon. Yvonne Gonzalez Rogers<br><br>Action Filed: April 3, 2019 |

Gibson, Dunn &
Crutcher LLP

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ........................................................................................................... 1

II.   ARGUMENT .................................................................................................................. 2

      A.    Plaintiffs Have Failed to Plead Falsity with the Required Particularity. ...................... 2

            1.    Amyris plainly disclosed its accounting methodology. ................................... 3

            2.    Amyris disclosed how the accounting methodology might impact
                  revenue calculations. ..................................................................................... 4

            3.    Amyris warned investors about this very risk:  that it was making
                  estimates, which might not always turn out to be correct. .............................. 5

            4.    Amyris appropriately disclosed material weaknesses in its internal
                  controls. ........................................................................................................ 7

      B.    Plaintiffs Have Failed to Plead a Strong Inference of Scienter. .................................... 8

            1.    Plaintiffs' "Confidential Witnesses" provide exculpation, not scienter ............ 9

            2.    Plaintiffs' Allegations of "Motivation" Are Immaterial. ................................ 11

      C.    The Claim for Control Person Liability Should Be Dismissed. .................................... 14

III.  CONCLUSION .............................................................................................................. 14

DEFENDANTS' REPLY TO PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS – CASE NO. 4:19-CV-01765-YGR

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re Aratana Therapeutics Inc. Sec. Litig.*,
  315 F. Supp. 3d 737 (S.D.N.Y. 2018)................................................................................13

*Bagley v. City of Sunnyvale*,
  No. 16-CV-02250-LHK, 2017 WL 344998 (N.D. Cal. Jan. 24, 2017)..............................2

*Brody v. Transitional Hospitals Corp*,
  280 F.3d 997 (9th Cir. 2002)....................................................................................3, 7, 8

*Gompper v. VISX, Inc.*,
  298 F.3d 893 (9th Cir. 2002)............................................................................................14

*Kaplan v. Rose*,
  49 F.3d 1363 (9th Cir. 1994 ...............................................................................................8

*Lipton v. Pathogenesis Corp.*,
  284 F.3d 1027 (9th Cir. 2002)..........................................................................................14

*Metro Leasing & Development v. Internal Revenue Service*,
  376 F.3d 1015 (9th Cir 2004)...........................................................................................10

*In re Silicon Graphics Inc. Sec. Litig.*,
  183 F.3d 970 (9th Cir. 1999).............................................................................................12

*Swartz v. KPMG LLP*,
  476 F.3d 756 (9th Cir. 2007)...............................................................................................2

*Tellabs, Inc. v. Makor Issues & Rights, Ltd*,
  551 U.S. 308 (2007)............................................................................................................9

*In re VeriFone Holdings, Inc. Sec. Litig.*,
  704 F.3d 694 (9th Cir. 2012).............................................................................................12

*Webb v. Solarcity Corp.*,
  884 F.3d 844 (9th Cir. 2018)...............................................................................................9

*Zucco Partners LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009).............................................................................................12

**Statutes**

15 U.S.C. § 77z- 2(c)(1)(A) ......................................................................................................6

15 U.S.C. § 78u-5(c)(1)(A). .......................................................................................................6

Gibson, Dunn &
Crutcher LLP

ii
DEFENDANTS' REPLY TO PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO
DISMISS – CASE NO. 4:19-CV-01765-YGR

26 U.S.C. § 446(c) ...................................................................................................................................11

Gibson, Dunn &
Crutcher LLP

## I.    INTRODUCTION

Plaintiffs Shane Mulderrig and Rony Devorah's Opposition brief focuses on a demonstrably incorrect theory of this case:  that Amyris was "guessing" when it set its royalty revenue estimates.  The Opposition ("Opp.") repeatedly characterizes Amyris's estimates as "uninformed guess[es]" (Opp. at 3); "uninformed predictions" (*Id*. at 8); and "blind predictions" (*Id*. at 5).  But the very SEC filings on which Plaintiffs rely to make these allegations explain, in detail, how those estimates were made; they were anything but wild guesses.  In the discussion of the accounting policy on which Plaintiffs' entire Complaint ("Compl.") focuses, Amyris explained that it made its estimates using "the most likely outcome method."  Declaration of Michael D. Celio ISO Motion to Dismiss ("Celio Dec."), Exh. A at page 13/42.  That filing further explained that the estimate was derived by taking "a single amount in a range" of volume and price that a licensee had paid in the past, as well as any recent commodity market pricing data and trends.  *Id*.  In other words, Amyris's estimates were based on what Amyris had received in the past.  As the Complaint itself admits, the estimates were incorrect in large part because of a precipitous decrease in the price of Vitamin E (Compl. ¶ 73) and, in turn, dramatic reductions in the price at which Amyris's licensees sold their products and the revenue Amyris was to receive.  This change admittedly took Amyris by surprise; crucially, there is nothing in the Complaint that suggests this was anything *other* than an unpleasant surprise.  Unpleasant surprises are not fraud.

