GIBSON, DUNN & CRUTCHER LLP
MICHAEL D. CELIO, SBN 197998
mcelio@gibsondunn.com
1881 Page Mill Road
Palo Alto, CA  94304-1211
Telephone: 650.849.5300
Facsimile: 650.849.5333

SHIREEN A. BARDAY (*pro hac vice*)
sbarday@gibsondunn.com
200 Park Avenue
New York, NY 10166-0193
Telephone: 212.351.2621
Facsimile: 212.817.9421

ELIZABETH A. DOOLEY, SBN 292358
edooley@gibsondunn.com
PIPER M. PEHRSON, SBN 324031
ppehrson@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone: 415.393.8342
Facsimile: 415.393.8469

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| SHANE MULDERRIG and RONY DEVORAH, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br>v.<br><br>AMYRIS, INC., JOHN G. MELO, and KATHLEEN VALIASEK,<br><br>Defendants. | CASE NO. 4:19-cv-01765-YGR<br><br>**DEFENDANTS' RESPONSE TO PLAINTIFFS' SURREPLY TO DEFENDANTS' REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**<br><br>**Hearing:**<br>Date:      February 18, 2020<br>Time:      2:00 p.m.<br>Place:      1301 Clay St., Courtroom 1, Fourth Floor<br>Judge:     Hon. Yvonne Gonzalez Rogers<br><br>Action Filed: April 3, 2019 |

Gibson, Dunn &
Crutcher LLP

Plaintiffs' surreply is a mixture of arguments recycled from their opposition brief and a series of mischaracterizations of Defendants' arguments in this case. While almost none of it is new—and even less of it is accurate—it is helpful in one respect. Each of the three areas that Plaintiffs thought necessitated a surreply relates directly to a specific, detailed disclosure by Amyris that Plaintiffs claim was omitted. The surreply quibbles with detailed disclosures Amyris made, but that quibbling only makes clear that Amyris disclosed the very issues that were allegedly "omitted."

## I.    Melo's Statement Regarding Market Volatility Was Discussed at Length—Not Hidden

Plaintiffs begin their surreply with an impassioned—but totally incorrect—argument that Amyris mischaracterized Melo's statement that "[w]e have been very effective at predicting market prices to date, but there is no[] guarantee we will always get this right." ECF No. 56 at p. 1. They claim that Amyris failed to note that his statement was made in the context of a broader discussion about second half revenues. This is totally false. Twice—once in Amyris's Motion to Dismiss *and again* in the Reply—Amyris discusses Melo's statement regarding predictions in the context of forward-looking statements. Indeed, in its Motion to Dismiss, Amyris quotes, as an example of a forward-looking statement, *the exact words that Plaintiffs now try to argue were omitted*:

> [W]e expect these activities and our base business to deliver between $135 million and $145 million of revenue and gross profit in excess of $100 million in the second half. We feel very confident about the second half and have been exceeding our plan for the areas of our business that we control. The only area of our business that we have no control over is our Vitamin E royalty . . . . This is a very volatile market, and we have no control over the price Nenter sells into this market . . . . We have been very effective at predicting market prices to date, but there's no guarantee that we will always get this right. . . .

ECF No. 45 at pp. 7:19-8:8. Plaintiffs are clearly accusing Amyris of hiding the ball; but if Amyris were trying to hide the ball, it would not have quoted the full passage from Melo's call in its Motion and then discussed it as cautionary language *accompanying a forward-looking statement*.[1] Amyris's Reply also discusses the aforementioned language in the context of cautionary language accompanying forward-looking statements. ECF No. 53 at pp. 6-7.

---

[1] Nor is it clear why a surreply was necessary to respond to this point since Plaintiffs previously made this *exact argument* in their Opposition to the Motion to Dismiss. *See* ECF No. 52 at p. 10 ("Defendant Melo was discussing the revenue *guidance* for the second half of the year—*not* the royalty revenue that Defendants were recognizing in their financial *results*.") (emphases in original).

