1  Robert S. Green
   GREEN & NOBLIN, P.C.
2  2200 Larkspur Landing Circle, Ste. 101
   Larkspur, California 94939
3  Tel: (415) 477-6700
   Fax: (415) 477-6710
4  -and-
   4500 East Pacific Coast Highway
5  Fourth Floor
   Long Beach, California 90804
6  Tel: (562) 391-2487
   rsg@classcounsel.com

*Liaison Counsel for Plaintiffs*

William B. Federman (admitted *pro hac vice*)
A. Brooke Murphy (admitted *pro hac vice*)
FEDERMAN & SHERWOOD
10205 N. Pennsylvania Ave.
Oklahoma City, OK 73120
Telephone:  405-235-1560
Facsimile:  405-239-2112
wbf@federmanlaw.com
abm@federmanlaw.com

*Lead Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHANE MULDERRIG and RONY DEVORAH, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>AMYRIS, INC., JOHN G. MELO, and KATHLEEN VALIASEK,<br><br>Defendants. | Case No.: 4:19-cv-01765-YGR<br><br>**PLAINTIFFS' NOTICE OF PENDENCY OF OTHER ACTION OR PROCEEDING**<br><br>Judge:  Hon. Yvonne Gonzalez Rogers |

Pursuant to Local Rule 3-13, Lead Plaintiff Rob Jansen and Plaintiff Vincent Carbone (collectively "Plaintiffs") hereby give notice of the pendency of *Lavvan, Inc. v. Amyris, Inc.* ("*Lavvan*"), Case No. 1:20-cv-07386-JPO, filed in the Southern District of New York on September 10, 2020. *See* Exhibit 1 (*Lavvan* complaint), attached hereto.

## I. INTRODUCTION

Local Rule 3-13 provides that whenever a party learns of an action filed in another district that "involves all or a material part of the same subject matter and all or substantially all of the same parties" as an action pending in this Court, the "party must promptly" file a notice of pendency of other action. Local Rule 3-13(a).

The above-styled action and the *Lavvan* action involve a material part of the same subject matter, as discussed *infra* at Section III. In addition, the *Lavvan* case is brought against Amyris, Inc., the key defendant in the present action, and thus potentially involves substantially the same parties. Accordingly, Plaintiffs file this mandatory Notice to comply with Local Rule 3-13.

## II. DESCRIPTION OF *LAVVAN*

The *Lavvan* case is brought on behalf of Lavvan, Inc. ("Lavvan"), a company that entered into a Research, Collaboration and License Agreement ("RCL Agreement") with Amyris, Inc. ("Amyris" or the "Company"). According to the complaint, Amyris never intended to fulfill its obligations under the agreement but instead wanted to publicly announce the partnership in an attempt to "stave off investors' worries about the company's hundreds of millions of dollars in losses, crushing debt load, and languishing stock price." (Exhibit 1 at ¶¶ 2-3). Lavvan alleges that in the course of repudiating the agreement that Amyris never intended to honor, the Company misappropriated intellectual property that Lavvan provided to Amyris pursuant to the RCL Agreement. Lavvan brings claims for trade secret misappropriation and patent infringement.

## III. RELATIONSHIP OF *LAVVAN* TO THIS ACTION

Plaintiffs in this action allege that Amyris, John G. Melo ("Melo") (Amyris's CEO), and Kathleen Valiasek ("Valiasek") (Amyris's then-CFO) knowingly or recklessly issued materially false or misleading statements during the period March 15, 2018 and April 11, 2019 (the "Class

1

Plaintiffs' Notice of Pendency of
Other Action or Proceeding                                                                                        FILE NO. 4:19-cv-01765-YGR

Period"). In particular, Plaintiffs allege that Amyris began utilizing accounting rule ASC 606 to report as recognized royalty revenues what were actually overstated estimates of future royalty payments at a time when Amyris had "no visibility on the actual royalty." CAC ¶¶ 23-32, 68.[1] Plaintiffs allege, *inter alia*, that through this improper application of ASC 606, Amyris was able to report record financial results and growing revenues (CAC ¶¶ 44, 51, 59, 61-62, 67-68) while falsely suggesting that these results were due to the growing acceptance of Amyris's products (and not Defendants' application of ASC 606). CAC ¶¶ 44, 51, 53, 62, 67. Plaintiffs allege that Defendants were motivated to knowingly or recklessly report overstated financial results because Amyris was buckling under significant debts and needed to conduct a successful secondary offering to generate approximately $46 million of funds needed to keep Amyris afloat. CAC ¶ 91.

