1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SHANE MULDERRIG AND RONY DEVORAH,** on behalf of themselves and all others similarly situated,

          Plaintiffs,

    **v.**

**AMYRIS, INC., JOHN G. MELO, KATHLEEN VALIASEK,**

        Defendants.

Case No.: 19-CV-1765 YGR

**ORDER DENYING MOTION OF DEFENDANTS TO DISMISS AMENDED CLASS ACTION COMPLAINT**

Defendants Amyris, Inc., John G. Melo, and Kathleen Valiasek move this Court for an order dismissing plaintiffs' claims for violation of Section 10(b) and Section 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a)), as alleged in plaintiffs' first Amended Class Action Complaint (Dkt. No. 43, "FAC").  Having carefully considered the papers submitted and the pleadings in this action, and the matters judicially noticeable, and for the reasons set forth below, the Court **DENIES** the Motion to Dismiss.

Plaintiffs contend that Amyris's financial statements overstated estimations of future royalty payments based on projected and estimated product sales, in violation of Generally Accepted Accounting Principles ("GAAP")[1].  Violations of GAAP are presumed to be misleading.  *See* SEC

---

[1]  As alleged in the complaint, "GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time. Those principles are the official standards adopted by the American Institute of Certified Public Accountants ("AICPA"), a private professional association, through three successor groups it established: the Committee on Accounting Procedure, the Accounting Principles Board, and the Financial Accounting Standards Board ("FASB").  On July 1, 2009, the FASB approved the Accounting Standards Codification ("ASC" or the "Codification") as the single source of authoritative U.S. accounting and reporting standards, other than guidance issued by the [Securities and Exchange Commission "SEC"]."

United States District Court
Northern District of California

Regulation S-X, 17 C.F.R. § 210.4-01.  Plaintiffs have alleged facts sufficient to show that defendants' alleged GAAP violations here were significant and material.  *See In re Daou Systems, Inc.*, 411 F.3d 1006, 1016-17 (9th Circ. 2005).  In addition, the statements defendants contend were forward-looking growth and revenue projections were accompanied by and premised upon false representations of current revenue, making them ineligible for the PSLRA's safe harbor.  Moreover, defendants made false or misleading statements concerning material weaknesses in its internal controls.  With respect to all these allegations, plaintiffs have alleged sufficient facts that, when viewed holistically, give rise to a strong inference of scienter.  Further, these allegations support plaintiffs' claims of control person liability pursuant to Section 20(a).[2]

**I.    SUMMARY OF ALLEGATIONS[3]**

**A.    Background Prior to Class Period**

Amyris is an industrial biotechnology company that manufactures and sells products in the health and wellness, "clean beauty," flavor, and fragrance markets.  Beginning in 2014, Amyris commercialized and licensed "farnesene," a type of hydrocarbon molecule that it manufactured using its engineered microbes.  Defendant John Melo was the Chief Executive Officer and director of Amyris beginning in January 2007, and president of the company beginning in 2008, through the relevant alleged Class Period.[4]  Melo had worked previously at Ernst & Young, an accounting firm.  Defendant Kathleen Valiasek became the Chief Financial Officer in January 2017 until June 2019.  Valiasek holds a degree in accounting from the University of Massachusetts, Amherst.

In 2017, as stated in the Company's Annual 10-K Report for the fiscal year ended December 31, 2017, Amyris disclosed a material weakness in its internal control over financial reporting related to "a lack of sufficient resources . . . to be able to adequately identify, record, and disclose non-routine transactions." (FAC ¶¶ 5, 47.)  The disclosure stated that the company "lacked a sufficient number of trained resources with assigned responsibility and accountability over the

---

[2]  Plaintiffs filed a "Notice of Pendency of Other Action" on September 21, 2020.  (Dkt. No. 59.)  Defendants filed their objection to the Notice.  (Dkt. No. 60.)  As the contents of those documents are not before the Court properly in the context of this motion, the Court has not considered them in reaching the decision herein.

[3]  The allegations of the operative FAC are assumed to be true for purposes of this motion.

[4]  The alleged Class Period runs from March 15, 2018 to April 11, 2019.  (FAC ¶ 1.)

United States District Court
Northern District of California

design and operation of internal controls related to complex, significant non-routine transactions as well as routine transactions and financial statement presentation and disclosure," and did not "have an effective risk assessment process to identify and analyze necessary changes in significant accounting policies and practices that were responsive to: (i) changes in business operations resulting from complex significant non-routine transactions, (ii) implementation of new accounting standards and related disclosures, and (iii) completeness and adequacy of required disclosures." (FAC ¶ 47.)

The statement for the year ended December 31, 2017, indicated these material weaknesses resulted in "material misstatements" in financial statements, and created "a reasonable possibility that a material misstatement of our annual or interim consolidated financial statements that would not be prevented or detected on a timely basis."  (*Id*.)  Amyris further represented that it was addressing the material weaknesses with a remediation plan, including increased staffing in key accounting positions, "documenting and augmenting" accounting policies, and training staff on new and existing accounting issues.  (*Id*.)  The 2017 Form 10-K reported total liabilities of $346.1 million and net loss attributable to the Company's common stockholders of $93.3 million. (FAC ¶ 46.)

On December 28, 2017, Amyris finalized the sale of its Amyris Brasil farnesene manufacturing facility to Koninklijke DSM N.V. ("DSM").  Under that agreement, Amyris licensed the use of farnesene in the Vitamin E, lubricant, and flavor and fragrance markets to DSM for a fee of $27.5 million and assigned to DSM a farnesene supply agreement Amryis had with Nenter & Co. ("the Agreement").  (FAC ¶ 23.)[5]  The Agreement required DSM to pay to Amyris a portion of the profits realized by Nenter and paid to DSM.  (*Id*.)

**B. Allegations Regarding the Class Period**

Beginning in March 2018, Amyris informed investors that it was now reporting revenue based upon new GAAP accounting standards issued by the Financial Accounting Standards

---

[5]  According to its 10-Q for the first quarter of 2018, the Agreement included a payment of $27.5 million in license fees, a nonrefundable royalty of $15.0 million to be paid at closing, plus a promise of future royalty payments for 2018 and 2019 valued at $17.8 million.  (Celio Decl., Ex. A at 9.)

Board—Accounting Standard Codification ("ASC") Topic 606, Revenue from Contracts with Customers ("ASC 606")—which for Amyris went into effect as of January 1, 2018.  In fact, Amyris's reported royalty revenue was not made consistent with ASC 606 but was based upon estimations of *future* payments that in turn relied on projected and estimated Nenter product sales. (FAC ¶ 30.)  Thus, Amyris represented that it had recognized royalty payments that were estimate of sales by DSM's client, Nenter, and any payments Amyris would receive under the Agreement were dependent on Nenter's profits at a later date.  (*Id.*)  Some detail about ACS 606 is necessary to put the allegations into context.

### 1.    *ASC 606*

ASC 606 regarding Revenue from Contracts with Customers, issued May 2014, went into effect for nonpublic entities as of annual reporting periods beginning after December 15, 2017. (ASC 606 at 9.)  As a general matter, ASC 606 allows a business to recognize revenue once it has fulfilled all of its performance obligations under a contract, rather than upon receipt of payment. (FAC ¶ 24.)  So, for example, a business may recognize revenue when it delivers a good sold for a fixed price if delivery of the goods is the business's final performance obligation under the contract.  In such a scenario, the amount of revenue is certain since there is a fixed price for the goods.

When the consideration to be paid by the customer is variable, ASC 606 puts restraints on how revenue from the contract can be recognized:

> An entity shall include in the transaction price some or all of an amount of variable consideration estimated . . . *only to the extent that it is probable that a significant reversal* in the amount of cumulative revenue recognized *will not occur* when the uncertainty associated with the variable consideration is subsequently resolved.

(FAC ¶ 28, citing ASC 606-10-32-11, emphasis in FAC.)[6]  In the case of a licensing agreement, as Amyris had with DSM here, ASC 606 more specifically provides that sales-based royalties

---

[6]  ASC 606-10-32-12 provides additional guidance on this constraint:
In assessing whether it is probable that a significant reversal in the amount of cumulative revenue recognized will not occur once the uncertainty related to the variable consideration is subsequently resolved, an entity shall consider both the likelihood and the magnitude of the revenue reversal. Factors that could increase the likelihood or the magnitude of a revenue reversal include, but are not limited to, any of the following:

received in exchange for a license of intellectual property should be recognized as revenue *only*

under the following conditions:

> [A]n entity should recognize revenue for a sales-based or usage-based royalty
> promised in exchange for a license of intellectual property *only when (or as)*
> the later of the following events occurs:
>
> a. The subsequent sale or usage occurs.
>
> b. The performance obligation to which some or all of the sales-based or usage-
> based royalty has been allocated has been satisfied (or partially satisfied).

(*Id.* ¶ 30; ASC 606-10-55-65, emphasis supplied.)  This sales-based royalty exception "applies

when the royalty relates only to a license of intellectual property or when a license of intellectual

property is the predominant item to which the royalty relates."  (FAC ¶ 27 citing ASC 606-10-55-

65A.)  When revenue is sales-based but the license of intellectual property is not the only or

predominant item to which the royalty relates, "the guidance on variable consideration . . . applies

to the sales-based or usage-based royalty." (*Id.* citing ASC 606-10-55-65B)[7]

As plaintiffs allege, the provisions of ASC 606 applicable to sales-based royalties differ

from the general principles of ASC 606:

---

> a. The amount of consideration is highly susceptible to factors outside the
> entity's influence. Those factors may include volatility in a market, the
> judgment or actions of third parties, weather conditions, and a high risk of
> obsolescence of the promised good or service.
> b. The uncertainty about the amount of consideration is not expected to be
> resolved for a long period of time.
> c. The entity's experience (or other evidence) with similar types of
> contracts is limited, or that experience (or other evidence) has limited
> predictive value.
> d. The entity has a practice of either offering a broad range of price
> concessions or changing the payment terms and conditions of similar
> contracts in similar circumstances.
> e. The contract has a larger number and broad range of possible
> consideration amounts.

(FAC ¶ 29.)

