UNITED STATES DISTRICT COURT        *ORIGINAL*

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable YVONNE GONZALEZ ROGERS, Judge

| | | |
|---|---|---|
| SHANE MULDERRIG and RONY DEVORAH, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) | **Motion to Dismiss** |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | NO. C 19-01765 YGR |
| | ) | |
| AMYRIS, INC., JOHN G. MELO, and KATHLEEN VALIASEK, | ) ) | Pages 1 - 52 |
| | ) | |
| Defendants. | ) | Oakland, California |
| _____ | ) | Tuesday, February 18, 2020 |

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiffs:            Green & Noblin, P..C.
                          2200 Larkspur Landing Circle
                          Suite 101
                          Larkspur, California  94939
                  BY:  ROBERT S. GREEN, ATTORNEY AT LAW

                          Federman & Sherwood
                          10205 N. Pennsylvania Avenue
                          Oklahoma City, OK  73120
                  BY:  A. BROOKE MURPHY, ATTORNEY AT LAW

For Defendants:           Gibson, Dunn & Crutcher LLP
                          1881 Page Mill Road
                          Palo Alto, California  94304
                  BY:  MICHAEL D. CELIO, ATTORNEY AT LAW

           (Appearances continued next page)

Reported By:         Raynee H. Mercado, CSR No. 8258

    Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

**A P P E A R A N C E S (CONT'D.)**


 For Defendants:            Gibson, Dunn & Crutcher
                            One Montgomery Street
                            Telesis Tower
                            San Francisco, California  94104-4506
                     BY:   ELIZABETH A. DOOLEY, ATTORNEY AT LAW

Tuesday, February 18, 2020                          1:57 p.m.

                    P R O C E E D I N G S

        **THE CLERK:**  Calling civil action 19-1765, Mulderrig versus Amyris, Inc.

    Counsel, please come forward and state your appearances.

        **MR. GREEN:**  Good afternoon, Your Honor.  Robert Green for plaintiffs.

        **MS. MURPHY:**  Good afternoon, Your Honor.  Amanda Brooke Murphy for plaintiffs.

        **THE COURT:**  Okay.  Good afternoon.

        **MR. CELIO:**  Good afternoon, Your Honor.  Michael Celio for defendants.

        **MS. DOOLEY:**  Good afternoon, Your Honor.  Elizabeth Dooley for defendants.

        **MR. CELIO:**  And, Your Honor, I'd also like to introduce sitting at counsel table our corporate representative, the general counsel of Amyris, Nicole Kelsey.

        **THE COURT:**  Okay.  Good afternoon.

    Ms. Murphy, welcome to California.

        **MS. MURPHY:**  Thank you, Your Honor.

        **THE COURT:**  All right.  I have some thoughts, but I think I'd like to start with just hearing some general argument.  I can tell you that in some ways, this seems relatively straightforward; that is, in terms of what happened and what the alleged misrepresentation or omission is.

In other ways, there are numerous statements in the complaint, and the way that I have dealt with these kinds of cases is to analyze each and every statement.

But here, it does seem to me that this boils down to an allegation of, you know, one approach to how the -- the statements were made in -- in terms of the 10Q's, and everything else flows from that. Some of them perhaps not actionable; others of them, depending on how I first -- find with respect to the first.

But it does seem like this accounting issue is the kind of threshold, and everything rises and falls with a determination of that.

So if I'm right, then let's first focus on that big threshold issue, and then we can get to the other -- the other statements that flow from there.

So we'll go ahead -- it's your motion. We'll start with you.

MR. CELIO: Thank you, Your Honor.

So ASC606 is a -- the way the accounting profession --

THE COURT: Do you have that -- say it slowly because --

MR. CELIO: Yes, ma'am.

THE COURT: -- because it's going to be used a lot.

MR. CELIO: ASC606 is the way, right at the start of the class period, that the accounting profession mandated that

companies like Amyris account for these sorts of licenses.

It required that the company make an estimate.  At the end of the period --

**THE COURT:**  Well, only in -- in one of two situations.  You make an estimate in certain situations, and you don't in another.  That's what it says.  Right?

**MR. CELIO:**  It -- it says that, Your Honor.  In this -- in this -- yes, I believe that's correct.

In this case, I don't think there's an allegation that no estimate could be made here.  And let me explain based on the facts alleged why that would be.

So this is a situation where as a result of a bunch of corporate transactions, Amyris is no longer making the vitamin product that it is receiving money on.  That's -- I can explain it, but I don't think it matters for today.

So that's essentially like an IP license.  So at the end of the period, you know you're going to be owed some money.  But you actually don't know how much money you're owed because you aren't making the product, and it's dependent on, in this case, the company in China called Nenter, N-e-n-t-e-r for the court reporter -- how much they sell, and you get a royalty on that.

So as of March 31 or at the end of any period, you don't know exactly what you're going to get.

**THE COURT:**  Correct.

**MR. CELIO:** And -- and so you have to estimate.

Now, the old rule prior to ASC606 -- and this is important because of the chart issue that we raise in our papers -- it used to be how much cash you actually got in the door. What ASC606 requires, at least in these circumstances where you don't know, is that you look back and you say these licensees, what's the rate they've paid us in the past, and what's the volume that they've delivered in the past, and then you try to go forward with an estimate.

You have the discretion -- in fact, you are required to modify it if you know there are trends in the market. So, for example -- and -- and this is the actual facts of the case, although we're not asking the court to consider them 'cause it's outside the record -- there was a fire in a plant in Germany that reduced the supply of vitamin E, so that's part of what we got into discovery, we would talk about it.

I bring it up only as an example of -- you're actually supposed to, under ASC606, increase your estimate at that point.

**THE COURT:** So let me -- I'm going to stop you.

ACS606-10-55-65 provides that an entity should recognize revenue for a sales-based or usage-based royalty promised in exchange for a license of intellectual property only when or as the latter of the following events occurs, A, the subsequent sale or usage occurs, so that's a possibility. Or,

B, the performance obligation to which some or all of the sales-based or usage-based royalty has been allocated -- has been satisfied or partially satisfied.  Right?

So 606 doesn't require that you must give an estimate, does it?

**MR. CELIO:**  Not in the abstract, but I believe under these circumstances that it would because even -- so this is a case with a --

**THE COURT:**  All right.  Stop.

So do you agree that an estimate was appropriate?

**MS. MURPHY:**  Your Honor, "estimate" can be used in different ways.  But here, the way that that rule is supposed to operate, the sales-based exception is an exception to the idea of needing to estimate the variable consideration amount.

So that aspect of it, that's how the rule is supposed to apply, and that's as explicated by the financial standards board, the board that enacted the rule.

