# EXHIBIT 2

GIBSON, DUNN & CRUTCHER LLP
MICHAEL D. CELIO, SBN 197998
mcelio@gibsondunn.com
1881 Page Mill Road
Palo Alto, CA  94304-1211
Telephone:  650.849.5300
Facsimile:  650.849.5333

SHIREEN A. BARDAY, (*pro hac vice*)
sbarday@gibsondunn.com
200 Park Avenue
New York, NY 10166-0193
Telephone:  212.351.2621
Facsimile:  212.817.9421

ELIZABETH A. DOOLEY, SBN 292358
edooley@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone:  415.393.8342
Facsimile:  415.393.8469

*Attorneys for Defendants Amyris, Inc. and John G. Melo*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHANE MULDERRIG and RONY DEVORAH, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>AMYRIS, INC., JOHN G. MELO, and KATHLEEN VALIASEK,<br><br>Defendants. | Case No.:  4:19-cv-01765-YGR<br><br>**DEFENDANT AMYRIS, INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES; VERIFICATION OF ANTHONY HUGHES** |

PROPOUNDING PARTY:          Plaintiffs ROB JANSEN and VINCENT CARBONE

RESPONDING PARTY:          Defendant AMYRIS, INC.

SET NUMBER:          One (1)

Gibson, Dunn &
Crutcher LLP

Pursuant to Rule 33(b) of the Federal Rules of Civil Procedure, Defendant Amyris, Inc. ("Amyris"), by and through its attorneys, hereby responds and objects to the interrogatories set forth in Plaintiffs Rob Jansen and Vincent Carbone's ("Plaintiffs") First Set of Interrogatories ("Interrogatories") served by Plaintiffs on December 18, 2020.

## PRELIMINARY STATEMENT

These responses are made solely for the purpose of, and in relation to, this action. Defendant has not completed Defendant's investigation of the facts relating to this case and has not completed preparation for trial in this matter. These responses are based upon discovery conducted as of this date and information presently available to and located by Defendant. Further, Plaintiffs have failed to respond adequately to Defendant's discovery requests to date, and thus Defendant has an incomplete record of relevant documents, responses, and facts with which to answer these Interrogatories. Defendant expressly reserves the right to supplement these responses and to assert any additional objections to the Interrogatories deemed necessary or appropriate in light of any new facts, further review of documents, meet and confer conferences, informal discovery conferences, or motions to compel further responses. Each response is given subject to all appropriate objections (including, but not necessarily limited to, objections concerning privilege, competency, relevancy, materiality, propriety, and admissibility). All objections are reserved and may be interposed at any time.

The fact that Defendant has responded to all or part of any Interrogatory is not intended to be and shall not be construed to be a waiver of all or any part of any objection or privilege applicable to any Interrogatory, an admission of any fact stated or assumed in the Interrogatory, or an admission that any information contained therein constitutes admissible evidence. In furnishing the responses herein, Defendant does not concede the truth of any factual assertion or implication contained in any of the Interrogatories.

## GENERAL OBJECTIONS APPLICABLE TO ALL INTERROGATORIES

The following general objections ("General Objections") are continuing objections that are incorporated into each and every one of the specific objections and responses set forth below, whether or not specifically referred to in the responses, and these responses are made subject to and without waiver thereof. From time to time, a specific response may repeat a General Objection for emphasis

1
DEFENDANT AMYRIS'S RESP. AND OBJ. TO PLAINTIFFS' FIRST SET OF INTERROGATORIES
CASE NO. 4:19-CV-01765-YGR

or some other reason.  The failure to include a General Objection in any specific response shall not be interpreted as a waiver of such objection.

1.      Defendant objects to the Interrogatories on the ground and to the extent that they purport to impose obligations on Defendant greater than or beyond the requirements specified in the applicable Federal Rules of Civil Procedure and Local Rules pertaining to party discovery, and to the extent that they seek information beyond the scope of inquiry permitted by these Rules or otherwise.

2.      Defendant objects to these Interrogatories on the ground and to the extent that they seek information that is confidential (including trade secret information), proprietary, and/or subject to a claim of privilege or that is otherwise protected from disclosure by, including without limitation, the attorney-client privilege, the attorney work product doctrine, and any other privilege or right of confidentiality or privacy recognized by the United States Constitution, the California Constitution, or any other law fully recognized privilege or immunity, whether conferred by contract or law.  Defendant and Defendant's counsel hereby assert all such privileges, rights, and protections.

3.      Defendant objects to the Interrogatories on the ground and to the extent that they attempt or purport to seek information that is neither relevant to any party's claim or defense nor proportional to the needs of the case, as required by Federal Rule of Civil Procedure 26(b)(1).

4.      Defendant objects to the Interrogatories on the ground and to the extent that they are vague and ambiguous as to the specific information sought, and on the ground and to the extent that they are overbroad, compound, disjunctive, duplicative, unduly burdensome, and/or oppressive. Defendant will respond to any vague or ambiguous Interrogatory based on Defendant's reasonable interpretation of such Interrogatory.

5.      Defendant objects to the Interrogatories on the ground that they call for documents and information that are outside of the relevant time period or subject matter for this litigation.

6.      Defendant objects to the Interrogatories on the ground and to the extent that they seek to impose any requirements or obligations on Defendant in addition to or different from those imposed by any applicable orders of the Court, as well as any stipulation or agreement of the parties.

7.      Defendant objects to the Interrogatories, including the Definitions and Instructions and each and every request therein, to the extent they seek documents or information not within Defendants'

Gibson, Dunn &
Crutcher LLP

possession, custody, or control. Defendants further object to the Interrogatories to the extent that they seek documents or information more readily available from sources other than Defendants, including without limitation, documents that are in Plaintiffs' possession, custody, or control, or are available to the public.

8. Defendant objects to the Interrogatories, including the Definitions and Instructions and each and every request therein, to the extent they call for a legal opinion or conclusion.

9. Defendant objects to the Interrogatories, including the Definitions and Instructions and each and every request therein, to the extent that they are argumentative, lack foundation, or incorporate allegations and assertions that are disputed or erroneous. By responding and objecting to any Interrogatory, Defendants do not admit the correctness of such allegations or assertions.

10. Defendant objects to the Interrogatories to the extent that they seek information the release of which would be a violation of any individual's right of privacy under Cal. Const. art. I, § 1, or any other constitutional, statutory or common law right of privacy of any person.

11. Defendant objects to the Interrogatories, including the Definitions and Instructions and each and every request therein, to the extent they that they are premature and/or seek information that is more properly the subject of expert discovery and testimony; the parties have not yet designated experts.

