MICHAEL D. CELIO, SBN 197998
mcelio@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1881 Page Mill Road
Palo Alto, CA  94304-1211
Telephone: 650.849.5300
Facsimile:  650.849.5333

ALEXANDER K. MIRCHEFF, SBN 245074
amircheff@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
Telephone: 213.229.7000
Facsimile:  213.229.7520

ELIZABETH AISLINN DOOLEY, SBN 292358
edooley@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA  94105-0921
Telephone: 415.393.8200
Facsimile:  415.393.8306

Attorneys for Defendants AMYRIS, INC. and JOHN G. MELO

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| SHANE MULDERRIG and RONY DEVORAH, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>AMYRIS, INC., JOHN G. MELO, and KATHLEEN VALIASEK,<br><br>Defendants. | CASE NO. 4:19-cv-01765-YGR<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>**Hearing:**<br>Date:      November 22, 2021<br>Time:     2:00 p.m.<br>Place:    Courtroom 1 (via Zoom)<br>Judge:   Hon. Yvonne Gonzalez Rogers |

## REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

# **TABLE OF CONTENTS**

**Page**

I. STATEMENT OF ISSUES ............................................................................................ 1

II. INTRODUCTION ...................................................................................................... 1

III. BACKGROUND ...................................................................................................... 4

    A.    The Parties and the Complaint ...................................................... 4

    B.    The Alleged Misstatements .......................................................... 4

    C.    The Purported Corrective Disclosures ......................................... 6

    D.    Plaintiffs' Request for Class Certification .................................. 7

IV. ARGUMENT ............................................................................................................ 7

    A.    Plaintiffs Fail to Satisfy the Requirements of Rule 23(a). ................. 7

        1.    Lead Plaintiff Jansen Is Not Typical or Adequate. ........................... 8

            a.    Jansen's Hundreds of Tweets about the Company Reflect a Sophisticated Investor Who Fully Understood Its Accounting Methodology. ................................................ 8

            b.    Jansen's Certification of Investment Concealed the Fact That He Was a Short Seller, Raising Credibility Issues That Preclude Class Certification. ............................................... 11

        2.    Plaintiff Carbone Is Not Typical or Adequate. ................................ 14

            a.    Carbone Did Not Purchase Before the November 2018 Disclosures, Which Is When Any Class Period Must End. ............... 14

            b.    Carbone Has Not Meaningfully Been Involved in the Suit. ............... 16

    B.    Plaintiffs Fail to Satisfy the Requirements of Rule 23(b)(3). .................... 18

        1.    The Presumption of Reliance Is Rebutted by Jansen's Purchases for Unrelated Concerns. ............................................... 19

        2.    Plaintiffs Fail to Propose a Method for Measuring Class-Wide Damages Consistent with Their Theory of Liability. ...................................... 20

            a.    Plaintiffs' Proposed Model Does Not Attempt to Identify or Account for Non-Fraud Factors, Including the Crash in the Vitamin E Market. ................................................ 20

            b.    Plaintiffs' "Materialization of the Risk" Theory Is Unsupported. ...... 22

V. CONCLUSION ......................................................................................................... 25

Gibson, Dunn & Crutcher LLP

i

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Alaska Elec. Pension Fund v. Pharmacia Corp.*,
No. 03-1519 AET, 2007 WL 276150 (D.N.J. Jan. 25, 2007) ........................................................14

*Alfus v. Pyramid Tech. Corp.*,
764 F. Supp. 598 (N.D. Cal. 1991) ..............................................................................................14, 16

*Basic v. Levinson*,
485 U.S. 224 (1988) ...........................................................................................................................19

*In re BP p.l.c. Sec. Litig.*,
No. 10-md-2185, 2014 WL 2112823 (S.D. Tex. May 20, 2014) ............................................23, 25

*Burkhalter Travel Agency v. MacFarms Int'l, Inc.*,
141 F.R.D. 144 (N.D. Cal. 1991) ......................................................................................................17

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) .................................................................................7, 18, 19, 20, 22, 24, 25

*Conn. Ret. Plans & Tr. Funds v. Amgen Inc.*,
660 F.3d 1170 (9th Cir. 2011)...........................................................................................................19

*In re Critical Path, Inc. Sec. Litig.*,
156 F. Supp. 2d 1102 (N.D. Cal. 2001) ...........................................................................................12

*Ellis v. Costco Wholesale Corp.*,
657 F.3d 970 (9th Cir. 2011)................................................................................................................7

*Erickson v. Snap, Inc.*,
No. 2:17-cv-03679-SVW-AGR, 2017 WL 11592635 (C.D. Cal. Sept. 18, 2018) ........................11

*Gary Plastic Packaging Corp. v. Merrill Lynch*,
903 F.2d 176 (2d Cir. 1990)..............................................................................................................11

*Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.*,
141 S. Ct. 1951 (2021) .................................................................................................................7, 19

*Goldman v. Alhadeff*,
No. C89-1061R, 1990 WL 86882 (W.D. Wash. Feb. 1, 1990)...........................................................9

*In re Grupo Televisa Sec. Litig.*,
No. 18 Civ. 1979 (LLS), 2021 WL 2000005 (S.D.N.Y. May 19, 2021) .....................................12

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014).....................................................................................................................7, 16, 18

Gibson, Dunn & Crutcher LLP

DEFS.' OPP'N TO MOT. FOR CLASS CERTIFICATION – CASE NO. 4:19-CV-01765-YGR

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998)........................................................................................................16

*Hanon v. Dataproducts Corp.*,
976 F.2d 497 (9th Cir. 1992)........................................................................................................7, 9

*Harris v. Vector Mktg. Corp.*,
753 F. Supp. 2d 996 (N.D. Cal. 2010) ..........................................................................................12

*Hatamian v. Advanced Micro Devices, Inc.*,
No. 14-cv-00226, 2016 WL 1042502 (N.D. Cal. Mar. 16 2016).....................................................19

*Hayes v. MagnaChip Semiconductor Corp.*,
No. 14-cv-01160, 2016 WL 7406418 (N.D. Cal. Dec. 22, 2016)..............................................14, 15

*Hodges v. Akeena Solar, Inc.*,
274 F.R.D. 259 (N.D. Cal. 2012) ..................................................................................................14

*Karth v. Keryx Biopharmaceuticals, Inc.*,
334 F.R.D. 7 (D. Mass. 2019) .......................................................................................................16

*Koenig v. Benson*,
117 F.R.D. 330 (E.D.N.Y. 1987) ...................................................................................................17

*In re Kosmos Energy Ltd. Sec. Litig.*,
299 F.R.D. 133 (N.D. Tex. 2014) .............................................................................................16, 17

*Lee v. Pep Boys-Manny Moe & Jack of Cal.*,
No. 12-cv-05064, 2015 WL 9480475 (N.D. Cal. Dec. 23, 2015).....................................................17

*Leyva v. Medline Indus. Inc.*,
716 F.3d 510 (9th Cir. 2013)..........................................................................................................20

*Loritz v. Exide Techs.*,
No. 13-cv-02607, 2015 WL 6790247 (C.D. Cal. July 21, 2015)...............................................20, 22

*Ludlow v. BP, P.L.C. ("BP II")*,
800 F.3d 674 (5th Cir. 2015).....................................................................................................23, 24

*Marsh v. First Bank of Delaware*,
No. 11-cv-05226, 2014 WL 554553 (N.D. Cal. Feb. 7, 2014) ........................................................12

*Mazza v. Am. Honda Motor Co.*,
666 F.3d 581 (9th Cir. 2012)...........................................................................................................7

*Mulderrig v. Amyris, Inc.*,
492 F. Supp. 3d 999 (N.D. Cal. 2020) ...........................................................................................16

*Rolex Emps. Ret. Tr. v. Mentor Graphics Corp.*,
136 F.R.D. 658 (D. Or. 1991) .........................................................................................................9

Gibson, Dunn &
Crutcher LLP

*Scott v. N.Y.C. Dist. Council of Carpenters Pension Plan*,
224 F.R.D. 353 (S.D.N.Y. 2004) ..........................................................................................17

*South Ferry LP No. 2 v. Killinger*,
271 F.R.D. 653 (W.D. Wash. 2011) ................................................................................14, 16

