# EXHIBIT 1

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SHANE MULDERRIG and RONY         )
DEVORAH, Individually and on )   CASE NO.
Behalf of All Others             )   4:19-cv-01765-YGR
Similarly Situated               )
                                 )
          Plaintiffs,            )
                                 )
vs.                              )
                                 )
                                 )
AMYRIS, INC., et al.,            )
                                 )
          Defendants.            )
_____ )

**CONFIDENTIAL PROCEEDING**

REMOTE DEPOSITION OF VINCENT CARBONE

FRIDAY, AUGUST 27, 2021

9:01 A.M.

REPORTED BY:  KATHERINE FERGUSON, CSR NO. 12332

JOB NO. 198711

Page 17

Q   Did you review all of the filings?  Some of the filings?

A   I reviewed the filings that I -- that are sent to me.

Q   So you only reviewed what your attorney sent you?

A   That's my -- my -- I communicate with my attorney.

Q   But in terms of the documents that you've reviewed, they are the ones who sent it to you?

A   Yeah, I don't go to the court and download and search for documents.

Q   Did you ask your attorneys to send you those documents?

A   I get all the documents pertaining to the case.

Q   Have you given your attorneys any kind of instructions about which documents to give you?

A   I asked for updates on the case, so I assume I get the information.

Q   How often do you ask for updates?

A   I don't know the number.

Q   Do you ask weekly, monthly, whenever it kind of pops into your head?

A   Yeah, I -- whenever I -- I don't think

history, basically stay up to date on the case.

Q   And what is the goal of those communications with your attorney?

MS. MURPHY:  Objection, vague.

THE WITNESS:  Yeah.

BY MR. ARBER:

Q   Please answer even though Ms. Murphy objected, unless she instructs you not to answer.

A   The -- I mean, my goal for the communication is to make sure I'm updated on my case.

Q   Why is it important for you to stay updated?

MS. MURPHY:  Objection, vague.

BY MR. ARBER:

Q   Mr. Carbone, why is it important for you to stay updated?

A   So I know what's going on.

Q   And why do you need to know what's going on?

A   To stay current with the progress of the litigation.

Q   And is that important for you to do individually?

A   This is for a class.  This is not about me.

Q   Is there any other reason that you do this

besides being current, staying up to date?

A   My communication with the attorney is to stay up to date.

Q   Is there any other reason for it?

A   And to review the documents, like I said, and to provide feedback and any questions that I have.

Q   How much time have you spent so far dealing with this case?

A   I have no idea.

Q   Do you spend any time -- on a random day, say, how much time would you spend?

MS. MURPHY:  Objection.

THE WITNESS:  Yeah.  I mean, it varies.

BY MR. ARBER:

Q   On average in a week, how many hours do you think you would spend on it?

MS. MURPHY:  Objection.

THE WITNESS:  I don't know.

BY MR. ARBER:

Q   One hour?  Five hours?  10 hours?  An estimate?

A   I would be guessing because it varies.

Q   How about on a month, over the course of a full month, how many hours do you think that you

Confidential

Page 29

commit to it?

MS. MURPHY:  Objection, calls for speculation.

THE WITNESS:  No, I cannot make an estimate of how much time I'm going to spend on it because I don't know how long this is going to go for.

BY MR. ARBER:

Q   How much time are you willing to commit to this case?

MS. MURPHY:  Objection.

THE WITNESS:  As long as it takes.

BY MR. ARBER:

Q   Going back a little bit to your communications with your attorneys, have you ever provided feedback on anything that your attorneys have filed?

A   Yes.

Q   What kind of feedback?

A   I don't remember specifically, but I provide feedback.

Q   Do you remember any specific document that you've provided feedback on?

A   I have communicated and provided feedback on my trade history.

Q   Anything else?

Page 32

Q   Mr. Carbone, do you remember if there was a second complaint?

A   I don't remember.

Q   Did you review either -- did you review a complaint before it was filed in this case?

A   Before it was filed, I -- I've only seen, I believe, what's been filed.

Q   So did you review the complaint after it was filed?

A   I don't know.

Q   Have you ever seen the complaint in this case, Mr. Carbone?

A   I've reviewed the allegations against Amyris.

Q   I'm asking if you've specifically reviewed the complaint, the document that is titled "the complaint"?

A   I've reviewed documents.  I don't remember seeing the word "complaint" on the document.

Q   So you've never reviewed the complaint in this case?

MS. MURPHY:  Objection, misstates the record.

THE WITNESS:  I think we're talking about the same thing and using different words.

Q    So you don't remember any communications?

A    I've received calls and e-mails, so I don't remember the specifics.

Q    So you don't remember any conversations specifically related to the complaint?

A    Yeah, I don't remember.

Q    And you don't remember any discussion with your attorneys about the existence of an amended complaint?

A    I thought we were talking about the amended complaint.

Q    So you don't remember either conversations about an initial complaint or an amended complaint?

MS. MURPHY:  Objection, misstates the record.

