# EXHIBIT 2

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

-------------------------------X

SHANE MULDERRIG and RONY

DEVORAH, Individually and on        CASE NO.

Behalf of All Others        4:19-cv-01765-YGR

Similarly Situated,

               Plaintiffs,

          vs.

AMYRIS, INC., et al.,

               Defendants.

-------------------------------X

CONFIDENTIAL

REMOTE DEPOSITION OF ROB JANSEN

September 8, 2021

Reported by:

MARY F. BOWMAN, RPR, CRR

JOB NO. 199149

A.    I have been contacted by -- I am sorry --

(Reporter clarification)

A.    I have been in contact, so I have a lot of communications with Murphy Brooke from Federman & Sherwood.

Q.    And is that Brooke Murphy?

A.    I'm sorry.  Yes.

Q.    Understood.

I want to go back, you mentioned you had testified previously in a court proceeding.  What was the nature of that proceeding?

A.    The nature was involved in a labor dispute.

Q.    A labor dispute, you said?

A.    Yes, that's what I said.

Q.    And you testified on one occasion or more than one?

A.    It was a court case about me being director of a company and somebody opposed being fired, so I was part of that litigation.

Q.    So were you accused of any wrongdoing in that litigation?

Confidential

the deposition, is that the question?

Q.    No, my question is a little more general.

I'm wondering when you first learned that you would be required to give a deposition ever in this lawsuit.

A.    I think that would be at the beginning of -- or that would be in 2019 when we discussed proceeding of trial in general terms.

Q.    Who told you about that?

A.    I'm not sure, but it was somebody from Federman & Sherwood.

Q.    So, of course, you know the testimony today is regarding the Mulderrig versus Amyris case, correct?

A.    I'm sorry?

Q.    You know that we are here today to talk about the Mulderrig versus Amyris case?

A.    It's -- me as lead plaintiff, I'm giving deposition on behalf of my attorney who is setting up a class action suit against Amyris, yes.

Q.    Do you know what court that lawsuit is pending in?

A.    In California, Oakland, if I am correct.

Q.    Do you know who the defendants in the litigation are?

A.    You just told me, so, yes, I do know.

It's the CEO and the CFO.  You just mentioned their names.  Melo and Kathy.

Q.    Did you do anything to prepare for the deposition today?

A.    I have contacted my attorney, yes.

Q.    Did you discuss the deposition with your attorney before you were sworn in?

A.    Yeah, explained me the details of depositions since we don't do these in the Netherlands, and we reviewed several documents from the past to refresh my memory.  We -- I mean, we reviewed documents from the past to refresh memory.

Q.    And did any of those documents refresh your memory?

A.    Yes.

Q.    What were those documents?

A.    For example, the filings.

Q.    The filings in the court action?

Page 76

So I don't know if that answers your question, but that would be my answer.

Q.    Let's look at your responses to interrogatories.

A.    The last word?

Q.    They are called "interrogatories." They are written questions that we submitted to you in the matter.  Do you recall those?

A.    I recall giving answers, yes.  But I don't recall each question and each answer at this moment.

Q.    Sure.  Exhibit 13.

(Exhibit 13, Responses to Interrogatories marked for identification, as of this date.)

Q.    Let me know when you can open that document.

A.    Actually, I've got one document pending, but it's 11.  So --

Q.    Disregard those -- disregard those numbers in the file names.

A.    OK.  Robert S. Green from Green & Noblin, PC?  That one?

Q.    Yes, sir.

Can you turn to page 7.

Confidential

Q.   Even though you wrote, "He is known for lying and overpromising," in other words, you hoped he would get it right?

A.   Again, with my background, you don't presume that people are misleading you.  I mean, I studied accounting.  So here you are being told that companies should provide all this information.  So that is my background.

I guess maybe I expect some doubt, but still, my core modality is that companies should provide you with trustworthy information.  That is how I have been trained, educated.  That's how I managed my own company for over ten years.

And based on the filings, given all the predictions, I was -- there were signed off by the accountant.  They all know that their internal controls were messy, at best, it turned out afterwards.

I did not predict that at that time.  I thought I was investing in a properly led company who will give honest information to the investors and that is how I invested.

