# EXHIBIT 6

**UNITED STATES OF AMERICA**
**Before the**
**SECURITIES AND EXCHANGE COMMISSION**

**SECURITIES EXCHANGE ACT OF 1934**
Release No. 93341 / October 15, 2021

**ACCOUNTING AND AUDITING ENFORCEMENT**
Release No. 4264 / October 15, 2021

**ADMINISTRATIVE PROCEEDING**
File No. 3-20624

| | |
|---|---|
| **In the Matter of**<br><br>**AMYRIS, INC.,**<br><br>**Respondent.** | **ORDER INSTITUTING CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTION 21C OF THE SECURITIES EXCHANGE ACT OF 1934, MAKING FINDINGS, AND IMPOSING A CEASE-AND-DESIST ORDER** |

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate that cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 21C of the Securities Exchange Act of 1934 ("Exchange Act"), against Amyris, Inc. ("Amyris" or "Respondent").

**II.**

In anticipation of the institution of these proceedings, Respondent has submitted an Offer of Settlement (the "Offer") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over it and the subject matter of these proceedings, which are admitted, Respondent consents to the entry of this Order Instituting Cease-And-Desist Proceedings Pursuant To Section 21C Of The Securities Exchange Act Of 1934, Making Findings, And Imposing A Cease-And-Desist Order ("Order"), as set forth below.

## III.

On the basis of this Order and Respondent's Offer, the Commission finds[1] that:

### Summary

1.      During the first two quarters of 2018, Amyris improperly recognized certain royalty revenues that rendered its financial statements materially inaccurate. These revenue recognition errors resulted from internal accounting control failures that led to important information not being communicated to the company's internal accounting staff concerning certain significant royalty payments, which also resulted in Amyris's failure to make and keep accurate books and records.

2.      Amyris failed to devise internal accounting controls to provide reasonable assurance that relevant information was communicated to its accounting staff so that transactions, including the estimation of royalty revenue could be recorded in accordance with U.S. generally accepted accounting principles ("GAAP"). Amyris also lacked sufficient resources within its finance and accounting function to provide reasonable assurance that the company properly applied GAAP to its royalty revenue transactions.

3.      As a consequence of Amyris's control insufficiencies, it overstated its royalty revenues in the first two quarters of 2018, rendering the company's financial statements materially inaccurate and leading to the Company's restatement of its quarterly revenue results for the first three quarters of 2018. As a result of this conduct, Amyris violated Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act and Rules 13a-11 and 13a-13 thereunder.

### Respondent

4.      **Amyris** is a Delaware corporation with its principal place of business in Emeryville, California. It researches and develops chemical products. At all relevant times, Amyris's stock was registered with the Commission pursuant to Section 12(b) of the Securities Exchange Act of 1934 and traded on the NASDAQ Global Select Market under the ticker "AMRS."

### Background

5.      In April 2016, Amyris entered into a contract with Company A to supply it with farnesene, a chemical compound that Amyris had developed. Company A intended to use this farnesene to create and sell Vitamin E products. The contract between Amyris and Company A included a "value sharing" component, whereby Company A would remit a portion of the sales of its Vitamin E products to Amyris as royalties, so long as the sales price for these products exceeded certain specified price floors.

6.      About eighteen months later, in December 2017, Amyris entered into an agreement with Company B, under which Amyris, among other things, transferred its farnesene-

---

[1]      The findings herein are made pursuant to Respondent's Offer of Settlement and are not binding on any other person or entity in this or any other proceeding.

manufacturing capabilities to Company B and entered into a license agreement with Company B to create farnesene using Amyris's intellectual property. Under this agreement, Amyris entered into a value sharing arrangement with Company B and assigned to Company B Amyris's rights under the farnesene supply agreement with Company A. As a result, after December 2017, Company A was contractually obligated to send its Vitamin E royalty payments to Company B, and Company B was in turn contractually obligated to send those payments to Amyris.

7. At all relevant times, in its Forms 10-Q filed with the Commission, Amyris represented that the financial statements included in those forms were prepared in accordance with GAAP. Under Accounting Standards Codification 606-10-55-65 ("ASC 606") sales-based royalties promised in exchange for a license to intellectual property, such as the value sharing payments described above, are considered variable consideration and should only be recognized to the extent it is probable a significant reversal of cumulative revenue recognized will not occur when the uncertainty associated with the variable consideration is subsequently resolved, as specified in Accounting Standards Codification 606-10-32-11 through 32-14.

8. Amyris reported material weaknesses in its internal control over financial reporting, applicable to its fiscal year 2018, in its Form 10-K that was filed with the Commission on October 1, 2019. These weaknesses were based upon, among other things, a lack of processes sufficient to provide reasonable assurance that relevant and reliable information was communicated timely to the company's accounting staff, and a lack of sufficient resources within its finance and accounting function to provide reasonable assurance regarding the proper application of GAAP to its royalty revenue transactions.

