**Pages 1 - 32**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Yvonne Gonzalez Rogers, Judge

SHANE MULDERRIG, ET AL.,          )
                                  )
          Plaintiffs,             )
                                  )
  VS.                             )      **NO. CV 19-01765-YGR**
                                  )
AMYRIS, INC., ET AL.,             )
                                  )
          Defendants.             )
_____)

                    Oakland, California
                    Tuesday, November 23, 2021

            **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:
                    FEDERMAN & SHERWOOD
                    10205 N. Pennsylvania Avenue
                    Oklahoma City, OK  73120
            BY:  **AMANDA BROOKE MURPHY, ESQUIRE**
                 **WILLIAM B. FEDERMAN, ESQUIRE**

For Defendant Amyris, Inc., and John G. Melo:
                    GIBSON, DUNN & CRUTCHER LLP
                    1881 Page Mill Road
                    Palo Alto, CA  94304
            BY:  **MICHAEL D. CELIO, ESQUIRE**

                    GIBSON, DUNN & CRUTCHER LLP
                    333 South Grand Avenue
                    Los Angeles, CA  90071
            BY:  **ALEXANDER K. MIRCHEFF, ESQUIRE**

Reported By:     Pamela Batalo-Hebel, CSR No. 3593, RMR, FCRR
                 Official Reporter

**APPEARANCES CONTINUED:**

For Defendant Kathleen Valiasek:
                         ORRICK, HERRINGTON & SUTCLIFFE, LLP
                         405 Howard Street
                         San Francisco, CA  94105
              **BY:   MOLLY MCCAFFERTY, ESQUIRE**

**Tuesday - November 23, 2021**                              **2:00 p.m.**

                          **P R O C E E D I N G S**

                              **---oOo---**

        THE CLERK:  We are now calling CV 19-1765, Mulderrig, et al. vs. Amyris, Inc., et al.

    Counsel, starting with the plaintiff, please state your appearance for the record.

        MS. MURPHY:  Brooke Murphy on behalf of plaintiffs.

        THE COURT:  Good afternoon.  Sorry about that.  I forgot to turn on my video.

    All right.  Mr. Federman, you're muted.

        MR. FEDERMAN:  I was saying "sorry" while I was still muted.  My apologizes.

    William B. Federman, Federman Sherwood, on behalf of the plaintiffs.

        THE COURT:  Okay.

        MR. CELIO:  Good afternoon, Your Honor.  Michael Celio of Gibson Dunn for defendants, Amyris and John Melo.

        MR. MIRCHEFF:  Good afternoon, Your Honor.  Alexander Mircheff, also for Amyris and John Melo.

        MS. MCCAFFERTY:  Good morning, Your Honor.  Molly McCafferty with Orrick Herrington & Sutcliffe on behalf of Kathleen Valiasek.

        THE COURT:  All right.  Good afternoon.

    So we are here on the motion for class certification.  I

don't really have too many questions.  I do have a procedural question, and I'd like to start there just to get the issue resolved.

But this motion's only being brought on behalf of -- or where you, the plaintiffs, are suggesting that the class reps should be Mr. Jansen and Carbone, so what is the status of Mulderrig and Devorah?

**MS. MURPHY:**  Your Honor, since -- they have not been active in this case since the motion appointing Plaintiff Jansen as lead plaintiff, so, frankly, they have simply been on the sidelines and are not being proposed as class representatives at this time.

**THE COURT:**  Okay.  But they aren't -- I'm just wondering whether we need to change the caption.  Are they pursuing this lawsuit individually?  What are they doing?

**MS. MURPHY:**  My understanding is that they are not pursuing the action individually.  They are simply class members at this time.

If Your Honor would like to change the caption to something along the lines of "In Re Amyris, Inc., Securities Litigation," I think that would certainly make sense.

**THE COURT:**  Well, I don't want -- they have brought a lawsuit, and they've brought a lawsuit individually and on behalf of others similarly situated, and if they personally are no longer bringing that lawsuit, they need to resolve that

issue.  So you all can talk about it, but I'd like you to clean up the docket with respect to those two individuals.

They can be class members and still not pursuing it as plaintiffs.  There's a difference.  Okay?

All right.  Let's go ahead and talk about what the main issues are here.  Defendants don't contest, really, numerosity; correct?

**MR. MIRCHEFF:**  Correct, Your Honor.

**THE COURT:**  And with respect to commonality, again, that's not really being disputed.  To the extent these cases ever get tried, they get tried or litigated given the common issues; correct?