Moreover, Amyris had expressly warned investors of this precise risk.  It told investors that it had "no control over . . .[its] Vitamin E royalty . . . [because] DSM is now responsible for the supply, and we are purely a receiver of [a royalty] based on market price and of volumes sold by Nenter."  Compl. ¶ 62.  Amyris further explained that Vitamin E was "a very volatile market and we have no control over the price Nenter sells into this market . . . .  **We have been very effective at predicting market prices to date, but there is no guarantee we will always get this right**."  *Id*. (emphasis added).  That this warning proved correct was regrettable—but, once again, it was not and cannot be fraud.  What Amyris said about how it was deriving its estimates was and is true.

The Complaint's scienter allegations are, if anything, even weaker than its claims of falsity.  There is nothing—not a single document, not a single witness—that so much as hints that any

Gibson, Dunn & Crutcher LLP

DEFENDANTS' REPLY TO PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS – CASE NO. 4:19-CV-01765-YGR

Defendant knew (or was reckless in not knowing) that the estimates provided were inaccurate when they were made. Plaintiffs have located a handful of witnesses who allege that the CFO went to meetings and was paying attention to the financials. They note that one defendant (but not the other) sold some stock. They argue that these royalty estimates were significant to the company so the Court should assume that the defendants were paying attention to the issue. All of that may well be true—indeed, probably is true—but none of it remotely suggests that anyone acted wrongfully. Indeed, every one of those allegations could be made about any well-run company. The law requires Plaintiffs to plead particularized facts giving rise to a strong inference of scienter; those facts are simply missing here. The Complaint should be dismissed.

## II.    ARGUMENT

The Opposition makes two primary arguments, and both are demonstrably wrong. First, it argues that Amyris presented as fact what was merely baseless speculation. But Amyris made very clear both that it was using an estimate and how it was calculating it—and it warned investors of the risk attendant on this approach. That estimate turned out to incorrect in hindsight due to factors beyond Amyris's control—but it was calculated in good faith according to accepted methodology that was clearly disclosed. Second, the Opposition argues that the Complaint pleads a strong inference of scienter. But nothing in the Complaint, separately or together, pleads any inference of scienter, much less a "strong" one.

## A.    Plaintiffs Have Failed to Plead Falsity with the Required Particularity.

As Defendants pointed out in their Motion to Dismiss, the Complaint in this action is long and confusing; it indiscriminately quotes page after page of Amyris's statements. It is difficult to discern from the Complaint exactly what Plaintiffs thought had been misstated or omitted. Plaintiffs' Opposition is much more direct and states their claim of falsity succinctly: "at no time, however, did Defendants disclose that . . . [they were] recognizing as revenue their uninformed guess[1] of what

---

[1] It perhaps bears noting that Plaintiffs' Complaint does not, in fact, anywhere contain this "uninformed guess" theory despite its length. Plaintiffs may not retroactively amend their complaint in their opposition brief. *See Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007) (holding that, on a Rule 12(b)(6) motion, "a court may generally consider only allegations contained in the pleadings [and] exhibits attached to the complaint"); *Bagley v. City of Sunnyvale*,

DEFENDANTS' REPLY TO PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS – CASE NO. 4:19-CV-01765-YGR

Gibson, Dunn &
Crutcher LLP

royalty payments would be nor . . . that [they] were materially uncertain." (Opp. at 3, emphasis removed). The Opposition thus clarifies, for the first time, that this is an omissions case. *See* Opp. at 3:11-19 (citing cases holding that "literal accuracy is not enough") (emphasis removed). Plaintiffs have thus adopted a heavy burden. The Ninth Circuit has explained there is no freestanding duty of disclosure; the law prohibits "*only* misleading and untrue statements, not statements that are incomplete." *Brody v. Transitional Hospitals Corp,* 280 F.3d 997, 1006 (9th Cir. 2002) (emphasis in original). Moreover, "[n]o matter how detailed and accurate disclosure statements are, there are likely to be additional details that could have been disclosed but were not." *Id.* Consequently, "[t]o be actionable under the securities laws, *an omission must be misleading*; in other words it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Id*. (emphasis added).