DEFENDANTS' RESPONSE TO PLAINTIFFS' SURREPLY IN RESPONSE TO DEFENDANTS' REPLY ISO DEFENDANTS' MOTION TO DISMISS – CASE NO. 4:19-CV-01765-YGR

Gibson, Dunn & Crutcher LLP

Moreover, Plaintiffs would be missing the point even if Amyris had not made clear the full context (which it did):  Amyris's CEO went out of his way, in the middle of the class period, to ensure that investors understood that royalty revenues, both past and future, were different from any other income the company would receive because they were *inherently unpredictable*:  "The only area of our business that we have no control over is our Vitamin E royalty."  ECF No. 45 at 8.  This is the very information Amyris is accused of concealing.  The standalone comment—"[w]e have been very effective at predicting [] prices to date"—clearly applies both to the second quarter projections (as Amyris made clear in its Motion) *and* to Amyris's estimates of royalty revenues under ASC 606.  *Id.* at p. 8.  As set forth below, Amyris's 10-Q stated that the licensing revenue figures represented a backward-looking estimate based on past prices:  "the single amount in a range of *possible amounts* derived from the licensee's *historical sales volumes and sales prices.*"  ECF No. 53 at p. 4; Celio Decl. ISO MTD, Exh. A at 13/42 (emphases added).  Against this express disclosure that the revenue number was a backward-looking estimate rather than actual sales data, the warning that those prices were negotiated by third parties and thus outside of the company's control is relevant both to the past quarter as well as to future periods.

**II.    Amyris's 10-Q Disclosures Explained Exactly How Revenue Royalties Were Calculated**

Plaintiffs second surreply claim, about Amyris's disclosures under ASC 606, again repeats an argument Plaintiffs previously made in their Opposition to the Motion to Dismiss.  In its Motion, Amyris argued that its disclosures, including those in its 10-Qs, were sufficient to explain Amyris's use of ASC 606 and disclosed that the revenues being recognized were estimates.  ECF No. 45 at pp. 2-3, 9-10.  In their Opposition, Plaintiffs claimed that there *were no such disclosures*, arguing that this is "precisely what Defendants did not disclose to investors when they discussed ASC 606, how it was being applied, and the significance of its application."  ECF No. 52 at p. 8:15-16.  In direct response, Amyris's Reply pointed to the language in the 10-Qs where this information was disclosed:  "[T]he sales-based royalty exception and revenue is _estimated_ and recognized at a point in time when the licensee's product sales occur.  Estimates of sales-based royalty revenues are made using the most likely outcome method, which is the *single amount in a range of possible amounts* derived from the licensee's *historical sales volumes and sales prices* of its products and recent commodity market

Gibson, Dunn & Crutcher LLP

2

pricing data and trends." ECF No. 53 at p. 4; Celio Decl., Exh. A at 13/42 (emphases added). This is precisely the disclosure that the Opposition claimed did not exist. Moreover, Amyris also included a chart showing the calculation of royalty revenues with and without ASC 606. Celio Decl., Exh. A at 14/42 (Chart for Q1 2018). This chart plainly shows that without adoption of ASC 606, no licensing and royalty revenue would have been recognized in the first quarter. The Opposition's false claim that this information was concealed was the proper subject of Amyris's Reply.

| Three Months Ended March 31, 2018 (In thousands) | As Reported | Adjustments | Amounts Without the Adoption of ASC 606 |
|---|---|---|---|
| Renewable products | $ 5,195 | $ — | $ 5,195 |
| Licenses and royalties | 11,437 | (11,437) | — |
| Grants and collaborations | 6,366 | 444 | 6,810 |
| Total revenue from all customers | $ 22,998 | $ (10,993) | $ 12,005 |

Plaintiffs' related argument that Amyris's disclosures in its 10-Qs were insufficient because they are "unclear" is rebutted by the disclosures themselves. The disclosure clearly spells out that royalty revenues are "estimated" and explains *how* such estimates are derived, by selecting "a single amount in a *range of possible amounts* derived from the licensee's historical sales." Celio Decl., Exh. A at 13/42 (emphasis added). The disclosure then clarified that estimates were made based on historical data. This disclosure provided the "how" and the related chart set forth the "how much."