The *Lavvan* action relates to Plaintiffs' action here and involves information obtained through Lavvan's officers' direct interactions with Amyris's officers, including Defendants Melo and Valiasek.

**A. The *Lavvan* action includes information about allegedly false or misleading statements made by Defendants during the Class Period and about Amyris's financial condition during the Class Period.**

As alleged in the *Lavvan* complaint, Amyris and Lavvan began negotiating a collaboration in December 2018. Exh. 1 at ¶ 47. According to the *Lavvan* complaint, "Amyris was in a precarious financial position at that time" and "had actually resorted to borrowing about $1.2 million from its CFO Valiasek[.]" Exh. 1 at ¶ 49. The *Lavvan* complaint alleges that:

> Following the execution of a term sheet in January 2019, Amyris immediately wanted to issue a press release touting the deal. As Lavvan came to learn, Amyris's insistence on pushing forward with press releases was reflective of its overall business model. Amyris and its CEO were "addicted" (their own word) to using the press to create interest in its stock to drive its stock price upward—allowing Amyris's perceived public-relations benefits to drive its business decisions. As Lavvan came to learn, Amyris measured success by stock-price reactions and market interest in its stock rather than the fundamental business metrics on which successful and profitable companies focus.
>
> Consistent with that approach, and despite the many open issues, Amyris pushed forward with its press release, announcing on February 5, 2019, that it was "pleased

---

[1] "CAC" refers to the Class Action Complaint filed in this action (Dkt. No. 43).

2

to have been recognized by a well-capitalized partner as the company best suited to leverage fermentation based technology in the production of the best quality and lowest cost and sustainably-produced cannabinoids." Amyris further stated in the press release that it stood to receive up to $255 million in payments from its role in "development and scaling of technology to produce CBD," in the form of "an upfront payment" and further payouts "linked to milestones that are expected over the next 12-36 months."

Amyris achieved its desired result: In the single trading day following this press release, Amyris's stock price increased 74% from a closing price of $3.16 on February 4 to a closing price of $5.47 on February 5, well above its past-30-day peak of $4.22.

Negotiation of the agreement continued on a quick pace because Amyris was eager to sign the deal by March 2019 and make a splashy announcement before the end of its fiscal quarter at the end of that month. Indeed, Amyris treated the end of the quarter as a deadline for finalizing the agreement—Amyris CEO John Melo and CFO Kathleen Valiasek told Lavvan that, 'if it's not done by then, we'll just do it ourselves.' Amyris apparently knew that it needed something to distract the markets from what would be another abysmal quarter and year—Amyris's results would again be, in Amyris CEO Melo's words, "below expectations."

Consistent with this need, Amyris publicly announced the execution of the RCL Agreement both through a press release and on a public conference call on March 18, 2019—*before* the Parties finalized the deal and signed the RCL Agreement the following day, and *on the same day that Amyris announced its disappointing financial results*. While Amyris was expressing time pressure to close the deal and agree to terms in the first quarter of 2019, it would claim to regret and wish to recant those agreed-upon terms only months later.

*Lavvan* Complaint (Exh. 1) at ¶¶ 52-56 (emphasis in original).

This information relates to Plaintiffs' claims that Defendants knowingly or recklessly issued materially false or misleading statements to investors. Indeed, Plaintiffs allege that Defendants strategically announced the signing of the RCL in an attempt to offset Amyris's same-day partial corrective disclosure that it had missed its revenue guidance. CAC ¶ 72.[2] The aforementioned information from *Lavvan*, including that Amyris had to resort to borrowing

---

[2] The *Lavvan* action alleges: "On March 18, 2019, Amyris issued a press release announcing it had 'signed a final definitive agreement for cannabinoid development' with Lavvan. As described above, Amyris's announcement blatantly misrepresented the status of the RCL Agreement because in reality, as the time of the announcement, there were still material open items under discussion and neither Amyris nor Lavvan had executed the RCL Agreement." *Lavvan* Compl. (Exh. 1) at ¶78.