[7]  The Court takes judicial notice of FASB ACCOUNTING STANDARDS UPDATE, REVENUE
FROM CONTRACTS WITH CUSTOMERS (TOPIC 606) available at
https://www.fasb.org/cs/ContentServer?c=Page&cid=1176156316498&d=&pagename=FASB%2F
Page%2FSectionPage (last visited September 29, 2020).  ASC 606 further states that "[a]n entity
should disclose sufficient information to enable users of financial statements to understand the
nature, amount, timing, and uncertainty of revenue and cash flows arising from contracts with
customers." (ASC 606 at p.6.)

Royalties are [a] form of variable consideration.  However, ASC 606 contains an exception to the principle requiring an estimate of variable consideration for a sales-based royalty for a license of Intellectual Property (IP).  This is because estimating future royalties is quite difficult and would likely result in significant adjustments to the amount of revenue recognized due to changes in circumstances not related to the entity's performance.

(FAC ¶ 30 at n. 2, quoting article from BDO USA, LLP found at

https://www.bdo.com/insights/industries/technology/life-sciences-spring-2017/when-it-comesto-

new-revenue-recognition-model,-as.)  "[Thus,] royalties received in exchange for a license of IP are

recognized as revenue at the later of when the sale occurs or when the performance obligation to

which the royalty relates has been satisfied."  (*Id*.)  "Under this sales- or usage-based royalty

exception, an entity *would not estimate* the variable consideration from sales- or usage-based

royalties. . . . [but] would wait until the subsequent sale or usage occurs to determine the amount of

revenue to recognize." (*Id*. ¶ 26, n.1 [quoting Deloitte & Touche guidance].)

## 2. *Amyris's Reporting of Sales-Based Royalty Revenues*

In a March 15, 2018 press release titled "Amyris Reports Another Strong Quarter with Solid

Operating Performance and 2017 Revenue of $143.3 Million up 113% over 2016," Amyris

represented that it had "started 2018 with continued strong growth in revenues" and each of its

markets was "delivering strong, profitable growth."  (*Id*. ¶ 42.)  In a call with analysts that same

date, Melo explained that the royalty revenue from the Agreement "has become very material faster

than we expected, and we will now be reported -- reporting separately and labeling these as license

and royalties.  When you see this line in our GAAP results, this is mostly value share and

represents the revenue we receive from partners."  (*Id*.)  Melo told analysts that they should

"[t]hink of royalties as 100% gross margin" and that 2018 is "starting off very well with very strong

gross operating performance and revenue that will be around double the first quarter of 2017." (*Id*.

¶ 44.)

Two months later, on May 14, 2018, the company issued a press release stating that it had

$23 million in revenue for the first quarter of 2018 compared to $13 million in the first quarter of

2017.  (*Id*. ¶ 50.)  The press release represented that "[o]ur product related royalty revenue . . .

delivered $11.4 million of 100% gross margin related revenue."  (*Id*.)  In an investor call that day,

Melo stated that "Our royalty payments, which we used to call value share from products delivered

United States District Court
Northern District of California

was $11.4 million in the first quarter versus $225,000 for the same period last year." (*Id.* ¶ 51.)
Melo was asked in the call "Is the $11.4 million, all of it royalties for the quarter? Or are there any
license fees in it, too?"  Melo replied, "all of it is royalty or what we used to call value
share . . . there is no license [fee] revenue in the quarter."  (*Id.* ¶ 53.)  Amyris's quarterly SEC Form
10-Q similarly reported royalty revenue of $11.4 million.  (*Id.* ¶ 56.)

Plaintiffs allege that all these statements referred to the royalties as amounts the company
had recognized as revenue consistent with ASC 606, *i.e.* "when Nenter is selling into the market."
(*Id.* ¶ 54.)  In fact, the claimed revenues were based upon estimated, *projected* Nenter sales that had
not yet occurred.  (*Id.* ¶ 54 ["it was not the case that Amyris waited to have actual sales information
before recognizing royalty revenue under the DSM and Nenter agreement since Amyris was instead
recognizing DSM/Nenter royalty revenue based on Defendants' inflated estimates of royalty
payments based on projected Nenter sales"]; *see also id.* ¶¶ 25, 30, 32.)  Defendants would later
admit that those estimates were in error, and that it had "no visibility" on Nenter sales on which to
base those recognized royalties.  (*Id.* ¶ 54.)

Defendants similarly reported on August 6, 2018 that Amyris had "delivered much better
revenue in the first half of 2018" and that "Q2 2018 GAAP revenue was $24.8 million compared to
$25.7 million for the second quarter of 2017."  (*Id.* ¶ 62, quoting Melo and Valiasek, respectively.)
Defendants attributed that revenue growth to "strong demand" for its products rather than estimated
future sales and payments.  (*Id.* ¶ 63.)  While describing these royalty revenues as "delivered" by
the end of the second quarter, and reporting in its 10-Q for the second quarter of 2018 royalty
revenue of $6.88 million, Amyris had only received a total of about $2.6 million in royalty
payments by that time.  (*Id.*)

In November of 2018, defendants indicated that its financial results were not as good as
expected and that third quarter GAAP revenue was down compared to the third quarter of 2017.
(*Id.* ¶ 67.)  In its press release, the company attributed that result to "volatility" in the Vitamin E
market.  In a November 13, 2018 analyst call, Melo admitted that the company had "expected
around $15 million of royalty revenue in the third quarter and realized 0" and that it had "no

United States District Court
Northern District of California

1   visibility on the actual royalty as it is calculated on the selling price of their contracts that have

2   been at a significant discount to market prices." (*Id*. ¶ 68.)

3          However, in these November 2018 statements, Melo did not concede that defendants had

4   had no visibility in *prior quarters* either.  To the contrary, Melo asserted that:

5          [w]e have realized about $20 million in royalty payments during the first half of
           this year. We continue to believe and expect around $40 million of annual royalty
6          payments in the short to midterm and after we get through the significant current
           market volatility.
7

8   (*Id*. ¶ 68.)  Valiasek reiterated the narrative that "the biggest negative hit for Q3 2018 revenue was

9   due to Vitamin E royalties not coming in for the quarter." (*Id*.)  Valiasek also noted the poor third

10  quarter results also arose from "a much smaller amount of fragrance partner royalty revenue that

11  was earned but could not be recognized in Q3 due to ASC 606 requirements." (*Id*.)  The

12  company's third quarter 10-Q reported license and royalty revenue of $18.46 million for the nine

13  months ended September 30, 2018. (*Id*. ¶ 70.)  The company did not disclose that its higher

14  revenue reports in prior quarters had not materialized. (*Id*.)  However, by the end of the third

15  quarter, Amyris had only received $4.37 million in royalty revenue. (*Id*.)

16         In March 2019, defendants reported results for the fourth quarter of 2018, recognizing just

17  $1.2 million in royalty revenue for the quarter. (*Id*. ¶ 72.)  In a March 18, 2019 analyst call, Melo

18  stated that:

19         we acknowledge that our financial results are not acceptable, and we want to
           avoid this in the future by better assessing what our realistic revenue assumptions
20         versus those that are simply potentially possible and may have elements we
           cannot control.
21

22  (*Id*. ¶ 73.)  Less than a month later, the company announced that, due to accounting errors, it would

23  have to restate several quarterly and annual financial reports. (*Id*. ¶ 76.)  Amyris revealed that it

24  had been operating with undisclosed material weaknesses in financial controls and that "a material

25  error was made related to the estimates for recognizing revenue for royalty payments." (*Id*.)  As of

26  April 11, 2019, the company conceded that it anticipated restatements to report a reduction in

27  revenue, and an increase in net loss, for the [2018 SEC filings] as follows:

28         approximately $4 million and $4 million, respectively, for the fiscal quarter ended
           March 31, 2018; approximately $8 million and $8 million, respectively, for the
           fiscal quarter ended June 30, 2018; approximately $1 million and $7 million,

8

respectively, for the fiscal quarter ended September 30, 2018; approximately $12 million and $11 million, respectively, for the six months ended June 30, 2018; and approximately $13 million and $18 million, respectively, for the nine months ended September 30, 2018.

(*Id.*)  Defendants admitted that they previously had reported the significantly increased royalty revenues despite having very "limited" information at their disposal and despite "the amount of consideration [being] highly susceptible to factors outside the entity's influence," including "volatility in a market" and "the judgment or actions of third parties."  (*Id.* ¶ 32.)

As a result of these revelations, the price of Amyris's stock fell precipitously. (*Id.* ¶¶ 75, 77.)  After uncovering further errors in auditing subsequent to the April 2019 revelations, "Amyris [still] ha[d] yet to restate its 2017 Form 10-K, its 2018 Forms 10-Q, or issue its 2018 Form 10-K or any 2019 financial results" as of the date of the filing of the complaint herein. (*Id.* ¶ 82.)

### 3. *Confidential Witness Statements*

The complaint alleges statements by two confidential witnesses, CW1 and CW2.  (*Id.* ¶¶ 34-41.)  CW1 served in Amyris's finance department from January to October of 2018, assisting in accounting and financial operations.  CW1 states that there was a Vice President of Technical Accounting who was primarily responsible for determining royalty revenues under the Agreement and reported directly to Valiasek.  CW2 served in Amyris's accounting department from January to August of 2018, assisting with operational accounting.  CW2 also reported that the Vice President of Technical Accounting worked closely with Valiasek, who was very involved in overseeing the process of revenue recognition and financial reporting.  (*Id.* ¶ 38.)  Valiasek and Melo reviewed revenue numbers at least monthly, if not weekly.  (*Id.* ¶ 39.)  Further, Valiasek had no choice but to be involved in day-to-day accounting operations because the turnover rate was so high in the accounting department—of the nine or ten employees in the accounting department, eight were temporary hires.  (*Id.* ¶ 40.)  Amyris's Chief Accounting Officer stayed with the company for just six months and was not replaced immediately.  (*Id.*)  CW1 confirmed that there was considerable turnover in the accounting department during their 10-month tenure at Amyris. (*Id.* ¶ 36.)  The turnover and lack of long-tenured employees made operations difficult, particularly because Amyris was in over $162 million in debt and had complex repayment plans that required constant monitoring.  (*Id.* ¶ 41.)