And we point this out in our surreply, Your Honor.  The board that enacted the rule says that "an entity should not recognize any revenue for the variable amounts until the uncertainty is resolved."  And they refer to this as the "royalties recognition constraint."  So that's what the design of the rule is.  That's what the purpose of the rule is.

That's not to say that a company can't, you know, based on the sales data, estimate what it has not yet received.  But

the company is not supposed to be estimating the variable consideration without that sales data.

THE COURT:  So you had no history in this case, is that -- you had no historical data, did you?

MR. CELIO:  No, we did, because prior to these corporate transactions, Amyris itself had been selling the product to Nenter.  So what was new was that that obligation to fulfill the contract had been sent to a company called DSM, but there was a history.

THE COURT:  Not by DSM.

MR. CELIO:  Amyris had been making it.  DSM was not making it.  DSM was corporate partner, so --

THE COURT:  But DSM itself had no sales prior to this initial reporting.

MR. CELIO:  So not -- that's not quite accurate, Your Honor.  It's the same contract -- the contract with Nenter doesn't change.  What -- what changes is the obligation to deliver product under the contract, so from Nenter's viewpoint there is history.  There's absolutely history.

THE COURT:  Okay.  Keep going.

MR. CELIO:  What would be most useful to you, Your Honor, 'cause I want to be responsive to your concerns?  I don't want to just talk into the -- in general.

THE COURT:  Well, I'm in trial, so I'm still trying to get my arms around this.

**MR. CELIO:**  Okay.  Right.  Understood.

What I had planned to talk about really was scienter because --

**THE COURT:**  I don't want to go to scienter yet.

**MR. CELIO:**  Okay.  That's fine.  Then we'll stay on -- we'll stay on 606.

So the -- the situation that Amyris found itself in was that it did have this -- this history of sales, but it no longer had direct visibility.  And -- and that's one of those things that they actually went out of their way -- so they did several things that are actually, we think, very important in this case.

One, they -- they put a chart in their filings to show --

**THE COURT:**  The second filing, not the first.

**MR. CELIO:**  I believe there was a chart in -- in each of the filings Your Honor.

**THE COURT:**  Hmm.  All right.  Well, then let's stalk about which chart you're talking about, so when I looked at Exhibit B, so the 10Q ending June, I see a chart that shows the distinction -- and this is at 15 of 55, bottom right-hand corner -- I show a comparison of how things would have been reported with the adoption of ASC606 and not.

**MR. CELIO:**  Correct.

**THE COURT:**  That same kind of chart did not exist in Exhibit A, which was the initial reporting.

(Pause in the proceedings.)

THE COURT:  So there was no disclosure in Exhibit A, which is for the first quarter at issue, as to the difference between how it would have been reported with versus without.

And on that topic, it seems to me to plaintiffs' counsel if they're disclosing in the second -- in the second 10Q here the difference between how it would have been reported with this C606 versus not, then where is the misrepresentation?

MS. MURPHY:  Your Honor, the mis- -- misrepresentation comes in how defendants were speaking about the impact of ASC606.  So what defendant said what specifically asked about the impact was first to state that the impact was, quote, de minimis, which they --

THE COURT:  Well, let me ask you this.

MS. MURPHY:  Um-hmm.

THE COURT:  Are you taking issues with the numbers that are on the 10Q as being a misrepresentation?

MS. MURPHY:  We are taking issue with those numbers as being materially false and exaggerated, and we allege that defendants were reckless and -- at least reckless --

(Simultaneous colloquy.)

THE COURT:  On page 15 or 55, Exhibit B where it shows the reported license and royalty numbers for the quarter ending June 30th --

MS. MURPHY:  Um-hmm.

**THE COURT:** -- and the two quarters ending June 30th, given that it's reporting it using two different accounting mechanisms, you're saying that that's still a misrepresentation?

**MS. MURPHY:** Yes, Your Honor, and the reason is -- is this because defendants said that what ASC did was allowed them to recognize revenue earlier. And here are the statements that they made. They said, "So rolling forward, any product --"

**THE COURT:** What paragraph of your complaint are you reading from?

**MS. MURPHY:** Oh, sure. This is paragraph 53.

**THE COURT:** Okay. Go ahead.

**MS. MURPHY:** Okay. This is, you know, slightly -- shorter version, but they say, "so rolling forward, any product where [sic] we are manufacturing, the royalty revenue will be recognized when we actually ship the product; whereas, the royalty revenue under DSM/Nenter agreement is recognized when Nenter is selling into the market."

And this is defendants explaining the impact of ASC606, and that's Defendant Valiasek. Defendant Melo then says, "We used to wait for the payment and then book, and now we can actually book when we ship the product out the door. That's the big change around."

So the way that defendants are describing the impact of

ASC606 is to act as though it is simply allowing the company to recognize revenue earlier, not that they are creating an estimate -- that the amount itself is unknown and uncertain now, but simply that now we can record it at the point that we deliver it.  Now we can record a known amount -- a certain amount earlier than we could previously.

So with that description of how ASC606 works where they in no way disclose that the amount itself is nothing but a projection, this chart that you're pointing to here where it shows the difference in calculations between the financial results with and without ASC606 is merely showing what the company is owed but has not yet received.  But it indicates that the company is indeed owed this amount, when that is false.

This -- what they were reporting were projections, Your Honor.

THE COURT:  So if I look at Exhibit A, the 10Q, and I go to page 13 of 42, second full paragraph, second line --

MS. MURPHY:  Um-hmm.

THE COURT:  -- it says, "The company applies the sale-based royalty exception, and revenue is estimated and recognized at a point in time when the licensee's product sales occur."

MS. MURPHY:  Um-hmm.

THE COURT:  I can read that in many ways.  I can read

it as an estimate.  I can also read it as telling the reader that you're -- you're not recognizing it until the sale occurs.

How does that tell me that -- I mean, it says you're recognizing at a point in time when the sale occurs, but you're not.

MR. CELIO:  No, we, in fact, are, Your Honor.  I mean -- two -- two points I would add.

The next sentence clarifies it, the last sentence of the -- the -- the --

THE COURT:  All the last sentence says is what you do when you're estimating.  But this also says that you're recognizing it at the sale point.  It doesn't say that you're recognizing it at an estimated point.

MR. CELIO:  Well, the first word of the next sentence is "estimate," so I guess the way I would read that -- and I concede that perhaps it could be read another way, but I -- the way I read it and the way I believe it's intended, I don't think they're saying in general --

THE COURT:  We don't care about intent, right?  A stockholder -- a reasonable stockholder can't -- and doesn't know the intent of the writer.

MR. CELIO:  Well, we do care about intent later.  I know we're not talking about that yet, but we will in a minute, I hope.