12. The fact that Defendant has responded to all, or part, of any Interrogatory, is not intended to be, and shall not be construed to be, a waiver of all, or any part, of any objection or privilege applicable to any Interrogatory made herein, nor an admission of any fact stated or assumed in the Interrogatory. No incidental or implied admissions are intended by the responses set forth below.

13. Amyris's investigation of the facts relevant to this litigation is ongoing. Amyris therefore makes the below responses to the best of its current knowledge, information, and belief of the facts available to it on the date these responses are given. These responses are based only on information currently in Amyris's possession, custody, and control. Amyris further reserves its rights to object to any discovery proceeding involving or relating to any subject matter or request, as well as its rights, at any time, to amend, alter, revise, clarify, delete, withdraw, and/or supplement any of the responses.

14.     The foregoing General Objections are incorporated into each and every one of the specific objections and responses set forth below, whether or not specifically referred to in the responses, and these responses are made subject to and without waiver thereof.

### SPECIFIC OBJECTIONS TO DEFINITIONS

Unless otherwise stated, the terms set forth below are defined as follows:

1.     Defendant objects to the Definitions contained in the Interrogatories to the extent they purport to define words or phrases to have a meaning different from their commonly understood meaning, or to include more than their commonly understood definitions.  Defendants will interpret any objectionable definition by using its commonly understood meaning.

2.     Defendant objects to the Definition of "Amyris" as vague, ambiguous, overbroad, unduly burdensome, assuming facts not in evidence, calling for a legal conclusion, incorporating assertions that are disputed or erroneous, and seeking irrelevant information unlikely to lead to the discovery of admissible information, including to the extent it (1) includes individuals or entities not employed by or under the control of Amyris, and/or (2) purports to require Amyris to identify and account for persons acting on another entity's behalf.

3.     Defendant objects to the Definitions of "Auditor," "Auditors," "BDO," "DSM," "KPMG," "Lavvan," "MGO," "plaintiff," and "defendant" to the extent they (1) include individuals or entities not employed by or under the control of Amyris, and/or (2) purport to require Amyris to identify and account for persons acting on another entity's behalf.

4.     Defendant objects to the Definitions of "concerning" or "in connection with" as vague, ambiguous, overbroad, unduly burdensome, calling for a legal conclusion, seeking information that is not relevant to any party's claims or defenses, and not proportional to the needs of the case, including, but not limited to, to the extent they mean "in any way logically or factually connected to the matter referred to."

5.     Defendant objects to the Definition of "Executive" as vague, ambiguous, overbroad, unduly burdensome, seeking information that is not relevant to any party's claims or defenses, and not proportional to the needs of the case, including, but not limited to, to the extent it encompasses

DEFENDANT AMYRIS'S RESP. AND OBJ. TO PLAINTIFFS' FIRST SET OF INTERROGATORIES
CASE NO. 4:19-CV-01765-YGR

Gibson, Dunn &
Crutcher LLP

"individuals who held senior level management positions."  Amyris will interpret the term "Executive" to mean only "officer, director, president, senior or executive vice president."

6.    Defendant objects to the Definition of "Identify" as overbroad, unduly burdensome, seeking information that is not relevant to any party's claims or defenses, and not proportional to the needs of the case, including, but not limited to, to the extent it seeks a "person's present or last known residential address and telephone number" and "the present or last known employer, business address, and telephone number."

7.    Defendant objects to the Definitions of "Meeting" or "Meetings" as vague, ambiguous, overbroad, unduly burdensome, seeking information that is not relevant to any party's claims or defenses, and not proportional to the needs of the case, including, but not limited to, to the extent it encompasses instances where "presence was by chance or pre-arranged and whether or not the meeting was formal or informal or occurred in connection with some other activity."

8.    Defendant objects to the Definition of "Policy" as vague, ambiguous, overbroad, unduly burdensome, seeking information that is not relevant to any party's claims or defenses, and not proportional to the needs of the case, including, but not limited to, to the extent it encompasses policies "formal or informal, written or unwritten, recorded or unrecorded, which [were] recognized or followed, explicitly or implicitly."

9.    Defendant objects to the Definitions of "Refer," "Relate," "Referring," or "Relating" as vague, ambiguous, overbroad, unduly burdensome, seeking information that is not relevant to any party's claims or defenses, and not proportional to the needs of the case, including, but not limited to, to the extent it encompasses "all documents which . . . explicitly or implicitly refer to, were reviewed in conjunction with, or were created generated or maintained as a result of the subject matter of the request."

## SPECIFIC OBJECTIONS TO RULES OF CONSTRUCTION

1.    Defendant objects to the construction of "and/or" as vague, ambiguous, overbroad, and unduly burdensome to the extent it seeks to "bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope."

2.    Defendant objects to the construction of singular and plural forms of words as vague, ambiguous, overbroad, and unduly burdensome to the extent it seeks to "bring within the scope of a request all responses that might otherwise be construed as outside its scope."

3.    Defendant objects to the construction of verbs in any tense as vague, ambiguous, overbroad, and unduly burdensome to the extent it seeks to "bring within the scope of a request all responses that might otherwise be construed as outside its scope."

## SPECIFIC OBJECTIONS TO INSTRUCTIONS

1.    Defendant objects to the Instructions to the extent they seek to impose obligations or requirements on Defendant beyond those contained in the Federal Rules of Evidence, the Federal Rules of Civil Procedure, and/ or the Local Rules and procedures of this Court.

2.    Defendant objects to the Instructions to the extent they purport to impose an ongoing obligation on Defendants not required by applicable law.

3.    Defendant objects to the instructions under the heading "Relevant Time Period" as vague, ambiguous, overbroad, unduly burdensome, calling for legal conclusions, seeking information that is not relevant to any party's claims or defenses, and not proportional to the needs of the case.

## SPECIFIC OBJECTIONS AND RESPONSES TO INTERROGATORIES

**INTERROGATORY NO. 1:**

Identify all persons (whether an Amyris employee or an employee of an Auditor or other third party) involved in the recognition of royalty revenue for Amyris, describe their roles in assisting with the recognition of royalty revenue for Amyris, describe the time period in which these individuals performed such roles, provide the job titles that each such individual had, and provide the last known mailing address and telephone numbers for such individuals.