*In re SunEdison, Inc. Secs. Litig.*,
329 F.R.D. 124 (S.D.N.Y. 2019) .........................................................................................15

*TransUnion LLC v. Ramirez*,
141 S. Ct. 2190 (2021) .........................................................................................................14

*Tyson Foods, Inc. v. Bouaphakeo*,
577 U.S. 442 (2016).............................................................................................................18

*In re Valence Tech. Secs. Litig.*,
No. C 95-20459, 1996 WL 119468 (N.D. Cal. Mar. 14, 1996)......................................8, 11

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011)...............................................................................................................7

*Werdebaugh v. Blue Diamond Growers*,
No. 12-CV-02724, 2014 WL 7148923 (N.D. Cal. Dec. 15, 2014).................................20, 22

**RULES**

Fed. R. Civ. P. 23 .....................................................................................................................9

Fed. R. Civ. P. 23(a)(3).................................................................................................8, 14, 16

Fed. R. Civ. P 23(a)(4)........................................................................................................8, 16

Fed. R. Civ. P. 23(b)(3)..............................................................................................................18

Gibson, Dunn &
Crutcher LLP

DEFS.' OPP'N TO MOT. FOR CLASS CERTIFICATION – CASE NO. 4:19-CV-01765-YGR

## I.  STATEMENT OF ISSUES

1.    Whether class certification should be denied because Plaintiffs fail to satisfy the requirements of Federal Rule of Civil Procedure 23(a), as:

(a)    Lead Plaintiff Rob Jansen is atypical and inadequate, as demonstrated by his hundreds of social media posts about the Company's finances and other evidence showing he was a sophisticated investor and short seller who was not deceived by and indeed understood the alleged accounting misstatements; and

(b)    Plaintiff Vincent Carbone, the other proposed class representative, is also atypical and inadequate, *first*, because he purchased stock only after any conceivable class period should end—*i.e.*, after disclosures by Defendant Amyris in November 2018 made it unreasonable to rely on any purported falsity in the challenged statements—and, *second*, because Carbone has abdicated control of this suit, leaving his attorneys with unfettered discretion in the prosecution of this action.

2.    Whether class certification should be denied because Plaintiffs fail to satisfy Rule 23(b)(3), as:

(a)    the presumption of reliance that Plaintiffs seek to invoke is rebutted; and

(b)    Plaintiffs have failed to meet their burden to propose a damages model that is consistent with their theory of liability.

## II.  INTRODUCTION

Plaintiffs' class certification motion should be denied for at least two independent reasons. First, Plaintiffs have put forward the most inappropriate class representative that could be imagined. Lead Plaintiff Rob Jansen has admitted that, among other things, he made hundreds of class-period tweets about the Company, several of which unequivocally demonstrate that he *understood the very statements he now asserts were misleading*.  He also has admitted that he affirmatively misled this Court about his stock holdings in Amyris by omitting numerous transactions from his sworn certification; toward the end of the class period he held a net short position in Amyris stock.  To make matters worse, Jansen made repeated public statements denigrating the CEO he is now suing on the basis of his ethnic heritage.  He is neither typical nor adequate under Federal Rule of Civil

Gibson, Dunn &
Crutcher LLP

Procedure 23(a).  Second, Plaintiffs cannot satisfy Rule 23(b)(3) because the skepticism repeatedly expressed by Jansen about Amyris's financial statements during the class period rebuts the presumption of class-wide reliance.

It bears noting that Plaintiffs' class certification motion seeks certification of a case that bears little resemblance to the Complaint that survived a motion to dismiss.  Plaintiffs had originally pinned this securities case on a stock drop in April 2019, one that they claimed was caused by an announcement of the "full truth" that Amyris, Inc. ("Amyris" or the "Company") would be restating its royalty revenues for the first two quarters of 2018.  In the operative Complaint, Plaintiffs told the Court that these early 2018 revenue figures and statements about them were somehow fraudulent.  Consequently, Plaintiffs sought to represent a putative class that extended from March 15, 2018 through April 11, 2019.  But, as Plaintiffs now tacitly concede, that theory of liability crumbles for a simple reason: following the announcement of Plaintiffs' purported "full truth" in April 2019, the stock price went *up*.

Plaintiffs have therefore tried to re-work their case.  Their revised class period now ends with Amyris's March 19, 2019 announcement that its annual report would be delayed due to difficulties accounting for a separate transaction that is not even alleged to have been the subject of fraud.  This new end date only underscores the incoherence in Plaintiffs' theory:  The day before, Amyris discussed the accounting issues on which Plaintiffs focus at length, announcing on March 18, 2019 that there might be a "material downward adjustment of the quarter and year-to-date 2018 licenses and royalties revenue."  Declaration of Alexander K. Mircheff ("Mircheff Decl."), Ex. A (Mar. 18, 2019 8-K) at 6, 9.  Following that announcement, *the stock price went up*.

With their reshuffled timeline, Plaintiffs now attempt to push through class certification even though neither Lead Plaintiff Jansen nor Plaintiff Vincent Carbone is a typical or adequate class representative under Federal Rule of Civil Procedure 23(a).  Indeed, as discovery has now shown, Jansen is subject to numerous unique defenses that would threaten to overtake this litigation.  Most significantly, if Jansen were appointed as a class representative, he would be forced to defend his *hundreds* of class-period tweets about the Company, many of which proclaim his skepticism about Defendants' statements or unequivocally demonstrate that he understood the very information that

Gibson, Dunn &
Crutcher LLP

DEFS.' OPP'N TO MOT. FOR CLASS CERTIFICATION – CASE NO. 4:19-CV-01765-YGR

Plaintiffs claim was concealed. Indeed, following the Company's November 13, 2018 announcement that it would have $0 in revenue from royalties for Q3 and Q4, Jansen publicly explained to other stockholders the meaning of Amyris's periodic disclosures about ASC 606—the same disclosures made previously in the disputed Q1 and Q2 financial statements.

If that were not enough, Jansen has now admitted that he actively misled this Court about his stock holdings. At his deposition, Jansen testified that he omitted numerous transactions from his lead plaintiff certification. This was, it appears, an attempt to conceal that months before the end of the proposed class period Jansen had begun moving toward a net *short* position on Amyris's stock; in other words, Jansen was actively selling his shares because, by his own admission, he understood the exact issues he claims were concealed. Jansen was even making his remaining stock available for lending to short sellers for a profit. It is hard to imagine a less appropriate class representative. Defendants are unaware of any individual with a similar background ever seeking to be appointed as a class representative in a securities class action, much less being appointed. Simply put, either Jansen is atypical, or the class has no claims. At a bare minimum, any class period must end by November 13, 2018 when Jansen was demonstrably able to explain the supposedly concealed facts.

Out of an apparent—and well-founded—fear that Jansen could not properly represent any purported class, Plaintiffs added Carbone as an additional named plaintiff in the amended complaint. Carbone, however, only purchased Amyris stock in February 2019, *after* the market had information it needed about the accounting methodology that Plaintiffs claim Defendants failed to properly disclose. In fact, the day after Carbone first purchased Amyris stock, Jansen sold off all of his shares, and just one day after that, Jansen had a net short position. Carbone has also been largely uninvolved in this litigation. He cannot rescue the motion for certification.

Even if this odd couple, or one of them, could manage to satisfy Rule 23(a)'s requirements, Plaintiffs' motion would still fail for the independent reason that they cannot satisfy Rule 23(b)(3). The skepticism repeatedly expressed by Jansen about Amyris's financial statements during the class period amounts to evidence of non-reliance, rebutting the presumption of class-wide reliance under *Basic v. Levinson*, 485 U.S. 224, 248 (1988), which Plaintiffs depend upon to contend that common issues predominate. Moreover, Plaintiffs' generalized descriptions of how a damages model could in

theory take into account non-fraud factors, without any elaboration at all, fail to satisfy their burden of proposing a model that *actually* attempts to rule out these factors.

In short, what Plaintiffs had originally presented as a typical stock-drop case is now a jumble of unsupported and inconsistent claims, dependent upon one of the least typical lead plaintiffs imaginable. Plaintiffs cannot satisfy Rule 23's demands and the motion should be denied.