THE WITNESS:  Yeah, I remember communications with my attorney for the complaint.

BY MR. ARBER:

Q    When you say "complaint" -- sorry, I realize I have been imprecise too -- do you mean you remember communications with your attorney about the initial complaint or the amended complaint?

A    I don't remember the specifics on the amended complaint.

Q    Do you know -- strike that.

Confidential

Page 39

THE WITNESS:  I remember answering questions.

BY MR. ARBER:

Q   Do you remember if you wrote out the answers, if you spoke by phone?

A   I don't remember.  I don't remember.

Q   You don't remember if it was an e-mail?

A   I don't remember if it was e-mail or phone. I don't remember.

Q   Did you ever review the final draft of those answers?

A   Yes.

Q   And who provided you with that final draft?

A   My attorney.

Q   Did you provide any feedback or comments on those responses?

A   Yes.

Q   What kind of things did you comment on?

A   I don't remember the specifics.

Q   Have you ever received any monetary payments in connection with this case, Mr. Carbone?

A   No.

Q   You've never been given any sort of payment in connection with this case?

A   No.

Confidential

Page 42

documents?

A   No, I don't remember.

Q   Do you remember the purpose of your review?

A   To be -- continue to be involved with the case.

Q   Are you -- did you know that the defendants in this case served document requests on you?

A   Yes.

Q   What's your understanding of those document requests?

MS. MURPHY:  Objection, vague.

THE WITNESS:  I don't know.

BY MR. ARBER:

Q   So when you received the document requests, did you think that you had to do anything?

A   Yes.

Q   What did you think you had to do?

A   To provide the requested documents.

Q   And how did you decide which documents were requested?

A   I provided what was requested.

Q   If you had any questions about what was requested, how did you answer that question; did you decide for yourself whether something was responsive?

A   I'm not sure what the question is.

Confidential

Page 43

Q   If there was -- if there was a request and you were unsure about whether or not a document in your possession would -- should be produced, you weren't sure if the question was asking for it, did you make that decision yourself whether you should produce it or not or did you communicate with someone about whether or not it should be produced?

A   If I had questions about what I need to provide, I ask the questions.

Q   Did you ask any questions in connection with those document requests?

A   Yes.

Q   Who did you ask?

A   I asked my attorney.

Q   So Mr. Carbone, I'm going show you three exhibits.  And I just want you to look over them. You don't need to read them fully, but I just want to make sure that -- one moment.  Let me pull them.

MS. MURPHY:  Jacob, if you want, maybe we could take a break, it's been about an hour, just if you want.

THE WITNESS:  That would be good.

MR. ARBER:  Yeah, let's take a break and I'll get this sorted and then -- so be back at 10:00, 10 minutes.

A    I don't recall.

Q    Are stock warrants relevant to your case?

MS. MURPHY:  Objection, calls for a legal conclusion.

BY MR. ARBER:

Q    Mr. Carbone, are they?

A    I'm not sure.

Q    What about debt (inaudible)?

MS. MURPHY:  Objection, calls for a legal conclusion.

BY MR. ARBER:

Q    Mr. Carbone?

A    I didn't hear the question.

Q    Are debt covenants relevant to your allegations?

MS. MURPHY:  Objection, calls for a legal conclusion.

THE WITNESS:  I'm not -- I don't recall.

BY MR. ARBER:

Q    So going back, you said your understanding of this case relates to Amyris's projections; projections related to what?

MS. MURPHY:  Objection, vague.

THE WITNESS:  They exaggerated royalty earnings.

Confidential

Page 73

BY MR. ARBER:

Q   Royalty earnings -- what is your understanding of where those came from; how were those earned?

A   Well, they weren't actually earned.  They were projecting to get the earnings for the vitamin E licensing.

Q   What were the royalties for?

MS. MURPHY:  Objection, calls for speculation, vague.

THE WITNESS:  For licensing the vitamin E.

BY MR. ARBER:

Q   Who do you believe Amyris licensed the vitamin E to?

A   I don't recall.

Q   Is it your understanding that Amyris gave a license for vitamin E?

MS. MURPHY:  Objection, calls for a legal conclusion, calls for speculation.

THE WITNESS:  I believe they had licensed the vitamin E product.

BY MR. ARBER:

Q   Do you know who -- sorry, go on.

A   The screen cut out.  I didn't hear.

Q   I didn't want to interrupt if there's

anything else you want to add.

A   No, that was it.

Q   Do you know who those licenses were with, who the counter-party was?

A   I don't recall.

Q   Is this case about anything other than the projections related to those royalty revenues?

MS. MURPHY:  Objection, vague.

THE WITNESS:  There's some issues with the internal auditing and -- yeah, just lack of control as far as the financial disclosures.

BY MR. ARBER:

Q   Could you tell me a little bit more?

What is your understanding of those issues?

What issues specifically are you referring to?

MS. MURPHY:  Objection, vague.

THE WITNESS:  I mean, the -- I'm not sure the right terms, but the internal controls, there was lack of internal controls and there were issues with that.