Confidential

behind that, I don't understand.  I'm not understanding anything.  Well, that's true.

Q.    Let's go to page 384.  It's responding to someone named Kareem the dream.

And you say, "Nope, these contract don't need to be announced when completed.  I was public accountant."

Do you see that?

A.    Oh, that would be a false statement since I never was a public accountant.  So you can disregard the entire post as being a lie.

But it's social media.  So I can honestly swear I never was a public accountant.  I was an assistant public accountant, or I don't know if you call a public accountant.  But I was assistant accountant so I never was a public accountant, if you will.

I think you call it certified accountant.  I'm not sure how you call that in America.  But I never was an official registered accountant in the Netherlands, so that statement, if you read that I'm a

Confidential

Page 158

Q.    And at least in part, that's because of your view that there was a misuse of 606 accounting to inflate revenue, correct?

A.    It was a wild guess.  I didn't sell out everything, so apparently I still had some hope for the company that they would be an honest company.  But, yes, my trust in the company started to waver, if that is correct English.

So my trust in the company was demising, and this was one way of outing that frustration.  And if you look back to the trades I made, I sold a big part of the trades.  And as you can see, my thoughts will get more negative in the future, and I was selling out the entire position, ending with a small short and closing my position in April of 2019.  If that is what you want to show me from now on.

Q.    And your recollection really is that it was those Q3 disclosures that, for you, was sort of a turning point?

A.    Yes, as you can see in my trades from that moment on, I start to downsize my

Confidential

Page 162

come back to that.

Q.     Page 348.  So 348, you're saying, "Well I don't trust Melo any more."

Do you see that, on November 16?

A.     Yes.  Yes.

Q.     And, "When I see the revenue 2018 versus 2017 is the same and 17 million of 61 million is based on ASC606."

Do you see that?

A.     Yes.

Q.     So you're looking at the company's disclosures regarding ASC606?

A.     That seems the right implication, yes.

Q.     And then -- and you're pointing to that as sort of a reason, well, I don't trust Melo anymore, right?

A.     It confirmed that, and I used the disclosures of the company, yes, based on my investments, yes.  This is after Q3.

Q.     Yeah.

A.     Again, it trust -- I mean, apparently, I still held shares, so I still had high hopes for Q4.  They had the sweetener coming up.  So they had -- I mean,

Confidential

Page 163

I don't understand how you can claim 50 percent of the 100 million in the pocket and then ending up with 23.

So, apparently, I made a calculation that if they made those 50 million in two weeks -- because this is in half of a quarter.  This is half of a quarter, correct?  So you still have a half of a quarter left.

If you claim to have 50 percent in your pocket over 100 million, that means at least you have 50 million.  If you don't sit on your ass for the next six weeks, you still have enough of revenue coming up.

So, apparently, this really started to doubt.  I sold the big part of my position, and I kept in the company to recover some of the losses in the hope -- well, based on the information that they provided on the Q4 outlook.  Which never materialized.  That we found out in April, I believe, or in March.  I don't know when they disclosed the Q4 numbers.

Q.    So you read the company's disclosures concerning ASC606, right?

Page 164

A.    It seems that way, or I picked it up on the platform.  I don't know where I read it.  I apparently I read it.  I commented on it.  It could also be posted on StockTwits, because --

Q.    Somehow you came across the company's disclosures on ASC606, and --

A.    Yes.

Q.    -- it informed your opinion?

A.    Yes.

Q.    Thanks.  Let's go to page 349 again --

A.    No.  It informed a part of the -- of it.  I mean, it's not a total picture.  It's only a part of it because, apparently, I still held shares.

So there is another part of the equation which is the outlook in Q4, where Melo clearly stated that they had 50 percent into the pocket.  I mean, if a CEO says we have 50 percent into the pocket, we produced and delivered, or it's in order and in transit, I mean, I'm paraphrasing, but this is what was in the Q3 release or as -- during the Q3 release, this is what they

Confidential

A.    Oh, no, no, not this one.  I'm saying that my entire posts together should all be finding that I have doubts, but I still continue to invest.

Q.    Oh, I see.  OK.  So this post where you said, "They missed two q's and there is doubt if the 14 million of 61 million revenue is real," in this post, you are expressing doubt about the disclosed revenues, correct?