**Amyris Improperly Recognized Certain Royalty Revenues Because it Failed to Share Important Information with its Accounting Staff**

9. After Amyris's first fiscal quarter of 2018 ended on March 31, 2018, Amyris's accounting staff began estimating its royalty revenues for the quarter under the value sharing arrangement described above. Using a combination of information provided by Company A regarding its sales of Vitamin E products and publicly-available market pricing data for Vitamin E, Amyris's accounting staff eventually estimated Amyris would receive royalty revenues of $11.4 million.

10. On or about April 13, 2018, Company A told an Amyris employee responsible for Amyris's relationship with Company A that it calculated the first-quarter value sharing payment at about $8 million, which was significantly below Amyris's estimate of $11.4 million. The Amyris employee shared this information with Amyris senior executives. Based on this information, Amyris should have reduced its estimated royalty revenue for the first quarter to $8 million, since it was probable that a significant portion of a revenue figure of $11.4 million would be subject to reversal. The Amyris executives, however, doubted the accuracy of Company A's calculations and the data supporting those calculations because the data included below-market prices. Although Amyris's accounting staff received some information regarding Company A's first-quarter sales volume and pricing, it did not receive complete sales and pricing information for the entire quarter, nor did it receive Company A's $8 million royalty calculation. As a result, the accounting staff did

not have all the information it needed in order to assess whether Amyris's revenue estimate should be reduced by $3.4 million.

11.     Accordingly, in its books and records for the first quarter of 2018, Amyris improperly recognized $11.4 million of license and royalty revenue related to the value sharing arrangement with Company B described above, but as the company later determined, it should have recognized only $8 million. On May 14, 2018, Amyris furnished a Form 8-K to the Commission in which it reported first-quarter 2018 revenue of $23 million and license and royalty revenues of $11.4 million. On May 18, 2018, Amyris filed its Form 10-Q for the first quarter of 2018, which repeated these figures.

12.     Amyris's royalty arrangement with Company B was a significant transaction that would constitute substantially all of the royalty revenue presented in Amyris's income statement. Amyris's insufficient internal accounting controls relating to communications with accounting personnel and Amyris's ability to account for significant royalty revenue transactions contributed to the financial errors in the first-quarter 2018 Form 10-Q.

13.     After Amyris's second fiscal quarter of 2018 ended on June 30, 2018, Amyris's accounting staff again began estimating its royalty revenues for the quarter. On July 13, the company's accounting staff estimated second-quarter royalty revenues at $7.4 million. This estimate was based on an analysis of farnesene volumes shipped to Company A and publicly-available market pricing data for Vitamin E.

14.     On or about July 18, Company A told Company B that the second-quarter value sharing payment would be $0 because Company A's sales of Vitamin E products occurred at prices lower than the contractually specified price floors. Company B shared this information with an Amyris executive, who shared it with other Amyris senior executives. Based on this information, Amyris should have reduced its estimated royalty revenue for the second quarter to zero, since it was probable that a significant portion of the $7.4 million would be subject to reversal. However, Amyris's executives again doubted the accuracy of Company A's calculations and the data supporting those calculations because it included below-market prices. No one at Amyris communicated Company A's underlying sales data or its royalty calculation to the accounting staff and, as a result, the accounting staff did not have all of the information it needed in order to assess whether Amyris's revenue estimate should be reduced.

15.     Accordingly, in its books and records for the second quarter of 2018, Amyris improperly recognized $7.4 million of license and royalty revenue related to the value sharing arrangement described above. On August 6, 2018, Amyris furnished a Form 8-K to the Commission in which it reported second-quarter 2018 revenue of $24.8 million and license and royalty revenue of $6.9 million.[2] On August 14, 2018, Amyris filed its Form 10-Q for the second quarter of 2018, which repeated these figures.

---

[2] The second-quarter financial statements reported $6.9 million in royalty revenues, rather than $7.4 million, due to an adjustment to certain payments accounted for in an earlier period.

16.     Amyris's insufficient internal accounting controls relating to communications with accounting personnel and Amyris's inability to account for significant royalty revenue transactions contributed to the financial errors in the second-quarter 2018 Form 10-Q.

17.     After Amyris's third fiscal quarter of 2018 ended on September 30, 2018, the company's accounting staff began preparing the company's quarter-end financial statements. By this time, Amyris's accounting staff had received certain information regarding Company A's actual first-quarter and second-quarter Vitamin E sales which suggested that Amyris's first-quarter and second-quarter royalty revenue estimates were materially overstated. Amyris's accounting staff discussed with a senior Amyris executive the possibility of reversing some of the license and royalty revenue recognized in the first and second quarters described above, but the senior executive continued to believe that Company A's sales data and royalty calculations for those quarters were inaccurate and believed Company B would pay the previously-recognized royalty revenues. In reliance on this information, Amyris's accounting staff erroneously concluded that the company did not need to reverse any of its first-quarter or second-quarter royalty revenues.