**MR. MIRCHEFF:**  That's correct, Your Honor.

**THE COURT:**  Okay.  So then why don't we go ahead and address the main issues in my mind, which are adequacy and typicality, and we can begin with respect to Mr. Jansen.

And I think on this front, the defendants make some good arguments, so who for the plaintiffs is arguing?  Which of the two attorneys?

**MS. MURPHY:**  I will be arguing, Your Honor.

**THE COURT:**  All right.  Ms. Murphy, go ahead then.

**MS. MURPHY:**  Certainly.

So here we allege that Plaintiff Jansen is adequate and typical.  In terms of adequacy, he has demonstrated his knowledge of the case.  He's demonstrated his willingness to

pursue this case on behalf of the class rather than just himself individually, and while defendants raised certain accusations regarding Plaintiff Jansen, predominantly accusing him of being inadequate because he is, quote, a liar, we dispute those allegations, Your Honor.

The first piece of evidence the defendants attempt to present --

**THE COURT:** I'm not so much concerned about the credibility allegations.

**MS. MURPHY:** Okay.

**THE COURT:** What concerns me more is that in terms of reliance, given his active and very express statements and sophistication on this issue, it doesn't seem to me that he is similar to many of the other investors.

So let's not talk so much about credibility as opposed to the actual things that he said and did that make him likely not, in my view -- not as typical as the others.

**MS. MURPHY:** Certainly, Your Honor.

So here while -- I think it's first and foremost important to point out that Plaintiff Jansen, even according to defendants, was not in possession of non-public information.

What defendants are arguing makes Plaintiff Jansen atypical is the fact that he is sophisticated and that he has a background in accounting. And while it's true that he is both of those things, the fact that he has an understanding of how

ASC 606 should have worked and should have been applied in no way suggests that he understood how defendants were misapplying it here. And the way that they were misapplying it was to report revenues that the company had not actually earned.

Now, while it's true that Plaintiff Jansen expresses some skepticism, particularly after the November 13, 2018, corrective disclosure in which Amyris reveals that they will be receiving zero in terms of royalty revenues for that quarter, the fact is even he explains that that was something of conjecture on his part. He was guessing that yes, maybe the only explanation for this was that maybe the company was -- Mentor -- that is, the seller was selling Vitamin E at below-market prices, for example. Okay. This in no way indicates that the prior earnings releases would have been false or misleading.

So even what Plaintiff Jansen is able to ascertain through his knowledge of the accounting rules, through his investigations of publicly-available information, does not suggest that he understood the fraud that was being perpetrated by defendants.

And certainly it makes sense that if he were understanding what was happening in terms of Amyris having actual royalty revenues results from Mentor and basically saying, "No, thank you, we'll use our own numbers, our invented numbers, which are much bigger," he would not have invested money and lost

hundreds of thousands of dollars.  And that's really why we maintain that he is still typical.

The fact that he was skeptical following the November 13, 2018, disclosures is not surprising.  It was a partial corrective disclosure.  It was disappointing to investors.  However, even Plaintiff Jansen testified that while he was disappointed, he had not given up hope in the company, which is why he continued to have a long position, even at the close of the class period.

So those are the reasons, essentially, Your Honor, in which we maintain that he is typical.  And, frankly, here defendants, while they do point to statements by Plaintiff Jansen, most courts have not used that as grounds for defining -- finding a proposed class representative to be atypical.

In fact, this Court in *In Re Cornerstone Propane* rejected arguments very similar to those being made by defendants in which the Court said that, you know, yes, there was testimony --

**THE COURT:**  Which judge?

**MS. MURPHY:**  I do not have the judge on -- I believe that was -- I think that may have been Judge Patel.  I can probably find out for you.  I can give you the case number, if you'd like, Your Honor.  The case number for that is 2000 WL 1180267.

But even there, the judge recognized that -- the Court recognized that while there were statements suggesting some skepticism, the fact remained that the plaintiff testified that he still was inclined to believe that the company would make a turnaround and did not believe that he was being defrauded at that time.

So those are essentially the reasons why we still maintain that Plaintiff Jansen is a typical plaintiff who is capable of representing the class in this case.

**THE COURT:**  All right.  I'll hear from the defendant.

Go ahead.  Which of the two of you is arguing?