Plaintiffs cannot meet this standard for a very simple reason: *Amyris disclosed the allegedly concealed information.* It disclosed the accounting methodology it used to make the estimates Plaintiffs now challenge, it disclosed how that methodology impacted its revenue, and it specifically warned investors that its estimates could be wrong and why.

**1.     Amyris plainly disclosed its accounting methodology.**

Plaintiffs state their claim of falsity succinctly: "[a]t no time, however, did Defendants disclose that . . . [they were] recognizing as revenue their uninformed guess of what royalty payments would be nor . . . that [they] were materially uncertain." (Opp. at 3, emphasis removed). Stripped of rhetorical flourishes, the claim is simply that Amyris concealed that it lacked a reasonable basis for its revenue estimates regarding its Vitamin E licenses. The flaw in this argument is that Amyris, in fact, disclosed how it was calculating the royalty payments, and it was neither uninformed nor a guess. Amyris repeatedly, and clearly, disclosed the accounting methodology it was using to calculate revenue estimates. For example, in its quarterly report for the quarter ending March 31, 2018, Amyris offered the following disclosure to explain how it recognizes revenue under

No. 16-CV-02250-LHK, 2017 WL 344998, at *18 n. 4 (N.D. Cal. Jan. 24, 2017) ("On a motion to dismiss, the Court only considers facts pled in the complaint.").

DEFENDANTS' REPLY TO PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS – CASE NO. 4:19-CV-01765-YGR

Gibson, Dunn & Crutcher LLP

circumstances where, as here, it was not manufacturing the product and instead was licensing its technology:

> When the Company's intellectual property license is the only performance obligation, or it is the predominant performance obligation in arrangements with multiple performance obligations, the Company applies the sales-based royalty exception and revenue is estimated and recognized at a point in time when the licensee's product sales occur. Estimates of sales-based royalty revenues are made using the most likely outcome method, which is the single amount in a range of possible amounts derived from the licensee's historical sales volumes and sales prices of its products and recent commodity market pricing data and trends.

Celio Dec., Exh. A at p. 13/42.  An investor with an interest in understanding the details of Amyris's accounting was thus provided with the exact technical accounting choice that had been made: application of the "sales-based royalty exception" under ASC 606.  But even an accounting novice would understand at least the following:  first, that Amyris was using an estimate (Amyris used the word itself); second, that it was recognizing the revenue when its licensee made the sale, *not* when Amyris received the funds; and third, that the estimate was constructed by looking *backward* to what the licensee had purchased before and at what price.  The Opposition *never* claims that Amyris was lying when it made this disclosure (much less provides specific allegations in support of such a claim); it simply alleges that Amyris was "guessing" and that it had never before disclosed that it was guessing.  The Opposition does not even attempt to grapple with this disclosure; it simply ignores it.

### 2. Amyris disclosed how the accounting methodology might impact revenue calculations.

Nor is the disclosure of the accounting methodology the only thing Amyris said on the topic of its licensing revenue.  Amyris *also* explained how the adoption of this new policy impacted revenue.  In a chart in the same quarterly report filed with the SEC, Amyris compared how its revenue would have been calculated prior to the adoption of ASC 606; notably the chart expressly demonstrates that the adoption of ASC increased Amyris's revenue calculations.  In the relevant category, Amyris's revenues increased from just over $1.9 million without ASC 606 to nearly $6.9 million after its adoption.  Celio Dec. Exh. B at p. 15/55.