The remainder of Plaintiffs' argument on this point, that the 10-Q disclosures did not neutralize Amyris's other allegedly misleading statements, fares no better as it rests upon a premise that they have not yet proven: that Amyris's other statements were, in fact, misleading. The cases they cite merely discuss whether informative disclosures can counteract other misleading appraisals and the answer to that question requires a case-by-case analysis. As Amyris explained at length in its briefing, its statements concerning calculation of royalty revenues under ASC 606 were not misleading, which renders these cases inapposite. The statements Plaintiffs allege are misleading are actually consistent with the explanation in the 10-Qs. And, even *assuming arguendo* that the statement that Plaintiffs cling to—Valiasek's response to a question during an investor call that the impact of ASC 606 was de minimus—could be misleading, this statement is neutralized by the 10-Q disclosures *because she points investors directly* to the 10-Q: "[Y]ou can read about it in our 10-Q."

Gibson, Dunn & Crutcher LLP

3
DEFENDANTS' RESPONSE TO PLAINTIFFS' SURREPLY IN RESPONSE TO DEFENDANTS' REPLY ISO
DEFENDANTS' MOTION TO DISMISS – CASE NO. 4:19-CV-01765-YGR

Celio Decl., Exh. G at p. 9.  Even if Valiasek's subjective description during the investor call was mistaken, the disclosure of the *objective* numbers, to which she expressly directed investors, cured any fault.  Indeed, the cases Plaintiffs cite, to the extent they are applicable, support Amyris.  As *Virginia Bankshares* teaches:  "While a misleading statement will not always lose its deceptive edge simply by joinder with others that are true, *the true statements may discredit the other one so obviously that the risk of real deception drops to nil.*"  *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097 (1991) (emphasis added).  Valiasek told investors to refer to the 10-Q.  The 10-Qs in turn disclosed *exactly* how royalty revenues were being estimated and, *in a chart*, no less, disclosed what revenues would be with and without ASC 606.  This is a far cry from the problematic situation in *Virginia Bankshares* where "it would take a financial analyst to spot the tension between the one and the other," or would require that "'overtones might have been picked up by the sensitive antennae of investment analysts.'"  *Id.* (internal citation omitted).  Even a lay person looking at this chart would have understood it and further would have understood that the 10-Qs contained the *objective* information.  *See Marksman Partners, L.P. v. Chantal Pharm. Corp.*, 927 F. Supp. 1297, 1306 (C.D. Cal. 1996) (explaining that in a fraud-on-the-market case, "[i]f both the 'true' and the 'false' information are transmitted to the market with 'roughly equal intensity and credibility,' then the market will be presumed to have received complete and accurate information").

### III.    Plaintiffs' Scienter Argument Rests on Faulty Assumptions

Plaintiffs' final argument in surreply rests on a false premise—that "[i]t was readily observable to Defendants that the royalty amounts recognized were significantly less than the royalty payments received or actually owed, even several months later."  ECF No. 56 at p. 4 (emphasis omitted).  Plaintiffs double down on their misunderstanding of accrual-based accounting.  Under accrual-based accounting, the revenue is recognized when earned, not when received.  Plaintiffs simply assume that the cash was contractually due to be delivered before these statements were made. That is pure speculation; the cash was obviously due at some point, but there is no citation to any allegation in the Complaint about the contractual terms for delivery of the cash.  Without such an allegation, Plaintiffs' scienter argument lacks any particularity—much less that required by the Reform Act.

DEFENDANTS' RESPONSE TO PLAINTIFFS' SURREPLY IN RESPONSE TO DEFENDANTS' REPLY ISO DEFENDANTS' MOTION TO DISMISS – CASE NO. 4:19-CV-01765-YGR

Respectfully submitted,

Dated: January 15, 2020

GIBSON, DUNN & CRUTCHER LLP

By:    /s/ Michael D. Celio
        MICHAEL D. CELIO

*Attorneys for Defendants*

DEFENDANTS' RESPONSE TO PLAINTIFFS' SURREPLY IN RESPONSE TO DEFENDANTS' REPLY ISO
DEFENDANTS' MOTION TO DISMISS – CASE NO. 4:19-CV-01765-YGR

Gibson, Dunn &
Crutcher LLP