3

money from its CFO, also relate to Plaintiffs' allegations that Defendants were motivated to mislead the investing public due to Amyris's dire financial condition and the Company's need to prop up its stock price to facilitate a $46 million secondary offering to keep the Company in operation. CAC ¶ 91.

The *Lavvan* complaint includes further admissions from Defendant Melo relating to these allegations:

> [I]n a meeting with Lavvan CEO Neil Closner, Amyris CEO Melo likened Amyris's decision to enter the RCL Agreement and partner with Lavvan on biosynthetic cannabinoids to 'cutting off the arm to save the body': Amyris needed to agree to create biosynthetic cannabinoids for Lavvan and cede control over commercialization and manufacturing to Lavvan in order to get Lavvan's cash and partnership to 'save the body' of the company—as Amyris wanted the press release about its partnership with Lavvan and entry into this space to pump its stock price and facilitate much-needed efforts to raise capital. This behavior is emblematic of Amryis's apparent corporate ethos under the 'leadership' of CEO John Melo—do whatever it takes to boost the stock price today, even if that means trouble down the road. Indeed, this is sufficiently regular behavior for Amyris that Melo actually admitted to Lavvan CEO Neil Closner in a December 2019 meeting that Melo was 'exhausted' from constantly having to do what it takes to keep his company's stock price afloat."

*Lavvan* Compl. (Exh. 1) at ¶ 15. The *Lavvan* complaint also clarifies that, during a meeting with Lavvan's CEO Closner, Melo admitted to entering into the RCL Agreement with Lavvan only because Amyris was desperate to increase the Company's stock price and to raise money:

> Given Melo's expressed disdain for the RCL Agreement, Closner asked Melo why Amyris agreed to sign it just five months earlier. Melo explained that he needed to be "careful" about what he said "because this may end up putting me on the witness stand." Even so, Melo proceeded to admit that Amyris was facing serious difficulties when it signed the RCL Agreement, and…Melo likened Amyris's decision to enter the RCL Agreement to "cutting off the arm to save the body."

*Id.* at ¶ 96. These issues relate to Plaintiffs' motive claims. CAC ¶ 91.

**B. Melo's "addiction" to making knowingly false or misleading statements to investors relates to Plaintiffs' falsity and scienter claims.**

The *Lavvan* action further relates to Plaintiffs' action by describing instances in which Defendant Melo knowingly issued materially false or misleading statements, including false statement about Amyris's expected revenues:

4

> On November 7, 2019, during another earnings call, Melo continued to promise major revenue to investors from Amyris's collaboration with Lavvan. Melo stated that Amyris's payments from Lavvan would be "between $20 million to $25 million this year," and "$70 million to $75 million next year."
>
> Melo's representations to investors did not reflect reality—because by the fall of 2019, it was clear that Amyris would not reach *any* milestones that year and therefore would not be entitled to any further payments beyond the $10 million upfront payment it received in May…. [A]nd there would be no way to do so and commercialize the necessary volume required to achieve any additional milestone before year's end…. *Each* of those steps [needed to achieve the milestone] would take at least a few months by themselves. Melo thus knew or should have known that his statements to investors were false and misleading.

Lavvan Compl. (Exh. 1) at ¶¶ 102-03 (emphasis in original). According to the allegations in *Lavvan*, "Amyris still has not achieved a single developmental milestone" let alone the multiple milestones that Melo told investors would be completed by end-of-year 2019. *Id.* at ¶ 104. The *Lavvan* action also provides information about additional misrepresentations by Melo, including a public announcement by Melo that Amyris was "providing samples" to Lavvan, when this was "plainly false." *Id.* at ¶ 112; *see also id.* at ¶¶ 113-14. According to the *Lavvan* action, "Lavvan CEO Closner told Amyris CEO Melo that he needed to stop misrepresenting the terms and progress of the RCL Agreement to the Public. Amyris CEO Melo responded that his propensity to over-promise was 'like an addiction' and 'something he could not control.'" *Id.* at ¶ 116. The misrepresentations from Melo were so frequent and egregious that Lavvan insisted that the RCL Agreement be amended to include terms that "place[d] constraints on Melo." *Id.* at ¶ 117. These attempts to prevent Melo from issuing materially false or misleading statements to investors were ultimately unsuccessful, according to the *Lavvan* complaint. *See, e.g., id.* at ¶¶ 158, 160, 208-10.