United States District Court
Northern District of California

### 4.     Additional False and/or Misleading Statements

In connection with each of the alleged misrepresentations of revenue, plaintiffs further allege that Melo and Valiasek made false and misleading statements about the sustainability of these revenues and what investors could expect going forward (*e.g.*, *Id.* ¶ 53 ["This is a strong indication of the underlying performance of our products in their respective end markets and the sustainability of our differentiated and advantaged business model;" "expect some choppiness, but full year strong flows. No change;" "we have the most profitable product portfolio in our industry with an anticipated gross margin of around 70% for the year. And we blew through that in the first quarter"]; ¶ 62 ["We expect to deliver with our prior stated target revenue range of $185 million to $195 million;" "we expect . . . to deliver . . . gross profit in excess of $100 million in the second half;" "we anticipate that our quarterly revenues in Q3 and Q4 will be at some of the highest quarterly levels we've experienced"].)

Plaintiffs also allege that defendants made false and misleading statements about the company's internal controls over financial reporting, representing that Amyris was curing its previously disclosed internal control weaknesses over financial reporting from fiscal year 2017 to prevent material misstatements.  (*Id.* ¶ 49.)  Amyris continued to represent that it was remediating the previously reported internal controls issues and had no changes in its internal controls over financial reporting in its quarterly statements for 2018.  (*Id.* ¶¶ 56, 64, 70.)  Defendants failed to disclose that it actually was not increasing accounting resources, staffing, and training at the time of their statements but instead was: experiencing near constant turnover; staffed predominately by inexperienced temporary employees in both regular staff and senior management positions; and struggling to function effectively.  (*Id.* ¶¶ 34-41, 49.)

Melo and Valiasek, in their roles as CEO and CFO, signed off on Sarbanes-Oxley (SOX)[8] certifications in Amyris's 10-Qs and annual report, attesting to the accuracy of the reports, the disclosure of any weakness or change in the company's internal controls over financial reporting, and corrective actions the company was taking regarding its prior failures.  (*Id.* ¶¶ 48, 49, 56, 64, 65.)  Defendants failed to disclose that the Company was in the process of preparing financial

---

[8]  Sarbanes-Oxley Act of 2002 ("SOX"), 15 U.S.C. § 7262.

1  statements for 2018 that included, for the first time, royalty revenues based on complex and

2  uncertain estimates that would further strain Amyris's internal control over financial reporting, as

3  they would later be required to admit. (*Id*. ¶ 49.)

4  **II.   APPLICABLE STANDARD**

5          Under the PSLRA's heightened pleading standard, a plaintiff claiming fraud must allege

6  with particularity facts demonstrating: "(1) a material misrepresentation or omission of fact, (2)

7  scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation,

8  and (5) economic loss." *In re Gilead Sciences Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008)

9  (internal quotation marks omitted); *see also* 15 U.S.C. § 78u-4(b); Fed. R. Civ. P. 9(b); *see Tellabs,*

10  *Inc. v. Makor Issues & Rights, Ltd*, 551 U.S. 308, 323(2007).  The Supreme Court has held that

11  "literal accuracy is not enough: An issuer must as well desist from misleading investors by saying

12  one thing and holding back another." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus.*

13  *Pension Fund*, 575 U.S. 175, 192 (2015). Indeed, a statement is actionably false or misleading if it

14  would give a reasonable investor "an impression of a state of affairs that differs in a material way

15  from the one that actually exists."  *Brody v. Transitional Hospital Corp.*, 280 F.3d 997, 1006 (9th

16  Cir. 2002).

17          When plaintiff alleges an omission, the omission is only material if "a *reasonable* investor

18  would have viewed the non[-]disclosed information as having *significantly* altered the total mix of

19  information made available."  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011)

20  (emphasis in original).  Section 10(b) and Rule 10b-5(b) "do not create an affirmative duty to

21  disclose any and all material information," but instead a duty to include all facts necessary to render

22  a statement accurate and not misleading, once a company elects to disclose that material

23  information.  *Id.* at 44-45, 47; 17 C.F.R. § 240.10b–5(b).  Material information must be disclosed if

24  its omission would "affirmatively create an impression of a state of affairs that differs in a material

25  way from the one that actually exists."  *Brody*, 280 F.3d at 1006.  "'[O]nce defendants cho[o]se to

26  tout' positive information to the market, 'they [are] bound to do so in a manner that wouldn't

27  mislead investors,' including disclosing adverse information that cuts against the positive

28

information." *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016) (quoting *Berson v. Applied Signal Tech. Inc.,* 527 F.3d 982, 987 (9th Cir. 2008).)

The PSLRA requires plaintiffs to allege facts to establish a strong inference of scienter. *Tellabs,* 551 U.S. at 324. Scienter includes knowledge of the falsity as well as "deliberate or conscious recklessness." *No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 937 (9th Cir. 2003) ("*America West*"). Scienter may be established "by alleging facts demonstrating an 'intent to deceive, manipulate, or defraud' or 'deliberate recklessness.'" *Webb v. Solarcity Corp.*, 884 F.3d 844, 851 (quoting *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1144 (9th Cir. 2017) ("*Quality Systems*"). A "'strong inference' is an inference that is 'cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *Webb*, 884 F.3d at 850 (citation omitted). The inference "must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." *Tellabs*, 551 U.S. 308 at 323, 324 (scienter claims "need not be . . . the most plausible" but "must be cogent and compelling").

When deciding whether a strong inference of scienter is pled, courts must consider the "totality of plaintiffs' allegations." *Daou*, 411 F.3d at 1022. "[T]he ultimate question is whether the defendant knew his or her statements were false, or was consciously reckless as to their truth or falsity." *Gebhart v. SEC*, 595 F.3d 1034, 1042 (9th Cir. 2010). It is not necessary for a complaint to establish a strong inference that defendants actually knew contradicting facts since "[r]ecklessly turning a 'blind eye' to impropriety is equally culpable conduct under Rule 10(b)-5." *In re Verifone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 708 (9th Cir. 2012). "Deliberate recklessness is an *extreme* departure from the standards of ordinary care[,] which presents a danger of misleading buyers or sellers that is either known to the defendant or is so *obvious* that the actor must have been aware of it." *Webb*, 884 F.3d at 851 (quoting *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 619 (9th Cir. 2017)).

Allegations must be taken holistically under *Matrixx* 563 U.S. at 48. The Court must "consider *all* reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs" *Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir. 2002) (emphasis

United States District Court
Northern District of California

12

United States District Court
Northern District of California

1   in original).  Any securities fraud claim that relies on statements from a confidential witness to

2   establish scienter must overcome "two hurdles."  *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d

3   981, 995 (9th Cir. 2009), *as amended* (Feb. 10, 2009).  First, a complaint must describe the

4   confidential witness "with sufficient particularity to establish [that witness's] reliability and

5   personal knowledge;" and second, the statements supplied by that confidential witness must

6   "themselves be indicative of scienter."  *Id.*  (citing *Daou*, 411 F.3d at 1015-16).

7   **III.   ANALYSIS**

8          *A.    False/Misleading Statements*

9          Plaintiffs allege that defendants made false and misleading statements or material omissions

10  in its disclosures to investors in three ways.  First, defendants misrepresented its revenues which

11  "affirmatively create[d] an impression of a state of affairs that differ[ed] in a material way from the

12  one that actually exist[ed]."  *Brody,* 280 F.3d at 1006.  In press releases, investor calls, and in its

13  SEC filings, defendants discussed Amyris's record financial results and growth in revenues.  (FAC

14  ¶¶ 42, 44, 51, 59, 61-62, 67-68.)  When asked about the impact of ASC 606, defendants represented

15  that its application had no material impact on the financial results other than simplifying Amyris's

16  financial reporting.  (*Id.* ¶¶ 44, 53).  Instead, defendants credited the "dramatic growth" in revenue

17  to factors in the market and success with its products.  (*Id.* ¶¶ 44, 51, 62, 67.)  Second, defendants

18  offered predictions of future revenue and growth that relied on these false statements of royalty

19  revenue in assuring shareholders that the revenue growth was real and sustainable. (*Id.* ¶¶ 51, 59,

20  62).  Third, defendants made false and misleading statements regarding its internal controls,

21  attesting that there were no undisclosed deficiencies in the Company's internal control over

22  financial reporting. (*Id.* ¶¶ 47-49, 55-58, 64-65, 70-71).  The Court considers each category of

23  alleged misrepresentations in turn.

24                **1. Alleged Misrepresentations of Revenue**

25         Plaintiffs contend that Amyris reported revenues in a manner inconsistent with the GAAP

26  standards stated in ASC 606 and misleading to investors.  Under the Agreement at issue here,

27  Amyris licensed farnesene to DSM, who supplied the ingredient to Nenter.  Nenter then used the

28  farnesene to produce Vitamin E products to sell to consumers.  Amyris and DSM shared royalties

on Nenter's profits from these product sales.  Thus, the amount of payment Amyris would receive
was dependent on Nenter's subsequent sales profits.  (*Id.* ¶ 25.)  Plaintiffs allege defendants
reported as revenue estimates of sales-based royalties Amyris expected to receive, and those
estimates were based upon ***predictions of future sales*** by Nenter rather than sales that had actually
occurred.

ASC 606-10-55-65 is directed specifically to sales-based royalty recognition and warns that
an entity should recognize such variable consideration "***only when . . . [t]he subsequent sale. . .
occurs, [or] [t]he performance obligation . . . has been satisfied***."  (*Id.* ¶ 30, emphasis supplied.)
As to all kinds of variable consideration in contracts, ASC 606-10-32-12 explicitly warns that an
entity must consider all the factors that could increase the likelihood an estimate will need to be
reversed, such as market volatility or limited experience or information with predictive value.  (*Id.*
¶ 29.)  ASC-606-10-32-11 expressly cautions that an entity should *only* include estimates of
variable consideration "to the extent it is probable that a significant reversal in the [estimated]
amount . . . will ***not*** occur[.]" (*Id.* ¶¶ 28, emphasis supplied.)  Further, ASC 606 cautions that an
entity must "***disclose sufficient information to enable users of financial statements to understand
the nature, amount, timing, and uncertainty of revenue***" it is reporting. (ASC 606 at p. 6,
emphasis supplied.)