**THE COURT:** For purposes of reading this thing, we don't know what any of the officers' or directors' intent is, nor should there be any reference to intent.

**MR. CELIO:** So I think there -- there are a couple of things. There is a disclosure without ASC606 on the next page. You caught me a little off guard, but it's on page 14 of 42. It's the second chart.

If you look at the far right column, it says, "amounts without the adoption of ASC606."

**THE COURT:** Okay.

**MR. CELIO:** So what that chart is telling an educated reader -- and this is pitch to an educated reader -- the old way you did it was when you had the cash in hand. The other way -- the way that ASC606 -- in other words, prior to ASC606, you could only -- and this is what counsel opposite was -- was reading Mr. Melo explaining. You -- you recognized it when it actually came in. I think that's pretty clear.

So a chart telling you the way that it used to be done tells you how much money is in the door and ASC606 is definitely saying we're recognizing revenue that we don't yet have in the door.

I think that is -- that is clearly what this is disclosing.

**THE COURT:** So how, then, does this not comply with GAAP?

**MS. MURPHY:**  Okay.  For a number of reasons.  For one thing, what defendants were recognizing was not a reliable or -- or useful representation of what --

**THE COURT:**  Let's --

**MS. MURPHY:**  -- actually was happening.

**THE COURT:**  Let's first start with the explicit amounts in the charts.

**MS. MURPHY:**  Absolutely.

Okay.  So --

**THE COURT:**  How did it not comply with GAAP specifically?

**MS. MURPHY:**  Okay.  So what it's not complying with is, among other things, ASC606.

Now, this chart -- we're not alleging that this chart is materially false or misleading.  What we're alleging is that this is not a sufficiently informative disclosure such as to render all of the other statements made by defendants immaterial as a matter of law.

And the reason is because what a reasonable investor would see when they look at this chart is precisely what counsel explained, which is that we're owed this money, but we've not yet received it.

Okay?  So we're owed $11.4 million.  Clearly, we haven't received it yet, but that's --

**THE COURT:**  And under the old system, we wouldn't

have booked a single penny of this.  That's what this tells me.

MS. MURPHY:  That's right.

The problem, however, is that it -- the issue with what defendants were doing is not just that they were recognizing revenue, a known amount earlier.  They were inventing the amount.  They had no sales data --

THE COURT:  Hold on.  Hold on.

So an investor looks at this chart and says, ah, okay, last year the company would have put zero down.  Now there's new counting model which shows 11 million or 11.4 million. These are potentially estimates.  Right?  I mean, taking defendant's view, they're estimates to be recognized at a point in time when the product sales occur.

MS. MURPHY:  Okay.  So --

THE COURT:  So -- so that's -- that's an objective reading, potentially, so now what's the issue?

MS. MURPHY:  Okay.  So the issue is that they were not basing these -- so -- plaintiffs are not alleging that it's wrong for companies to estimate.  You can recognize revenue before you've received it.  But it has to be actually earned at minimum, and it needs to be based on the sale data.

THE COURT:  Wait.  Wait.  Wait.

MS. MURPHY:  I think --

THE COURT:  Go ahead.

**MS. MURPHY:** Okay. So -- so here is's the issue. And -- and just to give them some perspective. They never -- not even for the entire year of 2018 actually got $11.4 million. No. For the entire year -- now, this is what they reported for just the first quarter in royalty revenue.

But the entire year based on the restatement, they received a total of $7.6 million roughly in royalty revenue. This is less than they reported for just the first quarter, and it's substantially less. And it's nowhere close to the $60 million in royalty revenue that defendants said they were going to receive for the year.

And the reason is that what defendants were doing is not looking at the sales data that the licensees [sic] was making as they should have done under the sales-based royalty exception, because you're right, Your Honor, they don't necessarily need to be estimating. They should be looking at the sales, the underlying sales, that the licensee is making.

Instead of doing that, defendants invented a number. They reported a projection that was not based in actual sales, that was not based in anything really except their best guess. That is what is problematic here, is they were essentially reporting what would typically be financial projections. So that's the problem here.

GAAP does not allow for that. GAAP does not allow for a company to report as a financial result what were actually

just aspirational guesses about what the company was going to receive.  That's the problem here, Your Honor.

And to the extent that defendants want to argue that this is allowable, it obviously -- it wasn't.  That's why they had to restate their financials.  And, Your Honor, a case that's very analogous here, the Ninth Circuit case of *In re: Dow Systems* dealt with a very similar issue.

In that case, a company was using this percentage of completion accounting in which they were allowed to book revenue based on the percentage of work that had been done on the contract.

But what they were doing was egregious.  They started abusing that, booking revenue very, very early for work that was nowhere close to being done.  And the Ninth Circuit looked at disclosures like this one where it's a comparison of what -- you know, a chart like this, and it said "What defendants disclosed, that revenue was sometimes being recognized before the customer was billed, does not reveal is [sic] that defendants were recognizing revenue before it was even earned.  An investor would read defendants disclosures of revenue, quote, recognized as meaning that the excess revenues recognized were at the very least earned."

That is very analogous here, Your Honor, because an investor would look at this chart and would say, "well, the company is clearly owed 11.4 million.  They haven't received

it but they're clearly owed that amount" when in truth that was a fictitious number.  It was invented.  They never got it because they never -- they never earned it.

They based it off of their best guess, and they reported in their financial results as though it was certain as what they had done previously.  Previously, they waited until they had payments, and then they recorded.  Now, they're just reporting an invented number and putting it in their results.

**THE COURT:**  All right.

Response.

**MR. CELIO:**  I agree that you can't just make stuff up.  That's not what is pleaded in this complaint.  Everything that counsel just said is I -- respectfully, I don't think --

**THE COURT:**  All right.  Well, then, with respect to, that, then what paragraphs of the complaint do you believe articulate the argument you just made?

**MS. MURPHY:**  Sure.  There are several, but I will -- I will take you to some.

Paragraph 54 talks about this.

**THE COURT:**  Just rattle off the numbers.  I'll look at them later.

**MS. MURPHY:**  Okay.  Paragraph 54.  Let's see. Paragraph 60.  Paragraph 63.  Paragraph 66.  It's -- it's really throughout the complaint.  The idea that it isn't is -- is just --

**THE COURT:** Okay.

Response.

(Simultaneous colloquy.)

**MR. CELIO:** This revenue was earned. Counsel is misreading the restatement. The restatement was not -- never said that this money didn't come in. The restatement was about the characterization of the way the money came in. Certainly restatement is not a gold star, and it's not something that Amyris is happy that it took place.

But what it does not do is by itself give rise to liability under the security laws. That's well established in a hundred cases.