**RESPONSE TO INTERROGATORY NO. 1:**

Defendant incorporates in full herein its preliminary statement, general objections, and specific objections to instructions.  Defendant objects to this Interrogatory on the ground and to the extent that it seeks information that is confidential (including trade secret information), proprietary, and/or subject to a claim of privilege or that is otherwise protected from disclosure by, including without limitation, the attorney-client privilege, the attorney work product doctrine, and any other

6

Gibson, Dunn & Crutcher LLP

privilege or right of confidentiality or privacy recognized by the United States Constitution, the California Constitution, or any other lawfully recognized privilege or immunity, whether conferred by contract or law. Defendant and Defendant's counsel hereby assert all such privileges, rights, and protections. Defendant further objects to this Interrogatory because it is vague, ambiguous, overbroad, and not proportional to the needs of the case, including because it does not define the term "involved in," and because auditors are not "involved in" the recognition of royalty for Amyris. For purposes of this Interrogatory, Defendant defines "persons" as Amyris officers, directors, presidents, and senior or executive vice presidents.

Without waiving the foregoing objection, Defendant responds as follows, based upon the information known to it as of the date of these responses: The following persons were involved in calculating the royalty revenue Amyris recognized in Amyris's public filings with the SEC:

| Name | Role | Time Period | Job Title | Mailing Address and Telephone Number |
|------|------|-------------|-----------|--------------------------------------|
| Burke, Nathan | Prepared royalty revenue calculations | January 16, 2018 to March 29, 2019 | Vice President, Technical Accounting | c/o undersigned counsel |
| Hughes, Anthony | Oversees accounting department that is responsible for calculating royalty revenue | June 11, 2018 to Present | Chief Accounting Officer | c/o undersigned counsel |
| Maloney, Justina | Oversaw accounting department that is responsible for calculating royalty revenue | January 1, 2018 to June 10, 2018 | Chief Accounting Officer | c/o undersigned counsel |
| Melo, John G. | Responsible for approving royalty revenue calculations | 2007 to present | Chief Executive Officer | c/o undersigned counsel |
| Valiasek, Kathleen | From January 2017 to June 2019, served as CFO and oversaw department responsible for calculating royalty revenue | January 2017 to May 2019 | Chief Business Officer (former Chief Financial Officer) | c/o James N. Kramer, The Orrick Building, 405 Howard Street, San Francisco, CA 94105 |

DEFENDANT AMYRIS'S RESP. AND OBJ. TO PLAINTIFFS' FIRST SET OF INTERROGATORIES
CASE NO. 4:19-CV-01765-YGR

Gibson, Dunn & Crutcher LLP

**INTERROGATORY NO. 2:**

Identify all recurring meetings in which any Amyris executive participated that dealt with or discussed Amyris's recognition of revenue and/or reporting of financial results, the title or name under which such meetings were referred, the usual attendees of those meetings, and any recurring documents that were supplied for, during, or subsequent to such meetings.

**RESPONSE TO INTERROGATORY NO. 2:**

Defendant incorporates in full herein its preliminary statement, general objections and specific objections to instructions. Defendant objects to this Interrogatory on the ground and to the extent that it seeks information that is confidential (including trade secret information), proprietary, and/or subject to a claim of privilege or that is otherwise protected from disclosure by, including without limitation, the attorney-client privilege, the attorney work product doctrine, and any other privilege or right of confidentiality or privacy recognized by the United States Constitution, the California Constitution, or any other lawfully recognized privilege or immunity, whether conferred by contract or law. Defendant and Defendant's counsel hereby assert all such privileges, rights, and protections. Defendant further objects to this Interrogatory because it is vague, ambiguous, overbroad, and not proportional to the needs of the case, including because it does not define the terms "dealt with," "recognition of revenue," "reporting of financial results," or "usual attendees" and because it incorporates the defined term "executive." For purposes of this Interrogatory, Defendant construes "dealt with or discussed Amyris's recognition of revenue and/or reporting of financial results" as the preparation or discussion of the financial information included in Amyris's public filings with the SEC during the Relevant Time Period.

Without waiving the foregoing objections, Defendant responds as follows, based upon the information known to it as of the date of these responses: There were no regularly occurring meetings where revenue recognition and/or the reporting of financial results were always discussed as a matter of course. The following recurring meetings most likely would have involved the discussion of the financial information included in Amyris's public filings with the SEC.

Gibson, Dunn &
Crutcher LLP

| Meeting | Dates | Usual Attendees | Recurring Documents |
|---|---|---|---|
| Meeting of the Board of Directors | **2018:** March 22, May 2, August 1, November 6<br><br>**2019:** February 20, April 15, May 14, July 23 | Amyris Directors, Nicole Kelsey | Relevant, non-privileged meeting minutes and presentations to be produced in discovery |
| Meeting of the Audit Committee of the Board of Directors | **2018:** March 14, March 21, April 13, May 11, July 31, August 3, September 11, November 5, November 9<br><br>**2019:** January 25; February 19; March 5, 15, 17, 25, 29, 31; April 1-15, 17-18, 22, 24, 26, 30; May 2, 4, 7, 13, 20, 31; June 6, 13, 19, 21, 27; July 2, 22; August 12, 21; September 4, 24; October 4 | Members of Audit Committee, Nicole Kelsey, Kathleen Valiasek, Tina Maloney, Anthony Hughes, representative(s) of independent auditor (KPMG, BDO, MGO) | Relevant, non-privileged meeting minutes and presentations to be produced in discovery |

**INTERROGATORY NO. 3:**

Identify all persons (whether an Amyris employee or an employee of an Auditor or other third party) involved in the consideration of, and/or determination to, restate Amyris's quarterly financial statements for 2018, describe their roles in assisting with that consideration/determination, describe the time period in which these individuals performed such roles, provide the job titles that each such individual had, and provide the last known mailing address and telephone numbers for such individuals.

**RESPONSE TO INTERROGATORY NO. 3:**

Defendant incorporates in full herein its preliminary statement, general objections and specific objections to instructions. Defendant objects to this Interrogatory on the ground and to the extent that it seeks information that is confidential (including trade secret information), proprietary, and/or subject to a claim of privilege or that is otherwise protected from disclosure by, including

DEFENDANT AMYRIS'S RESP. AND OBJ. TO PLAINTIFFS' FIRST SET OF INTERROGATORIES
CASE NO. 4:19-CV-01765-YGR

Gibson, Dunn & Crutcher LLP

without limitation, the attorney-client privilege, the attorney work product doctrine, and any other privilege or right of confidentiality or privacy recognized by the United States Constitution, the California Constitution, or any other lawfully recognized privilege or immunity, whether conferred by contract or law.  Defendant and Defendant's counsel hereby assert all such privileges, rights, and protections.  Defendant further objects to this Interrogatory because it is vague, ambiguous, overbroad, and not proportional to the needs of the case, including because it does not define the term "involved in."  For purposes of this Interrogatory, Defendant defines "persons" as (i) Amyris officers, directors, presidents, and senior or executive vice presidents and (ii) the representatives of Amyris's independent registered public accounting firm, KPMG, that were present at the April 5, 2019 meeting of the Audit Committee of Amyris's Board of Directors.