### III. BACKGROUND

**A.    The Parties and the Complaint**

This case was filed on April 3, 2019, and the Court issued an ordered designating Jansen as Lead Plaintiff on June 28, 2019. *See* Dkt Nos. 1, 29. On September 13, 2019, Jansen filed an amended complaint ("Complaint"), naming Amyris, John Melo (Amyris's CEO), and Kathleen Valiasek (Amyris's then-CFO) as defendants. Amyris is a California-based biotechnology company that, among other things, manufactures farnesene, a chemical compound used to make Vitamin E.

In the Complaint, Plaintiffs purported to bring claims on behalf of themselves and a class of all investors who purchased Amyris stock between March 15, 2018 and April 11, 2019. Dkt. No. 43 ("Compl.") ¶ 1. The Complaint also added Carbone as an additional named plaintiff; Plaintiffs did not seek leave to add Carbone, and no explanation for the addition was ever given. Certifications accompanying the Complaint showed that Jansen had purchased and sold Amyris stock numerous times during the class period. *See* Dkt. No. 43-1. Jansen's certification did not identify any short sales. *See id.* Carbone's certification identified only one class period purchase, in February 2019. *See* Dkt. No. 43-2.

**B.    The Alleged Misstatements**

Plaintiffs rest their case on statements allegedly made over an eight-month period between March 2018 and November 2018. *See* Compl. ¶¶ 42–71. The challenged statements all relate to Amyris's use of ASC 606, a newly promulgated accounting rule, and Amyris's reports of royalty revenues based on application of that new rule. Under ASC 606's general rule, companies are required to recognize revenue from a contract when performance on that contract is completed, rather than when payment on the contract is actually received. Revenue recognized under ASC 606's general rule is thus based in part on assumptions, or estimates, of what will ultimately be paid. For

contracts with variable consideration, such as royalties, ASC 606 also includes a potential limit on the amount of revenues that should be recognized. Under this limit, revenue from royalties or other variable consideration may be recognized when performance on the underlying contract is completed, "to the extent that it is probable that a significant reversal in the amount of cumulative revenue recognized will not occur" when any "uncertainty associated with the variable consideration is subsequently resolved." *Id.* ¶ 28.

Plaintiffs' claims are primarily directed at statements reporting Amyris's actual or projected royalty revenues for Q1 and Q2 of 2018, and reports or estimates of cumulative revenue figures incorporating these amounts. *See id.* ¶¶ 31–33, 42–77. Amyris had agreed with another company, DSM, to split the royalties from a contract to supply farnesene, the compound used to make Vitamin E, to a company called Nenter. *See id.* ¶¶ 23, 25. Under that contract, Nenter agreed to pay royalties on sales of the Vitamin E that Nenter manufactured using farnesene. *See id.* ¶ 25. In every quarterly statement throughout 2018, Amyris used the word "estimates" for its resulting royalty revenues, distinguished which revenues were from cash actually paid and which were estimates of amounts earned, and disclosed the method by which it was making those estimates. *See, e.g.*, Dkt. Nos. 45-2 (Q1 2018 10-Q), 45-3 (Q2 2018 10-Q). The estimates Amyris gave were correct given the information available to Amyris at the time and were properly reported as revenue under ASC 606. But Nenter sold Vitamin E at below-market prices and frustrated Amyris's efforts to audit Nenter's sales, undermining Amyris's auditor's confidence in the estimates and prompting a restatement of Amyris's financial disclosures while those doubts were resolved.

Plaintiffs, however, claim that the royalties Amyris was due to receive were too uncertain to have been recognized as revenue under ASC 606 at the time the corresponding farnesene was shipped. Plaintiffs appear to claim that Amyris should have emphasized more clearly that its reported royalty revenues were based on "uncertain" estimates. *See* Compl. ¶¶ 4, 31–32, 45, 49, 60, 63, 66. Plaintiffs further appear to claim that the revenue figures were incorrect merely because they were based on estimates at all, rather than actuals. *See id.* ¶¶ 32–33, 43, 45, 49, 52, 58, 88, 90. Plaintiffs also make a series of vague assertions regarding Amyris's characterization of its financial reporting and remediation of certain disclosed material weaknesses. *See id.* ¶¶ 5, 32–33, 49, 55–56, 58, 64, 70.

All of these tag-along theories, however, ultimately tie back to Plaintiffs' chief complaint: Amyris should have emphasized more clearly that its reported royalty revenues were based on estimates.

## C.    The Purported Corrective Disclosures

In the Complaint, Plaintiffs pointed to five days between November 2018 and April 2019 on which purported "corrective disclosures" occurred. *See id.* ¶¶ 67–77. The last of these was April 11, 2019, when Plaintiffs claim the "full truth" was "revealed." *Id.* ¶¶ 75–77. On this date, Amyris filed a Form 8-K announcing that it would be restating quarterly revenues for Q1 and Q2 2018. *Id.* ¶ 76. The Form 8-K stated that "a material error was made related to the estimates for recognizing revenue for royalty payments." *Id.*

However, as the instant motion shows, Plaintiffs have now abandoned their claim that the April 11, 2019 disclosure was a corrective disclosure at all; the report of their expert, Ms. Cynthia Jones, does not mention it either. *See generally* Dkt. No. 84-1 ("Jones Report"). Likewise, Plaintiffs have abandoned their claims that the disclosures made on two of the other prior dates—November 15, 2018 and March 18, 2019—were "corrective disclosures," now calling them "no-news" days. *See* Jones Report ¶ 67 & Ex. 11. Instead, Plaintiffs now reference only two dates on which they claim purportedly "corrective disclosures" occurred: November 13, 2018 and March 19, 2019. Dkt No. 83, Pls.' Mot. Class Certification ("Mot.") 17–18. On November 13, 2018, Defendants issued a press release reporting Q3 2018 revenue figures and held an earnings call discussing them. Compl. ¶ 68. During that call, John Melo stated that Amyris had "no visibility on the actual royalty as it is calculated on the selling price of contracts that have been at a significant discount to market prices." *Id.* Amyris also announced that, due to volatility in the Vitamin E market, it was reporting $0 in royalty revenues for Q3 2018 and projecting $0 in such revenues for Q4 2018. *See id.* This disclosure reflected no fraud—let alone a change in any accounting methodology—but rather the fact that, by the second half of 2018, the market price for Vitamin E had moved below the level at which Amyris would be contractually entitled to royalties. Mircheff Decl., Ex. B (Nov. 13, 2018 Earnings Call) at 3 ("We earn a royalty that is calculated as 35% of all dollars above approximately $8.40 a kilo for 100% Vitamin E oil sales . . . The biggest negative hit for Q3 2018 revenue was due to Vitamin E royalty is not [sic] coming in for the quarter."). On March 19,

2019, Amyris filed a Form 12b-25 stating that it would be unable to timely file its annual report for 2018 due to the complexities of a separate year-end deal with DSM.  Compl. ¶ 74.

**D.     Plaintiffs' Request for Class Certification**

The two would-be class representatives, Rob Jansen and Vincent Carbone, now move to certify a class of Amyris investors who purchased shares between March 15, 2018 and March 19, 2019.  They have failed to carry their burden to show that Rule 23's requirements have been met, and for that reason, class certification should be denied.

## IV.  ARGUMENT

"Parties seeking class certification bear the burden of demonstrating that they have met each of the four requirements of Federal Rule of Civil Procedure 23(a) and at least one of the requirements of Rule 23(b)." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 979–80 (9th Cir. 2011).  To do so, a plaintiff must "actually prove—not simply plead—that their proposed class satisfies each requirement of Rule 23." *Halliburton Co. v. Erica P. John Fund, Inc.* ("*Halliburton II*"), 573 U.S. 258, 275 (2014) (citation omitted); *see Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) ("Rule 23 does not set forth a mere pleading standard.").  In considering whether to certify a class, a "court must conduct a 'rigorous analysis'" to determine whether the requirements of Rule 23 have been met. *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012).  That is so "even when" the determination "requires inquiry into the merits." *Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.*, 141 S. Ct. 1951, 1961 (2021) (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013)); *see also Hanon v. Dataproducts Corp.*, 976 F.2d 497, 509 (9th Cir. 1992) ("[W]e are at liberty to consider evidence which goes to the requirements of Rule 23 even though the evidence may also relate to the underlying merits of the case." (quotation marks omitted)).