BY MR. ARBER:

Q   Mr. Carbone, what is your understanding of what internal controls are?

MS. MURPHY:  Objection, vague.

Confidential

THE WITNESS:  I'm not a CPA or anything, so I imagine there's guidelines for being honest with your numbers.

BY MR. ARBER:

Q   So what are your allegations about what the issues of the internal controls were?

A   That they were lacking information, false documents as far as revenues.

Q   Mr. Carbone, who are you suing in this case?

MS. MURPHY:  Objection, asked and answered.

THE WITNESS:  Yeah, I answered that.  That was one of the first questions you asked me.

BY MR. ARBER:

Q   I know.  If you could answer one more time, please.

A   The company is Amyris, the CEO is John Melo and the former CFO is Kathleen -- I'm going mess up her last name and I don't want to.

Q   Valiasek?

A   Okay, Valiasek.

Q   Are you suing anyone else?

A   Not that I'm aware of, no.

Q   Are you seeking damages from any of the defendants?

BY MR. ARBER:

Q   When did the stock tank?

MS. MURPHY:  Objection, vague.

THE WITNESS:  I don't have the date.

BY MR. ARBER:

Q   Do you know why the stock tanked?

MS. MURPHY:  Objection, vague.

THE WITNESS:  The PR, the negative PR that came out and the 10K was going to be late and that there was problems with the internal control over the financials.

BY MR. ARBER:

Q   And that's what your understanding is of why the stock tanked?

A   Yes.

Q   Mr. Carbone, why are you suing Mr. Melo?

MS. MURPHY:  Objection, calls for a legal conclusion.

THE WITNESS:  Well, we, as a class, believe he was a participant in that.

BY MR. ARBER:

Q   Sorry, in what?

A   I mean, there's got to be some responsibility by the CEO to know what's going on within his company.

Confidential

Page 81

What is your understanding of what the class is?

A    They're a group of investors that bought stock in Amyris during the class period.

Q    Do you know what the class period is?

A    I think it's March 8, 2018 to March 2019.

Q    Okay.

Do you know how many people are in the class?

MS. MURPHY:  Objection, calls for speculation.

THE WITNESS:  Yeah.  No, I don't know.

BY MR. ARBER:

Q    Are you aware that your counsel has moved to certify a class of Amyris shareholders?

A    Yes.

Q    Do you know what it means to certify a class?

A    Allows us to be -- continue with the class-action suit.

Q    And you mentioned earlier that you know -- that you believe there's another person who might be a class representative.

Do you know who that person is?

A    Yes.

will adequately represent the interest of the class?

A   Yes.

Q   And what makes you think that you'll adequately represent them in addition to being fair?

A   I will continue to communicate with the -- with my attorney and stay up to date as the -- as it proceeds.

Q   Mr. Carbone, have you ever been the first one to e-mail your attorney or have you only ever responded to e-mails from your attorneys?

A   I don't recall.

Q   Mr. Carbone, I'm going to drop in one more exhibit, and after this exhibit, we can take a break.

A   Okay.

Q   Let me know when you have the document open.

And for the court reporter's benefit, we'll mark this as Exhibit 4.

(Exhibit 4 was marked for identification.)

BY MR. ARBER:

Q   Have you had a chance to open the document, Mr. Carbone?

A   Yes.

Q   And do you recognize this document?

A   I do.

Confidential

Page 87

Q   You've seen it before?

A   I believe so.

Q   What is it?

A   Okay.  Let me pull it back up.  That's the motion to move forward with the class action.

Q   Did you review this document -- or have you reviewed this document before today?

A   Yes.

Q   When did you review it?

A   I don't remember.

Q   Do you remember if you reviewed it in the last couple of weeks, more than a month ago?

A   I don't recall.

Q   Do you remember if you reviewed this document before or after it was filed?

A   That I don't recall.  I just -- I remember the communications that we were moving forward with filing the motion for the class.

Q   And those communications came from your attorney?

A   Yes.

Q   You did not ask your attorneys when you would be moving forward with the filing (audio drop)?

        MS. MURPHY:  Objection, misstates the record.

Q   Have you ever initiated any communications with your attorneys related to this lawsuit?

A   You know, I believe so, but I don't -- I don't have specifics.  I'm sure I've made a call and I'm sure I sent an e-mail to check up, but I don't remember.

Q   And what is your understanding of the duties of class representative?

A   That's what we just talked about, to represent the class.

Q   And so the ways that you just described, responding to questions, e-mails, fulfilling those duties?

MS. MURPHY:  Objection, misstates the record.

THE WITNESS:  Yeah.  And, I mean, I've reviewed the filings and sat here for this deposition.

MR. ARBER:  Okay.  I think maybe now is a good time for a short break.

THE WITNESS:  Okay.

THE VIDEOGRAPHER:  We are going off the record.  The time is 11:03 a.m.

(Brief recess)

THE VIDEOGRAPHER:  We are back on the