A.    It also reflects my trade given that information provided by the company that I started to reduce my position.

So it would confirm that, yes, the company has disappointed me, and I start to selling shares because their disclosures don't match with the predictions that they made.

So if you go back to the start of 2018, when I started investing in Amyris, and if you can look at the outlook of the revenues they proclaim to have, and then you see the reality, I think this is actually the basis of the complaint that we filed over the misleading outlook on revenues and

Confidential

margins on the royalties. And, clearly, here it really starts to fall apart and they are being caught up with reality.

Unfortunately, I didn't know that because I still suffered loss after this. Because not only did they mess that in the revenue predictions and margin of royalties from the start of 2018, they also didn't come through on the predictions of the Q4.

So this -- actually, the entire post reflects the start of and build of the company, and then being disappointed by the reality and reality catching up on the company, and then they have to come clean about what they overpromised and misled the investors. So that is how I would read the post now, in hindsight.

Q.    Page 346.

On November 16, at 12:58, you write, "It looks like Melo clearly lied. He knew there would be no royalties."

Do you see that?

A.    Yeah, that's a statement I make, and this is also the case that we are presenting. We are presenting the case that

royalties?  Wow.

Q.    So your point is Mr. Melo should have been able to predict the prices that vitamin E was being sold at?

A.    He made the contract.  He knows what is in the contract.  I have not seen the contract.  So if you provide me with a contract, I can maybe make an educated guess about what he should have known.

But he signed the contract.  He has -- he should have had internal controls.  Unfortunately, later it is confirmed he doesn't.  But how can you report your revenue as a CEO without confirmation?  I mean, it's just never -- and another company involved?  How difficult would it have been to get this information as a CEO?  Really, honestly.  This is the case that we present as we are being misled.

Q.    Were you aware the company disclosed that it didn't have this information?  Did you know that?

A.    No.  But they signed the contract.  How can they not have the contract?  They signed the contract, correct?

Page 304

potentially join because I believe you can

also file for compensation in the end.  So

the term that we close, I believe, is not

over yet.  So I cannot foresee what happens

in the future.

Q.    So are you attempting to represent

any institutions?

A.    I represent everybody who is

entitled for compensation trading in Amyris

from March of 2018 until I believe

March 2019.  I don't know the exact dates

because I'm -- it's a little bit late.  But

given the class action trial period,

everybody who is entitled to compensation,

that is what I represent.

Q.    And are institutions included in

that group that you describe to your

knowledge?

A.    Only when they would file.  I'm

not sure -- I mean, basically everybody is

entitled.  That is how we discussed it.  If

it is institutions, now you start to make me

doubt.  I'm -- basically I represent

everybody who is entitled.

You need to leave that question

Confidential

Page 305

of institution have not been discussed in too detail because, again, I represent everybody who is entitled.  If they are entitled, fine. If not, then it's fine with me, too.  Because I only represent those who are entitled.  I know it excludes insiders, I know it excludes the CEO and the CEF.

Q.    When was the last time you directed your counsel to do something with regard to the litigation?

MR. FEDERMAN:  Object to form of the question.

A.    I don't instruct my counsel to do anything.  I don't understand the question. We work together.  I'm not his boss.

Q.    With regard to the search for documents, how did that work?  Did you perform the searches yourselves, Mr. Jansen?

A.    Yes, I did.

Q.    So you --

A.    Well, I had help from the attorney from Federman and Sherwood.

Q.    And what did that help entail?

A.    That they really want to make sure I did everything possible to find what was

Confidential

related to Amyris, and as you have seen, I have provided the most documents which probably would never ended up, my drafts included.  And there is not even -- I even included email to myself which I don't think is being regarded as communication.  So I think that would, you know, be -- so I did the utmost best to find anything even slightly related to Amyris.

Q.    But you were the one doing the searching --

A.    With help of my lawyer.

Q.    Not your attorney though, right?

A.    No, they helped because they had some -- they could show me how I easily could find that information and --

Q.    OK.

A.    -- then I have all the notes and they helped me extract them.

Q.    How did they help you extract them?

A.    They had a IT guy because you wanted to them in a certain format.  Not by screen prints.

Q.    So you identified the relevant