18.     Amyris's insufficient internal accounting controls relating to communications with accounting personnel and Amyris's ability to account for significant royalty revenue transactions contributed to Amyris's failure to reverse any of its first-quarter or second-quarter royalty revenues in the third-quarter 2018 Form 10-Q.

19.     Although Amyris did not recognize any additional royalty revenues in the third quarter of 2018, on November 13, 2018, Amyris furnished a Form 8-K to the Commission in which it reported that its revenues for the first nine months of 2018 were $61.1 million; this amount included the improperly-recognized royalty revenues from the first two quarters. On November 15, 2018, Amyris filed its Form 10-Q for the third quarter of 2018, which repeated this figure.

20.     On March 18, 2019, Amyris furnished a Form 8-K to the Commission in which it reported that its revenues for the 2018 fiscal year were $80.4 million; this amount included the improperly-recognized royalty revenues from the first two quarters of the year.

21.     After the company furnished its March 18, 2019 Form 8-K, Amyris's auditor obtained information showing when Amyris had received Company A's royalty calculations from the first and second quarters of 2018. After subsequent discussions with the auditor, Amyris decided to restate its financial statements to reverse the revenue it had improperly recognized in those quarters.

22.     On April 11, 2019, Amyris filed a Form 8-K with the Commission in which it disclosed that its recognition of the royalty payments discussed above were materially erroneous and that its system of internal control over financial reporting was not effective as of December 31, 2018. The company further disclosed that it anticipated restating its financial statements for the first three quarters of 2018, and that its full-year 2018 financial results, as announced on March 18, 2019, would likely be reduced by between $12 million and $16 million.

23.     On October 1, 2019, Amyris filed its Form 10-K for 2018, in which it restated the financial results it had reported in its Forms 10-Q for the first three quarters of 2018. The restated figures reduced Amyris's first-quarter and second-quarter royalty revenues to $8 million and $0, respectively, decreasing the company's total revenues for the first and second quarters by 15% and 32%, respectively.

24.     In determining whether to accept Amyris's Offer, the Commission has considered the company's current financial condition.

## Violations

25.     As a result of the conduct described above, Amyris violated Section 13(a) of the Exchange Act and Rules 13a-11 and 13a-13 thereunder, which require issuers to file accurate current and quarterly reports.

26.     As a result of the conduct described above, Amyris violated Section 13(b)(2)(A) of the Exchange Act, which requires an issuer to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect the issuer's transactions and disposition of Assets.

27.     As a result of the conduct described above, Amyris violated Section 13(b)(2)(B) of the Exchange Act, which requires an issuer to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that: transactions are executed in accordance with management's general and specific authorization; transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP or any other criteria applicable to such statements, and to maintain accountability for assets; access to assets is permitted only in accordance with management's general or specific authorization; and the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

## Remediation

28.     Since the conduct described above, the company hired multiple additional experienced accounting personnel, hired a Chief Financial Officer with greater accounting expertise, and retained an external consultant to help design and test its internal control over financial reporting. In particular, Amyris enhanced its controls around the quarter-end closing process and around its accounting for significant transactions.

## IV.

In view of the foregoing, the Commission deems it appropriate to impose the sanctions agreed to in Respondent Amyris's Offer.

Accordingly, it is hereby ORDERED that:

A.     Pursuant to Section 21C of the Exchange Act, Respondent cease and desist from committing or causing any violations and any future violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act and Rules 13a-11 and 13a-13 thereunder.

B.       Respondent shall, within 10 days of the entry of this Order, pay a civil money penalty in the amount of $300,000 to the Securities and Exchange Commission for transfer to the general fund of the United States Treasury, subject to Exchange Act Section 21F(g)(3). If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. §3717.

Payment must be made in one of the following ways:

(1)      Respondent may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

(2)      Respondent may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

(3)      Respondent may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

Enterprise Services Center
Accounts Receivable Branch
HQ Bldg., Room 181, AMZ-341
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

Payments by check or money order must be accompanied by a cover letter identifying Amyris as a Respondent in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to Monique C. Winkler, Associate Regional Director, Division of Enforcement, Securities and Exchange Commission, 44 Montgomery Street, Suite 2800, San Francisco, California 94104.

C.       Amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Respondent agrees that in any Related Investor Action, it shall not argue that it is entitled to, nor shall it benefit by, offset or reduction of any award of compensatory damages by the amount of any part of Respondent's payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Respondent agrees that it shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the Securities and Exchange Commission. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this proceeding. For purposes of this paragraph, a "Related Investor Action" means a

7

private damages action brought against Respondent by or on behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding.

By the Commission.

Vanessa A. Countryman
Secretary