**MR. MIRCHEFF:**  Thank you, Your Honor.  This is Alex Mircheff here.

So, Your Honor, with regard to Mr. Jansen, there really are thousands of Tweets that he issued concerning the company and hundreds during the class period that we've put in the record which really amounts to just unique, extensive evidence that he wasn't misled.

Maybe we start with the period after the November 2018 announcement when Mr. Jansen Tweeted, you know, that he understood the accounting methodology, that only 4.3 was paid royalty, the rest was accounting based on expectations.  So at that point, you know, he's saying he understands the things that were supposedly concealed.

Our point regarding that is that when he made that Tweet,

he circulated a screenshot of the same chart of information that the company used in its Q1 and Q2 to indicate its accounting methodology.  So we think that that is powerful evidence that the market wouldn't have been misled.  So at a minimum, it's unique defenses to Mr. Jansen.  And then he's Tweeting there is a restatement of the 10Qs of potential danger and it looks like the company used -- misused ASC 606 accounting to inflate revenues.  This is Mr. Jansen.

Now, we can go all the way back to the beginning of the class period as well where he's Tweeting again that he doesn't trust the company or my client for reasons that I can only describe as sort of unbecoming a class member saying, you know, can the guidance be trusted; you know, my client is known for lying; and citing his nationality.  So that sort of paper trail is really extraordinary.  I'm not aware of any case, you know, remotely approaching this where you have a lead plaintiff acknowledging an understanding of the accounting issues and creating unique defenses like that.

I will say, Your Honor, I heard your point about the issues of candor.  We do think those are somewhat significant. We would have the adequacy challenge and typicality kind of even without that.

I will say, you know, the acknowledgment that the social media posts were not true, the emails and then the class certification -- the stock transaction certificates --

Mr. Jansen had a net short position in Amyris stock as of February 2019, just two days before Mr. Carbone purchased stock.  So it's kind of remarkable, we think, Your Honor, that that wasn't disclosed in this one certification.

In any event, even setting aside the candor aspect of it, that is sort of just one more -- one more piece of evidence, piece of data that indicates the significant problems with Mr. Jansen.

THE COURT:  Ms. McCafferty, do you want to add anything?

MS. MCCAFFERTY:  I don't, Your Honor.  We join in full with Defendants Amyris' and John Melo's opposition and also their arguments today.  Thank you.

THE COURT:  So, Ms. Murphy, let me ask you, how many class actions have you tried?

MS. MURPHY:  Several.  But when you say "tried," do you mean take to a jury trial or just --

THE COURT:  Yes.  That's exactly what I mean.

MS. MURPHY:  Okay.  No.  This would -- I have not tried any.  Mr. Federman, my co-counsel, certainly has.  I have not taken --

THE COURT:  Mr. Federman, how many have you taken to jury?  How many trials, class actions, specifically?

MR. FEDERMAN:  Specifically we have not had a jury decision in a securities class action.  The cases have all

resolved before the jury deliberation.

**THE COURT:**  And how many class actions have you tried at all in any context?

**MR. FEDERMAN:**  I need to look that up, Your Honor.  I have over two dozen jury trials, over 200 securities arbitrations --

**THE COURT:**  And those two dozen jury trials were all class actions?

**MR. FEDERMAN:**  No, they were not.  They vary from white collar criminal defense to securities --

**THE COURT:**  I'm asking specifically class actions because they're pretty rarely tried, so that's why -- do you not recall whether you've had any or if you've --

**MR. FEDERMAN:**  I know we tried one, Your Honor.  It was probably 20 years ago.  It did not -- it got settled before the jury deliberated.

**THE COURT:**  So I ask for a reason.  In the last eighteen months, maybe two years, I've tried four.  I say that because they're pretty rarely tried.  But I've tried them.  And if I believe, and do not throw something out on summary judgment, that a class actually has a claim, class representatives are, in fact, important to the trial and it matters.

I think that frequently because these cases rarely, if ever, get tried, lawyers don't spend as much time on this topic

as maybe they should, but it seems to me Mr. Jansen's or "Yansen's" -- however you pronounce his name properly -- conduct would distract from the claims of the class because of everything he did and the manner in which he did it.

Now, I don't think that's the case with respect to Mr. Carbone. And, in fact, the defendants' arguments here are kind of the contrary; that is, he's not sophisticated enough and so therefore he's not adequate or typical. I tend to think that it is those individuals for whom the tool of a class action tends to be most important.