The Opposition's allegation that "[a]t no time" did Amyris disclose that its results were impacted by ASC 606, Opp. at 3 (emphasis removed), is therefore just wrong.  Plaintiffs

acknowledge this disclosure in passing, but their attempts to discount it border on the absurd.  First, they claim that the disclosure somehow does not count because it was supposedly required by ASC 606.  They provide neither law nor logic that would negate the impact of the disclosure; it matters not at all *why* it was made, only that it *was* made.  Moreover, it appears *every relevant quarter*.  Second, they claim that these disclosures were too obscure for them to find.  This is an odd argument as this language appears in the first few pages of a document that they themselves cite and quote from at length in their own Complaint.  To make the matter even more stark, in the conference call that Plaintiffs claim was misleading, *one of the Defendants expressly told readers to look at the 10-Q to see the impact of ASC 606*. [2]  Plaintiffs even cited this exchange in the Complaint.  *See* Compl. ¶ 54.  To claim that information they saw fit to include in their own Complaint was "buried" strains credulity.  Plaintiffs cannot discount these disclosures simply because they are inconsistent with their theory of the case.

3. **Amyris warned investors about this very risk:  that it was making estimates, which might not always turn out to be correct.**

Amyris also warned investors that it was making estimates regarding its Vitamin E royalty from Nenter, and that those estimates might turn out to be incorrect.  For example, during an investor call in August 2018, CEO John Melo explicitly warned of the volatility of the Vitamin E market and the fact that although Amyris had been effective at <u>predicting</u> market prices, "there is no guarantee we will always get this right.":

> The only area of our business that we have no control over is our Vitamin E royalty. In this activity, DSM is responsible for the supply, and we are purely a receiver of [a royalty] based on market price and of volumes sold by Nenter.  This is a very volatile market, and we have no control over the price Nenter sells into this market. . . . ***We have been very effective at predicting market prices to date, but there is no guarantee we will always get this right***.

[2]  When asked about the impact of ASC 606, CFO Valiasek acknowledged it had an impact and then stated "you can read about it in our 10-Q." Compl. ¶ 53.  Valiasek called the impact "relatively de minimis" which Plaintiffs claim was misleading.  *Id*.  The question, however, was not limited to royalties–ASC 606 applies to revenue recognition more generally.  And in the same answer, Valiasek directed readers to the 10-Q disclosure so they could determine for themselves what the impact was.

Gibson, Dunn & Crutcher LLP

5

Compl. ¶ 62 (emphasis added). Estimates of the sort that Amyris needed to make are inherently difficult because the company lacks real-time information about the price and volume sold. But, nothing about those inherent challenges in making estimates about royalty revenues means that Amyris was merely guessing. Plaintiffs assert that Melo's statement that Amyris had "no visibility on the actual royalty" amounts to a concession that Amyris was making estimates "based on virtually no information." Opp. at 18-19. That is a fundamental misunderstanding of the case. As discussed above, Amyris had a real foundation upon which to calculate these estimates. That it warned investors that these estimates *could* be wrong does not render the estimates mere guesses or not made in good faith. Indeed, there is nothing in the Complaint that suggests that the estimate was wrong when made—much less intentionally so.

This is equally, if not more true, of the estimates that Amyris made of *future* earnings. Current revenue calculations under ASC 606 are difficult enough given the volatility of the Vitamin E market; *future* predictions of such revenue figures are even more challenging to make. Amyris, nonetheless, clearly disclosed these difficulties by coupling its forward-looking statements of Amyris's future financial performance with "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 77z-2(c)(1)(A); *id*. § 78u-5(c)(1)(A). As discussed at length in Amyris's Motion to Dismiss, a large swath of the statements with which Plaintiffs take issue are such forward-looking statements that are accompanied by meaningful cautionary language. *See* Motion to Dismiss at 5-8. Such statements are protected by the PSLRA's Safe Harbor provision and are not actionable as a matter of law. 15 U.S.C. § 77z-2(c)(1)(A); *id*. § 78u-5(c)(1)(A).