Information from *Lavvan* concerning Melo's propensity to overstate revenues or to over-promise to investors relates to Plaintiffs' allegations that Melo knowingly or recklessly issued materially false or misleading statements to the public. *See, e.g.,* CAC ¶ 90.

### C. Amyris's false and improper accounting of revenues relates to Plaintiffs' claims of improper accounting of revenues.

Finally, the *Lavvan* action relates to Plaintiffs' action in that it describes a similar practice by Amyris and Melo to allegedly improperly recognizing revenue. According to the complaint

5

in *Lavvan*, toward the end of 2019, "Amyris initiated a series of frantic requests to amend the RCL Agreement to accelerate the timing and recognition of existing milestone payments." *Lavvan* Compl. (Exh. 1) at ¶ 120. The *Lavvan* action describes one such request by Melo as follows:

> On December 11, 2019, Amyris CEO Melo and Lavvan CEO Closner met in Amyris's offices in California. Melo told Closner that he needed to be able to send Lavvan invoices showing 2019 dates for work that would not be completed until 2020. He explained that Amyris was banking on $70 million more from Lavvan before the end of 2020.

*Id.* at ¶ 122. Thus, "Amyris now wanted to collect unearned milestone payments anyway—or at least be able to report additional revenue." *Id.* at ¶ 123. After Melo's request, Amyris decided it did not need Lavvan to send invoices for unperformed work because "Amyris had realized that accounting rules allowed it to book sufficient revenue ahead of time…. by using accounting rules that allow it (subjectively) to book a percentage of completion of the milestones." *Id.* at ¶ 127. As such, for Q4 2019, Amyris reported $8.3 million in revenue under the RCL Agreement that had not been earned. *Id.* However, "Amyris's revenue-recognition strategy drew the attention of its internal and external auditors, and in March 2020, Amyris sought to enlist Lavvan to help justify Amyris's accounting." *Id*. at ¶ 154. The *Lavvan* complaint explains:

> In order to book against that future revenue, however, Amyris needed Lavvan to sign a letter about Amyris's performance. Closner explained that Lavvan would naturally need to review such a letter before signing. Melo explained that it was important for Amyris to be able to book future payments from Lavvan because otherwise, Amyris would "miss street expectations by about four to five million bucks."
>
> Around this time, Amyris sent Lavvan a draft letter, addressed to Amyris's outside auditor Macias Gini & O'Connell LLP, for Lavvan to sign. The draft was riddled with misstatements and misrepresentations….
>
> Rather than giving Lavvan the freedom to amend the letter to accurately reflect the work Amyris had done to date, Melo told Lavvan to simply delete—but not provide any comment on—any language Lavvan did not "like."
>
> Meanwhile, Amyris continued to represent to the public that it was making progress on the development of cannabinoids….

\*\*\*

Plaintiffs' Notice of Pendency of
Other Action or Proceeding FILE NO. 4:19-cv-01765-YGR

> Lavvan signed a letter for Macias Gini & O'Connell LLP on the morning of March 13. The letter indicated Lavvan's understanding that Amyris would, before the end of the month, provide confirmatory data indicating that it had met additional milestones. Later that day, Amyris submitted its annual report for 2019 and hosted its investor call. For the second year in a row, it lost over $200 million. Of its reported revenue, 12% came from Lavvan. Amyris *still* has not delivered the confirmatory data it was to provide Lavvan by the end of March. The letter that Amyris fashioned for its own auditor, and that Amyris induced Lavvan to sign by falsely representing it would provide certain data to Lavvan, has now proven to be fraudulent.