Here, plaintiffs allege that defendants were recognizing royalties before sales occurred and
were not disclosing to investors the "nature, timing, and uncertainty" of the revenues they were
reporting.  By failing to comply with the restrictions in ASC 606, defendants used these predictions
as the basis for reporting significant growth in revenue as compared to 2017 instead of the alleged
true state of affairs, a stark decline.[9]  (FAC ¶¶ 26-31, 54, 60, 66.)  In speaking about the change to
Amyris's reporting of royalty revenues, defendants were required to disclose these material facts to
make their statements not misleading.  *Berson,* 527 F.3d at 987 ("[O]nce defendants chose to tout
the company's backlog, they were bound to do so in a manner that wouldn't mislead investors as to
what that backlog consisted of.").  Defendants used language indicating that the revenue results

---

[9]  For example, Amyris reported revenue growth of 19% in in the first quarter, rather than a
27% decline.  (FAC at ¶¶ 31, 88.)

they were reporting were certain, not mere puffery or predictions.  *See In re Atossa Genetics Inc Sec. Litig.*, 868 F.3d 784, 801 (9th Cir. 2017) (finding defendant's "use of the past tense: 'achieved' [and] 'obtained'" implied "that he spoke of events that had already happened, *i.e.*, that FDA clearance risk had already been achieved.").  For example:

- In a March 15, 2018 conference call Melo stated: "2018 is starting off very well with very strong gross operating performance and revenue that will be around double the first quarter of 2017."  (FAC ¶ 44.)

- In a May 4, 2018 press release, Amyris reported revenue of $23 million for the first quarter of 2018, compared with $13 million in the first quarter of 2017, including over $11 million in royalty revenues for the first quarter of 2018, explaining, "[o]ur product related royalty revenue (previously referred to as value share) delivered $11.4 million of 100% gross margin related revenue." (FAC ¶ 50.)

- In a May 14, 2018 investor call, Melo reiterated the press release, stating that "[w]e exceeded our guidance for the year of about 70% gross margin and delivered strong revenue growth. We delivered activity in the first quarter that would have represented an additional $1 million in revenue." (FAC ¶ 51.)  When asked about the reported $11.4 million in royalty revenue for the first quarter, Melo stated "[j]ust about all of it is royalty." (FAC ¶53.)  These revenue figures were repeated in Amyris's 10-Q filing, which both Melo and Valiasek certified.  (FAC ¶ 56.)

- Reporting its second quarter, Amyris's August 6, 2018 press release disclosed total revenue of $24.8 million. (FAC ¶ 61.)  In a conference call that same day, Valiasek stated: "Now let me review our second quarter 2018 results. Q2 2018 GAAP revenue was $24.8 million compared to $25.7 million for the second quarter of 2017.  As a reminder, this reflects . . . Vitamin E royalties and collaboration revenue.  Adjusting out the low-margin revenues from 2017, our growth is 15% on an absolute basis." (FAC ¶ 62.)  Melo stated "[w]e delivered much better revenue for the first half of 2018." (*Id.*)  The 10-Q issued August 14, 2018, certified by Melo and Valiasek announced $23.19 million revenue with license and royalty revenue comprising of $6.88 million of that total. (FAC ¶ 64.)

As of November 13, 2018, although Melo and Valiasek were stating that they had not "realized" the $15 million in third quarter royalty revenue they had expected, they did not revise the figures they had announced previously for the first two quarters, instead underscoring that:

- We ***have realized*** about $20 million in royalty payments during the first half of this year. We continue to believe and expect around $40 million of annual royalty payments in the short to midterm and after we get through the significant current market volatility.  (FAC ¶ 68 [Valiasek], emphasis supplied.)

- ". . . so far, this year, ***we've realized*** about $20 million, and again, at target." (*Id.* [Melo], emphasis supplied.)

Defendants argue that their SEC filings fully explained to investors the change in accounting rules and its effect on revenue reporting.  For example, defendants disclosed that the

royalty revenue they reported for the first quarter of 2018 would have been $0 under the old

accounting rule, which defendants reiterated in the comparative charts they provided in their SEC

filings, like the one below:

| Three Months Ended March 31, 2018 (In thousands) | As Reported | | Adjustments | | Amounts Without the Adoption of ASC 606 | |
|---|---|---|---|---|---|---|
| Renewable products | $ | 5,195 | $ | — | $ | 5,195 |
| Licenses and royalties | | 11,437 | | (11,437) | | — |
| Grants and collaborations | | 6,366 | | 444 | | 6,810 |
| Total revenue from all customers | $ | 22,998 | $ | (10,993) | $ | 12,005 |

(Declaration of Michael D. Celio ("Celio Dec."), Dkt. No. 45, at Exh. A [Form 10-Q filed 5-18-

2018], p. 14/42.)[10]

In this section of the 10Q, Amyris included what it represented was a comparison between

the amount of license and royalty revenue it would have recognized under the prior accounting rule

versus under new rule ASC 606.  However, the 10Q's accompanying description of the effect of the

new rule stated creates the impression that Amyris was only recognizing royalty revenue when

Nenter made actual sales of products:

> The most significant change in accounting policy is the Company now estimates
> royalty revenues from licenses of the Company's intellectual property and
> recognizes estimated royalty revenues at a point in time when the Company sells
> its renewable products to its customers (if the sales -based royalty exception does
> not apply) *or when the licensee sells its products to its customer* (if the sales -
> based royalty exception does apply).  Also, the transaction price for royalty
> revenues is reduced for variable incentive payments that may be payable by the
> Company to customers.

(Celio, Exh. B [Form 10-Q filed 8/14/2018] at 15/55, emphasis supplied; *see also* Exh. A at 16/42.)

As the complaint alleges, the revenues reported for these periods were *not* based on the actual

"licensee [sales of] its products to its customer" as the explanation in the 10Q indicates they were.

Instead, the reported revenues were based on *estimates* of what Amyris's licensee, Nenter, *might*

*sell* in the future.  (*See, e.g.*, FAC ¶¶ 25, 30-32, 43, 45.)  Thus, while the table shows that there

---

[10]  The Form 10-Q filed at the end of the second quarter contained a similar disclosure,
noting that without ASC 606, the company would only have reported $2.577 million in revenue.
(Celio Dec., Ex. B, Form 10-Q filed 8/14/2018, at p. 15/55.)  Rule ASC 606 required companies to
include this kind of comparison in their Forms 10-Q.  (*See* ASC 606-10-65-1(i)(1).)

would have been zero license and royalty revenue for the first quarter under the old accounting rule as compared to the $11,437,000 Amyris reported, the 10Q does not reveal that the reported revenues under the new rule were *estimates based on estimates, not based on actual sales*. Consequently, the complaint plausibly alleges that defendants both failed to disclose the uncertainty of the royalty revenues they reported and affirmatively misstated the manner in which they were calculated.

Defendants' alleged misleading statements here are similar to the alleged misstatements the Ninth Circuit found actionable in *Daou*. There, plaintiffs alleged that a computer networking company had made misleading statements regarding its revenues in violation of GAAP. *Daou*, 411 F.3d at 1017. The company argued it had disclosed its accounting methods in its financial statements, so investors could not have been misled. The Ninth Circuit held that disclosure of the Company's methods was nevertheless insufficient to prevent its revenue statements from being misleading. The Ninth Circuit held:

> What defendants' disclosure—that revenue was sometimes being recognized before the customer was billed—does not reveal is that defendants were recognizing revenue *before it was even earned*. An investor would read defendants' disclosure of revenues "recognized" as meaning that the excess revenues recognized were at the very least earned. As plaintiffs allege, that statement was misleading because defendants were allegedly recognizing revenue, before it was earned in violation of GAAP.

*Id.* at 1019 (emphasis in original). Thus, the Ninth Circuit reversed dismissal of the complaint, holding that the allegations that the company had recognized revenue inconsistent with GAAP, along with "at least some specific allegations of how the adjustments [to revenue] affected the company's financial statement and whether they were material in light of the company's overall financial position" sufficiently alleged materially misleading statements. *Daou*, 411 F.3d at 1018.

As in *Daou*, defendants' explanation of how ASC 606 required sales-based royalties to be recognized did not align with what defendants actually were recognizing in their statements. The fact that defendants explained how ASC 606 was supposed to be applied and how that differed from the prior accounting rule could not correct the misrepresentations caused by defendants' alleged revenue recognition inconsistent with that rule. Contrary to defendants' assurances that the

17

1   change in financial reporting was little more than a change in "labeling" that was

2   "simplifying . . . how we report our results" with no more than a "de minimus impact" on what was

3   being reported, they did not clarify or simplify but rather exacerbated the problem.  (FAC ¶¶ 44

4   [Melo], 53 [Valiasek].)

5          Defendants further argue that they disclosed in their 10Qs that their estimates were made

6   using the "most likely outcome method." (*See* Celio Decl., Exh. A at 13/42.)  For example, the 10Q

7   for the first quarter of 2018 stated:

8          When the Company's intellectual property license is the only performance
           obligation . . . the Company applies the sales-based royalty exception and revenue

9          is estimated and recognized at a point in time when the licensee's product sales
           occur.  Estimates of sales-based royalty revenues are made using the most likely

10         outcome method, which is the single amount in a range of possible amounts
           derived from the licensee's historical sales volumes and sales prices of its

11         products and recent commodity market pricing data and trends.

12   (*Id.*)[11]  Based on this language in the disclosures, defendants contend their estimates were made

13   using an accepted accounting model, not mere "blind predictions," and the risks of that method

14   were disclosed to investors.

15         Defendants do not persuade.  Like the tables comparing the effects of the new accounting

16   rule, the context of that statement in the 10Qs was the further assurance that Amyris "applies the

17   sales-based royalty exception and revenue is estimated and ***recognized at a point in time when the***

18   ***licensee's product sales occur***." (Celio Decl., Exh. A at 13/42, emphasis supplied.)  Defendants

19   are alleged to have recognized revenue (and represented it to investors as "received" or "realized")

20   *before* the sales occurred, *i.e.*, based on "projected and estimated Nenter product sales."  (FAC ¶¶

21   25, 30, 31, 32, 43 ["revenues were entirely estimated"], 45, 52, 54 [recognizing DSM/Nenter

22   royalty revenue based on estimates of projected sales], 59, 60 [attributing revenue to "products

23   sold" in first quarter]; 68, 69 [limiting revenue drop to third quarter market volatility which

24   reiterating revenues for first and second quarter as "realized"]).  Thus, a statement in the 10Q about

25

26   _____

27         [11]  The language in the 10Q tracks the general requirements of ASC 606 that apply to
     variable consideration, specifically ASC 606-10-32-8 which provides two methods by which

28   entities can estimate variable consideration, the "expected value" method and the "most likely
     amount" method.  That choice of estimation method language does not appear in the sales-based
     licensing exception.