It's -- it's -- it is not enough to look back and say, you didn't get the revenue that you thought you were going to get, that you made mistakes in your accounting. No question that this didn't -- this accounting ended up having to be changed. That's -- that's a hundred percent true.

But what you have to plead in a case like this is particularized facts that show that these statements were false when they were made. That's what's missing here. I don't want to move to scienter before Your Honor is ready.

But when you say these numbers were just made up, that these numbers were false, these numbers had no basis in fact, that's where you need to point to a document. That's where you need to point to a witness. That's where you need point

to something.  You can't simply argue that the accounting was wrong, that the numbers ended up having to be changed and that therefore fraud occurred.

THE COURT:  Did you ever explain to the investors where the number came from?

MR. CELIO:  Where -- which number are we talking about now?

THE COURT:  The 11,437,000.

MR. CELIO:  I believe that that's exactly what is in, for example, paragraph -- think it's 52 of the complaint. This is the -- quoting the conference call where Mr. Melo, the C.E.O., is saying to the market, look, we don't control this part of our business.

THE COURT:  No, the 11437 is supposed to be based on historical -- an historical estimate.  It's not supposed to be a number pulled out of the air.

Where did it come from?

MR. CELIO:  It -- it -- so it came from -- I mean, it came from exactly what Your Honor was looking at on page 13. It was -- they looked at the past data -- I mean, that's what that disclosure --

THE COURT:  That's what I'm asking.  Where do you tell the investors, if ever, how you got to that calculation?

MR. CELIO:  Well, I think that -- that what Your Honor was reading in Exhibit --

**THE COURT:** I've not seen -- I've not seen it. That's --

(Simultaneous colloquy.)

**THE COURT:** That's where --

**MR. CELIO:** That's the disclosure -- I apologize for interrupting.

(Simultaneous colloquy.)

**THE COURT:** There's nothing specific that was ever told to the investors in terms of where that number came from.

**MR. CELIO:** I think that what -- I think that Amyris did exactly what the requirements -- what the SEC requires them to do, which is it said how it -- how it got there. It drew attention to this number. It broke it out further, so I --

You know, it -- you aren't required to sort of show your math on a 10Q. You -- you show the result and you explain the accounting policy that was -- that was used.

**THE COURT:** Given that you had to restate, do you now -- and -- I can figure out whether 20/20 matters, but do you agree that it didn't comply with GAAP?

**MR. CELIO:** No, Your Honor. We -- we had to restate. The numbers were wrong. And -- a restatement means what it means. It means your numbers were significantly and materially wrong. We concede that. That's what happened. But that doesn't mean they were intentionally wrong, and it

doesn't mean it wasn't compliant with -- with GAAP.  There was an error.

**THE COURT:**  How was it not -- how was it compliant with GAAP?

**MR. CELIO:**  Well, because what happened was that the -- the projection was wrong.  I mean, it was -- the -- the -- you know, unfortunately, it didn't turn out to be correct.  It was done -- I guess the difference is was the methodology wrong, or was the result materially wrong?

GAAP requires that you get both of those things right.  The result was wrong.  I -- I don't believe there's any evidence here that the process was wrong, much less intentionally so.

**THE COURT:**  So I -- that's not what I hear.  I hear from the plaintiff that the methodology was, in fact, wrong, that the historical basis that you were -- that led to this number was not based in anything.

You say in the 10Q that it was a historical estimate, but, in fact, it wasn't.

**MR. CELIO:**  I heard counsel say that as well.  I --

**THE COURT:**  So from their perspective, the methodology was wrong.

**MR. CELIO:**  And their burden here is to plead why -- and I listened as quickly as I could and looked at the complaint as quickly as I could when counsel was reading off

those -- those statements.  I see the allegation.  What I don't see is any support for it.

I don't see evidence of a document.  I don't see one of their confidential witnesses.  I don't see anything that shows anything other than the bare allegation.

And that's not enough.

**THE COURT:**  Response.

**MS. MURPHY:**  We have defendants own admissions, Your Honor.  Here's what defendants have admitted.  Amyris --

**THE COURT:**  What paragraph of your complaint.

**MS. MURPHY:**  Well, so one of the paragraphs is paragraph 68 of the complaint --

**THE COURT:**  All right.

**MS. MURPHY:**  -- where they discuss --

**THE COURT:**  You can also refer me to specific -- I just need to make sure that my transcript is right in terms of the basis for your arguments, and I'm not interested in anything outside the record.

**MS. MURPHY:**  Okay.

**THE COURT:**  So to the extent that you're relying on documents or disclosures from 10Q's or the restatement or whatever, just make sure that you're identifying them.

**MS. MURPHY:**  Okay.

**THE COURT:**  Go ahead.

**MS. MURPHY:**  Defendants also in their motion to

dismiss and the papers with that on page 2 say that "because Amyris was not actually supplying the pharmacy, it had much less information about what it would receive and was required to estimate the revenue it would have received in a given quarter.  Amyris had no control of the price at which Nenter sold its product or the quantity it sold.  No control over the price or the quantity, and this made -- the revenue Amyris would ultimately received was inherently difficult to predict.  That's what they say.

So the issue here is that under the sales-based royalty exception, which is discussed on that -- in this -- Exhibit A on page 13, where it's talking about -- it's the statement that you discussed earlier -- where it's talking about recognizing revenue.  Under that sales-based royalty exception, you recognize revenue at the point that the sale occurs.

**THE COURT:**  Yeah, I agree.

Do you agree with that?

**MR. CELIO:**  Which --

**THE COURT:**  That's what it says.

**MR. CELIO:**  That --

**THE COURT:**  That -- that the recognition of revenue is supposed to happen at the sale.

**MR. CELIO:**  Agreed.

**THE COURT:**  But that's not what you did.

**MR. CELIO:**  That is what we did.  That's absolutely what they did.  There's a preexisting contract with Nenter that predates any of this that Amyris earns money on when it sells.  There's -- I'm not -- I guess I'm not following the argument, because that's exactly what Amyris did.

**THE COURT:**  Yeah, I'm not following how that you get that; that is, you didn't receive the money because the sale of -- didn't happen.

**MR. CELIO:**  No, the sale did happen.  The -- the sale -- the sale happened.  They have data -- they have data that they're getting from Nenter during the quarter.  It's -- it's not complete 'cause it's happening in real time.  There's a --

**THE COURT:**  At the end of the first quarter, you did not have $11.4 million.  That was an estimate of what you thought you were going to receive.