Without waiving the foregoing objection, Defendant responds as follows, based upon the information known to it as of the date of these responses:  The following persons participated in the deliberations regarding whether to restate Amyris's interim condensed consolidated financial statements for the quarterly and year-to-date periods ended March 31, 2018, June 30, 2018 and September 30, 2018, included in the Amyris's Quarterly Reports on Form 10-Q for the fiscal quarters ended March 31, 2018, June 30, 2018 and September 30, 2018:

| Name | Role | Time Period | Job Title | Mailing Address and Telephone Number |
|---|---|---|---|---|
| John Melo | Participated in decision to restate | January 2007 to present | President (June 2008 to present) and CEO (January 2007 to present) | c/o undersigned counsel |
| Kathleen Valiasek | Participated in decision to restate | January 2017 to present | CFO (January 2017 to June 2019); CBO (June 2019 to Present) | c/o James N. Kramer, The Orrick Building, 405 Howard Street, San Francisco, CA 94105 |
| Anthony Hughes | Participated in decision to restate | June 11, 2018 to present | Chief Accounting Officer | c/o undersigned counsel |
| R. Neil Williams | Voted to restate Amyris's quarterly financial | May 2013 to March 31, 2020 | Chair, Audit Committee of Amyris Board of Directors | c/o undersigned counsel |

10

Gibson, Dunn & Crutcher LLP

| | statements for 2018 | | | |
|---|---|---|---|---|
| Steven Mills | Voted to restate Amyris's quarterly financial statements for 2018 | 2018 to Present | Member, Audit Committee of Amyris Board of Directors | c/o undersigned counsel |
| Geoffrey Duyk | Member of Audit Committee that voted to restate Amyris's financial statements for 2018 | May 2012 to Present | Member, Audit Committee of Amyris Board of Directors | c/o undersigned counsel |
| Paulette DeFalco | Independent auditor | Q2 '17 to July 3, 2019 | Partner, KPMG | Can be contacted through KPMG. |
| Packy Kelly | Independent auditor | Q2 '17 to July 3, 2019 | Partner, KPMG | Can be contacted through KPMG. |
| Marc Scher | Independent auditor | Q2 '17 to July 3, 2019 | Partner, KPMG | Can be contacted through KPMG. |
| Katie Wechsler | Independent auditor | Q2 '17 to July 3, 2019 | Partner, KPMG | Can be contacted through KPMG. |

**INTERROGATORY NO. 4:**

Identify all recurring reports or other documents upon which Amyris relied (and/or that formed the basis) for its determination of what amount of royalty to recognize as revenue under the DSM Royal Agreement, who prepared and/or received such documents, and any title or name by which the documents were referred. This interrogatory includes, but is not limited to, recurring documents that tracked or discussed payments received under the DSM Royalty Agreement and/or that discussed the expected revenue under the DSM Royalty Agreement.

**RESPONSE TO INTERROGATORY NO. 4:**

Defendant incorporates in full herein its preliminary statement, general objections and specific objections to instructions. Defendant objects to this Interrogatory on the ground and to the extent that it seeks information that is confidential (including trade secret information), proprietary, and/or subject to a claim of privilege or that is otherwise protected from disclosure by, including without limitation, the attorney-client privilege, the attorney work product doctrine, and any other

11

DEFENDANT AMYRIS'S RESP. AND OBJ. TO PLAINTIFFS' FIRST SET OF INTERROGATORIES
CASE NO. 4:19-CV-01765-YGR

privilege or right of confidentiality or privacy recognized by the United States Constitution, the California Constitution, or any other lawfully recognized privilege or immunity, whether conferred by contract or law.  Defendant and Defendant's counsel hereby assert all such privileges, rights, and protections.  Defendant further objects to this Interrogatory because it is vague, ambiguous, overbroad, and not proportional to the needs of the case, including because it does not define the term "recurring reports" or "recurring documents."

Without waiving the foregoing objection, Defendant responds as follows, based upon the information known to it as of the date of these responses:  For January and February 2018, Amyris used Vitamin E sales data provided by Nenter that included actual amounts of Vitamin E that Nenter sold to third parties and the price at which Nenter sold the Vitamin E to third parties.  This document was provided to Amyris employee Aaron Kelley at a March 14, 2018 meeting he attended at Nenter.  For March 2018, Amyris estimated the value share due using the quantity of farnesene shipped to Nenter in March 2018, which was provided to Amyris by DSM, and an average of the daily market price of Vitamin E during March 2018 obtained from the website Feedinfo (www.feedinfo.com/pages/Vitamin_E_50).

For the second quarter of 2018 ("Q2 '18") and after, Amyris estimated the quantity of Vitamin E sold by using the information provided to it by DSM regarding the quantity of farnesene shipped by DSM to Nenter.  To estimate the price at which Nenter sold the Vitamin E, Amyris used a percentage of the average of the daily market price of Vitamin E during the relevant quarter obtained from the website Feedinfo (www.feedinfo.com/pages/Vitamin_E_50).  Amyris will produce the documents upon which it relied to calculate royalty revenue under the Value Share Agreement for Q1-Q3 '18.

**INTERROGATORY NO. 5:**

Describe the details of how Amyris determined the amount of quarterly revenue to recognize or report under the DSM Royalty Agreement, including what information Amyris considered in recognizing revenue under the DSM Royalty Agreement, how Amyris received information about Nenter's sales (and/or royalty payments owed to Amyris) pursuant to the DSM Royalty Agreement for

Gibson, Dunn & Crutcher LLP

a given quarter, who at Amyris (or at any of Amyris's Auditors) received the information, and when these individuals received the information.

**RESPONSE TO INTERROGATORY NO. 5:**

Defendant incorporates in full herein its preliminary statement, general objections and specific objections to instructions. Defendant objects to this Interrogatory on the ground and to the extent that it seeks information that is confidential (including trade secret information), proprietary, and/or subject to a claim of privilege or that is otherwise protected from disclosure by, including without limitation, the attorney-client privilege, the attorney work product doctrine, and any other privilege or right of confidentiality or privacy recognized by the United States Constitution, the California Constitution, or any other lawfully recognized privilege or immunity, whether conferred by contract or law. Defendant and Defendant's counsel hereby assert all such privileges, rights, and protections. Defendant further objects to this Interrogatory because it is compound and conjunctive. This interrogatory contains four discrete subparts, which count against the twenty-five written interrogatory per party limit as stated in Rule 33(a)(1).