Plaintiffs here claim that their makeshift class satisfies these requirements, but they are wrong.  Plaintiffs fail to satisfy the typicality and adequacy requirements of Rule 23(a) and their proposed damages model fails to satisfy the predominance requirements of Rule 23(b)(3).

**A.     Plaintiffs Fail to Satisfy the Requirements of Rule 23(a).**

Among its four prerequisites, Rule 23(a) requires that class representatives—class members "su[ing] . . . . on behalf of all members"—have "claims or defenses . . . [that] are *typical* of the claims

Gibson, Dunn &
Crutcher LLP

or defenses of the class; and . . . the representative parties will fairly and *adequately* protect the interests of the class." Fed. R. Civ. P. 23(a)(3)–(4) (emphases added). The putative class representatives, Jansen and Carbone, fail both of these requirements. Jansen is profoundly atypical—a living law school hypothetical of exactly the kind of plaintiff Rule 23 excludes. Amidst his hundreds of online posts about his investments in Amyris, he has revealed that he did not trust Amyris's public statements and fully understood the supposed fraud yet nevertheless invested. Moreover, he affirmatively misled this Court when he failed to disclose his own short position in Amyris in his sworn certifications. Jansen's posts further demonstrate that the market fully recognized that Amyris's royalty revenues were based on estimates no later than November 2018, which ends the class period (if any) at that time. When the class period is so cut, Carbone is rendered atypical as well; he could not even be a member of that putative class since he did not purchase securities until February 2019. And, even if the class period were extended, Carbone remains inadequate, as he has failed to monitor or control class counsel. Where, as here, Rule 23(a)'s typicality and adequacy requirements are unmet, class certification must be denied.

**1.    Lead Plaintiff Jansen Is Not Typical or Adequate.**

**a.    Jansen's Hundreds of Tweets about the Company Reflect a Sophisticated Investor Who Fully Understood Its Accounting Methodology.**

Between March 2018 and March 2019, the alleged class period, Jansen publicly posted about his investment in Amyris hundreds of times on the website Stocktwits—a Twitter-like finance-focused platform. His prolific posting reflects a highly sophisticated investor, well acquainted with accounting rules and financial statements, who invested in Amyris based on his own evaluation of the company's potential and his experience as a former corporate director—even as he espoused a deep skepticism and antipathy toward the company's leadership, including its CEO, John Melo, and decried its public statements as untrustworthy. That public correspondence, as described more fully below, leaves no doubt that Jansen actually understood the key alleged "misleading" statements at issue. This extraordinary fact pattern shatters any pretense that Jansen's claimed reliance on Amyris's public representations mirrors the alleged reliance of absent class members. Under such circumstances, he is an atypical and inadequate class representative. *See In re Valence Tech. Secs.*

*Litig.*, No. C 95-20459 JW, 1996 WL 119468, at *4–5 (N.D. Cal. Mar. 14, 1996); *Rolex Emps. Ret. Tr. v. Mentor Graphics Corp.*, 136 F.R.D. 658, 664 (D. Or. 1991) (deeming plaintiff atypical upon "any showing that severs the link between the alleged misrepresentations of the defendant and the price paid by a plaintiff or his decision to trade at a fair market price"), *cited with approval in Hanon*, 976 F.2d at 508; *Goldman v. Alhadeff*, No. C89-1061R, 1990 WL 86882, at *2 (W.D. Wash. Feb. 1, 1990) (collecting cases holding that "the level of sophistication of an investor is relevant in certain cases for determining the 'typicality' of a class representative's situation"); Fed. R. Civ. P. 23, 1966 Advisory Committee Notes ("[A]lthough having some common core, a fraud case may be unsuited for treatment as a class action if there was material variation in the representations made or in the kinds or degrees of reliance by the persons to whom they were addressed."). At a minimum, Jansen is subject to a disqualifying unique defense, and that also, standing alone, renders him inadequate. *See Hanon*, 976 F.2d at 508 (motion for class certification should not be granted where there is a danger that absent class members could suffer as a result of the named plaintiff being preoccupied with defenses unique to himself).

Jansen is no ordinary investor. ██████████████████████ ██████████████████████████ Mircheff Decl., Ex. C ("Jansen Dep.") 24:3– 25:10. ████████████████████████████████████ ████████████████████████████████████ *Id.* at 28:21– 29:19. ████████████████████████████████ ██████████████████████████████ *Id.* at 30:22–31:8, 32:21–33:14. ████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████

████████████████████████████████████████

[1] *See, e.g.*, Mircheff Decl., Ex. D at JANSEN000463 ███████████ (Mar. 16, 2018)), JANSEN000459 █████████████████████████████ (Apr. 4, 2018)), JANSEN000439 ███████████ (May 22, 2018)), JANSEN000348 ██████

*(Cont'd on next page)*



Mircheff Decl., Ex. D at JANSEN000295–296, 357.

Mircheff Decl., Ex D at JANSEN000342. These are the actions of a very sophisticated investor with an extremely specific and developed interest in the company in which he invested.

It is thus no surprise that Jansen actually understood the implications of the new accounting rule ASC 606 well before Defendants allegedly "revealed" the "truth." In fact, Jansen's sophistication enabled him to understand—and publicly *explain*—the central issue in this case:

Mircheff Decl., Ex. D at JANSEN00349. And Jansen demonstrated that understanding by circulating a version of the same chart that Amyris used in Q1 and Q2, which is the core of the alleged misstatements. Mircheff Decl., Ex. E (Nov. 16, 2018 Stocktwits post).

Even beyond that, Jansen's tweets would be powerful exhibits at trial for *Amyris* to demonstrate that it was a *victim* of fraud, not a perpetrator.

Mircheff Decl., Ex. D at JANSEN000341. Exactly.

see Jansen Dep. 166:2–4,

(Nov. 16, 2018)), JANSEN000296 (Jan. 9, 2019)).

Gibson, Dunn & Crutcher LLP

DEFS.' OPP'N TO MOT. FOR CLASS CERTIFICATION – CASE NO. 4:19-CV-01765-YGR

███████████████████████████████████ *Id.* at 276:19–20. ██

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████ *See* Mircheff Decl., Ex. F. "The fact that [Jansen] continued to trade in the stock of [D]efendants after he learned of the alleged misrepresentations of defendants severs the link between the alleged misrepresentations of defendants and the stock purchases made by [Jansen] and acts to rebut the presumption that [Jansen] relied on the alleged misrepresentations in making his purchases." *See Valence Tech.*, 1996 WL 119468, at \*4; *see also Gary Plastic Packaging Corp. v. Merrill Lynch*, 903 F.2d 176, 179–80 (2d Cir. 1990), *abrogated on other grounds by Microsoft Corp. v. Baker*, 137 S. Ct. 1702 (2017); *Erickson v. Snap, Inc.*, No. 2:17-cv-03679-SVW-AGR, 2017 WL 11592635, at \*3–4 (C.D. Cal. Sept. 18, 2018) (declining to appoint lead plaintiff because post-disclosure purchases render him atypical).[2]  It also demonstrates that the alleged fraud was no fraud at all, as Jansen continued to purchase Amyris stock even after he understood Amyris's accounting methodology.

     **b.**     **Jansen's Certification of Investment Concealed the Fact That He Was a Short Seller, Raising Credibility Issues That Preclude Class Certification.**

Indeed, as Jansen's deposition reveals, it is he, not Defendants, who has lied.  And, he has done so before this Court in a statement signed under penalty of perjury.  In the Certification of Investment he filed with the Court in order to become lead plaintiff, and which he attached as an exhibit to both the amended complaint and the instant motion for class certification, Jansen swore under penalty of perjury that his only transactions in Amyris securities during the class period were ordinary buy and sell transactions.  *See* Dkt. Nos. 12-2, 43-1, 84-3.  He advised the Court of no short

---

[2]  Jansen often bought and sold significant quantities of Amyris stock without any clear relation to any alleged misstatements or corrective disclosures, suggesting an atypical "in/out" trading history. ████████████████████████████████████████████ ███████ *See* Mircheff Decl., Ex. F. ████████████████████ ████ *See id.* ██████████ *See id.* ██████████████████████ *See id.*

DEFS.' OPP'N TO MOT. FOR CLASS CERTIFICATION – CASE NO. 4:19-CV-01765-YGR

Gibson, Dunn & Crutcher LLP

sales. ██████████████████████████████████

██████████████████████████████ *see* Mircheff Decl., Ex. F at

JANSEN000032–35, just two days after the other would-be class representative, Carbone, first

bought Amyris stock, *see* Dkt. No. 84-3.  Not only is it "a poor choice to appoint a class

representative who engaged in a trading practice premised on the belief the stock would fall," *In re*

*Critical Path, Inc. Sec. Litig.*, 156 F. Supp. 2d 1102, 1109–10 (N.D. Cal. 2001), but it is exceedingly

problematic to entrust the management of a class action to a representative with obvious credibility

issues, *see Marsh v. First Bank of Delaware*, No. 11-cv-05226-WHO, 2014 WL 554553, at *9 (N.D.