So with respect to Mr. Carbone, I think the plaintiffs have the better argument. So I'll let you in a moment, Ms. Murphy, reflect on what I've said and then you can respond if you'd like. I think that Mr. Jansen's conduct is very atypical to a normal class member, but I don't think that with respect to Mr. Carbone.

So if the defense wants to start first on -- with respect to that class rep, you may.

**MR. MIRCHEFF:** Thank you, Your Honor. I'd be happy to do that.

So I hear what you're saying a hundred percent, Your Honor, as far as conduct in the lawsuit. You know, I kind of -- in my mind, we've sort of thought of Mr. Carbone a little bit as a backup plan. He was not the lead plaintiff. He was brought in a little bit late. And I do think the record shows

sort of a lack of engagement, but I hear what the Court is saying on that.  I think it's been somewhat lawyer-driven, maybe more lawyer-driven than it ought to be, and that is troubling, but I hear Your Honor's point loud and clear.

I think the bigger issue for us, Your Honor, with regard to Mr. Carbone is what I'll just call the unique defenses concerning his standing, and as we see it, you know, there really is a very significant timing problem with regard to Mr. Carbone that we could look at that a number of ways.  It's sort of either a question of the appropriate end date for the class period or unique defenses for Mr. Carbone, a standing issue.  They all sort of go together.  I'll sort of address it first through the window of the class period.

And as we see it, Your Honor, there really are two choices for the Court on the end date for any class period, and we think November 2018 is by far the better one because, again, at the latest by that date, the company disclosed the accounting matters that the plaintiffs say were concealed, and you don't have to take our word for it.  Mr. Jansen was Tweeting about that.  So he was reacting to the company's disclosures.  And by 2018, we simply can't presume that investors were supposedly misled.  We know Mr. Jansen wasn't, and we think Mr. Jansen was reacting to the company's disclosures.  So we think the class period really has to end in November 2018 for that reason.

The plaintiffs have abandoned the first end date that they

put forward, the April end date, and now sort of their backup plan on that is March 2019.  In our view, Your Honor, March 2019 can't work because there was no disclosure of new information material to the claims.  We sort of saw in the papers the plaintiffs pointed to internal controls issues.  First of all, that wasn't new information either.  It was disclosed throughout.  And, in any event, it's really the tail wagging the dog.  I read the oral argument transcript.  I had not been involved with the case at that point, of course, but I did read the transcript, and that was an argument about ASC 606.

So to kind of narrow things in order to make it an internal-controls-only case to extend the class period for purposes of Mr. Carbone, to us that's a narrowing and shift in focus that just shows that Mr. Carbone is not the right person to carry the water for pre-November plaintiffs who want to maybe assert ASC 606 issues.

Another way of saying that is just that Mr. Carbone can't advance the core claims that plaintiffs have brought forward. He is subject to unique defenses.  He's inadequate for that reason.

**THE COURT:**  Ms. Murphy.

**MS. MURPHY:**  Your Honor, we would disagree on a number of issues.

First, we dispute that Plaintiff Carbone has not been

involved in the litigation.  He has been involved as is clear from his deposition testimony.  Defendants' representations regarding his involvement and his knowledge of the case are simply wrong.

But going to the typicality argument, which seems to be the focus of defendants' argument now, is -- the fact that defendants would like to now assert that the class should end at a different date is, frankly, raising a loss causation argument which is premature at a class certification stage. Plaintiffs are not required to prove this at class certification, as the Supreme Court has recognized in *Halliburton I*.

Moreover, the suggestion that the November 13 disclosure was fully corrective is simply false as recognized by Your Honor in the order on the motion to dismiss in which this Court recognized that, yes, this disclosure was partially corrective, but it was also partially misleading and contained within itself independent actionable misstatements.

Further, the March 19th, 2019, disclosure did reveal new information.  It was the first time that the company revealed that there were significant concerns with the internal controls of the financial reporting as they existed throughout 2018. This was in no way part of the disclosures that were made in the November 13, 2018, disclosure.

And just to clarify further here, we are not alleging that

defendants failed to advise the market of the fact that they were utilizing ASC 606.  They certainly advised the market that that was the accounting rule they were applying.  The issue is did they advise the market of how they were misapplying it because the recent order from the SEC demonstrates that they were not applying it correctly.  They were violating GAAP in their application of ASC 606 because they were reporting unearned royalty revenues, period.  So just wanting to clarify that point for purposes of this argument.