Plaintiffs fail to directly respond to this argument, instead arguing: (1) some forward-looking statements were mixed with non-forward-looking statements that were misleading; and (2) that the cautionary language was insufficient. *See* Opp. at 11 (conceding that "Plaintiffs do not allege Defendants' statements were false because their predictions of future events were wrong"). As to the first argument, merely mixing forward-looking and non-forward-looking statements is insufficient to render the forward-looking statements unprotected. Instead, there must be some omission or misstatement of material fact in the non-forward-looking statements, and as described above, there is

Gibson, Dunn &
Crutcher LLP

none. Without a problematic non-forward-looking statement, this argument fails. As to the second argument, the cautionary language discussed in Amyris's Motion and quoted above is plain as day and is extremely specific: "The only area of our business that we have no control over is our Vitamin E royalty . . . we have no control over the price Nenter sells into this market. . . . We have been very effective at predicting market prices to date, but there is no guarantee we will always get this right."[3] Plaintiffs' assertion that Amyris's cautionary language constituted a "generic and vague warning [that] could refer to any number of things," Opp. at 14 (emphasis removed), rings hollow. Amyris repeatedly warned investors that it was making estimates and that those estimates might turn out to be incorrect. Amyris was neither merely guessing, nor did it have perfect visibility. But most importantly, it told investors exactly that.

**4.    Amyris appropriately disclosed material weaknesses in its internal controls.**

Plaintiffs also point to alleged omissions concerning Amyris's disclosure of material weaknesses in its internal control over financial reporting, *see* Opp. at 14-16, but those allegations fare no better. Plaintiffs appear to be arguing that although Amyris appropriately disclosed material weaknesses in its internal controls in its Form 10-K filed in April 2018, it failed to disclose *additional* material weaknesses in its internal controls that arose during the class period. But Plaintiffs have failed to demonstrate that any omission, if there was one, was "misleading" or that it "affirmatively creat[ed] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]." *Brody* 280 F.3d at 1006.

In April 2018, Amyris's Form 10-K disclosed far-reaching material weaknesses in internal controls. By its plain terms, these weaknesses included problems with identifying and analyzing changes in significant accounting standards and related disclosures. Compl. ¶ 47. Then, repeatedly during the class period, Amyris told investors that it continued to operate with the same issues disclosed in the Form 10-K. *See* Compl. ¶¶ 56, 64. Despite these clear and repeated disclosures, Plaintiffs now latch onto Amyris's 2019 restatement as evidence of some material omission during

---

[3] Plaintiffs allege in their Opposition that "[t]he most specific language Defendants identify is that 'management's current expectations . . . may differ materially due to . . . risks related to Amyris's reliance on third parties." Opp. at 14. This is simply wrong. Amyris clearly pointed to the aforementioned language about Nenter as "further cautionary language." Mtn. at 7-8.

DEFENDANTS' REPLY TO PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS – CASE NO. 4:19-CV-01765-YGR

Gibson, Dunn & Crutcher LLP

the class period.  In its restatement, Amyris noted that it was in the process of finalizing its evaluation of internal control over financial reporting and expected to report material weaknesses in addition to the material weaknesses reported in the prior year's Form 10-K.  Compl. ¶ 76.  Nothing about Amyris deciding to detail additional issues in internal controls following a restatement is unusual or actionable.  Plaintiffs' Opposition spends several pages trying to contort these explicit and repeated disclosures into some kind of actionable omission, but it is impossible to see how repeated warnings that the company was struggling with its internal controls "affirmatively creat[ed] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]."  *Brody*, 280 F.3d at 1006.  Amyris is not proud that this state of affairs came to pass, but it was brutally open and honest about it.

Finally, a word about Plaintiffs' apparent assertion that Defendants are relying upon a "truth on the market defense."  Lest there be any doubt, Defendants are not advancing such a defense.  There is no reference of any kind to that defense anywhere in Defendants' Motion and it has almost nothing to do with Defendants' argument here.  Indeed, the truth-on-the-market defense (as Plaintiffs use it here) is a straw man.  The truth-on-the-market defense is an argument that if the information that "defendants are alleged to have withheld from or misrepresented to the market has *entered the market through other channels*, the market will not have been misled, and . . . plaintiffs' claims . . . will fail."  *Kaplan v. Rose*, 49 F.3d  1363, 1376 (9th Cir. 1994), *overruled on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 616 (9th Cir. 2017) (citations omitted; emphasis added).  Defendants are not pointing to information that "entered the market through other channels"—they are pointing to information contained *in the very document Plaintiffs challenge*.  This is not "truth on the market"—this is just "truth," and the truth is contained in the very documents that Plaintiffs have placed before the Court.  Without a misstatement or omission, there can be no claim; here the allegedly omitted information was not omitted.