*Id.* at ¶¶ 155-58, 162. Similarly, during an April 14, 2020 Joint Steering Committee meeting, "Amyris COO Alvarez had described to Lavvan how Amyris had *regularly* commercialized unprofitable molecules and then explained how they hide it financially." *Id.* at ¶ 178 (emphasis in original); *see also id.* at ¶ 179.

The *Lavvan* action further alleges that Amyris also wanted Lavvan to deceive Amyris's investment bankers:

> Only a few weeks after its March 13 annual report and investor call, Amyris asked Lavvan to participate in a different diligence process, this time with its investment bankers. Lavvan CEO Closner received several messages from the Amyris team about the importance of the diligence call, which was related to the $200 million private placement Amyris would go on to complete in June.
>
> Surprisingly, this time Amyris wanted Lavvan to confirm for the bankers the exact *opposite* of what it was confirming for auditors: that Amyris was *not* working on THC. Because THC remains a controlled substance subject to strict regulatory scrutiny, Amyris sought this reassurance for regulatory and investor-relations reasons. That is, Amyris wanted to be able to book revenue toward work on THC while telling its bankers it was *not* working on THC. As Melo impliedly confirmed in future calls with Closner, it was apparent to Lavvan that Amyris was trying to mislead the bankers about its THC work because the diligence questions that the bankers provided included the leading question: "Please confirm that you are only working on CBD and CBG and not THC products." When Closner confronted Melo about this inconsistency during a call on April 6, 2020, and asked Melo "how do you want me to answer that, John?" Melo was silent.

*Id.* at ¶¶ 163-65.

Information from *Lavvan* about Amyris and Melo's alleged attempts to overstate and improperly account Amyris's revenue relates to Plaintiffs' allegations that Amyris, Melo, and Valiasek knowingly or recklessly misapplied ASC 606 to report overstated revenues. *See, e.g.,*

7

Plaintiffs' Notice of Pendency of
Other Action or Proceeding                                                                                       FILE NO. 4:19-cv-01765-YGR

1  CAC ¶¶ 44, 51, 53 59, 61-62, 67-68.  Information from the *Lavvan* action about Melo's alleged
2  attempts to deceive investment bankers further relates to Plaintiffs' scienter claims, including
3  claims that Amyris was motivated to report falsely positive financial results in order to conduct a
4  successful secondary offering to secure needed funding.  *See* CAC ¶ 91.

## IV. FORMAL COORDINATION BETWEEN THE ACTIONS IS NOT WARRANTED

Plaintiffs do not believe that consolidation or formal coordination between the two actions is warranted.  Because the present action and the *Lavvan* case have different claims, different parties, and different legal standards, it is highly unlikely that consolidation or formal coordination would avoid conflicts or promote efficiencies.  To the contrary, because of the differences between the two cases, including that the present case is brought as a class action, it is likely that consolidation would create considerable inefficiencies and complications. To the extent that informal coordination of discovery may be appropriate (if at all), this would need to wait until after a ruling on the pending motion to dismiss (Dkt. No. 45) pursuant to the statutory discovery stay in this action.  *See* 15 U.S.C. § 78u-4(b)(3)(B) (staying discovery in securities actions until after the disposition of a motion to dismiss).

Dated: September 21, 2020            Respectfully submitted,

*/s/A. Brooke Murphy*
A. Brooke Murphy (admitted *pro hac vice*)
William B. Federman (admitted *pro hac vice*)
FEDERMAN & SHERWOOD
10205 North Pennsylvania Avenue
Oklahoma City, Oklahoma 73120
Tel: (405) 235-1560/Fax: (405) 239-2112
-and-
212 W. Spring Valley Road
Richardson, TX  75081
abm@federmanlaw.com
wbf@federmanlaw.com

*Lead Counsel for Plaintiffs*

Robert S. Green
GREEN & NOBLIN, P.C.
2200 Larkspur Landing Circle, Ste. 101
Larkspur, California 94939
Tel: (415) 477-6700/Fax: (415) 477-6710

8

-and-
4500 East Pacific Coast Highway
Fourth Floor
Long Beach, CA 90804
rsg@classcounsel.com

*Liaison Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that this document was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants on Monday, September 21, 2020.

                                                              */s/A. Brooke Murphy*
                                                              A. Brooke Murphy