1   the company's estimation method does not neutralize its alleged false statements in recognizing

2   royalty revenue *prior* to the licensee's sale.  Rather, it is quite plausible that a jury would find the

3   statements merely obfuscated what ASC 606 required and Amyris was purporting to do—

4   recognizing revenue when sales occur, not before. (*See* FAC ¶ 26, n.1 [sales-based royalty

5   exception requires entity not to estimate variable consideration, but to wait until subsequent sales or

6   usage of IP occurs before recognizing revenue]; ¶ 30 n.2 [sales-based royalty exception is "an

7   exception to the principle of requiring an estimate" of variable consideration].)

8                    **2.    Amyris's Statements Touting Sustainability of Financial Results**

9          Plaintiffs also allege defendants made false and misleading statements touting the

10   sustainability of their reported revenue growth.  Plaintiffs contend that, at a minimum, defendants'

11   statements were false and misleading because they did not disclose the defendants lacked necessary

12   information to estimate the royalty revenues Amyris actually would receive.

13          Defendants argue that the plaintiffs have identified nothing more than forward-looking

14   statements protected by the PSLRA's safe harbor, 15 U.S.C. § 78u-5(c)(1).  The PSLRA's safe

15   harbor provision states that a defendant is not liable for a "forward-looking statement" if:

16   •   the statement is identified as a forward-looking statement and accompanied by meaningful
        cautionary statements identifying important factors that could cause actual results to differ
17      materially (15 U.S.C. § 78u-5(c)(1)(A)(i)); and

18   •   plaintiff fails to prove that the forward-looking statement was made with "actual knowledge
        by [the speaker] that the statement was false or misleading" or, if the alleged statement was
19      made by a business entity, that the statement was "made or approved by [an executive
        officer] with actual knowledge the statement was false or misleading."
20

21   15 U.S.C. § 78u-5(c)(1)(B)(i), (ii).  For the reasons stated below, the Court finds that the statements

22   at issue do not qualify as forward-looking and, even if they could, were not accompanied by

23   sufficient cautionary statements to qualify for the PSLRA's safe harbor.

24                    *a.    More than forward-looking*

25          Defendants argue that misstatements plaintiffs target in the FAC "are classic growth and

26   revenue projections, which are forward-looking on their face."  *Police Ret. Sys. of St. Louis v.*

27   *Intuitive Surgical, Inc.*, 759 F.3d 1051, 1058 (9th Cir. 2014); *Cutera*, 610 F.3d at 1111 ("earnings

28   projection[s]" are "by definition [] forward-looking statement[s].").  To the extent that plaintiffs try

                                                    19

to parse these forward-looking statements to focus on phrases that are phrased in the present tense, this is a futile exercise "because, examined as a whole, the challenged statements related to future expectations and performance." *Police Ret. Sys.*, 759 F.3d at 1059 (holding that statements regarding future expenditures projects were, in context, entirely forward-looking). The Court disagrees.

First, the Court notes that even "general statements of optimism" may be actionable if they are related to aspects of the company's operations that the speakers "kno[w] to be performing poorly." *Quality Systems*, 865 F.3d at 1143.[12] Here, however, the forward-looking aspects of defendants' statements are accompanied by and premised on the alleged false representations of Amyris's *current* revenues—*i.e.* non-forward-looking statements. For example, during the same call in which Melo is alleged to have falsely represented that Amyris had recognized $23M in revenue for the first quarter, including $11.4M in farnesene royalty revenue inconsistent with GAAP, Melo coupled that false revenue statement with the following announcements:

> We exceeded our guidance for the year of about 70% gross margin and delivered strong revenue growth. We delivered activity in the first quarter that would have represented an additional $1 million in revenue. This would have been mostly 100% gross margin revenue that is expected to be accounted for in the second quarter due to timing. This is what we consider growing sustainably, and we have very good visibility on continuing at this rate or better for the next several years.
> * * *
> I think what we said in the last call is that we would generate around $50 million to $60 million of value share for the year, and that is the royalty line. And that's what you should expect. It won't be perfectly linear for the year, so you'll see some choppiness. But again, for the full year, $50 million to $60 million, I'd expect some choppiness, but full year strong flows. No change.

(FAC ¶¶ 51, 53.)

Similarly, shortly after reporting the misstated first quarter royalty revenue, in May of 2018, Amyris hosted a presentation in which it told investors:

> MELO: We see the growth ahead at about 71%, and we see a margin in the health and wellness space of about 83%. So great gross margin business. And it's a great gross margin business because a core part of that business in the near to medium

---

[12] For example, the statement that a company "anticipates a continuation of its accelerated expansion schedule," while knowing that the expansion is already failing, is materially misleading. *Id.* (citing *Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995)); *see also Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996) (statements that "everything [was] going fine" with FDA approval was misleading when clinical studies actually failed to produce results that could lead to FDA approval).

term is actually 100% margin payments, or we used to call value share, we now call it royalty, from DSM for some of our [farnesene] vitamin technology.
\*\*\*
VALIASEK: So again, what are [we] seeing? Sustainable growth. This is how we get to EBDITDA [i.e., earnings before interest, taxes, depreciation, and amortization] positive in 2018 and the outer years, Okay. 83% non-GAAP gross margin versus last year same quarter, negative 4%.
\*\*\*
But if you take out of our run rate from Q1 2018, that $6 million where it's almost at the exact same run rate we were at for Q4 2017. So a lot of investors and analysts are saying to me, Okay, well the information that you're giving me, we're doing the math, we've said our EBITDA[13] will be $10 million positive. If we do the math, you're going to be even more than that. But what we wanted to do consistently is be conservative, make sure that we meet our numbers. Here's our revenue growth. It's again, year over year amazing. We're expecting to do 185 to 195 in 2018. Again, gross margin at least 70% for 2018. And you'll see the same thing in 2019.

(FAC ¶ 59.) Melo also stated in that presentation that Amyris had "the most profitable product portfolio in our industry with an *anticipated gross margin of around 70%* for the year. And we *blew through that in the first quarter*, as you know, based on the mix of products *that we sold in the first quarter*." (FAC ¶59, emphasis supplied.) In so doing, Melo provided a specific prediction of annual revenue growth (down to the percentage), while using misstated revenues for the first quarter to indicate that prediction had already been met.[14]

Similarly, the same day Amyris issued its August 6, 2018 press release reporting misstated revenues of $24.8M for the second quarter of 2018, Melo also stated:

We delivered much better revenue in the first half of 2018, much stronger gross margin, lower cost and continued our improvement in net income. Our strategy of delivering strong, profitable growth is working, *and we expect a very strong second half to build on the momentum of the first half*.

We expect to deliver with our prior stated target revenue range of $185 million to $195 million and to achieve a full year positive EBITDA of around $10 million. . . . In aggregate, we expect these activities and our base business to deliver between $135 million and $145 million of revenue and gross profit in excess of $100 million in the second half.

(FAC ¶ 62, emphasis supplied.) Valiasek underscored the growth projections Melo described, stating: "This pipeline of business is sizable. In fact, we anticipate that our quarterly revenues in

---

[13] EBITDA stands for earnings before interest, taxes, depreciation, and amortization.

[14] The Court further notes that defendants' statements of recognized and projected revenues went beyond mere "feel good monikers" of performance or "mildly optimistic" assessments. *Cf. Oregon Pub. Employees Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014) (citing *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010).

United States District Court
Northern District of California

1    Q3 and Q4 will be at some of the highest quarterly levels we've experienced since executing the

2    fuels business and at much improved profitability." (*Id.*)

3           The allegations here are similar to those examined by the Ninth Circuit in *Quality Systems*.

4    The court in *Quality Systems* considered statements in which defendants predicted a "revenue range

5    of growth of 21% to 24% for the year and an EPS growth of 29% to 33% for the year" while

6    "characterizing these predictions as 'quite conservative' given QSI's 'large' pipeline" that was

7    'growing.'" *Quality Systems*, 865 F.3d at 1147.  The court held that these statements were not

8    protected but were "non-forward[-]looking statements about the state of QSI's sales pipeline." *Id.* at

9    1148; *see also Am. West*, 320 F.3d at 937 (statements about the effects of past facts are not

10   "forward-looking").  The Ninth Circuit held that these statements "went beyond 'feel good'

11   optimistic statements. . . . [and] did not just describe the pipeline in subjective or emotive

12   terms. . . . [but] provided a concrete description of the past and present state of the pipeline."  *Id.* at

13   1144.  Moreover, defendants in *Quality Systems* were alleged to have actual knowledge that their

14   statements of present facts were false and misleading.  *Id.* at 1149.  Thus, forward-looking

15   statements *premised on* those false statements about present facts also were made with knowledge

16   of their falsity and were not covered by the PSLRA's Safe Harbor.  *Id.*[15]

17          Here, as in *Quality Systems*, defendants' enthusiastic, specific financial forecasts were

18   intertwined with its misstatements of current revenues and the revenue pipeline.  Defendants failed

19   to disclose the material facts undermining those projections.  Defendants made materially false or

20   misleading statements about the reliability and sustainability of the Company's present reported

21   revenues.  Defendants' alleged statements therefore misrepresented or omitted material past or

22   present facts, such that the PSLRA's safe harbor does not apply.