**MR. CELIO:**  Correct.

**THE COURT:**  Under ASC606, you cannot recognize the 11.4 until the ultimate sale occurs.

**MR. CELIO:**  The ultimate sale here -- maybe this is the confusion -- is the sale between Nenter and the third party.  Okay?  And those have happened.  By definition, those have happened.  Amyris doesn't earn money on anything that Nenter doesn't sell so when Nenter --

**THE COURT:**  Correct.

**MR. CELIO:** -- so when Nenter in the China sells to whoever its end uses are -- I don't even know who that is -- but whoever buys vitamin D [sic]. That's the moment where the sale occurs. At that exact moment, Amyris automatically earns a royalty.

**THE COURT:** Well, is -- my understanding of how 606 works is that that is the point in when it can be recognized.

**MR. CELIO:** Yes.

**THE COURT:** What I am understanding this 11.4 million to be is an estimate of what you think those sales by Nenter are going to be to the third parties which have not yet occurred.

**MR. CELIO:** No, they have occurred. The sales have occurred. They've 100 percent occurred. There should be no doubt about that. I will concede on a lot of things, but this I will stand firm on.

**THE COURT:** So then they stiffed you on the 11.4?

**MR. CELIO:** Absolutely. If we had done discovery in this case, I got a great story --

(Simultaneous colloquy.)

**MR. CELIO:** I know, but I'm just saying, yes, they stiffed us. That's what happened. That's the problem here. I will -- it's outside the record. I'll leave it be. But that's what happened.

And actually, to go back to the record, you know, counsel

was talking about paragraph 68, that -- that's -- I mean, 68B, Melo says, the -- the selling price of their contracts that have been at a significant discount to market prices. Okay. So what he's saying there is what Amyris discovered after the fact was that the price it thought they were selling at was at a discount to market. Huge shock to Amyris. That's the problem. That actually is in the record.

So, you know, when counsel's saying this is where the fraud is, I respectfully disagree. I respectfully suggest that this is Amyris trying explain what happened, but the sales had occurred.

I -- if I do nothing else today, I want this to be clear. This was not a guess. Nenter had sold this stuff into the market. We're not talking about future things that might happen that hadn't happened yet. These are actual sales by Nenter into the market.

The fight later that we're not going to talk about is how much and blah blah blah. Not relevant today.

**THE COURT:** Response.

**MS. MURPHY:** Sure. So first, we're not saying that this is where the fraud occurred, just to be clear, this paragraph 68. However, this is where some of the fraud occurred, because while counselor is saying that, you know, now they're coming clean. It's trying to explained what happened. Melo in the very same breath says that we realized

about 20 million in royalty payments during the first half of the year. Quote, realized. In the past tense. Reaffirming what they had already reported, which was totally -- you know, which was totally wrong.

They should have obviously knew this by this point. This is November 2018. And yet, they're reiterating that same $20 million saying that this has been realized when it actually wasn't. And Defendant Melo goes on to say, and we continue to believe and expect around 40 million in annual royalty payments in the short term to midterm after we get through the significant current market volatility.

This is not Defendant Melo coming clean to investors. This is not Defendant Melo explaining what has happened. This is Defendant Melo trying to, again, put one over on investors, because what was happening here is that -- I will --

And just to be clear, plaintiffs are not alleging that sales weren't occurring by the licensee, by Nenter. What plaintiffs are alleging is that Amyris and defendants, according to their own statements, had no visibility into those -- into those sales. They didn't know the quantity. They didn't know the prices and regardless of that fact, they started reporting revenues as though it was just as certain as it had been in previous years.

They did not disclose to investors that they did not know what amount they were ultimately going to received to the

tune -- I mean, to the extent that they were having to guess on extremely key variables, such as pricing and quantity.

That's not the sort of thing that you get to just guess at, and it's not allowable under ASC606 that you guess on it. You're supposed to wait for the sale to occur so that you don't estimate the variable consideration. That is the purpose of the sales-based royalty exception. It's an exception for the need to estimate the variable consideration, period. It's not an exception to the need to --

**THE COURT:** He's saying that the sales did occur.

**MS. MURPHY:** I agree. I'll agree --

**THE COURT:** And so what evidence do you have or what allegations do you have from confidential witnesses or others, research or analysis, that show that the sales did not -- had not occurred?

**MS. MURPHY:** We're not alleging that the sales didn't occur. What we're alleging is that defendants had no insight into what those sales were. They didn't know the quantity. They don't know the amount. According to defendants' own admissions, they apparently just knew that some ambiguous sale occurred with no actual facts around it.

So the fact that you know, okay, some sales have occurred. We know that some sales have occurred, so that gives us license to go ahead and put down any number. That's what ASC606 says. The idea that you wait for the sale --

(Simultaneous colloquy.)

**THE COURT:** What allegations do you have to suggest -- well --

**MS. MURPHY:** Well, I will say this, Your Honor. I mean, we do not have a confidential witness that's saying that -- that's giving insight into how exactly these royalty revenues were working.

We do have the restatement, and we have defendants' own admissions in their motion to dismiss on page 2 where they're talking about the fact --

(Simultaneous colloquy.)

**THE COURT:** The admissions are not in your complaint. You don't bring a lawsuit based upon -- your lawsuit's based upon your complaint.

**MS. MURPHY:** Yes, Your Honor.

So -- so let me say this. On what we have -- first, just as background, the restatement occurred was filed by Amyris after we filed the complaint. It did -- it took them almost a year to do the restatement. But we do attach it as exhibit -- relevant portions of it as an exhibit to our opposition to motion to dismiss.

But, regardless, defendants did admit that they were going to need to restate. And they acknowledged -- and I can get you the paragraph, but they acknowledged it was because they made a material error in the way that they were reporting

royalty revenues.

**THE COURT:**  So is it your perspective that every time a company files a restatement that they should be subject to a lawsuit?

**MS. MURPHY:**  Not necessarily, Your Honor.  However --

**THE COURT:**  How is this different?

**MS. MURPHY:**  Well, for -- first off, a lot of times the restatement -- a restatement means that there has been a material error.  For one thing, and -- we also have allegations in here which we haven't touched upon. Allegations about the effectiveness of the internal controls of the financial reporting.

Now, defendants signed off on they signed --

(Interruption by the court reporter.)

**MS. MURPHY:**  I apologize.

-- Sarbanes-Oxley certifications saying that the financial results they were presenting were reliable, or reasonably so.

That's one basis because obviously that was not correct. And among other things that ultimately got disclosed is the fact that unlike what defendants had certified in those Sarbanes-Oxley certifications, they had not implemented and operated effective processes for recognizing royalty revenue. We know this fact.

And defendants have -- have since, having to kind of come clean on this, said that the reason is because what we were

having to report was inherently difficult to predict.

Okay. That's never disclosed to investors. That is -- nowhere can defendants point to any sort of statement in which they say, we lacked information from Nenter as to the number of products that were being sold. We lacked the knowledge about what quantity of products were being sold.