Without waiving the foregoing objection, Defendant responds as follows, based upon the information known to it as of the date of these responses: On April 26, 2016, Amyris and Nenter & Co., Inc. entered into a Renewable Farnesene Supply Agreement (the "Nenter Agreement") that established the terms of a supply and value share arrangement between Amyris and Nenter. Amyris will produce the Nenter Agreement in discovery.

On December 28, 2017, Amyris completed the sale of Amyris Brasil, which operated Amyris's Brotas 1 production facility, to DSM Nutritional Products AG. Concurrent with that sale, Amyris assigned the Nenter Agreement to DSM. Amyris and DSM also entered into a Value Sharing Agreement (the "DSM Agreement"). Annex 1 of the DSM Agreement specifies the formula used to calculate value share (the "Value Share Formula"). Amyris will produce the DSM Agreement in discovery.

In March 2018, Amyris and DSM entered into Amendment No. 1 to the Value Sharing Agreement (the "DSM Amendment No. 1"). Amyris will produce the DSM Amendment No. 1 in discovery. In June 2018, Amyris and DSM entered into Amendment No. 2 to the Value Sharing

DEFENDANT AMYRIS'S RESP. AND OBJ. TO PLAINTIFFS' FIRST SET OF INTERROGATORIES
CASE NO. 4:19-CV-01765-YGR

Gibson, Dunn & Crutcher LLP

Agreement (the "DSM Amendment No. 2").  Amyris will produce the DSM Amendment No. 2 in discovery.

For the first quarter of 2018, ("Q1 '18"), Amyris calculated the amount of value share using the Value Share Formula.  For January and February 2018, Amyris used Vitamin E sales data provided by Nenter that included actual amounts of Vitamin E that Nenter sold to third parties and the price at which Nenter sold the Vitamin E to third parties.  For March 2018, Amyris estimated the value share due using the quantity of farnesene shipped to Nenter in March 2018 and an average of the daily market price of Vitamin E during March 2018 obtained from the website Feedinfo (www.feedinfo.com/pages/Vitamin_E_50).  Using the Value Share Formula, the value share due for Q1 '18 was $11.4 million.

For the second quarter of 2018 ("Q2 '18") and after, Amyris calculated the value share due pursuant to the Value Share Formula, as supplemented by DSM Amendment No. 1 and DSM Amendment No. 2.  To estimate the quantity of Vitamin E sold, Amyris used the information provided to it by DSM regarding the quantity of farnesene shipped by DSM to Nenter.  To estimate the sale price, Amyris used an average of the daily market price of Vitamin E during Q2 '18 obtained from the website Feedinfo (www.feedinfo.com/pages/Vitamin_E_50).  Using the Value Share Formula, the value share due for Q2 '18 was $7.4 million.  Using the Value Share Formula, the value share due for Q3 '18 and Q4 '18 were $0 due to the average Vitamin E price during those periods being below the contractual threshold price necessary to generate royalty amounts.

**INTERROGATORY NO. 6:**

Describe the "material error [that] was made related to the estimates for recognizing revenue for royalty payments under the Value Sharing Agreement, dated December 28, 2017 (the 'Value Sharing Agreement'), as amended, between the Company and DSM under Accounting Standards Codification Topic 606, Revenue from Contracts with Customers, for the quarterly and year-to-date periods ended March 31, 2018 and June 30, 2018 and year-to-date period ended September 30, 2018," as disclosed on April 11, 2019 (*see* paragraph 76 of the Complaint), the circumstances and/or difficulties that caused or contributed to the material error, the circumstances that allowed the material error to persist throughout those quarters, and the steps that Amyris took to resolve the material error.

**RESPONSE TO INTERROGATORY NO. 6:**

Defendant incorporates in full herein its preliminary statement, general objections and specific objections to instructions. Defendant objects to this Interrogatory on the ground and to the extent that it seeks information that is confidential (including trade secret information), proprietary, and/or subject to a claim of privilege or that is otherwise protected from disclosure by, including without limitation, the attorney-client privilege, the attorney work product doctrine, and any other privilege or right of confidentiality or privacy recognized by the United States Constitution, the California Constitution, or any other lawfully recognized privilege or immunity, whether conferred by contract or law. Defendant and Defendant's counsel hereby assert all such privileges, rights, and protections. Defendant objects to this Interrogatory because it is vague, ambiguous, overbroad, and not proportional to the needs of the case, including because it does not define the phrase "circumstances and/or difficulties that caused or contributed to the material error." Defendant further objects to this Interrogatory because it is compound and conjunctive. This interrogatory contains four discrete subparts, which count against the twenty-five written interrogatory per party limit as stated in Rule 33(a)(1).

Without waiving the foregoing objection, Defendant responds as follows, based upon the information known to it as of the date of these responses: ASC 606-10-32-12 states:

> In assessing whether it is probable that a significant reversal in the amount of cumulative revenue recognized will not occur once the uncertainty related to the variable consideration is subsequently resolved, an entity shall consider both the likelihood and the magnitude of the revenue reversal. Factors that could increase the likelihood or the magnitude of a revenue reversal include, but are not limited to, any of the following:
>
> a. The amount of consideration is highly susceptible to factors outside the entity's influence. Those factors may include volatility in a market, the judgment or actions of third parties, weather conditions, and a high risk of obsolescence of the promised good or service.
> b. The uncertainty about the amount of consideration is not expected to be resolved for a long period of time.
> c. The entity's experience (or other evidence) with similar types of contracts is limited, or that experience (or other evidence) has limited predictive value.
> d. The entity has a practice of either offering a broad range of price concessions or changing the payment terms and conditions of similar contracts in similar circumstances.
> e. The contract has a large number and broad range of possible consideration amounts.

Gibson, Dunn &
Crutcher LLP

Based on the information reasonably available to members of Amyris's finance department during Q1-Q3 '18, Amyris followed the guidance in ASC 606-10-32-12 to arrive at the appropriate amounts for recording royalty revenue in Q1 '18, Q2 '18, and Q3 '18.

For Q1 '18 and Q2 '18, Amyris personnel outside the finance department had calculation estimates of the purported value share amounts for those quarters that were based on sales data provided by Nenter for March 2018 to June 2018. This sales data, however, was not in the format that Amyris's contract with DSM required. Moreover, Amyris personnel doubted the accuracy of the Nenter sales data because it included significantly below-market prices for the Vitamin E sold to third parties and discrepancies in the quantity of inventory sold and held by Nenter at the end of each quarter. Amyris further doubted the accuracy of Nenter's sales data based on Amyris's prior experiences with data integrity at China-based companies. Indeed, Amyris retained forensic investigators from Navigant to conduct a contractually-permitted audit of Nenter's sales of Vitamin E. Nenter failed to fully cooperate in the audit. As a result, the audit was inconclusive (though it did note multiple instances when Nenter sold Vitamin E to customers at prices well below market and discrepancies in the quantity of inventory sold and held at various Nenter locations). Nenter's dubious sales data was not provided to personnel in Amyris's finance department prior to Amyris issuing its Q1 '18 and Q2 '18 financial statements.