Cal. Feb. 7, 2014) ("There is inadequacy only where the representative's credibility is questioned on

issues directly relevant to the litigation." (quotation marks omitted)), *Harris v. Vector Mktg. Corp.*,

753 F. Supp. 2d 996, 1015 (N.D. Cal. 2010) ("[T]he honesty and credibility of a class representative

is a relevant consideration when performing the adequacy inquiry because an untrustworthy plaintiff

could reduce the likelihood of prevailing on the class claims." (quotation marks omitted)).

As the Southern District of New York recently explained under similar circumstances:

> Because the undisclosed . . . short sales and large profits touch upon the key factor of typicality they were not only a material consideration in selecting a Lead Plaintiff but a predominant one.  [Plaintiff's counsel's] decision not to disclose the [short] trades, and thus to assure the lucrative Lead Counsel position, was knowing and intentional. [Plaintiff's counsel] omitted to state material facts necessary in order to make the statements in its memorandum [seeking appointment as Lead Plaintiff and Lead Counsel], in light of the circumstances under which they were made, not misleading. In the world of securities law, that is a definition of fraud.

*In re Grupo Televisa Sec. Litig.*, No. 18 Civ. 1979 (LLS), 2021 WL 2000005, at *3 (S.D.N.Y.

May 19, 2021).[3]  These undisclosed short trades render Jansen atypical and inadequate.

Indeed, Jansen appears to be something of a serial liar.  He admitted he lied repeatedly in his

communications with Amyris's investor relations director, to whom Jansen wrote in an apparent

attempt to obtain non-public information. ██████████████████████████

___

[3] ████████████████████████████████ *See* Jansen Dep. 249:14–252:7.  If so, Jansen may find himself at odds with proposed class counsel, who he apparently blames for the admittedly false statements that he submitted.

*(Cont'd on next page)*

████████████████████████████████████████████ ████████

███████████████████████████████████████████████████████

███████████████████████████████████ Jansen Dep. 62:5–17. █

████████████████████████████████████ Mircheff Decl., Ex. D at

JANSEN00384, ██████████████████████████████████████████

███████████████████████ Jansen Dep. 140:3–20. To state the matter plainly, Jansen lied to this Court, lied to Amyris, and lied to other members of the putative class. Such credibility issues are directly relevant to the issues in this litigation, make it significantly more likely that Jansen's credibility problems would prejudice the class before a jury, and render Jansen inadequate as a class representative.

Finally, Jansen also has admitted that he is biased against Defendant John Melo because of Melo's ethnic heritage. His public statements repeatedly indicated that Melo was not to be believed and was incompetent because he is of Portuguese heritage. His public statements indicate that he believes that individuals of Portuguese descent are less intelligent, are unreliable, and tend toward laziness.[5] These biased sentiments are a troubling motive for Jansen's stated skepticism of Melo, which bears upon Jansen's credibility and reflects a further unique defense that renders him atypical.

██████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████ Jansen Dep. 115:10–13. But this is the all-too-common response of those whose bias is exposed; it is simply not sufficient to claim one was "joking" or to claim that it is unfair to call out bias. And, put simply, although anti-Portuguese bias may be uncommon in the United States, at a minimum, a public record of xenophobic or nationalistic

---

[4] *See* Jansen Dep. 234:14–235:1 ███████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████ Mircheff Decl., Ex. G at JANSEN00059.

[5] *See* Jansen Dep. 114:14–116:4, 134:16–135:5; Mircheff Decl., Ex. D at JANSEN000132
                                                              JANSEN000398
███████████████████████████████████████████████████████
JANSEN000439 ███████████████████

Gibson, Dunn &
Crutcher LLP

statements about defendants is unbecoming of, and inappropriate to, a court-appointed class representative.

In sum, Jansen was a highly sophisticated investor who understood the key disclosures at issue and traded in Amyris stock because of his own idiosyncratic analyses and projections. He has presented false statements to the Court, to the Company, and to other stockholders. This is neither typical nor adequate.

### 2. Plaintiff Carbone Is Not Typical or Adequate.

#### a. Carbone Did Not Purchase Before the November 2018 Disclosures, Which Is When Any Class Period Must End.

The foregoing problems with Jansen are fatal because no other putative class representative purchased stock before November 2018. Carbone, the other proposed class representative, only purchased shares in February 2019—long after November 2018, when any conceivable class period would need to end. That renders Carbone atypical and an improper representative, as he only purchased stock in February 2019, outside of any appropriate class period. It is axiomatic that "an aspiring class representative must be a member of the class." *Alfus v. Pyramid Tech. Corp.*, 764 F. Supp. 598, 605 (N.D. Cal. 1991) (quotation marks omitted); *see, e.g.*, Fed. R. Civ. P. 23(a)(3); *South Ferry LP No. 2 v. Killinger*, 271 F.R.D. 653, 659 (W.D. Wash. 2011) ("[U]ncertain standing renders [plaintiff] an atypical class representative."). And an individual who has no standing to bring a claim cannot be a member of a class. *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2212 (2021).

It is well settled that a class period should not extend "beyond the date of disclosures" that "ma[k]e continued reliance on [prior] financial reports unreasonable." *Hayes v. MagnaChip Semiconductor Corp.*, No. 14-cv-01160-JST, 2016 WL 7406418, at *8 (N.D. Cal. Dec. 22, 2016); *see also Alaska Elec. Pension Fund v. Pharmacia Corp.*, No. 03-1519 AET, 2007 WL 276150, at *3 (D.N.J. Jan. 25, 2007) ("[T]he class period should not extend past the date upon which curative information becomes available."); *Hodges v. Akeena Solar, Inc.*, 274 F.R.D. 259, 271 (N.D. Cal. 2012) ("In determining the duration of a securities fraud class based on a fraud-on-the-market theory, the court must determine whether 'a curative disclosure that had been made so as to render it unreasonable for an investor, or the market, to continue to be mislead [sic] by the defendants' alleged

misrepresentations.'"); *In re SunEdison, Inc. Secs. Litig.*, 329 F.R.D. 124, 134 (S.D.N.Y. 2019) (collecting cases). As one court in this district explained, "[t]he question is not" whether a particular disclosure "was 'fully corrective,'" but "whether it made further reliance" on a defendant's prior alleged misstatements "unreasonable." *Hayes*, 2016 WL 7406418, at *8.

Here, as Plaintiffs themselves emphasize, on November 13, 2018 Amyris disclosed that it had "no visibility on the actual royalty" from its value-share agreement with DSM and DSM's supply agreement with Nenter "as it is calculated on the selling price of [Nenter's] contracts that have been at a significant discount to market prices." Compl. ¶ 68. The Company likewise disclosed that it would be recognizing $0 in Vitamin E royalties for Q3, and projecting $0 for Q4 (again, because the market price had plunged). Accordingly, investors were advised that:

- Amyris could not have recognized its Q1 and Q2 royalty revenues flowing from Amyris's value share relationship with DSM or DSM's assigned supply agreement with Nenter based exclusively on payments *actually received* (for which it plainly would have had "visibility" on the "actual royalty"); rather, certain of the recognized revenues were based on *estimates*;

- Because these estimates were uncertain, Amyris's actual or projected royalty revenues for Q1 and Q2 2018, and any revenue figures incorporating these amounts, were potentially incorrect;

- If Amyris were to eventually hit its full year-projections for 2018, it would be because of other business lines, not Vitamin E royalties.