And, finally, in terms of standing, that's not the argument that defendants specifically made in their brief. They made an argument for typicality.  However, if we were to get into standing, the Ninth Circuit in *Blackie vs. Barrack* made very clear that it is not necessary for a plaintiff to have purchased during a specific time in order to be an adequate class representative.  You can purchase after a material misrepresentation and still be a representative for earlier misrepresentations so long as there is a common scheme that's defrauding the market, which we certainly allege here.

And that's been recognized further in the *Countywide* -- the *In Re Countrywide* case, which is a Central District of California case, where the court recognized that, yes, it doesn't matter if the plaintiff purchased after a purported -- after a partial corrective disclosure.  They are still entitled to represent the class because they purchased stock during the

class period and in reliance on the integrity of the stock price, which we certainly have demonstrated in this instance, that we are entitled to the basic presumption of reliance.

So, frankly, we -- if Your Honor is inclined to view Plaintiff Jansen as atypical or inadequate as a class representative, this Court can absolutely still appoint Plaintiff Jansen and this case can proceed as a class cert -- as a class-certified case.

**THE COURT:**  All right.  Any response from the defense?

**MR. MIRCHEFF:**  Thank you, Your Honor, if I may.  I will try to go in order as I think of the points.

So on the idea that this is sort of just a loss causation argument, I think the Supreme Court has really squarely refuted that sort of reasoning at this point.  The *Goldman Sachs* case from this year really -- at Footnote 2 of that case said when there is an overlap with the merits, the Court doesn't defer things until summary judgment.  If it goes to a Rule 23 factor, it is the plaintiff's burden by a preponderance of the evidence -- I think Your Honor recognized that standard in the *Bailey* case, but *Goldman Sachs* says those Rule 23(a) factors have to be engaged with and sort -- of course they touch on merits issues.  Sometimes they touch on reliance and whether the basic presumption exists.  Sometimes they touch on loss causation and the like, but if they do relate to the Rule 23 factors, they do have to be grappled with, and here, sort of

the standing and the adequacy and typicality of Mr. Carbone who purchased only in February of 2019 really does put that all squarely at issue.

And I think for related issues concerning Your Honor's prior order about November 13th, I think a few reasons why things would come out differently at this point.  First, it is a different legal standard.  That was a plausibility standard, of course, on the motion to dismiss, and now plaintiffs are required to come forward with evidence concerning their -- their attempt to satisfy Rule 23.  At the class -- at the motion to dismiss, of course, the evidence, as demonstrated by Mr. Jansen's Tweets acknowledging what the disclosures meant -- that was not in the record, so the Court was making inferences based on the allegations, but now we have, I think, unrebutted, unrefuted evidence through Mr. Jansen that the market had understood in November the accounting methodology.  And the accounting methodology, to be clear, Your Honor, that was allegedly concealed is that the use of ASC 606 involved accounting based on expectations.  I think there is a number of citations that I could point to in the -- in the Amended Complaint --

THE COURT:  Mr. Mircheff, you can't have it both ways; that is, you can't argue that Jansen is sophisticated and atypical of everyone else and then use those same facts to say that the market had knowledge with respect to Carbone and the

rest of the class.  You are asking me to make factual -- ultimate findings of fact when you make that kind of argument.

So let's say Jansen isn't the class rep.  All his sophistication, all his understanding is not typical, then that argument fails for class cert purposes.

**MR. MIRCHEFF:**  Your Honor, our point is that Mr. Jansen's Tweets do two things.  They indicate that he had unique issues as to reliance, that he was sophisticated, that he had troubling motives.  That is all one thing that the Tweets do.

The other thing the Tweets do is illustrate what was disclosed to the market.  There are other sophisticated investors in the market as well, and the aspect of the Tweets that are commenting in November of 2018 --

**THE COURT:**  But those are all disputed facts.  I'm not going to resolve that on a class cert motion.

**MR. MIRCHEFF:**  Very well, Your Honor.  I understand the point and I don't need that point.  I can move on to something separate, which is even if the November disclosures were not sort of enough to end the class period, there is no other good end date.  Plaintiffs have now conceded -- and this is something else that was different from the motion to dismiss -- that after the figures in the restatement were announced in April of 2019, the stock price went up.  So that -- that can't be the end date for the class period.