**B.    Plaintiffs Have Failed to Plead a Strong Inference of Scienter.**

As set forth above, Defendants made no misrepresentations; while the estimates themselves did not prove to be correct, there was nothing misleading about what Defendants said about their process.  But even if that were not the case, there is simply no evidence that Plaintiffs *intentionally*

misspoke; and without particularized allegations giving rise to a *strong* inference of scienter this action cannot go forward.  *See Webb v. Solarcity Corp.*, 884 F.3d 844, 850 (9th Cir. 2018).  As Defendants explained in their moving papers, a "'strong inference' is an inference that is 'cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'"  *Id*. at 850 (internal citation omitted).  The inference "must be more than merely 'reasonable' or 'permissible'— it must be cogent and compelling, thus strong in light of other explanations."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd*, 551 U.S. 308, 324 (2007).

In evaluating Plaintiffs' arguments in the Opposition, it is worth pausing on what Plaintiffs have *not* alleged.  As set forth in Defendants' Motion, Plaintiffs have pointed to no document that suggests that any Defendant knew she or he was saying something incorrect.  They have no witness who claims to have told any defendant that the estimates in question were wrong.  Everything they do plead—"confidential" witness statements, stock sales by one defendant (but not the other), an unrelated financing deal—is perfectly consistent with honest behavior.  For example, as set forth below, Defendants urge the Court to look at what the supposed "confidential witnesses" actually (allegedly) told Plaintiffs; read fairly, they claim nothing more than that senior management was paying attention to the company's financial condition.  This is not wrongful; this is exactly what senior management is supposed to do.  *Tellabs* made clear that the Court must consider "other explanations" in determining whether Plaintiffs have pleaded a strong inference of scienter—and Plaintiffs' own pleadings provide just such an explanation:  good faith.  *Id*.

### 1.    Plaintiffs' "Confidential Witnesses" provide exculpation, not scienter.

Plaintiffs must plead facts giving rise to a strong inference that each Defendant either did something intentionally wrong or was deliberately reckless.  The supposed "confidential witnesses" never come close to saying that anyone did anything intentionally wrong; moreover, their purported statements demonstrate that the Defendants were anything but deliberately reckless.  Their statements instead paint a picture of senior management deliberately attending to the company's finances during a period of employee turnover.  There is nothing in what the CWs allege that suggests wrongdoing.

The Opposition spends nearly a page repeating the statements from the three CWs.  Opp. at 17-18.  The Opposition does not, however, provide any analysis of what those facts would

supposedly show. For example, they do not explain how the fact that the Chief Financial Officer attended "senior level meetings" (Compl. ¶ 85; Opp. at 17), "received regular reports," (*id.*) "reviewed the Company's revenue numbers" (*id.*) or had "access to the financial information" (*id.*) is remotely wrongful. Indeed, these are descriptions that can be applied to any senior corporate officer. These things are only wrongful if the underlying information to which they had access contradicted their public statements—*and this is exactly the thing that Plaintiffs do not plead.*

The relevant section of the Opposition is titled "Defendants Had Access to Facts Contradicting Their Statements" but one searches both the Opposition and the Complaint itself in vain for any such facts. As noted above, Plaintiffs rely heavily on their misunderstanding of Melo's statement that Amyris had "no visibility on the actual royalty" amounts Compl. at ¶ 68 (emphasis removed). Again, this is simply what ASC 606 states. Amyris was *required* to recognize revenue at the time the licensee sells the product, and make an estimate based on the data based on past experience. Such estimates are difficult because the company does not have the "visibility" Melo mentions; that is not an admission of fraud, but a statement of proper accounting. Estimates will sometimes be wrong when, as here, the price of the commodity in question drops precipitously. Indeed, as noted above *Amyris expressly warned investors of this precise risk: "*we have no control over . . . our Vitamin E royalty . . . This is a very volatile market and we have no control over the price Nenter sells into this market . . . We have been very effective at predicting market prices to date, but there is no guarantee we will always get this right." Compl. ¶ 62. The Opposition's claim that Defendants "do not dispute that they had access to and [] knowledge of" the alleged misstatements (Opp. at 19 (emphasis removed)) is thus a complete misunderstanding of both Amyris's disclosures and its defense.