---

23          [15]  Other district courts in the Ninth Circuit prior to *Quality Systems* found that "the

24   PSLRA's safe harbor does not apply" to challenged statements that omit or misrepresent the
     present facts underpinning those statements.  *Mallen v. Alphatec Holdings, Inc.*, 861 F.Supp.2d
     1111, 1118, 1126 (S.D. Cal. 2012) *aff'd sub nom. Fresno Cty. Employees' Ret. Ass'n v. Alphatec*

25   *Holdings, Inc.*, 607 F. App'x 694 (9th Cir. 2015) (finding statement that "we anticipate that our
     revenues throughout the balance of 2010 will continue to grow" not protected by the safe harbor);

26   *see also, In re Celera Corp. Sec. Litig.*, 2013 WL 4726097 (N.D. Cal. Sept. 3, 2013) ("the failure to
     alert investors to the reimbursement problem was not forward-looking; rather, it was an omission of

27   a historical fact"); *In re Nuvelo, Inc. Sec. Litig.,* 668 F.Supp.2d 1217, 1230 (N.D. Cal. 2009)
     (statements about drug's path to approval were actionable as they "concealed or downplayed

28   known *present* risks related to regulatory approval").

22

United States District Court
Northern District of California

b.   *Meaningful Cautionary Statements*

Defendants further contend they provided meaningful cautionary statements in connection

with all the statements they contend are forward-looking.  Defendants cite to standard cautionary

statements in their press releases[16] and transcripts of earnings calls.[17]  In addition, they contend that

cautionary language was offered in the May 22, 2018 presentation, in which Melo stated:

> I am going to share information with you that is forward-looking.  I wish I could
> guarantee that it's all going to happen without question.  The reality is there are
> risks in what we do.  But I wouldn't be sharing it with you if I didn't believe it
> and if we didn't have it well underpinned and expected for it to happen.

(Celio Decl. Exh. I [May 22, 2018 presentation] at p. 2.)

---

[16]  The press releases all included the same standard language:

Forward -Looking Statements
This release contains forward-looking statements, and any statements other than
statements of historical fact could be deemed to be forward -looking statements.
These forward -looking statements include, among other things, statements
regarding future events, such as expected 2018 revenue and EBITDA, anticipated
2018 business performance, expected market opportunities for our products and
anticipated future revenue composition, that involve risks and uncertainties. These
statements are based on management's current expectations and actual results and
future events may differ materially due to risks and uncertainties, including risks
related to Amyris's liquidity and ability to fund operating and capital expenses,
potential delays or failures in development, production and commercialization of
products, risks related to Amyris's reliance on third parties, and other risks
detailed from time to time in filings Amyris makes with the Securities and
Exchange Commission, including Annual Reports on Form 10-K, Quarterly
Reports on Form 10-Q and Current Reports on Form 8-K. Amyris disclaims any
obligation to update information contained in these forward -looking statements
whether as a result of new information, future events, or otherwise.

(Celio Decl., Exh. C at 2/6; *see also* Exhs. D, E.)

[17] The earnings call presentations all began with a standard disclaimer at their start, read by
Peter DeNardo, Director of Investor Relations and Corporate Communications:

During this call, we will make forward-looking statements about events and
circumstances that have not yet occurred, including projections of Amyris'
operating activities and their anticipated financial impact on our business and
financial results for 2018 and beyond. These statements are based on
management's current expectations, and actual results and future events may
differ  materially due to risks and uncertainties, including those detailed from time
to time in the filings Amyris makes with its Securities and Exchange
Commission, including Annual Reports on Form 10-K, quarterly reports on Form
10-Q and current reports on Form 8-K. Amyris disclaims any obligation to update
information contained in these forward -looking statements, whether as a result of
new information, future events or otherwise. Please refer to the Amyris SEC
filings for detailed discussion of the relevant risks and uncertainties.

(Celio Decl. Exh. F at 1; *see also* Exh. G at 1, Exh. H at 1.)

That defendants included these cautionary statements in their disclosures does not change the analysis here.  Adequate cautionary language under the PSLRA must identify "important factors that could cause actual results to differ materially from those in the forward-looking statement." *See* 15 U.S.C. § 78u-5(c)(1)(A)(i).  "Where a forward-looking statement is accompanied by a non-forward-looking factual statement that supports the forward-looking statement, cautionary language must be understood in the light of the non-forward-looking statement." *Quality Systems*, 865 F.3d at 1146–47.  "For cautionary language accompanying a forward-looking portion of a mixed statement to be adequate under the PSLRA, that language must accurately convey appropriate, meaningful information about not only the forward-looking statement but also the non-forward-looking statement." *Id.* at 1148.  "Where, as here, forward-looking statements are accompanied by non-forward-looking statements about current or past facts, that the non-forward-looking statements are, or may be, untrue is clearly an 'important factor' of which investors should be made aware." *Id.*  "If the non-forward-looking statement is materially false or misleading, *it is likely that no cautionary language—short of an outright admission of the false or misleading nature of the non-forward-looking statement—would be 'sufficiently meaningful' to qualify the statement for the safe harbor.*" *Id.* at 1146-47 (emphasis supplied); *see also Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097 (1991) ("not every mixture with the true will neutralize the deceptive. . . . [t]he point of a proxy statement, after all, should be to inform, not to challenge the reader's critical wits.") (internal citations omitted).

The cautionary language offered by defendants here does not meaningfully address the risks inherent in Amyris's projections of future revenues.  Those projections were all accompanied by statements of royalty revenue defendants had recognized improperly, and as to which they later admitted they had "no visibility."  (FAC ¶ 68.)  Like the "materially false or misleading non-forward-looking statements about the state of QSI's sales pipeline" in *Quality Systems*, "virtually no cautionary language short of an outright admission" would be sufficient to qualify the forward-looking portions of the statements alleged here.  *Quality Systems*, 865 F.3d at 1146.

United States District Court
Northern District of California

1    In sum, the statements alleged here do not qualify as forward-looking statements under the

2    PSLRA's safe harbor.[18]

### 3. Amyris's Disclosures About Material Weaknesses in Internal Controls

Finally, plaintiffs allege that Amyris was operating with material weaknesses in its internal controls over financial reporting that it failed to disclose truthfully to investors. "A material weakness is a deficiency, or combination of control deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis." 17 C.F.R. § 240.13a-15. "[A] statement of opinion is actionably misleading if it "omits material facts" that "conflict with what a reasonable investor would take from the statement itself[.]" *Omnicare,* 575 U.S. 175, 188 ("[A]n investor . . . expects such an assertion to rest on some meaningful legal inquiry—rather than, say, on mere intuition, however sincere.").

Prior to the relevant period here, Amyris disclosed significant material weaknesses in its internal controls over financial reporting for fiscal year 2017, including that it "lacked a sufficient number of trained resources" with responsibility over financial presentation and disclosure, and "did not have an effective risk assessment process to identify and analyze necessary changes in significant accounting policies." (FAC ¶¶ 46, 47.) Amyris disclosed that those material weaknesses "resulted in material misstatements" regarding revenue for fiscal year 2017, and that they "create[d] a reasonable possibility that a material misstatement of our annual or interim consolidated financial statements that would not be prevented or detected on a timely basis." (*Id.* ¶ 47.) At the same time, Amyris reported that it was addressing those material weaknesses with a remediation plan including increasing accounting resources, staffing, and training. (*Id.* ¶¶ 48, 49.)

---

[18] Further, even assuming any of the statements alleged could be viewed as purely forward-looking, plaintiffs have sufficiently alleged that defendants had actual knowledge their statements were materially false or misleading, as set forth herein in section B. This, too, would bar reliance on the safe harbor. *See Quality Systems,* 865 F.3d at 1149 ("As described above, Defendants had actual knowledge that their non-forward-looking statements were false and misleading. *Their forward-looking statements were premised on those non-forward-looking statements. It necessarily follows that they also had actual knowledge that their forward-looking statements were false or misleading.*") (emphasis supplied).

1    Amyris continued to represent in its SEC filings that it was remediating the previously

2 reported internal controls issues.  (*Id*. ¶¶ 56, 64, 70.)  Further, on May 18, 2018, August 14, 2018,

3 and November 15, 2018, Defendants asserted in the Forms 10-Q1, Q2, Q3 that: "There were no

4 changes in our internal control over financial reporting during [the most recently completed fiscal

5 quarter] that have materially affected, or are reasonably likely to materially affect, our internal

6 control over financial reporting." (*Id*.)

7    Contrary to those representations, Amyris's accounting department was not increasing and

8 improving but in fact was experiencing near constant turnover; was staffed predominately by

9 inexperienced temporary employees in both regular staff and senior management positions; and

10 was struggling to function.  (*Id*. ¶¶ 34-41, 49.)  Thus, far from remediating the prior internal control

11 weaknesses and experiencing no new issues, plaintiffs allege that Amyris's internal controls were

12 deteriorating further and new failures were occurring as the result of the Company's adoption of

13 ASC 606, none of which was disclosed to investors.  (*Id*. ¶ 49.)  Defendants failed to disclose that

14 the Company was in the process of preparing financial statements for 2018 that included royalty

15 revenues based uncertain estimates that would further strain Amyris's internal control over

16 financial reporting, as they would later be required to admit. (*Id*.)  Defendants' representations left

17 investors with the false or misleading impression that Amyris was curing its prior internal controls

18 weaknesses and no new concerns needed to be disclosed in prevent that statement from being false

19 or misleading.

20    Further, Melo and Valiasek, in their roles as CEO and CFO, signed off on the SOX

21 certifications in Amyris's 10-Qs and annual report, attesting to the accuracy of the reports, the

22 disclosure of any weakness or change in the company's internal controls over financial reporting,

23 and the corrective actions the company was taking regarding its prior failures.  (*Id*. ¶¶ 48, 49, 56,

24 64, 65.)  However, both Melo and Valiasek were aware of pre-existing material weaknesses as well

25 additional, then-existing material weaknesses in Amyris's internal control over financial

26 reporting—namely that it lacked the necessary information to account effectively for the royalty

27 revenues it was reporting (*id*. ¶ 68) and that its accounting department was struggling to function

28 due to constant turnover (*id*. ¶¶ 34-41).  As Amyris would later admit, these undisclosed material

weaknesses again significantly increased the likelihood that their reported financial statements were unreliable.  (*Id*. ¶ 76.)

Accordingly, Amyris's statements, as certified by Melo and Valiasek, representing to investors and the SEC that there were no changes "reasonably likely to materially affect" Amyris's internal control over financial reporting satisfy the pleading standard with respect to being objectively false, misleading, and undisclosed throughout the Class Period.