And, in fact, that makes this financial result highly susceptible to reversal and uncertainty. That is not at all what defendants were doing. Instead, they were characterizing these financial results as though it was based on products sold. That's what they state, and I can get a paragraph for you.

Paragraph 59, Your Honor. "We blew through our anticipated projections in the first quarter based on the mix of products we sold in the first quarter." This is Defendant Melo.

And they also talk about "how our product royalty revenue delivered $11.4 million in revenue," when, again, this was, you know, really just a complete projection about what the company would receive and was the projection that was made during a time in which the company lacked critical key information that it needed in order to recognize this as a financial result.

These are not projections, Your Honor. These are financial results in specific SEC filings, and investors

expect that they have a -- a very firm basis, because that's what's required under GAAP.

THE COURT:  All right.  Any --

MS. MURPHY:  And --

THE COURT:  -- response?  And then we're going to move on.

MR. CELIO:  Yes, Your Honor.  The place -- I believe I heard counsel say it was never disclosed that we had no control, that Amyris had no control.

I would refer to court to the complaint paragraph 62. It's something that's been mentioned in the briefing a lot. But Mr. Melo says on August 6th, 2018, "This is a very volatile market and we have no control over the price Nenter sells into the market.  These royalties represent between 10 million and 15 million of expected second-half performance.

So I do think that it is fair to say that at least at this point in time, Amyris is saying it didn't have visibility.

THE COURT:  Anything before August 6th?

MR. CELIO:  So I will say that the other thing in the Exhibit A that we been talking about in the very sentence that Your Honor quoted, I would just move the court back a few words, where it says the company --

THE COURT:  What page of 42?

MR. CELIO:  13 of 42, Your Honor.

"The company applies the sales-based royalty exception,

and revenue is estimate and recognized at a point in time," so it does say "recognize" --

THE COURT:  -- telling my that it wasn't an estimate. You just told me -- you can't have it both ways.  You told me this was not an estimate, that, in fact, these goods were sold, and that's where -- why you recognized the -- the number.

MR. CELIO:  They -- they were sold, and we had some data, but we did not have complete data.  That's the piece that -- the estimate.  That's what this paragraph is trying to communicate.

THE COURT:  Where does it -- well, it -- it doesn't say that.

MR. CELIO:  Well, I think it does.  It's a single amount in a range of possible amounts is -- is what it says in the last line of that paragraph.  That's --

THE COURT:  It says, "derived from the licensee's historical sales volumes."  It doesn't say that these have already been sold but you lack information regarding the nature of the sales.

MR. CELIO:  It's -- it's absolutely positively been sold.  I believe counsel said that she doesn't even disagree with that, so -- I mean, this is information that was sold -- you know that products are being sold.  I think counsel and I -- this is one of the rare things we agree on.

The company knows products are being sold.  What it doesn't have full visibility into, as Mr. Melo later says, is exactly what price.  I think what the record shows that is they were using public data about the -- the sales price of that.  That was -- that's what -- I believe it was 62.  I may have the number wrong -- where he says it came in below market prices.  That's what that's talking about, Your Honor.

**THE COURT:**  All right.  Well, let's move to --

Well, one specific question.  Are you proceeding on -- on affirmative false and misleading statements or an omission theory?  The analysis is different.

**MS. MURPHY:**  Sure.  We are alleging that defendants issued materially false or misleading statements.  They could have --

**THE COURT:**  So you are not proceeding on an omissions theory.

**MS. MURPHY:**  Certainly not.  And -- and if I may, Your Honor, I want to correct one thing because it's very important.

What counsel just pointed to where he says that Melo says this is a very volatile market, and we have no control, it is very clear from that paragraph, he is talking about financial projections for the next half of the year.  He is not talking about what the company had already recognized and reported.  He's talking about what the company is expecting to report for

the next year.  That is what --

(Simultaneous colloquy.)

THE COURT:  -- not agree with you.  I may not agree with them either.  This is an incredibly poorly worded paragraph.

MS. MURPHY:  Well --

THE COURT:  And that's why, by the way, I always say to litigators, the business lawyer side of the folks, that's why you end up in litigation when it's not done right.

So we're moving on to scienter.  Go ahead.

MR. CELIO:  So, Your Honor, I think that the key point we've -- fortunately we've touched on a lot of this already because we been talking for so long and appreciate your patience.

The company really went out of its way to do sort of four things to draw the market's attention to this.  And -- and, you know, we have to look at scienter holistically.  That's what the ninth Circuit tells us.  And so we --

(Off-the-record discussion.)

MR. CELIO:  The evidence is as follows:  Okay?  The first thing that they did is they specifically called out this issue by, in the second quarter, actually breaking out the value share into its own line.

So, Your Honor, we were talking earlier about the difference between Exhibit A and Exhibit B, and they look a

little different, and you'll notice that.  And what -- what you see in Exhibit B is that they actually break out the value share into its own line, because they're trying to give the market more transparency.

And so that's a step towards transparency not away from it.  I think that argues against scienter.

They specifically called out this issue.  Your Honor has been critical about the clarity of some of those statements, but I think that for the scienter analysis that we're going through, if you're trying to hide things, if you're trying to mislead the market, drawing attention to that -- again, I think, tends to count against scienter.

They gave technical detail.  We've talked a lot about that.  Again, one can criticize the clarity of that.  We've talked a lot about the different interpretations, but the fact is that there's actually quite a lot of detail here about how they're doing it.

And then they say -- whether it's forward looking or backward looking, they say to the market, we don't control this area.  And so, you know, I started by saying, you know, when you look at the standard they have to plead -- you know, if I was talking to a jury, I'd say, you know, close your eyes, go through the red light.

This is company putting on its hazard lights and saying look at this area of our accounting.  We want to draw your

attention to it 'cause this is a place where things are hard and where we might get this wrong.

Now -- and so under *Gompers*, you look at those influences that flow both ways, so on -- that's what you have on the one hand that points against it.

What they have on the other side, what they've put on the scale on the other side, is two confidential witnesses who, with all due respect to those nice people, I think basically say there was an accounting department. There was a lot of turnover. This is the Bay Area, housing's expensive. You sometimes do get turn over in accounting departments.

That's basically all the confidential witnesses say, and that -- you know, the C.F.O. was paying attention, which I think is something that you would hope for. I think that actually counts against recklessness.

You have no sales --

**THE COURT:** Depends, given --

**MR. CELIO:** Well --

**THE COURT:** It really depends.

**MR. CELIO:** I -- I guess that's -- I guess that's a statement I agree with. I think in this case, you know, there's nothing in the -- I guess my -- my larger point is there's nothing the confidential witness says that anyone was doing anything wrong. And for scienter, that's what really matters.