In Q1 '19, Amyris began its audit of fiscal year 2018. In the course of that audit, Amyris's independent registered public accounting firm, KPMG, reviewed Nenter's sales data from March to June 2018 and the resulting calculations of the purported value share amounts for Q1 '18 and Q2 '18. Though Amyris continued to dispute the accuracy of the underlying sales data, and had already collected the $11.4 million Q1 '18 value share amount due from DSM, KPMG nonetheless recommended that Amyris restate its 2018 financials to incorporate Nenter's sales data in Amyris's Q1 '18 and Q2 '18 value share calculations. Pursuant to that recommendation, Amyris concluded that based on Nenter's sales data for March to June 2018, Amyris should have constrained additional revenue ($3.5 million for Q1 '18 and $7.4 million for Q2 '18) to match the dubious sales data from Nenter that Amyris had access to prior to issuing its Q1 '18 and Q2 '18 financial statements.

DEFENDANT AMYRIS'S RESP. AND OBJ. TO PLAINTIFFS' FIRST SET OF INTERROGATORIES
CASE NO. 4:19-CV-01765-YGR

Gibson, Dunn &
Crutcher LLP

Based on guidance provided in ASC 250, in 2019, Amyris determined that the $10.9 million royalty revenue constraint from Q1 '18 and Q2 '18 should be treated as a correction of an error in the earliest period the March 2018 Nenter sales data was reasonably available to Amyris personnel, which was determined to be on or around April 25, 2018, prior to issuing the Q1 '18 financial statements.  As a result, on April 11, 2019, Amyris filed an SEC Form 8-K that stated, "During the preparation and audit of the Company's consolidated financial statements for Fiscal 2018, the Company concluded that (i) a material error was made related to the estimates for recognizing revenue for royalty payments under the Value Sharing Agreement, dated December 28, 2017 (the "*Value Sharing Agreement*"), as amended, between the Company and DSM under Accounting Standards Codification Topic 606, Revenue from Contracts with Customers, for the quarterly and year-to-date periods ended March 31, 2018 and June 30, 2018 and year-to-date period ended September 30, 2018 . . . ."

The "material error" discussed above was caused by a deficiency in Amyris's internal control over financial reporting that resulted in information relevant to the value share calculations (the disputed Nenter sales data for March to June 2018) being available to certain Amyris personnel, but not available to personnel in Amyris's finance department.  Amyris discovered these deficiencies in its internal controls during the preparation and audit of its financial statements for fiscal year 2018 that was conducted by Amyris's independent registered public accounting firm, KPMG, in the first quarter of 2019.  To correct this error, Amyris restated its interim condensed consolidated financial statements for the quarterly and year-to-date periods ended March 31, 2018, June 30, 2018 and September 30, 2018, included in Amyris's quarterly reports on SEC Form 10-Q for the fiscal quarters ended March 31, 2018, June 30, 2018 and September 30, 2018, respectively.

Gibson, Dunn & Crutcher LLP

DEFENDANT AMYRIS'S RESP. AND OBJ. TO PLAINTIFFS' FIRST SET OF INTERROGATORIES
CASE NO. 4:19-CV-01765-YGR

Notably, each of these quarterly reports already included a calculation of what the royalty revenue for each quarter and year-to-date would be both *with* and *without* application of ASC 606. For Q1 '18, Amyris's SEC Form 10-Q stated that without application of ASC 606, royalty revenue for that quarter would be $0:

| Three Months Ended March 31, 2018 (In thousands) | As Reported | Adjustments | Amounts Without the Adoption of ASC 606 |
|---|---|---|---|
| Renewable products | $ 5,195 | $ — | $ 5,195 |
| Licenses and royalties | 11,437 | (11,437) | — |
| Grants and collaborations | 6,366 | 444 | 6,810 |
| Total revenue from all customers | $ 22,998 | $ (10,993) | $ 12,005 |

For Q2 '18, Amyris's SEC Form 10-Q stated that without application of ASC 606, royalty revenue for that quarter would be $1.907 million:

| (In thousands) | Three Months Ended June 30, 2018 | | | Six Months Ended June 30, 2018 | | |
|---|---|---|---|---|---|---|
| | As Reported | Adjustments | Amounts Without the Adoption of ASC 606 | As Reported | Adjustments | Amounts Without the Adoption of ASC 606 |
| Renewable products | $ 6,633 | $ — | $ 6,633 | $ 11,828 | $ — | $ 11,828 |
| Licenses and royalties | 6,887 | (4,980) | 1,907 | 18,324 | (15,747) | 2,577 |
| Grants and collaborations | 9,674 | (2,039) | 7,635 | 16,040 | (2,265) | 13,775 |
| Total revenue from all customers | $ 23,194 | $ (7,019) | $ 16,175 | $ 46,192 | $ (18,012) | $ 28,180 |

DEFENDANT AMYRIS'S RESP. AND OBJ. TO PLAINTIFFS' FIRST SET OF INTERROGATORIES
CASE NO. 4:19-CV-01765-YGR

Gibson, Dunn &
Crutcher LLP

For Q3 '18, Amyris's SEC Form 10-Q stated that without application of ASC 606, royalty revenue for that quarter would be $1.798 million.

| (In thousands) | Three Months Ended September 30, 2018 | | | Nine Months Ended September 30, 2018 | | |
| | As Reported | Adjustments | Amounts Without the Adoption of ASC 606 | As Reported | Adjustments | Amounts Without the Adoption of ASC 606 |
|---|---|---|---|---|---|---|
| Renewable products | $   9,639 | $      — | $      9,639 | $  21,467 | $      — | $      21,467 |
| Licenses and royalties | 142 | 1,656 | 1,798 | 18,466 | (14,091) | 4,375 |
| Grants and collaborations | 5,085 | (1,555) | 3,530 | 21,125 | (3,820) | 17,305 |
| Total revenue from all customers | $  14,866 | $      101 | $      14,967 | $  61,058 | $  (17,911) | $      43,147 |

In addition to restating its financial statements for 2018, Amyris also implemented a remediation plan, which is discussed in detail in Amyris's SEC Form 10-K, filed on October 1, 2019. *See* Item 9A(d).