To be sure, Amyris's accounting methodology was appropriately disclosed at all times. Its statements distinguished between revenue actually paid and revenue recognized pursuant to ASC 606 using estimates, and it explained it used "most likely outcome method" for its estimates. *See* Dkt. Nos. 45-2 at 13, 45-3 at 13.

But for present purposes, the point is this: after the November 2018 disclosures regarding no visibility and $0 revenues, under Plaintiffs' own theory, it plainly would have been unreasonable to uncritically interpret the Company's statements as Plaintiffs once claimed to have done. At a minimum, a class cannot be certified on the presumption that all purchasers after November 2018 can

claim to have been uniformly "misled."  In sum, the market was well advised about Amyris's accounting methodology for the royalty revenues no later than November 13, 2018, long before the alleged corrective disclosures in March 2019 (which did not mention any issue with royalties at all).

The Court need not take Defendants' word for it:  Plaintiffs' purported class representative said much the same. ████████████████████████████████████████ ████████████████████████████████████████ ████   Mircheff Decl., Ex. D at JANSEN000350–51. ████████████████████ ████████████████████████████████████████ ████████████████████████████████████ Jansen Dep. 255:21–258:4.

The foregoing is reason enough to deny the Motion in its entirety.[6]  Jansen is inadequate and atypical as discussed above, and in addition to the other problems with Carbone discussed below, it is undisputed that Carbone did not purchase Amyris stock until February 2019.  Plainly, Carbone cannot lead a class of which he is not a member.  *See, e.g.*, Fed. R. Civ. P. 23(a)(3); *South Ferry*, 271 F.R.D. at 659; *Alfus*, 764 F. Supp. at 605; *Karth v. Keryx Biopharmaceuticals, Inc.*, 334 F.R.D. 7, 16–18 (D. Mass. 2019).

### b.       Carbone Has Not Meaningfully Been Involved in the Suit.

Apart from the dispositive timing problem discussed above, Plaintiffs also fail to demonstrate that Carbone is "adequate."  *See* Fed. R. Civ. P 23(a)(4).  Plaintiffs must show that Carbone would "prosecute the action vigorously on behalf of the class[.]"  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998), *overruled on other grounds by Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011); Mot. 9.  Yet Plaintiffs assert only that Carbone has "gathered and produced" documents, "answered interrogatories," and is "willing to fulfill the duties of Class Representative."  Mot. 9.

This is insufficient.  A certification that "contains little more than formulaic, boiler-plate assertions . . . presented to the Court through Lead Plaintiff's counsel . . . carries little weight."  *In re*

---

[6] On the pleadings, the Court previously held that it was "plausible" an investor could have interpreted the "no visibility" statements as pertaining only to Q3. *Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1009–10 (N.D. Cal. 2020).  While Defendants respectfully disagree, at the class certification stage, Plaintiffs must do more than come up with "plausible" allegations; instead they must affirmatively demonstrate, through evidence, that class certification is appropriate. *See Halliburton II*, 573 U.S. at 275.  As set forth above, the evidence demonstrates otherwise.

Gibson, Dunn &
Crutcher LLP

*Kosmos Energy Ltd. Sec. Litig.*, 299 F.R.D. 133, 145 (N.D. Tex. 2014).  Rather, "the Court must feel *certain* that the class representative will discharge his fiduciary obligations by fairly and adequately protecting the interests of the class."  *Burkhalter Travel Agency v. MacFarms Int'l, Inc.*, 141 F.R.D. 144, 154 (N.D. Cal. 1991).  The burden rests with plaintiffs to "produce actual, credible evidence that the proposed class representatives are informed, able individuals, who are themselves—not the lawyers—actually directing the litigation." *In re Kosmos*, 299 F.R.D. at 145.

Carbone has offered little to demonstrate that he is meaningfully aware of the duties of a class representative, let alone that he can adequately fulfill those duties.  Carbone could not identify any occasion on which he has directed his counsel to do anything or even initiated communication with them.  *See* Mircheff Decl., Ex. H ("Carbone Dep.") at 86:8–11.  He could not remember any specific filing he had reviewed.  *See id.* at 16:22–25, 41:8–42:2.  Nor was Carbone able to articulate why he was suing defendant John Melo, stating "that's something you can talk *to the attorneys* about as far as who, why, what." *Id.* at 78:14–20 (emphasis added).  This is not adequate representation.  *See Lee v. Pep Boys-Manny Moe & Jack of Cal.*, No. 12-cv-05064, 2015 WL 9480475, at *11 (N.D. Cal. Dec. 23, 2015) (finding plaintiff inadequate where his "sole participation has been reviewing the initial . . . settlement demand letters with his attorneys and attending his deposition" and "he was able to articulate in the most general of terms the nature of his claims").  Indeed, Carbone characterized the process by which he became a named plaintiff as being "chosen" and "selected" *by his attorney.* Carbone Dep. at 82:17–83:14.  And Carbone did not know how much time he spent on this case.  *See id.* at 27:8–28:19.

In addition to being unfamiliar with his obligations as class representative, Carbone lacks basic knowledge of the case.[7]  Carbone could not recall reading *any* of the alleged misstatements or

---

[7]  "[A] party who is not familiar with basic elements of its claim is not considered to be an adequate representative for the class because there is no sense that there is an actual party behind counsel's prosecution of the action." *Burkhalter Travel Agency*, 141 F.R.D. at 153.  For instance, in *Koenig v. Benson*, 117 F.R.D. 330, 337 (E.D.N.Y. 1987), the court held that a class representative was inadequate because, among other things, "he did not read the complaint before it was filed" and "[h]is understanding of the basic cause of action [was] weak, and [he] admit[ted] confusion or lack of knowledge frequently in his deposition." *See also Scott v. N.Y.C. Dist. Council of Carpenters Pension Plan*, 224 F.R.D. 353, 356 (S.D.N.Y. 2004) (collecting cases deeming putative class representatives inadequate due to insufficient familiarity).

corrective disclosures in this case, and could not identify which financial statements he believed to be false. *See id.* at 89:10–21, 146:12–23, 151:10–11, 154:9–20, 157:4–158:23 ("I don't have an answer for that."), 161:4–165:4. Carbone also admitted that he is "not . . . aware of" DSM or Nenter, *id.* at 49:12–16, integral players in the transaction underlying the allegations in this case. Indeed, Carbone could not even recall if the alleged misstatements "impact[ed] [his] decision to buy or to sell." *Id.* at 89:22–25, 90:20–25.

Carbone's inability to recall or identify *any* alleged misstatements demonstrates his fundamental lack of awareness of the material aspects of this case, rendering him wholly inadequate to represent a class of shareholders that purportedly *relied* on those same alleged misstatements. He appears simply to be counsel's backup plan given the glaring issues with Jansen.

**B.      Plaintiffs Fail to Satisfy the Requirements of Rule 23(b)(3).**

In addition to satisfying all four requirements of Rule 23(a)—which Plaintiffs do not— Plaintiffs must also "satisfy through evidentiary proof" at least one subsection of Rule 23(b). *Comcast*, 569 U.S. at 33. Plaintiffs have opted to pursue class certification under Rule 23(b)(3), which requires a showing of predominance, *i.e.*, that "questions of law or fact common to class members predominate over any questions affecting only individual class members." Fed. R. Civ. P. 23(b)(3). Plaintiffs fail to satisfy this predominance requirement.

Predominance is similar to, but conceptually distinct from, Rule 23(a)'s requirement of commonality. "The predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (quotation marks omitted). That is, the inquiry tests whether "members of a proposed class will need to present evidence that varies from member to member" or whether "the same evidence will suffice for each member." *Id.* In determining whether Rule 23(b) is satisfied, courts must apply "even more demanding" scrutiny of a proposed class than the already "rigorous analysis" required by Rule 23(a). *Comcast*, 569 U.S. at 33–34.

As Plaintiffs admit, to demonstrate predominance in a securities case, they must show that reliance and damages—essential elements of their Section 10(b) claim—can be proven on a class-wide basis. "[C]ertification under Rule 23(b)(3)" would be "inappropriate" and "individual issues . . .

would . . . overwhelm[] the common ones" if "every plaintiff had to prove . . . reliance" individually. *Halliburton II*, 573 U.S. at 268. Likewise, "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class" unless a plaintiff can "establish[] that damages are capable of measurement on a classwide basis." *Comcast*, 569 U.S. at 34. Plaintiffs can demonstrate neither here.