So now we're sort of looking for another end date, and that's -- plaintiffs have landed on the March -- the March 19th disclosures which don't touch on ASC 606 at all.  They're just not on that topic, and they are on internal control matters, and I don't think it's accurate -- I think I heard counsel say that there had never been prior disclosures on internal control matters.  That's not accurate, Your Honor.  Throughout the Qs in 2018 and the Form 10-K filed in 2018, there were disclosures that internal controls were an issue for Amyris, and so that wasn't new information that the market received.

And I kind of want to put a fine point on it.  Plaintiffs have sort of tried to say that internal controls are new information.  They're not.  But I just want to emphasize kind of what a narrow needle to thread that would be for plaintiffs if we had a Mr. Carbone-only class.  What we would be talking about is a whole class of investors, you know, kind of the great bulk of which, as I understand it, would be the investors who were dependent on the November stock price drops for their alleged losses because those related to ASC 606.  You would have all of those people being put in the hands of Mr. Carbone who really can't have an ASC-606-related claim and can only prevail if he makes, boy, one of the -- one of the most unusual arguments in the securities case that I've been aware of, that you can sort of have an internal-controls-only case somehow, particularly for a company that had repeatedly disclosed

internal control issues.

So that's sort of why we've tried to articulate for us why this is an issue with Mr. Carbone and his adequacy and typicality as a class representative.

**THE COURT:** All right.

Ms. Murphy, a response.

**MS. MURPHY:** Certainly, Your Honor.

So, first, while it is true that Amyris had previously disclosed other material deficient and one single material deficiency in its internal control over financial reporting, for a prior time period, 2017, they also disclosed that they were remediating their internal control issue, and the fact is that what was disclosed on March 2000 -- March 19, 2019, was that they would not only be reporting an unremediated material deficiency in their internal control over financial reporting, they were also needing additional time to evaluate the internal controls as they existed throughout 2018 and may well be reporting additional internal control deficiencies.  So that's just part of what was disclosed.  They also disclosed that they -- there is substantial doubt as to their ability to continue as a going concern.

Now, defendants want to consistently separate and isolate the internal control issues, but that simply is not how the facts developed in this case.  Here, as recognized by the SEC order, which we've presented as Exhibit 6 to the declaration,

the most recent declaration, the reason why ASC 606 was being misapplied and why the royalty revenues were being essentially exaggerated throughout the class period is because the internal controls were not operating effectively.

The accounting department at Amyris was not receiving relevant information that other people, including senior executives such as Defendant Melo, had in their possession at Amyris.  So everything is related to the internal control issue here.  They are not separate issues, and it's not an issue that can simply be pushed to the side and ignored, as defendants suggest that it can be.

However, we do also maintain -- so in addition to -- so let me step back.

So for those reasons, the notion that Plaintiff Carbone isn't capable of representing the class, we disagree with.

We further maintain that Plaintiff Jansen is a capable class representative.  Certainly he was sophisticated, but that simply -- that level of sophistication does not suggest that he understood the fraud, that he did not rely on defendants' misrepresentations, or that he did not rely on the integrity of the stock price.  We still maintain that if he, in fact, knew what was happening, he would not have lost hundreds of thousands of dollars through his investments in Amyris.

So we certainly believe that he is also an adequate class representative, a typical class representative because he

purchased based on public information during the class period, and while he did have some skepticism about the company, that's also not unusual for class members and for investors to be displeased at the revelation that the company was going to be reporting zero in royalty revenues as opposed to 15 for the third quarter.

So our view is that Plaintiff Carbone is certainly capable of representing the entire class in this case.  His purchases and the timing of those purchases do not render him atypical, and defendants have failed to cite a single case suggesting that this is a winning argument with them.  Moreover, we maintain that Plaintiff Jansen has demonstrated his adequacy and his typicality because while, yes, he was a vocal person on social media, that does not render him incapable of being a class representative.

As the Southern District of California recognized in *Nunez vs. Bae Systems*, credibility arguments need to be so sharp as to essentially prejudice the entire class -- the entire interests of the class.  We do not believe that the issues being raised by defendants here rise to that level.  It's a very high burden --

**THE COURT:**  Ms. Murphy, I have to tell you that if I have to get to the credibility determinations -- and I don't think that I do -- but this is some of the worst that I've seen.  I just -- and, frankly, I can't imagine why you would

want him on the stand to represent this class.

Let's move on to 23(b).

Comments?

**MS. MURPHY:** Certainly, Your Honor.

So with respect to Rule 23(b), this is where defendants claim that we can -- that individualized issues will predominate over common ones.