The Opposition's entire section on imputation of knowledge (Opp. at 19) similarly misses the point. Defendants are not claiming that there was some "truth" at Amyris that differed from their public statements, but that they were simply unaware of it. To the contrary, Defendants' argument is that their public statements were completely consistent with what Amyris believed to be true. As a result, this entire section of the Opposition can be disregarded; it is a response to an argument that the Defendants have never made.

One claim that Plaintiffs make, however, is so blatantly incorrect that it cannot be allowed to pass: Plaintiffs' claim that the individual defendants "certainly would have been aware of the fact that the Company was not actually receiving revenue payments" related to the license. Opp. at 20:13-14. This sentence suggests that Plaintiffs do not appreciate the difference between cash-based accounting and accrual-based accounting. Amyris, like almost every sophisticated business in the world, uses accrual-based accounting. This is plainly disclosed every quarter. *See, e,g.*, Celio Dec. Exh. A at p. 12/42 (Revenue is "recognized when . . . the Company satisfies a performance obligation by transferring control over a product or service to a customer."). Under the accrual method, revenue is recognized when it is *earned* not when it is *received*. *See Metro Leasing & Development v. Internal Revenue Service*, 376 F.3d 1015, 1020 n.6 (9th Cir 2004) ("the accrual method of accounting . . . counts income at the time of sale instead of when payments are received . . . the cash receipts and disbursement method . . . counts income when payments are actually received"); *see also* 26 U.S.C. § 446(c) (describing difference in the context of tax payments). This is a fundamental principle of accounting. As a result, the idea that the individual defendants would be looking at the cash "the company was actually receiving" to determine if revenue should be recognized is completely and totally wrong.[4] This error is so basic and so fundamental that it suggests that the "fraud" that Plaintiffs allege here may be nothing more than their misunderstanding of Amyris's financial statements.

### 2. Plaintiffs' Allegations of "Motivation" Are Immaterial.

With the alleged "confidential witness" statements understood correctly, the scienter allegations are premised entirely on their claim that Melo and Valiasek were "[m]otived [sic] to report favorable financial results." Opp. at 22:18. Specifically, they claim that the company inflated its stock price so that it could finance further operations and so that it could increase the individual defendants' compensation through the sale of stock options or through bonus payments. These claims lack merit.

---

[4] Even a moment's reflection makes the reasons for this clear: a particular contract may allow for some period of time to pay. There is simply no reason to believe that Amyris was expecting to receive the licensing revenue in the same quarter it was earned. Amyris said nothing of the sort, and Plaintiffs certainly do not cite to any such statement.

11

Gibson, Dunn & Crutcher LLP

First, the "motive and opportunity" standard has been rejected. Even if Plaintiffs had pleaded any relevant facts here (they have not) "[f]acts showing mere recklessness or a motive to commit fraud and opportunity to do so provide some reasonable inference of intent, but are not sufficient to establish a strong inference of deliberate recklessness." *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012). More fundamentally, the "facts" pleaded here do not even show recklessness or motive. For example, Plaintiffs make much of Melo's stock sales. But they have no explanation for why Valiasek sold no shares at all. The fraud they allege took place (if it happened) was in her department, and she is mentioned much more frequently in the Complaint. The allegations here can be fairly described as accounting fraud, relating as they do to the application of ASC 606. It is therefore fatal to their theory that the individual who would necessarily have been at the heart of any such scheme did not seek to benefit from it.

Even as to Melo, Plaintiffs do not list the percentage of the sale of total shares sold by Melo on each date. Compl. ¶ 93 (noting that Melo sold a combined 27,550 shares for $186,655.55 on July 16, 2018 and October 15, 2018, but not placing this sale in the context of the total number of shares owned by Melo); *see Zucco Partners LLC v. Digimarc Corp.*, 552 F.3d 981, 1005 (9th Cir. 2009) (requiring "the amount and percentage of shares sold by insiders") (internal citations omitted); *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999) ("When evaluating stock sales, . . . the proportion of shares actually sold by an insider to the volume of shares he could have sold is probative of whether the sale was unusual or suspicious."). Second, Plaintiffs have failed to identify Melo's total trading position (perhaps because the numbers are unfavorable to them) by failing to plead any facts about the exercisable options held by Melo. *Id.* at 986-87 ("Actual stock shares plus exercisable options represent the owner's trading potential more accurately than the stock shares alone."). Plaintiffs only response is that this admitted pleading failure is "not dispositive." Opp. at 24:19 (emphasis removed). This is a non-response. Defendants' argument is not that this pleading failure disposes of the claim with nothing more; the argument is that this failure points *away* from scienter. Surely Plaintiffs would have pleaded such information if they believed it would aid their case; that information is readily available.