### B.    Scienter

The Court further finds that the allegations herein, taken in their totality, sufficiently allege a strong inference of scienter as required under the PSLRA.  "Scienter may be established . . . by showing that the defendants knew their statements were false, or by showing that defendants were reckless as to the truth or falsity of their statements."  *Gebhart*, 595 F.3d at 1041.  Although scienter is an inquiry into the defendant's subjective state of mind, "the objective unreasonableness of a defendant's conduct may give rise to an inference of scienter."  *Id*. at 1041-42.  Thus, "an extreme departure from the standards of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it" can supply evidence of scienter.  *Id*. (quoting *Hollinger v. Titan Capital Corp.,* 914 F.2d 1564, 1569 (9th Cir. 1990) (en banc)).  "To determine whether a 'strong' inference has been pleaded, 'the reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?'"  *Webb*, 884 F.3d at 850 (quoting *Tellabs*, 551 U.S. at 326.)

Here, plaintiffs allege significant GAAP violations resulting in millions of dollars in overstated royalty revenue based on nothing more than projections of future sales.  They allege facts, including confidential witness statements to show that defendants had access to and would have known information contradicting the statements they were making to investors.  They allege defendants had accounting knowledge and occupied key roles in the company's decision-making such that knowledge of the falsity of their statements can be imputed.  In addition, defendants had responsibility for internal financial controls that they had already conceded were weak and at risk of reporting material misrepresentation yet continued to certify that remedial efforts were

underway.  What is more, plaintiffs plausibly allege that defendants had reason to misrepresent the company's royalty revenues during the relevant time period due to the company's dire financial condition and the individual defendants' potential to profit from inflated revenue reports in bonuses and stock sales.  The Court considers each category of scienter allegations in turn.

### 1.   GAAP Violations

First, the alleged GAAP violations here were significant and repeated throughout the class period.  To support a strong inference of scienter based on alleged GAAP violations, a complaint must describe them with sufficient particularity "so that 'a court can discern whether the alleged GAAP violations were minor or technical in nature, or whether they constituted widespread and significant inflation of revenue.'"  *Daou Sys.*, 411 F.3d at 1016–17 (quoting *In re McKesson,* 126 F.Supp.2d at 1273); *see also S.E.C. v. Todd*, 642 F.3d 1207, 1218–19 (9th Cir. 2011) (sufficient evidence of scienter where recording sale as revenue violated GAAP and CFO understood that it was inconsistent with GAAP at the time it was recorded); *McKesson,* 126 F.Supp.2d at 1273 ("[W]hen significant GAAP violations are described with particularity in the complaint, they may provide powerful indirect evidence of scienter.  After all, books do not cook themselves."); *Sec. & Exch. Comm'n v. Bardman*, 216 F.Supp.3d 1041, 1052–53 (N.D. Cal. 2016) (finding allegations sufficient to support strong inference of scienter where complaint alleged "that GAAP requires a company to record a 'lower of cost or market' (LCM) charge if the value of inventory is less than its market value," that [defendants] knew of this rule, and that they failed to write-down inventory value when they should have."); *Thomas v. Magnachip Semiconductor Corp*., 167 F.Supp.3d 1029, 1042 (N.D. Cal. 2016) ("[a]ccounting errors that prove to have a significant impact on core business operations-*i.e.* cash, revenue, profits, liquidity . . . sometimes give rise to a compelling inference of scienter," quoting *In re Medicis Pharm. Corp. Sec. Litig.*, No. CV-08-1821-PHX-GMS, 2010 WL 3154863, at *5 (D. Ariz. Aug. 9, 2010)).  "If the GAAP violations are minor or technical, there is less implication that senior management was aware of the misstatement[, but i]f the GAAP violations involve substantial clients or significant inflation of revenue, 'a strong inference arises that senior management intentionally misstated earnings.'"  *In re Capstone Turbine Corp. Sec. Litig.*, No. 15-CV-8914-DMG-RAOX, 2018 WL 836274, at *6 (C.D. Cal. Feb. 9, 2018)

28

United States District Court
Northern District of California

1    (quoting *McKesson*, 126 F.Supp.2d at 1273).  Thus, "plaintiff must show with particularity how the

2    adjustments affected the company's financial statements and whether they were material in light of

3    the company's overall financial position."  *Daou*, 411 F.3d at 1018.

4         Defendants argue that mere publication of inaccurate revenue figures does not establish

5    scienter.[19]  Defendants contend that they made good-faith royalty revenue estimates, using a brand-

6    new accounting rule that ultimately turned out to be wrong and were no more than negligent.

7    Based upon the allegations here, the Court disagrees.

8         Plaintiffs' allegations describe a substantial misstatement of revenue that ultimately had a

9    devastating impact on a company already in serious trouble before the accounting violations

10   occurred.  They establish the sort of widespread and significant inflation of revenue that would

11   support a finding of scienter.  Further, Valiasek stated that a portion of the poor third quarter results

12   arose from "a much smaller amount of fragrance partner royalty revenue that was earned ***but could***

13   ***not be recognized in Q3 due to ASC 606 requirements***."  (FAC ¶ 68, emphasis supplied.)  This

14   acknowledgment by Valiasek—that ASC 606 restricted recognition of royalty revenue even if the

15   company considered it "earned"—strongly indicates that Valiasek understood that ASC 606

16   precluded recognition of royalty revenues based solely on projected sales, but nevertheless

17   continued to report farnesene royalty revenues based on projected sales, contrary to ASC 606.  *Cf.*

18   *Todd*, 642 F.3d at 1218–19 (sufficient evidence of scienter where CFO and controller knew "the

19   auditors wouldn't go for" recognizing sale as revenue but did so anyway, in violation of GAAP);

20   *see also Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1207 (9th Cir. 2016) (in order to allege strong

21   inference of scienter based on failure to follow GAAP must allege, for example, "that a company's

22   CFO was aware that the practice was improper").

23        //

24        //

25   _____

26   [19]  Defendants' citation to *DSAM Global Value Fund v. Altris Software, Inc.,* 288 F.3d 385,
     390 (9th Cir. 2002) on this point is distinguishable.  There, the court found the allegations that an

27   *outside* accounting and auditing firm hired by the company failed to follow GAAP and catch the
     company's improper revenue recognition did not compel an inference of intentional or reckless

28   conduct as opposed to mere carelessness.  Here, the allegation is that the company's key executives
     disregarded GAAP and had access to information contradicting revenue recognition statements they
     themselves made.

United States District Court
Northern District of California

## 2.     Access to Contradictory Information

Second, defendants Melo and Valiasek had access to information contradicting their statements, supporting an inference that they knew those statements to be false. "[P]articularized allegations that defendants had 'actual access to the disputed information' may raise a strong inference of scienter. *Dearborn Heights*, 856 F.3d at 620. Further, "[a]llegations regarding management's role in a corporate structure and the importance of the corporate information about which management made false or misleading statements may also create a strong inference of scienter when made in conjunction with detailed and specific allegations about management's exposure to factual information within the company." *Id.* (quoting *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785 (9th Cir. 2008)).

Here, the statements of the confidential witnesses (CW's) confirm both Melo and Valiasek, in addition to being top executives in the company with access to the financial information by virtue of those positions, were themselves reviewing the revenue numbers monthly or weekly. (FAC ¶¶ 38, 39.) Both met frequently with the top accounting personnel and received regular reports on the company's financial information. (*Id*. ¶ 39.) Valiasek was not only controlled and managed accounting and financial reporting but was personally involved in day-to-day accounting operations due to high turnover in a small department. (*Id*. ¶¶ 38-40.)[20] Valiasek was actively engaged in the process of revenue recognition and financial reporting. (*Id.* ¶ 40.) And Valiasek was aware that the accounting department was struggling to operate effectively due to high turnover and lack of experienced employees. (*Id.*) She would have been aware that temporary employees were filling key roles, such as SEC reporting and accounting. (*Id.*) CW2 stated that Valiasek "worked closely with the technical accounting, especially with [the VP of Technical Accounting]," who was primarily responsible for handling the revenue from Amyris's royalty agreement with DSM. (*Id.* ¶ 38.)

---

[20]   CWs here are alleged to have served in the company's accounting and financial operations department during the relevant period. CW1 worked in accounting and financial operations. (FAC ¶ 34.) CW2 worked in the accounting department, primarily in operational accounting. (*Id.* ¶ 37.) Both were in positions to possess knowledge of the information they provided. (*Id.* ¶¶ 34-41.)

1

### 3.     Accounting Knowledge and Involvement in Core Operations

Third, both Melo and Valiasek had significant accounting knowledge and training and were in positions of control over Amyris's core operations.  By virtue of their specific knowledge of and access to the financial information here, as well as their knowledge of the company's precarious financial state and failure of internal controls, Melo and Valiasek can be inferred to have known that the reported revenues were not based on actual sales.

"The core operations doctrine—the theory that facts critical to a business's core operations . . . are known to a company's key officers—can be one relevant part of a complaint that raises a strong inference of scienter."  *Azar v. Yelp, Inc.*, No. 18-CV-00400-EMC, 2018 WL 6182756, at *20 (N.D. Cal. Nov. 27, 2018) (citing *South Ferry*, 542 F.3d at 784) (internal citations omitted).  Scienter can be inferred even in the absence of more particularized allegations "where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter."  *Reese v. Malone*, 747 F.3d 557, 576 (9th Cir. 2014), *overruled on other grounds by Dearborn Heights*, 856 F.3d 605.  For example, in *Berson*, the Ninth Circuit found a strong inference that officers "directly responsible for [the company's] day-to-day operations" would not have known about stop work orders affecting tens of millions of dollars of the company's work.  *Berson*, 527 F.3d at 988.  Similarly, in *Reese*, the court held that scienter could be imputed to a corporate officer since the statements were specific and reflective of her access to disputed information.  *Reese*, 747 F.3d at 576 (finding it "absurd to believe" that head of operations, an experienced chemical engineer, was without knowledge of the contradictory information when she made alleged false statements regarding oil spill).