You have no stock sales by the C.F.O. at all, and though you do have some by the C.E.O. they haven't in this complaint given you any context for those, so under *Zucco Partners*, you can't really do anything with that.  You don't know if that's a lot or a little for him.  And so I think you've just got to sort of put that to the side.

There's -- you know -- so, and that's really the main thing you've got.  You've got some allegations --

THE COURT:  You have the bonuses.

MR. CELIO:  Right.  And as we pointed out, bonuses aren't mechanical at Amyris.  There's no allegation that anything's tied.  Certainly nothing wrong with the company giving bonuses to its --

THE COURT:  No, I thought it was, in fact, tied to what was being reported.

MR. CELIO:  No, that's --

THE COURT:  Go ahead on that point, on the bonuses.

MS. MURPHY:  Right.  I mean, my understanding -- so the -- the bonuses are in part at least -- perhaps maybe not entirely because they're some considerations that apparently are made, vague though.

But the metrics that the company was supposed to hit were revenue and gross operating margins.  Those were the metrics [phonetic] that were being used to determine bonuses here.

And the gross operating margins was almost -- I mean,

exactly in line with royalty revenue because there was no upfront cost. It was almost all profit, so those two factors were fueling -- were behind the bonuses. And it, at minimum, gave defendants motive to exaggerate the financial results, which they obviously did.

MR. CELIO: I'll give you a citation, Your Honor. Ms. Murphy's declaration, Exhibit B, page 57 of 96, one of the things that goes into Mr. Melo's bonus, he's the C.E.O. He was tasked with engaging -- with improving -- this is a quote -- "employee engagement, maintaining a safe work environment, executive leadership, and living our values."

This wasn't -- the -- the reason I point this out is that some companies do have a very mechanical system where if the company achieves this much, then the executives receive that much.

I point to this portion of Exhibit B, page 57 of 96, to show that that's not what's going on at Amyris. It is not inherently wrongful to give executives bonuses, and actually it makes a lot of sense to try to encourage those executives to do a good job for shareholders.

THE COURT: So is it your claim that it is -- that the bonuses were mechanical?

MS. MURPHY: All right. So I will point Your Honor to the preceding page. Now, I -- I won't say "mechanical," but I will point you to the page which is -- it's Exhibit B to

the declaration.  This is -- it has the page number of 50, and it shows --

THE COURT:  To which -- to Murphy's declaration?

MS. MURPHY:  Yes, Murphy's declaration.  It's -- it's really just the page immediately preceding the one that -- that he referenced.

It talks about -- it shows the annual bonus plan, and it shows the performance goals that were to be achieved under the performance -- under the bonus plan.  And those performance goals were GAAP revenue and gross margin.  Those were the only two actual mechanical aspects of this.

While it's true that then --

THE COURT:  Hold on.

MS. MURPHY:  Oh.

THE COURT:  I'm not -- you said --

MS. MURPHY:  Yes, this is the Murphy declaration.

THE COURT:  Right, but --

MS. MURPHY:  Exhibit B.

THE COURT:  Page 56?

MS. MURPHY:  Right.  Yes.  So 56, it's -- it's got the page number 50 also because --

THE COURT:  I see.

MS. MURPHY:  But yes, so --

THE COURT:  And what --

MS. MURPHY:  Oh, okay.

So what I was pointing out is that this shows the -- the annual bonus structure and the performance goals that were to be achieved.  And the only ones that are given any kind of, you know, mechanical representation are GAAP revenue and gross margin.

On the next page, which is the page that --

THE COURT:  Hold on.  Let me find it.

MS. MURPHY:  Oh, okay.

(Off-the-record discussion.)

(Pause in the proceedings.)

THE COURT:  Okay.  I'm not seeing what you're --

MS. MURPHY:  Okay.

THE COURT:  Oh, I see.  You're just talking about the chart and you're --

MS. MURPHY:  Yes.

THE COURT:  But what is your comment to the entire paragraph about the difficulty of ascertaining a -- performance goals?

MS. MURPHY:  About the difficulty --

THE COURT:  The -- the paragraph that actually explains it in words.

MS. MURPHY:  Okay.  All right.

So -- so they were supposed to obtain those performance goals, supposed to be guiding the bonuses.  Or -- even when it's discussing individual performance goals, it says growing

GAAP, gross margin and EBITDA.  That's for the C.E.O.

For Defendant Valiasek, it's the achievement of meeting quarterly financial targets, performing -- and -- and those types of things.  So they are tied -- the performance goals -- the individual performance goals are tied to the company performance goals.  And those company performance goals have only two aspects, both of which are very directly tied to royalty revenue.

**THE COURT:**  All right.

**MS. MURPHY:**  And --

**THE COURT:**  Go ahead.

**MS. MURPHY:**  And, Your Honor, just to discuss scienter more broadly, I think defendants have tried to present a situation where they're saying that everything they did was reasonable, that the financial results that they represented were based on the best information they had, and that was acceptable.

I want to point out, Your Honor, that what defendants represented in 2018 were hugely improved financial results.  For example, that first quarter of 2018, they recognized $11.4 million in royalty revenues.  For that -- and as we allege in paragraph 53, for that same quarter of 2017, they had recognized 22 -- $225,000 in royalty revenues.  That's an increase of 5,000 percent in royalty revenues from one year the same quarter.

And, in fact, you know, they did this throughout. It's -- it's -- throughout the class period, they were recognizing hugely improved, dramatically improved royalty revenues, which defendants called themselves, quote, unquote, year-over-year amazing. And the idea that they were doing just what was reasonable, that they were going off of historical sales data and that this was reasonable to do is simply false.

For 2017, and we allege in this paragraph 56 -- for 2017, the total royalty payment that Nenter made to Amyris was $2.6 million for the entire year. That's it. Yet first quarter, suddenly that's now 11.4 million just for that quarter.

And another thing to go into scienter, we do have evidence by the confidential witnesses that these defendants were, in fact, paying very close attention to the financial statements and the revenue numbers.

Now what was not happening is that the company was not receiving money at anywhere near the rate, not necessarily even just within the quarter, but even several months later, the company was not receiving payments anything close to what it had reported. And at no point did they disclose to investors until the end of the class period.

Instead, they continue talking about those in terms of, quote, realized, as I pointed Your Honor to earlier. And continue to say that we're going to expect 40 million in

revenue for the rest of the year.  That was Defendant's Melo's statement in November 2018.