**INTERROGATORY NO. 7:**

Identify any and all weaknesses and/or deficiencies in Amyris's internal control over financial reporting that related and/or contributed to Amyris's misstatements (and/or error(s) in its reporting) of its royalty revenues under the DSM Royalty Agreement, during what period(s) these weaknesses or deficiencies existed, how they were identified, when they were first identified, and who identified them.

**RESPONSE TO INTERROGATORY NO. 7:**

Defendant incorporates in full herein its preliminary statement, general objections and specific objections to instructions. Defendant objects to this Interrogatory on the ground and to the extent that it seeks information that is confidential (including trade secret information), proprietary, and/or subject to a claim of privilege or that is otherwise protected from disclosure by, including without limitation, the attorney-client privilege, the attorney work product doctrine, and any other privilege or right of confidentiality or privacy recognized by the United States Constitution, the California Constitution, or any other lawfully recognized privilege or immunity, whether conferred by contract or law. Defendant and Defendant's counsel hereby assert all such privileges, rights, and protections. Defendant further objects to this Interrogatory because it is compound and conjunctive.

DEFENDANT AMYRIS'S RESP. AND OBJ. TO PLAINTIFFS' FIRST SET OF INTERROGATORIES
CASE NO. 4:19-CV-01765-YGR

Gibson, Dunn & Crutcher LLP

This interrogatory contains five discrete subparts, which count against the twenty-five written interrogatory per party limit as stated in Rule 33(a)(1).

Without waiving the foregoing objection, Defendant responds as follows, based upon the information known to it as of the date of these responses:  ASC 606-10-32-12 states:

> In assessing whether it is probable that a significant reversal in the amount of cumulative revenue recognized will not occur once the uncertainty related to the variable consideration is subsequently resolved, an entity shall consider both the likelihood and the magnitude of the revenue reversal.  Factors that could increase the likelihood or the magnitude of a revenue reversal include, but are not limited to, any of the following:
>
> f.  The amount of consideration is highly susceptible to factors outside the entity's influence.  Those factors may include volatility in a market, the judgment or actions of third parties, weather conditions, and a high risk of obsolescence of the promised good or service.
> g.  The uncertainty about the amount of consideration is not expected to be resolved for a long period of time.
> h.  The entity's experience (or other evidence) with similar types of contracts is limited, or that experience (or other evidence) has limited predictive value.
> i.  The entity has a practice of either offering a broad range of price concessions or changing the payment terms and conditions of similar contracts in similar circumstances.
> j.  The contract has a large number and broad range of possible consideration amounts.

Based on the information reasonably available to members of Amyris's finance department during Q1-Q3 '18, Amyris followed the guidance in ASC 606-10-32-12 to arrive at the appropriate amounts for recording royalty revenue in Q1 '18, Q2 '18, and Q3 '18.

For Q1 '18 and Q2 '18, Amyris personnel outside the finance department had calculation estimates of the purported value share amounts for those quarters that were based on sales data provided by Nenter for March 2018 to June 2018.  This sales data, however, was not in the format that Amyris's contract with DSM required.  Moreover, Amyris personnel doubted the accuracy of the Nenter sales data because it included significantly below-market prices for the Vitamin E sold to third parties and discrepancies in the quantity of inventory sold and held by Nenter at the end of each quarter.  Amyris further doubted the accuracy of Nenter's sales data based on Amyris's prior experiences with data integrity at China-based companies.  Indeed, Amyris retained forensic investigators from Navigant to conduct a contractually-permitted audit of Nenter's sales of Vitamin E.  Nenter failed to fully cooperate in the audit.  As a result, the audit was inconclusive

Gibson, Dunn & Crutcher LLP

20

DEFENDANT AMYRIS'S RESP. AND OBJ. TO PLAINTIFFS' FIRST SET OF INTERROGATORIES
CASE NO. 4:19-CV-01765-YGR

(though it did note multiple instances when Nenter sold Vitamin E to customers at prices well below market and discrepancies in the quantity of inventory sold and held at various Nenter locations). Nenter's dubious sales data was not provided to personnel in Amyris's finance department prior to Amyris issuing its Q1 '18 and Q2 '18 financial statements.

In Q1 '19, Amyris began its audit of fiscal year 2018. In the course of that audit, Amyris's independent registered public accounting firm, KPMG, reviewed Nenter's sales data from March to June 2018 and the resulting calculations of the purported value share amounts for Q1 '18 and Q2 '18. Though Amyris continued to dispute the accuracy of the underlying sales data, and had already collected the $11.4 million Q1 '18 value share amount due from DSM, KPMG nonetheless recommended that Amyris restate its 2018 financials to incorporate Nenter's sales data in Amyris's Q1 '18 and Q2 '18 value share calculations. Pursuant to that recommendation, Amyris concluded that based on Nenter's sales data for March to June 2018, Amyris should have constrained additional revenue ($3.5 million for Q1 '18 and $7.4 million for Q2 '18) to match the dubious sales data from Nenter that Amyris had access to prior to issuing its Q1 '18 and Q2 '18 financial statements.

Based on guidance provided in ASC 250, in 2019, Amyris determined that the $10.9 million royalty revenue constraint from Q1 '18 and Q2 '18 should be treated as a correction of an error in the earliest period the March 2018 Nenter sales data was reasonably available to Amyris personnel, which was determined to be on or around April 25, 2018, prior to issuing the Q1 '18 financial statements. As a result, on April 11, 2019, Amyris filed an SEC Form 8-K that stated, "During the preparation and audit of the Company's consolidated financial statements for Fiscal 2018, the Company concluded that (i) a material error was made related to the estimates for recognizing revenue for royalty payments under the Value Sharing Agreement, dated December 28, 2017 (the "***Value Sharing Agreement***"), as amended, between the Company and DSM under Accounting Standards Codification Topic 606, Revenue from Contracts with Customers, for the quarterly and year-to-date periods ended March 31, 2018 and June 30, 2018 and year-to-date period ended September 30, 2018 . . . ."

The "material error" discussed above was caused by a deficiency in Amyris's internal control over financial reporting that resulted in information relevant to the value share calculations (the

disputed Nenter sales data for March to June 2018) being available to certain Amyris personnel, but not available to personnel in Amyris's finance department.  Amyris discovered these deficiencies in its internal controls during the preparation and audit of its financial statements for fiscal year 2018 that was conducted by Amyris's independent registered public accounting firm, KPMG, in the first quarter of 2019.  To correct this error, Amyris restated its interim condensed consolidated financial statements for the quarterly and year-to-date periods ended March 31, 2018, June 30, 2018 and September 30, 2018, included in Amyris's quarterly reports on SEC Form 10-Q for the fiscal quarters ended March 31, 2018, June 30, 2018 and September 30, 2018, respectively.