### 1. The Presumption of Reliance Is Rebutted by Jansen's Purchases for Unrelated Concerns.

Plaintiffs erroneously assert that they can demonstrate reliance on a class-wide basis by invoking the fraud-on-the-market presumption, a class-wide presumption of reliance. *See* Mot. 12. The fraud-on-the-market presumption assumes that plaintiffs traded in an efficient market and based their decision to buy or sell a stock on the market price. As Plaintiffs concede, however, this presumption may be rebutted. Mot. 13. This may be done by "'[a]ny showing that severs the link between the alleged misrepresentation[s] and either the price . . . paid . . . by the plaintiff, or his decision to trade at a fair market price.'" *Goldman*, 141 S. Ct. at 1958 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 248 (1988)). More specifically, the presumption may be rebutted by a showing "'that an individual plaintiff traded or would have traded despite his knowing the [challenged] statement[s] w[ere] false.'" *Hatamian v. Advanced Micro Devices, Inc.*, No. 14-cv-00226, 2016 WL 1042502, at *7 (N.D. Cal. Mar. 16 2016) (quoting *Basic*, 485 U.S. at 248). Put differently, "[t]he presumption . . . is rebuttable . . . by showing that a particular plaintiff would have bought the stock without relying on the integrity of the market price." *Conn. Ret. Plans & Tr. Funds v. Amgen Inc.*, 660 F.3d 1170, 1174 (9th Cir. 2011). This occurs when a plaintiff "believe[s]" that the challenged statements are false or misleading but purchases shares "nevertheless because of other unrelated concerns." *Basic*, 485 U.S. at 248.

Jansen here falls victim to precisely this problem: his posts on Stocktwits show that he traded because of unrelated concerns. Jansen believed that the stock price was tainted by what he viewed as inaccurate misstatements by Defendants, but he nonetheless purchased shares on the belief that he could profit from his own trading strategy. As set forth above, Jansen understood the precise accounting rule at issue and posted online about the impact of ASC 606 on Amyris's royalty revenue

calculations. Indeed, Jansen cited the same disclosure chart that the Company used in Q1 and Q2. Jansen also repeatedly stated that he did not trust Amyris or its CEO, John Melo. Nevertheless, Jansen bought and sold tens of thousands of shares of Amyris stock while he made these very statements (and afterward), demonstrating that his purchases of Amyris stock were disconnected from any purported misstatements contained in Amyris's public filings. *See supra* Section IV.A.1.a. In sum, Jansen, the putative class representative, did not rely on the integrity of the market price when he traded in Amyris stock, making it impossible for Plaintiffs to invoke the fraud-on-the-market presumption on behalf of the entire class. Plaintiffs thus fail to show that reliance can be proven on a class-wide basis; any common issues therefore do not predominate.

> **2.    Plaintiffs Fail to Propose a Method for Measuring Class-Wide Damages Consistent with Their Theory of Liability.**
>
> **a.    Plaintiffs' Proposed Model Does Not Attempt to Identify or Account for Non-Fraud Factors, Including the Crash in the Vitamin E Market.**

Plaintiffs also fail to show that damages can be proven on a class-wide basis—and thus fail to satisfy Rule 23(b) for this reason as well. Although Plaintiffs need not actually measure or calculate their claimed damages at the class certification stage, they "must be able to show that their damages stemmed from the defendant's actions that created the legal liability." *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013); Mot. 19. As the Supreme Court explained in *Comcast*, to satisfy Rule 23(b), Plaintiffs must propose a "model purporting to serve as evidence of damages" and must show that this model would "measure only those damages attributable" to Plaintiffs' theory of liability. *Comcast*, 569 U.S. at 35. In a securities case, this means that a plaintiff's proposed damages model must attempt to distinguish between losses attributable to a defendant's alleged conduct—*i.e.*, alleged misstatements—and losses attributable to other unrelated reasons. "If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Id.*

Applying these principles, courts in this circuit have denied class certification in whole or in part when plaintiffs have provided only general descriptions of proposed damages models untethered to the specific details of a case. *See Loritz v. Exide Techs.*, No. 13-cv-02607, 2015 WL 6790247, at *22 (C.D. Cal. July 21, 2015) (denying in part class certification in securities case when plaintiffs'

expert only "describe[d] generally some techniques that he asserts can be used to address" possible issues, such as confounding factors, but "fail[ed] to *tie these theories to the facts of this case or to each other*" (emphasis added)); *see also Werdebaugh v. Blue Diamond Growers*, No. 12-CV-02724, 2014 WL 7148923, at *13 (N.D. Cal. Dec. 15, 2014) (granting motion to decertify class after concluding that "Plaintiff's damages model fail[ed] to control for the effect" of a confounding factor for the "price premium[]" plaintiffs sought to isolate and that such failure "render[s] the model incapable of providing a damages figure that is consistent with Plaintiff's liability case").  That, however, is precisely what Plaintiffs are trying to do here.

Plaintiffs claim that they have satisfied their burden under *Comcast* simply because they propose using an "event study" to calculate the alleged "artificial inflation" in the price of Amyris's stock.  Mot. 20.  Plaintiffs support this proffer with conclusory assertions that an event study could "isolate[] that portion of the price impact attributed" to any purported corrective disclosures, "along with company-specific information relevant the allegations of this case."  *Id.*

Plaintiffs, however, never specify what this "information" is or will be.  Indeed, Plaintiffs' expert concedes that an event study could fail to isolate a purported "fraud-related price impact" if it fails to take into account "confounding information."  Jones Report ¶ 89.  Such confounding factors are "non-fraud related information" that "enters the market on the same day" as a purported "corrective disclosure[]" and itself "contribut[es]" to any "price decline."  *Id.*  Yet Plaintiffs and their expert do not even *name* the confounding factors that they propose to take into account in this case, much less describe how the event study that Plaintiffs propose to use would account for these particular confounding factors.  In her deposition, Jones admitted that she had not "been asked to identify the confounding factors, if any, that should be taken into account," Mircheff Decl., Ex. I ("Jones Dep.") at 119:25–120:5; had not "drawn a conclusion as to whether . . . any confounding information . . . should be taken into account," *id.* at 119:18–23; and had not even "attempted" to identify any such factors to take into account, *id.* at 120:15–17.  Jones further admitted that, as of her deposition, she could not name a single confounding factor that should be taken into account.  *Id.* at 120:6–11.

Gibson, Dunn &
Crutcher LLP

Plaintiffs' proposed damages model thus does not *attempt* to isolate "fraud-related price impact" from specific confounding factors.  This failure is particularly problematic given that the November 2018 purported corrective disclosure *specifically identified* a possible confounding factor—the volatility of the market price of Vitamin E.  *See* Compl. ¶ 67.  The March 19, 2019 purported corrective disclosure also did not mention royalty revenues, suggesting that any number of other factors may have impacted the price of Amyris's shares in its wake.  Indeed, Amyris's royalty revenues had instead been mentioned the day before, on March 18th; that day, the Company announced that there might be a "material downward adjustment of the quarter and year-to-date 2018 licenses and royalties revenue amounts," *see* Mircheff Decl., Ex. A at 6, 9—yet the stock price went up after that announcement, *see* Jones Report, Ex. 11.  In her report Plaintiffs' expert mentions none of these points.  Instead, she merely asserts generally that "in some cases," though not even necessarily this case, there are confounding factors.  Jones Report ¶ 89.  Jones then asserts generally that an event study "may" take such factors into account—though not necessarily here.  *Id.*

In sum, nowhere do Plaintiffs *show* that the model they propose to use actually "*attempt[s]*" to "measure only those damages attributable" to Plaintiffs' theory of liability.  *See Comcast*, 569 U.S. at 35.  *Comcast* requires more.  *See Loritz*, 2015 WL 6790247, at *22; *Werdebaugh*, 2014 WL 7148923, at *13.