Defendants take an unusual position for this argument. They do not dispute that there was an efficient market throughout the class period, which means that we are entitled and the class is entitled to a presumption of reliance under basic Rule 7. Defendants don't dispute this, and our expert, Cynthia Jones, has clearly demonstrated market efficiency under all of the factors, as well as pricing.

So what defendants argue in terms of reliance is specific to Plaintiff Jansen, and it relates to what they allege to be his failure to rely on the integrity of the stock market -- integrity of the stock price, that is.

The Supreme Court --

**THE COURT:** I disagree that that's what they focus on. Right, Mr. Mircheff? Am I misreading your papers?

**MR. MIRCHEFF:** With respect to a presumption of reliance, I think that's -- that's correct, Your Honor. We have other points as well, but I wanted to answer that question.

THE COURT:  All right.  So let's move on to the other points.

Ms. Murphy.

MS. MURPHY:  Certainly.  Certainly.

So the remaining challenge by defendants is that damages methodology cannot -- that there is no adequate damages methodology for this case and that damages cannot be established on a class-wide basis.

For this, defendants raise very standard arguments, and, frankly, they just simply do not win the day here.  The methodology that's been proposed by plaintiffs' expert, Ms. Jones, is a methodology that is very well-accepted, both in terms of courts as well always financial experts.  Her methodology in particular has been approved by two reported court -- in two reported cases, including *Angley vs. UTI Worldwide*, in which the Central District of California approved a methodology she proposed.

It was also approved --

THE COURT:  Ms. Murphy, I'm going to cut you off because we've already been going for a while here.

You have a stronger argument, Mr. Mircheff.  Any comments?

MR. MIRCHEFF:  Your Honor, I think I'll just point out that because of the plaintiffs' efforts to extend the class period past the November disclosures, they have characterized the November disclosures as a materialization of risk, and in

doing that, I think they have sort of backed directly into sort of the problem that the *BP* court addressed concerning the materialization of risk, but their expert, Ms. Jones, hasn't done the work required at this stage that's required under the *Comcast* case to actually prove that she has a damages model that can account for the --

THE COURT:  The damages model that I understood was an out-of-pocket damages methodology.  I don't read their expert report as articulating a materialization of the risk theory.

MR. MIRCHEFF:  That may be so, Your Honor, but I think that is part of the problem, that plaintiffs have articulated a materialization of the risk theory, but their expert report --

THE COURT:  But their expert report is sufficient, and that's what they're bringing it on.  I'm not exactly sure where you think plaintiffs characterized it given that it's not in their expert report and their expert report is sufficient on the theory that is articulated.

MR. MIRCHEFF:  I think they've characterized it that way in the -- in the First Amended Complaint.

THE COURT:  Could you give me a specific cite?

MR. MIRCHEFF:  Let's say paragraph 75, I think, Your Honor.

THE COURT:  Of the First Amended Complaint?

MR. MIRCHEFF:  Correct.  Let me see if I can find my copy.

**THE COURT:** How is that relevant when they brought a motion and articulated what their theory is as part of the motion?

**MR. MIRCHEFF:** Well, Your Honor, I think they've said it in interrogatory responses as well, and that is what we understand that they are, you know, proceeding on. I think the interrogatory responses we haven't put in the record, and if I'm -- if I'm misunderstanding, I'm sure plaintiffs' counsel will correct me, but I do think that they are depending on a materialization of the risk.

**THE COURT:** Are you or not, Ms. Murphy, because I didn't see it?

**MS. MURPHY:** Your Honor, we have as one of our theories a materialization of the risk theory. We maintain that it can be both, frankly. Loss can be caused by a correction in which truth is revealed. It can also be caused through materialization of the risk.

This does not, however, make this case like the *BP* case. There are many, many securities class actions which utilize a materialization of the risk theory for loss causation, and they also simultaneously utilized these well-accepted damages methodologies that are being proposed by Ms. Jones. In fact, the *UTI Worldwide* case, that one was also alleging a materialization under the risk theory.

The fact is the *BP* case is easily distinguishable from

this case because there, what plaintiffs -- what the expert was proposing was a constant inflation theory which directly contradicted plaintiffs' theory of liability.  There were two disparate classes.  There were post-spill and a pre-spill set of classes, and they wanted the exact same level of inflation to be applied to everyone.