DEFENDANTS' REPLY TO PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS – CASE NO. 4:19-CV-01765-YGR

Gibson, Dunn & Crutcher LLP

As to the alleged bonuses, Plaintiffs fail to respond to Defendants' argument that the Complaint does not allege that either Melo or Valiasek would have been denied bonuses or received lower bonuses but for the alleged misstatements. To be sure, they *claim* that they made such an allegation, citing paragraph 92 of the Complaint, but that paragraph does not actually say that. Moreover, Plaintiffs have totally misrepresented how Amyris calculated bonuses for Melo and Valiasek; while financial targets were one element of the bonus plan, it is not the mechanical exercise that Plaintiffs suggest. The very documents on which they rely show that while company-wide goals like revenue are considered, the individual bonus plans applicable to Melo and Valiasek consider factors specific to each individual that were described in great detail. For example, Amyris disclosed that Ms. Valiasek's bonus would be based on not just the financial targets, but also on "developing a corporate tax strategy and debt reduction plan, improving finance department performance, executive leadership and living our values." *See* Decl. of A. Brooke Murphy ISO Opposition to Motion to Dismiss, Exh. B at p. 57/96. Mr. Melo, was tasked with improving "employee engagement, maintaining a safe work environment, executive leadership and living our values." *Id.* Crucially, the Board of Directors maintained discretion to award or not award bonuses; the formula was not purely mechanical. *Id.*

So too with the reference to Amyris's secondary stock offering. Amyris does not disagree with Plaintiffs that, in some circumstances, a secondary offering *might hypothetically* support an inference of scienter. The problem for Plaintiffs is that they have not shown as much here. The motivation that they plead is entirely generic. Amyris obviously needed to raise capital; this is implicit in the very nature of a secondary offering. But this need to raise capital is routine in business and does not make it any more likely that anyone committed fraud. As Defendants' Motion made clear, "a mere desire to reduce debt outlays, without more, is insufficient to establish motive." *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 765 (S.D.N.Y. 2018) ("[T]he same is true of '[a]ny potential motive to keep the share price high in order to have a more successful [offering],' which is 'just an example of a generalized motive that any officer or director who desires to operate a successful company will have.'") (citation omitted).

DEFENDANTS' REPLY TO PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS – CASE NO. 4:19-CV-01765-YGR

Gibson, Dunn & Crutcher LLP

Taking all of these allegations together, and evaluating them as a whole, Plaintiffs have not pleaded *any* inference of scienter. When the Court "consider[s] *all* reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs," *Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir. 2002) (emphasis in original), it becomes clear that the inferences are *very* unfavorable to Plaintiffs. Plaintiffs have fallen far short of their burden to plead a strong inference of scienter. Read fairly, what Plaintiffs have pleaded is simply a normal, albeit disappointing, corporate situation.

**C.     The Claim for Control Person Liability Should Be Dismissed.**

The Opposition concedes that the "controlling persons" claims under Section 20(a) of the Exchange Act rise and fall with their underlying Section 10(b) claims. Because those fail, the control person liability claim fails as well. *See Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1035 n.15 (9th Cir. 2002).

### III.     CONCLUSION

For the reasons set forth above and Defendant's Memorandum in Support of their Motion to Dismiss, the Complaint should be dismissed.

Respectfully submitted,

Dated: December  20, 2019

GIBSON, DUNN & CRUTCHER LLP

By:    */s/ Michael D. Celio*
         MICHAEL D. CELIO

*Attorneys for Defendants*

DEFENDANTS' REPLY TO PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS – CASE NO. 4:19-CV-01765-YGR

Gibson, Dunn & Crutcher LLP