Here, the company was in serious debt and faced a continuing deficit in internal controls over financial reporting.  Melo and Valiasek had certified that the failures in internal controls created a significant likelihood of additional material misstatements to investors.  Even when they conceded, in their November 2018 statements, that $15 million in expected third quarter revenues had not materialized, and that they had "no visibility on the actual royalty" from Nenter, both Melo and Valiasek continued to assure investors that the first two quarters, made with the same faulty recognition in violation of GAAP, were "realized" revenues.  (FAC ¶ 68.)  That Melo and Valiasek

1   would not have known that the millions of dollars in revenues had not been realized, despite their

2   constant monitoring of the company's debts and the revenues, and their duties to active remediation

3   plan on the financial controls issues, rises to the level of the "absurd" that the Ninth Circuit found

4   in *Berson* and *Reese*.

### 4.   Failure of Internal Controls

6          Fourth, defendants' alleged failure to maintain an effective control environment, and their

7   attestations to the contrary, supports a strong inference of scienter.  Both Defendants were required

8   to oversee and manage financial reporting and the effectiveness of Amyris's internal controls.  Both

9   attested in their certifications under the Sarbanes–Oxley Act that their financial reporting was

10  accurate, that they had "[d]esigned such internal control over financial reporting, or caused such

11  internal control over financial reporting to be designed under our supervision, to provide reasonable

12  assurance regarding the reliability of financial reporting and the preparation of financial

13  statements", and that there were no undisclosed material errors or changes.  On (FAC ¶¶ 57, 65,

14  71.)  Months later, defendants later confirmed that *during the Class Period*, they had "no visibility

15  on the actual royalty" amounts (*id*. ¶ 68), that "a material error was [being] made related to the

16  estimates for recognizing revenue for royalty payments . . . under [ASC] 606" for the 2018

17  quarterly financial statements (*id*. ¶ 76), that they "did not design and operate effective controls

18  over . . . complex, significant non-routine transactions related to licenses and royalty revenue

19  recognition" (Murphy Dec., Exh. A, at p. 13).[21]  These allegations, added to the others here, support

20  an inference that defendants were aware of matters relevant to their certifications or recklessly

21  failed to make themselves aware.  *See Howard v. Everex Sys., Inc*., 228 F.3d 1057, 1061 (9th Cir.

22  2000) ("when a corporate officer signs a document on behalf of the corporation, that signature will

23  be rendered meaningless unless the officer believes that the statements in the document are true.");

24  *see Thomas*, 167 F.Supp.3d at 1043 (allegations that defendants signed SOX certifications attesting

25

26

----

27          [21]  Plaintiffs also allege facts that they contend establish a motivation to mislead, including
     stock sales and bonuses tied to performance.  Because the Court finds that the allegations discussed
28   above are sufficient to establish a strong inference of scienter, it need not reach the merits of the
     parties' arguments as to the sufficiency of these additional allegations.

United States District Court
Northern District of California

United States District Court
Northern District of California

to accuracy of quarterly statements and that management was "not maintaining an effective control environment" supported scienter).[22]

### 5. Motivation to Misstate Revenues

Finally, plaintiffs allege that defendants were motivated to misrepresent recognized revenues both for the sake of the company and for their personal gain.  "A strong correlation between financial results and stock options or cash bonuses for individual defendants may occasionally be compelling enough to support an inference of scienter."  *Zucco Partners*, 552 F.3d at 1004 (scienter can be shown depending on "how intimately the bonuses were tied to the company's financials" including comparisons with prior years' bonuses and correlation between bonuses and performance).

Plaintiffs allege that defendants used Amyris's artificially inflated stock to provide needed financing to continue operations during a period when the company was struggling with significant debt and had "substantial doubt about its ability to continue as a going concern."  (FAC ¶ 91 [quoting 2017 Form 10-K]; ¶ 41 (CW2 statement that company's debts and repayment schedules were significant concern).)  Plaintiffs allege that, on August 21, 2018, defendants conducted a secondary offering, selling millions of shares of stock to come up with $46 million in desperately needed cash.  (*Id.* ¶ 91.)  This secondary offering occurred a little over two weeks after its August 6 press release and earnings call touting its $24.8 million dollars in revenue for the second quarter of 2018, and just one week after Amryris filed its August 14 10-Q, as certified by Melo and Valiasek, announcing $6.88 million in royalty revenue and $23.19 million in revenue for the period ending June 30, 2018. (*Id.* ¶¶ 61, 64.)  Plaintiffs' allegations support an inference that defendants made their revenue statements with fraudulent intent.  *See WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1052 (9th Cir. 2011), *abrogated on other grounds by Lorenzo v. Sec.*

---

[22]   The Ninth Circuit has held that "boilerplate language in a corporation's 10-K form or required certifications under Sarbanes-Oxley section 302" will not create a strong inference of scienter on their own or save otherwise insufficient scienter allegations.  *Zucco Partners*, 552 F.3d at 1003.  However, specific allegations related to those certifications may be part of a totality giving rise to a compelling inference of scienter.  *See Thomas*, 167 F.Supp.3d at 1043 (allegations of SOX certifications can be one "part of a broader picture from which a court may, at the initial pleading stage, infer a compelling claim of scienter. This is squarely in line with applicable case law.") (citing *America West*, 320 F.3d at 944–45).

United States District Court
Northern District of California

& *Exch. Comm'n*, 139 S. Ct. 1094 (2019) (allegation that company "needed continued infusion of investment capital" supported finding of scienter as against founders of company); *see also In re Portal Software, Inc. Sec. Litig.*, No. C-03-5138 VRW, 2005 WL 1910923, at *12 (N.D. Cal. Aug. 10, 2005) (though insufficient standing alone, allegation of motivation to inflate stock price "in order to conduct a successful secondary public offering and obtain much-needed operating capital" was "motive evidence . . . stronger than the generic 'desire to raise capital' which can be attributed to every company"); *Howard*, 228 F.3d at 1064-65 (executives' recognition of inadequate cash flow and need for additional funding created potential for motivation to inflate sales and otherwise misrepresent financials, supporting scienter).

Plaintiffs further allege that Melo and Valiasek stood to profit personally from their alleged revenue misrepresentations. Amyris's 2017 bonus structure was based upon reported revenue (weighted 40%), technical milestone dollars (weighted 30%), production costs (weighted 15%) and cash operating expenditures (weighted 15%). (FAC ¶ 92.) For 2018, Amyris's executive bonus structure was changed to make bonuses dependent only on reported revenues (50%) and gross margins based primarily on royalty revenues (50%) with 12.5% of the bonus allocated for each quarter and 50% allocated for the annual period. (*Id.* ¶ 92.) This change in the 2018 bonus structure incentivized defendants to report overall revenues and particularly royalty revenues that were inflated. These allegations stated the kind of "strong correlation" the Ninth Circuit has found to support an inference of scienter. *See America West,* 320 F.3d at 944 (finding scienter adequately alleged where complaint alleged executives were "motivated to inflate America West's financial results and stock prices because their eligibility for stock options and executive bonuses were based principally on the company's financial performance"); *In re Maxwell Techs., Inc. Sec. Litig.*, 18 F.Supp.3d 1023, 1044 (S.D. Cal. 2014) ("The existence of performance-based compensation provides motive for the individual defendants to order or ignore misconduct that would increase revenues. The Court considers this in its holistic review."); *cf. Zucco Partners*, 552 F.3d at 1004 (allegation that bonuses were merely "based in part" on financial performance, not directly correlated with it, insufficient to meet heightened pleading requirements).

United States District Court
Northern District of California

1    Plaintiffs further allege that Melo profited in terms of stock sales during the class period,

2    having sold 27,550 shares of personally held Amyris stock on July 16 and October 15, 2018, when

3    Amyris stock traded at or near all-time highs of $6.61 per share and $7.50 per share, respectively,

4    for proceeds of $186,655.55.  (FAC ¶ 93.)  Plaintiffs allege that Melo's sales were unusual since his

5    *only* other sale within the prior five years was on January 16, 2018, for proceeds of $83,172. (*Id.*,

6    emphasis as alleged.)  A defendant's stock sales may be probative of scienter when coupled with a

7    "'meaningful trading history' for purposes of comparison to the stock sales within the class period."

8    *Zucco Partners*, 552 F.3d at 1005.  "Scienter can be established even if the officers who made the

9    misleading statements did not sell stock during the class period."  *America West*, 320 F.3d at 944.

10   However, here, the allegations of Melo's sales during the class period and the significant uptick

11   compared with his prior sales history are supportive of scienter.[23]

12           **6.      Totality of the Allegations**

13           When deciding whether a strong inference of scienter is pled, courts must consider the

14   "totality of plaintiffs' allegations."  *Daou*, 411 F.3d at 1022.  "[T]he ultimate question is whether

15   the defendant knew his or her statements were false, or was consciously reckless as to their truth or

16   falsity."  *Gebhart*, 595 F.3d at 1042.  Here, based upon the foregoing, the Court finds that the

17   totality of the allegations supports a strong inference of scienter.

18           *C.      Section 20(a) Liability*

19           Under the controlling Ninth Circuit test, to establish control person liability, a plaintiff must

20   establish two elements: (1) a primary violation of federal securities laws; and (2) defendants

21   exercised actual power or control over the primary violator.  *Howard*, 228 F.3d at 1065.  Based

22   upon the foregoing, plaintiffs have alleged primary violations as well as the exercise of control over

23   Amyris by defendants Melo and Valiasek.  The motion to dismiss this claim fails.

24

25           [23]  Defendants argue that plaintiffs have not alleged the percentage of shares sold such that
     the allegation is not probative of scienter.  To the contrary, the Ninth Circuit has held that the
26   percentage of total stock is not dispositive as to whether stock sales are indicative of scienter.
     *Nursing Home Pension Fund, Local 144 v. Oracle Corp*., 380 F.3d 1226, 1232 (9th Cir. 2004)
27   (explaining that stock trades are indicative of scienter in insider trading case when they are
     "dramatically out of line with prior trading practices at times calculated to maximize the personal
28   benefit" and finding sale representing just 2.1 percent of holdings suspicious given timing and
     trading history).

United States District Court
Northern District of California

**IV.    CONCLUSION**

Based upon the foregoing, and considering the totality of the allegations, the Court finds that the allegations sufficiently state the claims and the motion to dismiss is **DENIED**.

Defendants shall file their answer to the FAC within 21 days of this Order.

This terminates Docket No. 45.

**IT IS SO ORDERED**.

Date: October 5, 2020

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**

36