**THE COURT:**  All right.

**MS. MURPHY:**  So --

**THE COURT:**  Any closing comments?

**MR. CELIO:**  Just -- just a couple, Your Honor.  I'll be very brief.

The comment that it went up 5,000 percent -- that royalties went up 5,000 percent is in part because these weren't royalties before.  They were sales.  I started with saying that these were complicated corporate transactions.  Prior to this period, Amyris was selling itself.  It wouldn't have been represented as a royalty line.  It would have been represented as sales, so that's -- that's part of the reasons these numbers go up so dramatically, is because there is a change at this point in the way that this is being accounted for because it's no longer a sale, it's now a royalty.

But -- but to step back more broadly.  I -- there just isn't evidence on scienter in this case that is sufficient to -- to carry their burden.  They have to plead particularized facts giving rise to a strong inference.

It sounds like counsel thinks that they can get there on an amended complaint.  We haven't sought dismissal with prejudice because we understand that they get another shot, you know, even if we prevail on this motion.

I think that if they think that they can bring forward this evidence, they -- they can do that on amended complaint. I think that this complaint doesn't have those particularized facts that -- that show that these statements were false when they were made.

With that, I'll yield.

**MS. MURPHY:**  Your Honor, we would disagree.  We absolutely think that this isn't even a very close call.  We have defendants own admissions about the fact that they lacked key critical information necessary to properly recognize revenues, to present them as financial results, and to present them as no less certain than they had been in previous years when this was simply false.

And defendants could see that they were not receiving the payments anywhere close to the rate that they had -- or the amounts in which they were reporting.  They essentially did not ever disclose this to investors until the very end.

And, in fact, we have alleged these claims against the company and two individuals, the C.E.O. and C.F.O., the two people who are responsible for ensuring the reliability of the financial results, who signed stock certifications saying that they were reliable, and who were supposed to be in charge of designing and implementing effective processes for recognizing royalty revenues.

Defendants have admitted that this is not what was

happening -- that this is hot what was done.  And I'll point you to Exhibit A to the Murphy declaration as one -- one place where that is admitted, that the company had not designed proper operations over financial reporting for royalty revenues.  That's one aspect.

Another thing I'd like Your Honor to keep in mind is, again, these were not royalty numbers in anything close to what had been presented previously.  And while defendant has said that there was a change in the way that these were reported, we have clearly alleged in the -- paragraph 46 that for the total year from Nenter, they received 2.6 million in royalty revenues.  That has not changed.

What changed is DSM has come into the play, but that's it. Those are the same royalty revenues that they're now recognizing, but they're now recognizing at astronomically higher numbers, based not on actual sales date, not on actual quantity and pricing, but on their best guess, which they are not making clear to investors that's what they are doing, even though defendants concede that this is what they were doing.

Your Honor, we also do have motive allegations here. Those come in two forms.  First, defendants were motivated to conduct a secondary offering because the company was in extreme debt.  They had 106 -- over $160 million of debt according to confidential witness two, which they were very concerned about.

In order to keep the company going, they conducted a secondary offering using the inflated stock price, using these exaggerated financial results.  And it provided the company with almost $50 million in much-needed cash flow.

We also have the bonuses, which we have a touched upon, and stock sales by Defendant Melo.

Now, we're not even saying that these motive allegations by themselves allege scienter.  They just need to go into the calculus, Your Honor.  They need to be considered in the totality of the circumstances in determining whether we have alleged that -- that it is as likely -- at least as likely that defendants were at minimum reckless.  That's our standard.  We don't have to prove that it's more likely. *Tellabs* says that we simply have to show that it's as likely. The tie goes to the plaintiff, Your Honor.  That is under the Supreme Court's ruling in *Tellabs*.

And here, we have alleged many facts that suggest that defendants were at least reckless in representing these results as -- as reliable financial results and as talking -- and representing that they had designed processes when, in fact, they had not.

And -- and the fine point that I would make, Your Honor, is simply to say that we are at the pleading stage.  And we have not had the benefit of discovery.

**THE COURT:**  So -- it's an argument that you shouldn't

make in a securities case.  That is, a security case that the 12(b)(6) is -- is the main motion, so these things don't go through.  You do not get discovery unless there is something there.

MS. MURPHY:  That --

THE COURT:  So -- so that argument is -- plays very little -- plays very, very little bit of role in my analysis.

MS. MURPHY:  Okay.

And -- and just to -- just to be clear, Your Honor, the only thing I'm pointing to is the Ninth Circuit's holding in *Xoma vs. Warshaw* in which it simply counsels courts to not raise the pleading standard to an insurmountable level.  That is all, recognizing, in fact, that while the PSLRA is supposed to ferret out meritless --

THE COURT:  Its a heightened standard.

MS. MURPHY:  It is a heightened standard. Absolutely.  And we think we meet that heightened standard, but to the extent that --

THE COURT:  So it is not a regular 12(b)(6) standard. It is a heightened standard --

MS. MURPHY:  Um-hmm.

THE COURT:  -- and we spend a significant amount of time on these cases at this juncture for that reason.

I am trying to decide, and I -- you may get an order from me for a chart.  That is, I don't want any more argument, but

I do think that it is useful in these kinds of cases to require the plaintiff to identify the very specific statement that they are proceeding on because we have to analyze these individually.

So if I -- if I issue an order, I'll do that very shortly here, and you'll have to turn it around very quickly.

Understand that if I get significant argument back on these things, I will strike it and you will not get another chance.

These charts are there to help us make our job easier. They are not to reargue things. So it would require you to give us the -- you know, and the direct quotation which is -- has to be from the complaint, so it is a cut-and-paste so that I know exactly what you're proceeding on and couple of other things, but probably a cross-reference to your argument in your briefs. There will be no argument in these -- in the document.

MR. CELIO: Your Honor, what role, if any, do defendants play in this?

THE COURT: So once I get the chart, then there'll be an opportunity to reply. But, again, primarily to say, see argument at page X. But it -- and that's why you will have literally a very fast turnaround 'cause I don't want to give you opportunity to -- to be creative and -- by making arguments. I don't want the -- you already had an

opportunity.

What I'm trying to get you to do is distill this in a way that makes our job easier because we are busy.

MR. CELIO: So, Your Honor, just so I get it right so I don't incur the an anger of the court, I'm supposed to say "see" --

THE COURT: It will be --

MR. CELIO: -- "this section of my brief?"

THE COURT: It will be explicit in the order.

MR. CELIO: Okay.  Thank you, Your Honor.

THE COURT: All right.  Thank you.

MR. CELIO: Thank you.

(Proceedings were concluded at 3:05 P.M.)

--o0o--

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter. I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken, and further that I am not financially nor otherwise interested in the outcome of the action.

_____

Raynee H. Mercado, CSR, RMR, CRR, FCRR, CCRR

Thursday, July 1, 2021