Notably, each of these quarterly reports already included a calculation of what the royalty revenue for each quarter and year-to-date would be both *with* and *without* application of ASC 606. For Q1 '18, Amyris's SEC Form 10-Q stated that without application of ASC 606, royalty revenue for that quarter would be $0:

| Three Months Ended March 31, 2018 (In thousands) | As Reported | Adjustments | Amounts Without the Adoption of ASC 606 |
|---|---|---|---|
| Renewable products | $ 5,195 | $ — | $ 5,195 |
| Licenses and royalties | 11,437 | (11,437) | — |
| Grants and collaborations | 6,366 | 444 | 6,810 |
| Total revenue from all customers | $ 22,998 | $ (10,993) | $ 12,005 |

For Q2 '18, Amyris's SEC Form 10-Q stated that without application of ASC 606, royalty revenue for that quarter would be $1.907 million:

| (In thousands) | Three Months Ended June 30, 2018 | | | Six Months Ended June 30, 2018 | | |
|---|---|---|---|---|---|---|
| | As Reported | Adjustments | Amounts Without the Adoption of ASC 606 | As Reported | Adjustments | Amounts Without the Adoption of ASC 606 |
| Renewable products | $ 6,633 | $ — | $ 6,633 | $ 11,828 | $ — | $ 11,828 |
| Licenses and royalties | 6,887 | (4,980) | 1,907 | 18,324 | (15,747) | 2,577 |
| Grants and collaborations | 9,674 | (2,039) | 7,635 | 16,040 | (2,265) | 13,775 |
| Total revenue from all customers | $ 23,194 | $ (7,019) | $ 16,175 | $ 46,192 | $ (18,012) | $ 28,180 |

DEFENDANT AMYRIS'S RESP. AND OBJ. TO PLAINTIFFS' FIRST SET OF INTERROGATORIES
CASE NO. 4:19-CV-01765-YGR

For Q3 '18, Amyris's SEC Form 10-Q stated that without application of ASC 606, royalty revenue for that quarter would be $1.798 million.

| (In thousands) | Three Months Ended September 30, 2018 | | | Nine Months Ended September 30, 2018 | | |
| --- | --- | --- | --- | --- | --- | --- |
| | As Reported | Adjustments | Amounts Without the Adoption of ASC 606 | As Reported | Adjustments | Amounts Without the Adoption of ASC 606 |
| Renewable products | $ 9,639 | $ — | $ 9,639 | $ 21,467 | $ — | $ 21,467 |
| Licenses and royalties | 142 | 1,656 | 1,798 | 18,466 | (14,091) | 4,375 |
| Grants and collaborations | 5,085 | (1,555) | 3,530 | 21,125 | (3,820) | 17,305 |
| Total revenue from all customers | $ 14,866 | $ 101 | $ 14,967 | $ 61,058 | $ (17,911) | $ 43,147 |

In addition to restating its financial statements for 2018, Amyris also implemented a remediation plan, which is discussed in detail in Amyris's SEC Form 10-K, filed on October 1, 2019. *See* Item 9A(d).

Dated:  January 19, 2021

Respectfully submitted,

By: /s/ *Michael D. Celio*

GIBSON, DUNN & CRUTCHER LLP
MICHAEL D. CELIO, SBN 197998
mcelio@gibsondunn.com
1881 Page Mill Road
Palo Alto, CA  94304-1211
Telephone:  650.849.5300
Facsimile:  650.849.5333

SHIREEN A. BARDAY, (*pro hac vice*)
sbarday@gibsondunn.com
200 Park Avenue
New York, NY 10166-0193
Telephone:  212.351.2621
Facsimile:  212.817.9421

ELIZABETH A. DOOLEY, SBN 292358
edooley@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone:  415.393.8342
Facsimile:  415.393.8469

*Attorneys for Defendants Amyris, Inc. and John G. Melo*

23
DEFENDANT AMYRIS'S RESP. AND OBJ. TO PLAINTIFFS' FIRST SET OF INTERROGATORIES
CASE NO. 4:19-CV-01765-YGR

**VERIFICATION**

I, Anthony Hughes, am employed by Amyris, Inc., as the Chief Accounting Officer. I make this verification for and on behalf of Amyris, a Defendant in *Mulderrig v. Amyris, Inc.* No. 4:19-cv-01765-YGR (N.D. Cal.). I have reviewed DEFENDANT AMYRIS, INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES and know the contents thereof. Based on records maintained by Amyris, Inc., on information furnished to me by Amyris employees, or based on my personal knowledge, I affirm that these answers are true. The same is true of my own knowledge, except as to those matters which are therein stated on information and belief, and as to those matters, I believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed at Pleasanton, California on this 19th day of January 2021.


By _____
                Anthony Hughes

DEFENDANT AMYRIS'S RESP. AND OBJ. TO PLAINTIFFS' FIRST SET OF INTERROGATORIES
CASE NO. 4:19-CV-01765-YGR

Gibson, Dunn &
Crutcher LLP

## CERTIFICATE OF SERVICE

I, Elizabeth A. Dooley, declare as follows:

I am employed in the County of San Francisco, State of California, I am over the age of eighteen years and am not a party to this action; my business address is 555 Mission Street, San Francisco, CA 94105, in said County and State.  On January 19, 2021, I served the following document(s):

**DEFENDANT AMYRIS, INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES; VERIFICATION OF ANTHONY HUGHES**

on the parties stated below, by the following means of service:

Robert S. Green
GREEN & NOBLIN, P.C.
2200 Larkspur Landing Circle, Ste. 101
Larkspur, California 94939
Tel:  (415) 477-6700
Fax:  (415) 477-6710
-and-
4500 East Pacific Coast Highway
Fourth Floor
Long Beach, California 90804
Tel:  (562) 391-2487
rsg@classcounsel.com

William B. Federman
A. Brooke Murphy
FEDERMAN & SHERWOOD
10205 N. Pennsylvania Ave.
Oklahoma City, OK 73120
Telephone:  405-235-1560
Facsimile:  405-239-2112
wbf@federmanlaw.com
abm@federmanlaw.com

**BY ELECTRONIC SERVICE**:  On the above-mentioned date, based on a court order or an agreement of the parties to accept service by electronic transmission, I caused the documents to be sent to the persons at the electronic notification addresses as shown above.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 19, 2021.

/s/ *Elizabeth A. Dooley*
Elizabeth A. Dooley

DEFENDANT AMYRIS'S RESP. AND OBJ. TO PLAINTIFFS' FIRST SET OF INTERROGATORIES
CASE NO. 4:19-CV-01765-YGR

Gibson, Dunn & Crutcher LLP