###### b.    Plaintiffs' "Materialization of the Risk" Theory Is Unsupported.

The little that Plaintiffs have stated regarding their proposed damages model also demonstrates that it would be inadequate as a measure of class-wide damages in any event.  Plaintiffs assert a "*materialization of the risk*" theory with respect to the purported corrective disclosure on November 13, 2018—in particular, to what Plaintiffs call Amyris's "disappointing" royalty revenues for Q3.  *See* Mot. 4.  But Plaintiffs' proposed damages model would calculate damages based on the *entire* drop in Amyris's stock price following that purported "materialization" (subject only to unnamed "confounding factors" on that date).

The failure of such a damages model under *Comcast* was explained at length by the Fifth Circuit in *Ludlow v. BP, P.L.C. ("BP II")*, 800 F.3d 674 (5th Cir. 2015).  There, the plaintiffs also claimed to rely on a "materialization of the risk" theory with respect to one of the purported

"corrective" disclosures in that case: the announcement of the April 20, 2010 Deepwater Horizon explosion and oil spill. *Id.* at 678, 680. In contrast to a typical case, the *BP* plaintiffs did not argue that the oil spill itself, or the announcement of it, disclosed some fact to the world that showed that the *BP* defendants alleged misstatements were false or misleading. Instead, the *BP* plaintiffs argued that the spill was the "materialization of [a] risk"—of an oil spill—that was higher than defendants' alleged misstatements had purportedly lead investors to believe. *Id.* at 680.

The problem under *Comcast*, the Fifth Circuit stated, arose because the plaintiffs in *BP* sought "recovery of the *entire* fall in stock price caused by materialization of the risk of the spill." *BP II*, 800 F.3d at 680. In a typical case—when an alleged disclosure reveals a fact to the world that shows a defendants' alleged misstatements to be false or misleading—the drop in a company's stock price following the disclosure can be used to calculate how much an alleged misstatement artificially inflated the company's stock price. On the other hand, as the lower court in *BP* explained, "when the corrective event is the materialization" of an allegedly misrepresented risk, "the stock price movement on the date of correction (i.e., on the date that the risk materialized) *will not equate* to [alleged] inflation on the date of purchase unless the probability of the risk materializing was 100 percent" when investors purchased the stock. *In re BP p.l.c. Sec. Litig.*, No. 10-md-2185, 2014 WL 2112823, at *10 (S.D. Tex. May 20, 2014) ("*BP I*") (emphasis added); *see also BP II*, 800 F.3d at 690.

For this reason, as the Fifth Circuit concluded, a damages model that purports to allocate as damages the entire stock drop following an alleged materialization of an undisclosed risk "cannot be applied uniformly across the class, as *Comcast* requires." *BP II*, 800 F.3d at 691. That is because such a model "lumps together those who would have bought the stock at the heightened risk with those who would not have." *Id.* Class members who "might have purchased the stock even assuming the true risk . . . cannot be compensated for the materialization of a risk [they] may have been willing to take," even if such class members might be "entitled" to smaller "damages based on [an] inflated price" only. *Id.* at 690.

In other words, the failure of such a proposed model under *Comcast* is two-fold. *First*, such a proposed model "cannot provide an adequate measure of class-wide damages under *Comcast*"

because it "does not provide any mechanism for separating these two classes of plaintiffs." *Id.* One set of plaintiffs would not have purchased the stock at all had the risk been accurately disclosed, whereas another set would have purchased the stock but only for a lower price. Treating as damages the entire stock decline following the materialization of a risk would overcompensate the second class of plaintiffs. *Second*, if such a proposed damages model were actually employed, it would be subject to "a determination that each plaintiff would not have bought . . . stock *at all* were it not for the alleged misrepresentations—a determination not derivable as a common question, but rather one requiring individualized inquiry." *Id.* (emphasis in original). Plaintiffs would be subject to individualized inquiries as to whether they fell into the first or second classes of plaintiffs described above. In this case, "[q]uestions of individual damage calculations w[ould] inevitably overwhelm questions common to the class." *Comcast*, 569 U.S. at 34.

Here, Plaintiffs' proposed damages model suffers from all of these failings. Like in *BP*, Plaintiffs assert a "materialization of the risk" theory with respect to at least one of the alleged corrective disclosures—Amyris's reported Q3 2018 royalty revenue of $0, versus an expected revenue of "around $15 million." Compl. ¶ 68. Plaintiffs assert that these "disappointing royalty revenues" in "the November 13, 2018 disclosures" were "a materialization of some of the risks" allegedly "concealed by" Defendants' purportedly "false or misleading statements." *Id.* ¶ 69; *accord* Mot. 4. Plaintiffs' proposed damages model, however, purports to allocate as "artificial inflation" the full stock price decline after the November 13, 2018 disclosure, subject only to unnamed "confounding information." Jones Report ¶¶ 88–89. Plaintiffs' own expert also admitted that she believed that "the amounts of artificial inflation, if any, in the price of Amyris's stock during the class period" "*could be*" measured "*solely* based on any residual *decrease* in the price of the Amyris's stock when corrective information enter[ed] the market." Jones Dep. 93:20-94:3 (emphases added).

Plaintiffs' proposed model thus suffers from multiple irreconcilable defects under *Comcast*. First, it *does not* simply measure out-of-pocket losses with respect to the November 2018 alleged corrective disclosure because it seeks as damages the entire decline in Amyris's stock following what Plaintiffs call the "materialization of some risks." What Plaintiffs attempt to pass off as out-of-pocket losses are in effect consequential damages, without any consideration of proximate causation.

Like in *BP*, they "will not equate" to the alleged inflation purportedly caused by Defendants' alleged misstatements when investors purchased the stock. *BP I*, 2014 WL 2112823, at *10. Thus, the model fails to "measure only those damages attributable" to Plaintiffs' theory of liability, *see Comcast*, 569 U.S. at 35, and instead effectively makes Amyris an insurer against drops in the value of its stock.

Further, as in *BP*, Plaintiffs' proposed damages model lumps together putative class members who would have bought Amyris stock even if they fully understood the risk with those who only bought stock because of the allegedly misrepresented risk. The model provides no mechanism for separating these two classes of plaintiffs, and it requires individualized inquiries into whether each plaintiff would have bought Amyris stock at all were it not for the alleged misrepresentations. Thus, damages cannot be calculated on a class-wide basis, and common issues do not predominate.

## V.  CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiffs' motion for class certification. Alternatively, if a class is certified, Defendants respectfully request that the Court define the class period to end no later than November 13, 2018.

Dated: September 24, 2021

GIBSON, DUNN & CRUTCHER LLP


By:  */s/ Alexander K. Mircheff*
       Alexander K. Mircheff, SBN 245074

Attorneys for Defendants AMYRIS, INC. and JOHN G. MELO

# CERTIFICATE OF SERVICE

I, Alexander K. Mircheff, declare as follows:

I am employed in the County of Los Angeles, State of California, I am over the age of eighteen years and am not a party to this action; my business address is 333 South Grand Avenue, Los Angeles, CA 90071-3197, in said County and State.  On September 24, 2021, I served the following document(s):

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION; DECLARATION OF ALEXANDER K. MIRCHEFF IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION; AND [PROPOSED] ORDER DENYING MOTION FOR CLASS CERTIFICATION**

on the parties stated below, by the following means of service:

Robert S. Green
GREEN & NOBLIN, P.C.
2200 Larkspur Landing Circle, Ste. 101
Larkspur, California 94939
Tel: (415) 477-6700
Fax: (415) 477-6710
-and-
4500 East Pacific Coast Highway
Fourth Floor
Long Beach, California 90804
Tel: (562) 391-2487
rsg@classcounsel.com

William B. Federman
A. Brooke Murphy
FEDERMAN & SHERWOOD
10205 N. Pennsylvania Ave.
Oklahoma City, OK 73120
Telephone: 405-235-1560
Facsimile: 405-239-2112
wbf@federmanlaw.com
abm@federmanlaw.com

**BY ELECTRONIC TRANSFER TO THE CM/ECF SYSTEM**:  On this date, I electronically uploaded a true and correct copy in Adobe "pdf" format the above-listed document(s) to the United States District Court's Case Management and Electronic Case Filing (CM/ECF) system.  After the electronic filing of a document, service is deemed complete upon receipt of the Notice of Electronic Filing ("NEF") by the registered CM/ECF users.

**(FEDERAL)**    I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 24, 2021.

*/s/ Alexander K. Mircheff*
Alexander K. Mircheff

Gibson, Dunn & Crutcher LLP