That is not at all what Ms. Jones has proposed in her methodology.  What she is proposing is an inflation matrix which can account for, if it ends up being relevant, differing levels of inflation, if that in fact is true.

Now, overall --

**THE COURT:**  Wait.  So in your reply, you state that you're only pursuing one theory.  Now you saying you're pursuing two theories?

**MS. MURPHY:**  I don't believe that in the reply we -- we don't abandon the materialization of the risk theory in our reply.  What we say is that the methodology that's being proposed for damages can be utilized for either theory.  It's not the situation where simply because we're alleging a materialization of the risk theory, which has been accepted by the Ninth Circuit in *Mineworkers vs. First Solar* -- it's a very-often utilized theory for loss causation -- simply because we have as part of our theory materialization of the risk notion does not mean that the damages methodology is not applicable, and it does not mean that this damages methodology

is like what existed in the *BP* case.

If, in fact, defendants are correct and there is -- which it's hypothetical. All right. And this Court recognized that in the *Hanon* case. Defendants there made very similar arguments, and the Court recognized that it was related to loss causation, which is premature.

**THE COURT:** Look -- hold on.

It seems to me if there is a methodology that works, such as the out-of-pocket damages, and one that may or may not -- it seems, Mr. Mircheff, that perhaps that particular issue is one resolved by summary judgment. And I say that because I just need one for purposes of class certification, and it sounds like I don't have a complete record in front of me in any event, plus this is not a complete merits analysis.

So I don't think I can resolve the dispute in this procedural context, even though perhaps it would need to be resolved before trial.

**MR. MIRCHEFF:** Your Honor, that may be, and I -- I know how to take a hint, and I'm happy to sort of submit on the papers on that piece.

I did have one other point to share on the class period and Mr. Carbone, if Your Honor would allow it, but I also am --

**THE COURT:** All right. Go ahead.

**MR. MIRCHEFF:** -- mindful of the hour.

So, Your Honor, I think I heard counsel say again that the

issues concerning material -- I'm sorry -- concerning internal controls were new issues and hadn't previously been disclosed. I think I would just point Your Honor to paragraph 47 of their Complaint which recites the four point disclosures, you know, concerning the internal -- internal controls which were reiterated throughout the class period, throughout -- and throughout 2018, and then compare that to -- I heard Your Honor -- I heard counsel talk about the SEC order which, by the way, was a non-fraud finding, but that's not my main point. In paragraph 18 of the SEC order, it really cites the same internal controls that the company itself had disclosed.

Our point, Your Honor, simply is that internal controls were not a new issue. Investors were well aware of them, and, again, it is a unique issue for Mr. Carbone. And maybe with that I'll just sort of end where Your Honor started, that, you know, there may be other people in the world who could bring this case and represent this class. Mr. Carbone, who had purchased, you know, in the relevant time period, you know, whether -- you know, someone else should take over is -- you know, that's perhaps an issue for another day.

But I do think if Your Honor is harboring sort of grave doubts about Mr. Carbone that we have, it's just an indication they haven't carried their burden with regard to preponderance of the evidence under Rule 23, and at least for today, perhaps even without prejudice, the motion ought to be denied for that

reason.

THE COURT: Ms. Murphy, any final comments?

MS. MURPHY: Sure, Your Honor.

First, I want to clarify that just on the damages methodology, the out-of-pocket methodology works for both materialization of the risk theory as well as just an outright disclosure of fraud. So that is one methodology that can apply for both. I just want to make that clarification.

And in terms of the adequacy and typicality of Plaintiff Carbone, he purchased during the class period, and he purchased based on non-public information, and the Ninth Circuit has held that the timing of purchases for these cases should not render a person atypical to be a class representative.

Defendants do not cite a case suggesting otherwise. We do, however, cite cases supporting our view on this point.

THE COURT: And in terms of Mr. Mulderrig and Mr. Devorah, when did they purchase?

MS. MURPHY: I would have to go back and look, Your Honor. I could check into that, but they have not been active in the case since the appointment of lead plaintiff.

THE COURT: Okay. All right. I will take it under submission. It's Tuesday, so I hope you all have a wonderful Thanksgiving. Stay safe. And we'll be in touch in writing.

(Proceedings adjourned at 2:51 p.m.)

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:    Wednesday, December 1, 2021

*Pamela Batalo Hebel*

_____

Pamela Batalo Hebel, CSR No. 3593, RMR, FCRR
U.S. Court Reporter